No. 15-1513

# United States Court of Appeals
# For the Federal Circuit

DELL INC., *Appellant*

v.

ACCELERON, LLC, *Cross-Appellant*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, IPR2013-00440

## BRIEF OF APPELLANT

Kevin Meek
(kevin.meek@bakerbotts.com)
Paula Heyman
(paula.heyman@bakerbotts.com)
Catherine Garza
(cat.garza@bakerbotts.com)

BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Suite 1500
Austin, TX 78701
(512) 322-2500

*Attorneys for Appellant*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Dell Inc. ("Dell") certifies the following:

**1.      The full name of every party or amicus represented by me is:**

Dell Inc.

**2.      The name of the real party in interest (if the party is not the real party in interest) represented by me is:**

None

**3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Dell is a privately held corporation and its direct parent company is Denali Intermediate Inc.  There is no publicly held corporation owning 10% or more of Denali Intermediate Inc.'s stock.

**4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

Baker Botts, LLP: Kevin Meek, Paula Heyman, Catherine Garza.

Dated: June 1, 2015                    Respectfully submitted,

_____/s/ Kevin Meek_____
Kevin Meek

*Attorney for Appellant*

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ........................................................... i

STATEMENT OF RELATED CASES ................................................. vii

I.     STATEMENT OF JURISDICTION ...............................................1

II.    STATEMENT OF THE ISSUES ..................................................1

III.   STATEMENT OF THE CASE .....................................................1

    A.    Introduction ........................................................................1

    B.    Procedural History ..............................................................4

    C.    Statement of the Facts .........................................................4

        1.    The Disclosure of the '021 Patent ................................4

        2.    The Disclosure of *Hipp* ............................................5

IV.    SUMMARY OF ARGUMENT ....................................................8

V.     ARGUMENT ........................................................................10

    A.    Standard of Review ............................................................10

    B.    The PTAB Failed to Consider the Complete Legal Standard Relating to the Programming Required to Satisfy the Functional Elements of Claims 14–17 ..................................................................................10

        1.    The PTAB erred in relying exclusively on *Typhoon Touch* in its analysis of claims 14–17 .........................................10

        2.    *Fantasy Sports* and *Finjan*, as supported by *Nazomi*, articulate the complete legal standard the PTAB should have applied .................13

    C.    Under the Complete and Appropriate Legal Standard, Claims 14–17 are Explicitly Disclosed by *Hipp* ....................................................16

        1.    A person of ordinary skill in the art would understand that all elements of claim 14 are explicitly disclosed by *Hipp* ..................16

        2.    All elements of claim 15–17 are explicitly disclosed in *Hipp* ........21

    D.    The PTAB Based Its Determination that Claims 34–36 are Not Rendered Obvious Under *Hipp* in View of *Gasparik* on the Same Incomplete Standard Applied to Claim 14 .................................................23

VI.    CONCLUSION ......................................................................26

ADDENDUM ..............................................................................28

CERTIFICATE OF FILING AND SERVICE ........................................68

CERTIFICATE OF COMPLIANCE........................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

*ArthroCare v. Smith & Nephew, Inc.*,
406 F.3d 1365 (Fed. Cir. 2005) ......................................................16

*Belkin International, Inc. v. Kappos*,
696 F.3d 1379 (Fed. Cir. 2012) ......................................................10

*Consol. Edison Co. V. N.L.R.B.*,
305 U.S. 197 (1938) ......................................................................10

*Ecolab, Inc. v. FMC Corp.*,
569 F.3d 1335 (Fed. Cir. 2009) ......................................................13

*Fantasy Sports Props. v. Sportsline.com, Inc.*,
287 F.3d 1108 (Fed. Cir. 2002) .......................................3, 9, 13, 14, 17

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ................................3, 9, 13, 14, 15, 17

*Gechter v. Davidson*,
116 F.3d 1454 (Fed. Cir. 1997) ......................................................24

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ..........................................................................24

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ......................................................10

*In re Rambus*,
694 F.3d 42 (Fed. Cir. 2012) ..........................................................10

*In re Sasse*,
629 F.2d 675 (C.C.P.A. 1980) ........................................................16

*In re Schreiber*,
128 F.3d 1473 (Fed. Cir. 1997) ......................................................17

*IPXL Holdings v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005) ......................................................17

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ....................................................................................24

*Lewmar Marine, Inc. v. Barient, Inc.*,
  827 F.2d 744 (Fed. Cir. 1987) ....................................................................13

*Nazomi Comm's, Inc. v. Nokia Corp*,
  739 F.3d 1339 (Fed. Cir. 2014) ............................................................13, 15

*Perfect Web Techs. v. InfoUSA, Inc.*,
  587 F.3d 1324 (Fed. Cir. 2009) ............................................................23, 24

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) ....................................................2, 9, 11, 12

## STATUTES AND OTHER AUTHORITIES

28 U.S.C. § 1295(a)(4)(A) ...............................................................................1

35 U.S.C. § 6 .....................................................................................................1

35 U.S.C. § 103(a) ..........................................................................................24

35 U.S.C. § 329 .................................................................................................1

H.R. Rep. No. 112-98, pt. 1 (2011) .................................................................1

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5(a), Appellant provides the following:

(a)      there have been no previous appeals in this proceeding; and

(b)      the '021 Patent is involved in an administratively closed lawsuit

entitled *Acceleron, LLC v. Dell Inc.*, No. 1:1-12-cv-04123-TCG (N.D. Ga.).

## I.   STATEMENT OF JURISDICTION

The Patent Trial and Appeal Board ("PTAB") had jurisdiction over Dell's Petition under 35 U.S.C. § 6.  The PTAB issued a final written decision on December 22, 2014.  Dell timely filed its notice of appeal on February 20, 2015.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.

## II.   STATEMENT OF THE ISSUES

Whether the PTAB correctly stated and fully applied the legal standard relating to the programming required to satisfy functional elements in the analysis of:

1) the apparatus claims 14–17; and

2) the method claims 34–36.

## III.   STATEMENT OF THE CASE

### A.   Introduction

This Appeal arises from Dell's *Inter Partes* Review ("IPR") Petition ("Dell's Petition") challenging the patentability of certain claims of U.S. Patent No. 6,948,021 (the "'021 Patent").  IPR proceedings came into existence via the American Invents Act in order to combat the "growing sense that questionable patents are too easily obtained and are too difficult to challenge."  *See* H.R. Rep. No. 112-98, pt. 1, at 39 (2011); *see also* H.R. Rep. No. 112-98, at 45–47.  The '021 Patent, owned by Cross-Appellant Acceleron, LLC ("Acceleron") and wielded in

multiple litigations, is one such questionable patent. Accordingly, in response to Dell's Petition, the PTAB instituted review on twenty-three (23) claims and ultimately determined that sixteen (16) of the challenged claims of the '021 Patent are unpatentable.

The PTAB did not, however, go quite far enough. A single prior art reference, U.S. Patent No. 6,757,748 ("*Hipp*"), forms the basis for the unpatentability of a majority of the claim elements, with the remaining elements being found in another reference, U.S. Patent No. 6,157,974 ("*Gasparik*"). The PTAB properly determined that *Hipp* or *Gasparik* disclose every limitation of the challenged claims save one. As to the purportedly missing limitation, the PTAB committed multiple errors.

First, the PTAB applied an incomplete and incorrect legal standard in determining that *Hipp* does not disclose the limitation of "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot" recited in claim 14 of the '021 Patent. In making this determination, the PTAB relied exclusively on the holding of *Typhoon Touch Techs., Inc. v. Dell, Inc.,* 659 F.3d 1376, 1380 (Fed. Cir. 2011), which held that a functional claim element is not satisfied when further programming is necessary to perform the recited function. *See* A15. As explained below, however, *Typhoon Touch* does not set forth the complete legal standard. The PTAB erred by failing to consider the precedent

established by *Fantasy Sports Props. v. Sportsline.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002) and *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010), which define what does and does not constitute "further programming." Both *Fantasy Sports* and *Finjan* make clear that selection from "a number of different options" or activation of "the functions [already] programmed" does ***not*** constitute further programming. *See Fantasy Sports*, 287 F.3d at 1118; *Finjan*, 626 F.3d at 1205.

Second, the PTAB, at best, failed to sufficiently analyze, and at worst simply ignored, the factual record regarding *Hipp*'s disclosure of the limitation of "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot" recited in claim 14. As discussed in detail below, the record confirms that the appliance of *Hipp* already contains the programming necessary to satisfy this limitation and no "further programming" is required.

Finally, the PTAB extended these errors to claims 15–17 and 34–36. The PTAB did not independently analyze claims 15–17 and 34–36; instead, it merely referred back to its analysis of claim 14. A18; A23–24. The multiple and compound errors on the part of the PTAB in its analysis of these claims simply cannot be sustained.

**B.    Procedural History**

On July 12, 2013, Dell filed the Petition challenging claims 1–4, 6–9, 13–20, and 22–24 of the '021 Patent as being unpatentable as anticipated by *Hipp* and claims 10–12, 30, and 34–36 as being unpatentable as obvious over *Hipp* in view of *Gasparik.* A103; A108. On January 16, 2014, the PTAB issued a Decision on Institution of *Inter Partes* Review, in which it instituted review of claims 1–4, 6–20, 30, and 34–36. A152.

On December 22, 2014, the PTAB issued a Final Written Decision (the "Decision") determining that, by a preponderance of the evidence, (a) claims 1–4, 6–13, 18–20, and 30 were shown to be unpatentable, and (b) claims 14–17 and 34–36 were not shown to be unpatentable. A2–3.

**C.    Statement of the Facts**

1.    <u>The Disclosure of the '021 Patent</u>

The '021 Patent was filed on November 16, 2001, and claims priority to a provisional application filed on November 16, 2000. A28. The '021 Patent is directed to a computer network appliance (*e.g.*, a server) with hot-swappable components including a CPU module, a power module, and an ethernet switch module. A34 at 1:63–67. Each CPU module includes a hardware basic input/output system ("BIOS") including instructions for performing a remote booting operation. Specifically, each CPU module includes a BIOS that instructs a

network attached storage ("NAS") to locate an operating system to perform a remote boot.  A35 at 4:36–38.

In the Decision, the PTAB determined that all challenged claims were unpatentable except apparatus claims 14–17 and method claims 34–36.  A2–3. The PTAB analyzed *Hipp* with respect to claim 14 and determined that *Hipp* failed to disclose a CPU module including "a hardware BIOS for . . . ***instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot*.*"  A14–15 (emphasis added).  The PTAB used the same rationale in its analysis of claims 15–17 and 34–36.  A18; A23–24.

### 2.    The Disclosure of *Hipp*

*Hipp* discloses a network appliance including web server processing cards, network interface cards, and power supplies.  A451 at Figure 1; A456–58 at Figures 10–12; A461 at 3:60–62 and 4:9–15; A467 at 16:6–7 and 62–64; A114–18; A715–17 at ¶ 52 (claim chart for claim 1); A1754–56 at ¶¶ 35–37. Additionally, *Hipp* discloses: a NAS connected over communication links to the network appliance (A451 at Figure 1 (showing network 30 that includes web server processing cards 32 communicatively coupled to NAS 54 via communication links 52 and 62); A462 at 5:35–36 (discussing communication links 52 and 62 connected to NAS 54); A123–24; A724–25 at ¶ 52 (claim chart for claim 14); A744–45 at ¶ 59), "boot from LAN [local area network]" functionality

on the web server processing cards (A452 at Figure 2 (showing chip set 90, 91, and 92 that includes boot from LAN functionality); A464 at 9:57–62; A123–24; A724–25 at ¶ 52 (claim chart for claim 14); A744–45 at ¶ 59), and a BIOS on the web server processing cards that "contains instructions for sending information . . . to the appropriate hardware device within network 30" (A451 at Figure 1; A461 at 3:42–47; A464 at 10:46–54; A123–24; A724–25 at ¶ 52 (claim chart for claim 14); A744–45 at ¶ 59). Thus, like the system disclosed by the '021 Patent, the network appliance disclosed by *Hipp* is programmed to perform a remote booting operation.

The phrase "remote booting" generally describes the booting of a CPU from an operating system that is stored remotely. *See* A540–41; A546; A547. The CPU that is remotely booted is referred to as a "client." *See* A543; A546. The remote device at which the operating system is stored is referred to as a "boot server." A546. The actual operating system used to boot the CPU is referred to as a "boot image." *See* A543; A546; A549. Thus, a boot image stored on a boot server is used to remotely boot a client. A543; A546; A1612 at 199:10–24; A1613 at 200:11–17.

Both the general concept of remote booting and the use of BIOS for remote booting were well-known to persons of skill in the art at least by the earliest priority date of the '021 Patent. A535–36; A744–45 at ¶ 59; A1633–34 at 220:18–221:1. Version 2.1 of the Preboot Execution Environment ("PXE") Specification

(the "PXE Specification"), which was in effect as of the earliest priority date of the

'021 Patent, was created to provide a consistent communication protocol for

remote booting using hardware and software from a variety of vendors.  A540;

A1633–34 at 220:18–221:1.[1]   Given the necessity of the PXE protocol to

consistent and reliable network communications, one of ordinary skill in the art[2]

would have had knowledge of and understood remote booting operations as

defined by the PXE protocol.  A744–45 at ¶ 59 ("At the time the '021 patent was

filed, booting remotely over a network was well-known and was even the subject

of standardization.").  Using a BIOS for remote booting was also well-known to

one of skill in the art—the PXE Specification cross-references multiple BIOS boot

documents including a BIOS Boot Specification from 1996. A542; A635.

Remote booting, as described in the PXE Specification, includes a client

sending a request to a server.  A546.  The server returns a list of boot servers, and

then the client selects (discovers) a boot server and downloads a boot image.

A546.  Here, both the parties' experts agree that a NAS can operate as a boot

---

[1]   Other contemporaneous documents recognized the use of the PXE protocol for
remote booting operations.  For example, a Linux Remote-Boot document
published in February 1999 discusses "PXE-compliant Boot" personal
computers, using PXE Boot ROM to download a boot image from a remote
server, and choosing between the available operating systems. A1021; A1026.

[2]   One of ordinary skill in the art, as defined by the Acceleron's expert, is an
individual "*with several years of work experience in the field* [including] *. . .
computer networking technologies*." A1744 at ¶ 17 (emphasis added).

server and store a boot image from which a client can remotely boot. For example, Acceleron's expert explained that "there are a number of devices shown on the private network [46 of Figure 1 of *Hipp*] that are secondary storage," including a NAS that can "be storage locations for boot files or operating systems that one could use." A1286 at 122:4–14; *see also* A1768–69 at ¶ 61 ("All that is required is a device or system with non-volatile storage to hold a boot file and operating system. Remote boot capability is not unique to network attached storage (NAS) systems."). Similarly, Dell's expert explained that *Hipp's* disclosure of "boot from LAN means it's booting from a network attached storage device." A1622 at 209:6–11. Specifically, Dell's expert pointed to "network attached storage device 54," shown in Figure 1 of *Hipp*, as "the one that would store boot images for the cards—the web server processing cards 32." A1622 at 209:16–20. Thus, the ability to "boot from LAN," as described by *Hipp*, includes **at least** the programming to remotely boot from a NAS.

## IV.    SUMMARY OF ARGUMENT

The PTAB failed to apply the correct and complete legal standard to its analysis of the patentability of claim 14 in light of the disclosure of *Hipp*. In finding that *Hipp* does not disclose "instructing a [NAS] to locate an [OS] from which to boot," as recited by claim 14, the PTAB relied exclusively on the holding of *Typhoon Touch*, which, taken alone, provides an incomplete and incorrect

understanding of the legal standard applicable in this case. A14–18. As explained below, *Typhoon Touch* held that a functional claim element is not satisfied when ***further*** programming is necessary to perform the recited function. *See Typhoon Touch*, 659 F.3d at 1380; A15. This standard is further defined, however, in *Fantasy Sports* and *Finjan*, both of which make clear that selection from "a number of different options" or activation of "the functions [already] programmed" does ***not*** constitute further programming. *See Fantasy Sports*, 287 F.3d at 1118; *Finjan*, 626 F.3d at 1205. The PTAB's reliance on an incomplete and incorrect legal standard alone necessitates reversal and remand for reconsideration under the correct legal standard.

Moreover, *Hipp's* disclosure makes clear that the network appliance of *Hipp* ***does not*** require further programming for "instructing a [NAS] to locate an [OS] from which to boot." Instead, the record shows that the parties' experts agree that *Hipp's* network appliance already includes the ability to remotely boot from a NAS. Thus, under the law, *Hipp's* network appliance is already programmed to satisfy claim 14, even if it requires selection or activation. The PTAB either misunderstood or ignored these facts in their decision.

Finally, the PTAB extended these errors to claims 15–17 and 34–36. The PTAB did not independently analyze claims 15–17 and 34–36; instead, it merely referred back to its analysis of claim 14. A18; A23–24. The multiple and

compound errors on the part of the PTAB in its analysis of these claims simply cannot be sustained. For at least the above reasons, this Court should reverse the PTAB's determination regarding claims 14–17 and 34–36 and remand for reconsideration under the appropriate legal standards.

## V.  ARGUMENT

### A.  Standard of Review

The PTAB's legal conclusions are reviewed de novo. *Belkin International, Inc. v. Kappos*, 696 F.3d 1379, 1381 (Fed. Cir. 2012). Anticipation is a question of fact reviewed for substantial evidence. *In re Rambus*, 694 F.3d 42, 46 (Fed. Cir. 2012). The PTAB's determination of obviousness is reviewed de novo and the factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. V. N.L.R.B.*, 305 U.S. 197, 229 (1938).

### B.  The PTAB Failed to Consider the Complete Legal Standard Relating to the Programming Required to Satisfy the Functional Elements of Claims 14–17

#### 1.  The PTAB erred in relying exclusively on *Typhoon Touch* in its analysis of claims 14–17

The legal standard applied to claim 14 by the PTAB is both incomplete and incorrect, and does not represent the standard that has been defined by the Federal Circuit regarding the programming required to satisfy functional elements in

apparatus claims.    In its determination regarding claim 14, the PTAB relied exclusively on *Typhoon Touch* for the proposition that, "for purposes of anticipation, the prior art structure must be capable of performing the function without further programming."   A15 (citing *Typhoon Touch*, 659 F.3d at 1380). The PTAB's exclusive reliance on *Typhoon Touch* is inappropriate for two reasons.

First, the PTAB's reliance on *Typhoon Touch* appears to rest on its misunderstanding of Dell's argument.   The PTAB asserts that Dell's "argument implies that even without instructions for 'a network attached storage (NAS) to locate an operating system (OS) from which to boot,' Hipp's hardware BIOS meets [the limitations of claim 14] because the hardware BIOS *could* be programmed with such instructions."   A15 (emphasis in original).   Dell has consistently and exclusively argued, however, that the network appliance disclosed in *Hipp* includes a BIOS that is ***already able to*** "instruct[ ] a network attached storage (NAS) to locate an operating system (OS) from which to boot" without any further programming.   A249 ("*Hipp* discloses a hardware BIOS capable of booting from a NAS."; "*Hipp* discloses a hardware BIOS capable of performing the recited function."); A250 ("Dr. Horst has explained that a person of skill in the art would understand *Hipp*'s disclosure to teach booting from NAS."); A123–24 ("Thus, *Hipp* discloses that a BIOS instructs a NAS to locate an operating system from

which to boot."). As such, the PTAB erroneously applied the holding of *Typhoon Touch*, which is applicable only when further programming is required to satisfy a claimed limitation. A15; *Typhoon Touch,* 659 F.3d at 1380.

Second, the holding of *Typhoon Touch* is not applicable to the facts of this case. In contrast to the network appliance of *Hipp*, the system at issue in *Typhoon Touch* required additional programming to perform the claimed function. The claims at issue in *Typhoon Touch* recited a touch screen computer including, among other things, "a memory for storing at least one data collection application." *Typhoon Touch*, 659 F.3d at 1380. Typhoon Touch argued that it is sufficient if the accused device "***can be programmed or configured*** to perform the function" or, specifically, if the memory "is capable of being configured to store data collection applications, ***even if the memory is not so configured***." *Id*. (emphasis added). The district court rejected this argument and held that the claim required a device that actually performs or is programmed to perform each of the functions recited by the claim. *Id*. at 1381. The Federal Circuit affirmed that the "memory for storing" limitation requires that the memory is ***actually programmed to store*** the data collection application—not that the programming might later be modified to perform that function. *Id*. Thus, in the system at issue in *Typhoon Touch*, further programming was required to perform the recited function. As discussed in detail below, however, the network appliance

of *Hipp* does not require "further programming" to "instruct[ ] a network attached storage (NAS) to locate an operating system (OS) from which to boot." Rather, *Hipp* is already able to do so.

### 2. *Fantasy Sports* and *Finjan*, as supported by *Nazomi*, articulate the complete legal standard the PTAB should have applied

Had the PTAB applied the complete legal standard relating to the programming required for functional elements of apparatus claims to its analysis of claim 14, the PTAB would have determined that *Hipp* anticipates claim 14. Instead of relying exclusively on *Typhoon Touch*, the PTAB should have applied the holdings of *Fantasy Sports* and *Finjan*, which make clear that it is sufficient to satisfy a functional claim element that the programming necessary to perform the claimed function exists in the prior art product, even if not yet activated or selected.[3] *See Fantasy Sports*, 287 F.3d at 1118; *Finjan*, 626 F.3d at 1205.

In *Fantasy Sports*, the Federal Circuit held that software for playing fantasy football would infringe a claim to a "computer for playing football" even though the programming necessary to perform some of the functions required by the claim had to be activated by a user. *Fantasy Sports*, 287 F.3d at 1118. The Federal

---

[3] Although *Typhoon Touch, Fantasy Sports, Finjan,* and *Nazomi Comm's, Inc. v. Nokia Corp,* 739 F.3d 1339 (Fed. Cir. 2014) are infringement cases, the same analysis is applicable to anticipation. "That which would *literally* infringe if later in time anticipates if earlier than the date of invention." *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987) (emphasis in original); *see also, Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1348 (Fed. Cir. 2009).

Circuit rejected the defendants' argument that direct infringement occurred only

when users activated the programming necessary to perform the claimed functions,

explaining that:

> [T]he software underlying a computer program that presents a user **with the ability to select among a number of different options** must be written in such a way as to enable the computer to carry out the functions defined by those options when they are selected by the user.  Therefore, although a user must **activate the functions programmed** into a piece of software by selecting those options, the user is only activating means that are *already present in the underlying software*.

*Id*. (italics in original, bold italics added).  Thus, programming that is "*already*

*present in the underlying software*" satisfies a functional claim limitation even if it

must be selected or activated by a user in order to perform the claimed function.

*Id.* (emphasis in original).

This reasoning was also applied in *Finjan*.  There, the apparatus claims

recited, among other things, "a logical engine *for preventing* execution." *Finjan*,

626 F.3d at 1205 (emphasis in original).  The accused software included

programming for performing each of the functional limitations, but that

programming had to be unlocked or activated using a product key.  *Id*.  The

Federal Circuit observed that "software for performing the claimed functions

***existed in the products when sold***—in the same way that an automobile engine for

propulsion exists in a car even when the car is turned off." *Id*. (emphasis

added).  Thus, the Federal Circuit held that the functional claim limitation was

satisfied, ***even if the software for performing the claimed functions had not been activated***. *Id*.

The standard set forth in *Fantasy Sports* and *Finjan* relating to the programming required to satisfy the functional elements of apparatus claims is further defined in *Nazomi Comm's, Inc. v. Nokia Corp,* 739 F.3d 1339 (Fed. Cir. 2014). In *Nazomi*, the Federal Circuit distinguished the finding in *Typhoon Touch* from the standard articulated in *Finjan.* *Id*. at 1345–46. Specifically, the Court explained that in *Typhoon Touch*, the accused devices ***were not able*** to perform the claimed function as sold, but required additional programming to perform the claimed function, while in *Finjan*, the software for performing the claim limitations was already present in the accused devices, despite needing to be unlocked to perform the claimed function. *Id*. at 1346.[4]

Thus, in the software arts, the Federal Circuit has drawn a distinction between systems that require additional programming or a "modification" to have the ability to perform a claimed function, and systems that already have the ability to perform the recited function, despite the need to "select among a number of

---

[4]   In *Nazomi*, the accused product required the installation of additional software (JTEK software) in order to perform the function recited in the apparatus claim. *Id*. at 1345. The Federal Circuit held that purchasing and installing the JTEK software "clearly constitutes a 'modification' of the accused products" such that the accused products did not infringe. *Id*. Thus, the facts of *Nazomi* are distinguishable from the facts of the instant case because the network appliance of *Hipp* is already programmed and does not require modification to perform the recited function of claim 14.

different options" or otherwise activate the programming necessary to perform that function. Here, there is no dispute that the ability to remotely boot a CPU module from a NAS *already exists* in the network appliance of *Hipp*. As explained below, under the legal standards of *Fantasy Sports*, *Finjan*, and *Nazomi*, the network appliance of *Hipp* satisfies the limitations of claim 14 even if remote booting a CPU module from NAS has to be selected, activated, or enabled. Accordingly, had the PTAB applied the correct and complete legal standard, it would have concluded that *Hipp* anticipates claim 14.

### C. Under the Complete and Appropriate Legal Standard, Claims 14–17 are Explicitly Disclosed by *Hipp*

1. A person of ordinary skill in the art would understand that all elements of claim 14 are explicitly disclosed by *Hipp*[5]

As explained above, the PTAB relied on an incomplete and incorrect legal standard in reaching the determination that *Hipp* does not disclose "a hardware BIOS" for "instructing a network attached storage (NAS) to locate an operating

---

[5] The knowledge of one of skill *must* be considered in an anticipation analysis. *ArthroCare v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1373–74 (Fed. Cir. 2005), (a reference anticipates if a person of ordinary skill in the art would understand it to disclose the limitation and could combine the prior art description with his own knowledge to make the claimed invention); *see also*, *In re Sasse,* 629 F.2d 675, 681 (C.C.P.A. 1980) (noting that anticipation requires determining whether one skilled in the art could take the description of the invention and "combine it with his own knowledge of the particular art and from this combination be put in possession of the invention").

system (OS) from which to boot."[6]   A15; *see also supra* Section V.B.1.   With

respect to anticipation, the functional limitations of an apparatus claim are satisfied

if the prior art apparatus is able to perform the claimed function, even if the

programming necessary to perform the claimed function must be selected or

activated.  *See e.g., Fantasy Sports*, 287 F.3d at 1118; *Finjan*, 626 F.3d at 1205; *In

re Schreiber,* 128 F.3d 1473, 1478–79 (Fed. Cir. 1997).[7]

   *Hipp* discloses both the physical structure and the programming required to

perform the functional limitation of "instructing a network attached storage (NAS)

to locate an operating system (OS) from which to boot."   First, there is no dispute

that *Hipp* discloses the physical structure necessary to "instruct[ ] a network

attached storage (NAS) to locate an operating system (OS) from which to boot."

For example, Figure 1 of *Hipp*, which is reproduced below, illustrates network 30

that includes web server processing card 32 connected via communication links 52

and 62 to NAS 54:

---

[6]  Because claim 14 is an apparatus claim, the limitation at issue is a functional
limitation (requiring only capability) and cannot be a method step (requiring
affirmative action), or risk running afoul of *IPXL Holdings v. Amazon.com,
Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).

[7]  Although *In re Schreiber* relates to a mechanical device, the holding that a prior
art system or device anticipates if it is able to perform the claimed function is
directly in line with Federal Circuit precedent regarding software or
"programming" as discussed in *Fantasy Sports* and *Finjan*.



FIG. 1

A451; *see also* A123–24; A744–45 at ¶ 59.

Additionally, *Hipp* discloses programming for "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot." For example, *Hipp* includes: (1) a BIOS resident on a CPU module (A451 at Figure 1; A461 at 3:42–47; A464 at 10:46–54; A123–24; A724–25 at ¶ 52 (claim chart for claim 14); A744–45 at ¶ 59), (2) the CPU module communicating with a NAS (A451 at Figure 1 (showing network 30 that includes web server processing cards 32 communicatively coupled to NAS 54 via communication links 52 and

62); A462 at 5:35–36 (discussing communication links 52 and 62 connected to NAS 54); A123–24; A724–25 at ¶ 52 (claim chart for claim 14); A744–45 at ¶ 59), (3) boot from LAN functionality on CPU modules (A452 at Figure 2 (showing chip set 90, 91, and 92 that includes boot from LAN functionality); A464 at 9:57–62; A123–24; A724–25 at ¶ 52 (claim chart for claim 14); A744–45 at ¶ 59), and (4) multiple OSs (A463 at 8:25–30; A123–24; A724–25 at ¶ 52 (claim chart for claim 14); A744–45 at ¶ 59). Acceleron does not dispute that *Hipp* discloses these elements. A1768 at ¶ 60; A212–13.

The only element of claim 14 that Acceleron alleges is not disclosed by *Hipp* is "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot." A212  Acceleron argues that because *Hipp* discloses the ability to boot from any storage component connected to the LAN, without specifically referring to NAS, it fails to disclose booting from NAS.  A214–15 *Hipp* is not required to specifically refer to "booting from a NAS" (A216), however, because one of skill in the art would understand that "boot from LAN" includes booting from anything connected to the LAN (network 30 of *Hipp*, including NAS 54) in light of the communication protocol provided by the PXE Specification.  *See supra* Section III.C.2; *see also* A1622 at 209:6–11.  As explained above, both parties' experts agree that a boot image can be stored in a NAS.  *See supra* Section III.C.2; *see also* A215; A1285–86 at 121:12–122:14;

A745 at ¶ 59.  As such, the ability to "boot from LAN" disclosed in *Hipp* includes the ability to boot from any storage component connected to the LAN (*e.g.*, any component connected within network 30), including NAS 54.  *See* A464 at 9:61–62; A451 at Figure 1.

Further, *Hipp* discloses a BIOS for "instructing" the devices within network 30.  For example, *Hipp* discloses that the BIOS "contains the appropriate instructions for sending information from a program to the appropriate hardware device within network 30."  A464 at 10:46–50; A724–25 at ¶ 52 (claim chart for claim 14); A744–45 at ¶ 59.  In other words, the BIOS of *Hipp* is able to instruct components of network 30, including NAS 54.  At the time of *Hipp*, remote booting was well-known and the subject of standardization via the PXE Specification.  A745 at ¶ 59.  As explained above, the PXE Specification requires that when a remote booting operation is performed, the BIOS on the client sends a boot request that facilitates identification of a boot server for remote booting.  A547; *see also* A123; A745 at ¶ 59.  Thus, ***no additional programming is required*** for *Hipp* to satisfy the functional limitation of claim 14.

In contrast to the PTAB's determination based on the incomplete and incorrect legal standard outlined in *Typhoon Touch*, under the complete and correctly applied legal standard set forth in *Finjan* and *Fantasy Sports*, ***selection of a location from which to boot*** is not further programming but merely "***the ability***

*to select among a number of different options*" to "**activate the functions programmed**."     Thus, *Hipp* discloses all of the software and programming necessary for "a hardware BIOS" to instruct a NAS to locate an OS from which to boot.[8]     There is no additional programming or installation of software required. *Hipp*, as understood by one of skill in the art, is ***already programmed for*** "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot."     A1286 at 122:4–14; A1622 at 209:16–20; A724–25 at ¶ 52 (claim chart for claim 14); A745 at ¶ 59.

Accordingly, the PTAB's determination that Claim 14 is not anticipated by *Hipp*, must be reversed and remanded for consideration under the correct legal standard.

### 2.     All elements of claim 15–17 are explicitly disclosed in *Hipp*

For the same reasons that claim 14 is anticipated by *Hipp*, claims 15–17 are likewise anticipated.     The PTAB did not independently analyze claim 15.     A18. Instead it relied on its analysis for claim 14 to determine that *Hipp* does not anticipate claim 15.     *Id.*     Claim 15 depends directly from claim 1 and recites: "wherein a CPU module is **configured to** boot remotely from an OS located in an

---

[8]     Although the PTAB reaches a conclusion related to inherency, Dell did not argue inherency in its briefing in the IPR.     A16–17.     Indeed, *Hipp* expressly discloses all limitations of claim 14 to one of skill in the art, thus, inherency is not at issue.

NAS." A38 (emphasis added). Claim 15 is much simpler than claim 14 as it does not include the "instructing" limitation that exists in claim 14. Instead, claim 15 requires *only* that the CPU module be "*configured to*" boot remotely. A38 at 10:1–15.

As explained above with respect to claim 14, *Hipp* discloses a CPU module including a BIOS for "instructing" a NAS to locate an OS from which to boot. *See supra* Section V.C.1; *see also* A451; A462 at 5:35–36; A463 at 8:25–30. Thus, *Hipp* discloses, at a minimum, a "CPU module . . . *configured to* boot remotely from an OS located in an NAS" as recited by claim 15. A38 at 10:1–5 (emphasis added). Additionally, as explained above with respect to claim 14, and in direct contrast to the determination by the PTAB, no *additional programming is required* for *Hipp* to satisfy the functional limitation of claim 15. *See supra* Section V.C.1.

Claims 16 and 17 depend from claim 15. As with claim 15, the PTAB did not independently analyze claims 16 and 17. A18. Instead it relied on its analysis for claim 14 to determine that *Hipp* does not anticipate claims 16 and 17. *Id*. Thus, the PTAB provided no rationale beyond that provided for claim 14 to support its finding that these claims are not anticipated by *Hipp*. As shown in Dell's Petition, all elements of claims 16 and 17 are disclosed in *Hipp*. A124–25;

*see also* A746–47 at ¶¶ 61–63; A250–51. Thus, claims 16 and 17 are also anticipated by *Hipp.*

Accordingly, the PTAB's determination that claims 15–17 are not anticipated by *Hipp*, must be reversed and remanded for consideration under the correct legal standard.

### D. The PTAB Based Its Determination that Claims 34–36 are Not Rendered Obvious Under *Hipp* in View of *Gasparik* on the Same Incomplete Standard Applied to Claim 14

The PTAB's determination regarding claims 34–36 is erroneous for three reasons. First, in its analysis of claims 34–36, the PTAB applied the same incomplete and incorrect legal standard it applied to claim 14. Second, the PTAB failed to provide sufficient analysis of and explanation for its determination regarding claims 34–36. And finally, the PTAB failed to take into account the knowledge of a person of ordinary skill in the art, which is "not only permit[ed], but require[d]" in an obviousness analysis. *Perfect Web Techs. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009).

As with claims 15–17, the PTAB did not independently analyze claims 34–36. A23–24. Instead, it relied on its analysis for claim 14 to determine that *Hipp* in combination with *Gasparik* does not render obvious claims 34–36. *Id*. Thus, the PTAB provided no rationale beyond that provided for claim 14 to support its finding that claims 34–36 are not rendered obvious by *Hipp* in combination with

*Gasparik*.  As explained above, the PTAB erred by exclusively relying on *Typhoon Touch*, which represents an incomplete recitation and analysis of the legal standard applicable to the claims at issue in this case.  *See supra* Section V.B.1.

Additionally, the PTAB's failure to independently analyze claims 34–36 is in direct contravention of Federal Circuit precedent, which has long required the PTAB to supply a "sufficient explanation for their decisions so that those decisions may be judged against the relevant statutory standards, and that failure to provide such an explanation is grounds for striking down the action."  *Gechter v. Davidson*, 116 F.3d 1454, 1459 (Fed. Cir. 1997) (quotation marks and citation omitted).

Further, by failing to independently analyze claims 34–36, the PTAB also failed to distinguish between the unpatentability of claims 14–17, which is based on anticipation, and the unpatentability of claims 34–36, which is based on obviousness.  Obviousness is a question of law based on four factual inquiries: the scope and content of the prior art, the differences between the prior art and the claimed invention, ***the level of ordinary skill in the field of the invention***, and any relevant objective considerations.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)) (emphasis added).  Thus, an obviousness analysis "not only permits, but requires," consideration of the knowledge of one of skill in the art.  *Perfect Web*, 587 F.3d at 1329; *see also* 35 U.S.C. § 103(a) (2006) (barring patentability if "***the subject***

***matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art*** to which said subject matter pertains" (emphasis added)).  The PTAB's failure to consider the knowledge of one of skill in the art in its analysis of these claims is an error.

Based on the disclosures of *Hipp* and *Gasparik*,[9] as supported by the knowledge of one of skill in the art regarding remote booting using the technology disclosed by the PXE Specification, claim 34 is obvious.  It is undisputed that *Hipp* includes CPU modules communicating with a NAS.  A451; A462 at 5:35–36; A463 at 8:25–30.  Furthermore, the parties' experts agree that a boot image can be stored in a NAS.  *See supra* Section III.C.2.  *Hipp* also includes web server processing cards with the ability to "boot from LAN."  A464 at 9:61–62.  As explained above with respect to claim 14, "boot from LAN" includes booting from any device that stores a boot image and is connected to the LAN, *e.g.*, network 30, and both experts agree.  *See supra* Section V.C.1.

At the time of *Hipp*, remote booting was well-known and the subject of standardization via the PXE Specification.  A744–45 at ¶ 59; A1633–34 at 220:23–221:1.  As explained above, the PXE Specification requires that when remote booting, the BIOS on the client sends a boot request, and then, a boot server is

---

9    *Gasparik* was cited in Dell's Petition for some of the elements of claim 30, from which claim 34 depends.  However, claim 30 is not at issue in this appeal. In the Decision, the PTAB determined that *Hipp* in view of *Gasparik* rendered claim 30 obvious.  A21–23.

identified for booting. A547; *see also* A123; A745. Thus, there is no difference between the teaching of *Hipp* and claim 34. A138–39; A738–39 at ¶ 52 (claim chart for claim 34); A744–45 at ¶ 59; A764 at ¶ 80. Indeed, claim 34 is merely describing performance of a standard operation of standard networks at the time of the '021 Patent. Additionally, as shown in Dell's Petition, all elements of claims 35 and 36 are disclosed in *Hipp*. A138–39; *see also* A124–25; A744–45 at ¶ 59; A764 at ¶ 80; A254. Thus, claims 35 and 36 are also rendered obvious by *Hipp* in view of *Gasparik*.

Accordingly, the PTAB's determination that Claims 34–36 are not rendered obvious by *Hipp* in view of *Gasparik*, must be reversed and remanded for consideration under the appropriate legal standards.

## VI.    CONCLUSION

For all the reasons given, Dell respectfully requests that the determination of the PTAB with respect to claims 14–17 and 34–36 be REVERSED and the case REMANDED to the PTAB for further proceedings.

Respectfully submitted,

Dated: June 1, 2015

_____/s/ Kevin Meek_____

Kevin Meek
(kevin.meek@bakerbotts.com)
Paula Heyman
(paula.heyman@bakerbotts.com)
Catherine Garza
(cat.garza@bakerbotts.com)

BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Suite 1500
Austin, TX 78701
(512) 322-2500

*Attorneys for Appellant*

# ADDENDUM

## TABLE OF CONTENTS

|  | Page |
|---|---|
| FINAL WRITTEN DECISION | A1 – A27 |
| U.S. PATENT NO. 6,948,021 | A28 – A39 |

Trials@uspto.gov                                                    Paper 41
Tel: 571-272-7822                              Entered:  December 22, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

DELL INC.,
Petitioner,

v.

ACCELERON, LLC,
Patent Owner.

————————

Case IPR2013-00440
Patent 6,948,021 B2

————————

Before THOMAS L. GIANNETTI, TRENTON A. WARD, and
JEREMY M. PLENZLER, *Administrative Patent Judges*.

PLENZLER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
35 U.S.C. § 318(a) and 37 C.F.R. § 42.73

IPR2013-00440
Patent 6,948,021 B2

## I.    INTRODUCTION

### A. *Background*

Dell Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–4, 6–20, 22–24, 30, and 34–36 of U.S. Patent No. 6,948,021 B2 (Ex. 1001, "the '021 patent"). Paper 7 ("Pet."). The Petition was accompanied by an expert declaration from Robert Horst, Ph.D. Ex. 1018 ("the Horst Declaration"). Acceleron, LLC ("Patent Owner") did not file a Preliminary Response. We granted the Petition and instituted trial on the following grounds: (1) anticipation of claims 1–4, 6–9, and 13–20 by Hipp[1]; and (2) obviousness of claims 10–12, 30, and 34–36 over Hipp and Gasparik.[2] Paper 10 ("Dec. on Inst."). Trial was not instituted for claims 22–24. Dec. on Inst. 3, 11–13, 17.

During trial, Patent Owner filed a Patent Owner Response (Paper 23, "PO Resp."), which was accompanied by an expert declaration from William Putnam (Ex. 2001, "the Putnam Declaration"). Petitioner filed a Reply to the Patent Owner Response. Paper 28 ("Pet. Reply"). Patent Owner and Petitioner each filed a Motion to Exclude Evidence. Papers 29, 32. An oral hearing was held on September 4, 2014. A transcript of the hearing has been entered into the record. Paper 40 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a).

We determine that Petitioner has shown by a preponderance of the evidence that claims 1–4, 6–13, 18–20, and 30 of the '021 patent are unpatentable. We further determine that Petitioner has not shown, by a

---

[1] U.S. Patent No. 6,757,748 B1, issued June 29, 2004 (Ex. 1004, "Hipp").
[2] U.S. Patent No. 6,157,974, issued Dec. 5, 2000 (Ex. 1007, "Gasparik").

IPR2013-00440
Patent 6,948,021 B2

preponderance of the evidence, that claims 14–17 and 34–36 are unpatentable.

### B. Related Proceedings

The '021 patent is involved in district court litigation: *Acceleron, LLC v. Hitachi Data Systems Corp.*, Case No. 1:12-cv-02996 (N.D. Ga.); and *Acceleron, LLC v. Dell, Inc.*, Case No. 1:12-cv-04123 (N.D. Ga.).  Pet. 2.

### C. The '021 Patent

The '021 patent is titled "Cluster Component Network Appliance System and Method for Enhancing Fault Tolerance and Hot-Swapping," and generally relates to a computer network appliance including CPU modules, a power module, and an Ethernet switch module having hot-swappable connectors corresponding to mating hot swap connectors on a backplane board.  Ex. 1001, 3:18–23.  The '021 patent describes a computer network appliance that allows replacement of the various modules via hot swap connectors in order to reduce the mean time to repair the computer network appliance.  *Id*. at 5:53–59.

Figure 1 of the '021 patent, reproduced below, illustrates computer network appliance 100.

IPR2013-00440
Patent 6,948,021 B2



FIG.1

Figure 1 is a schematic illustration of a computer network appliance. As shown above in Figure 1 of the '021 patent, computer network appliance 100 includes CPU modules 102(a)–(e), power module 106, microcontroller module 108, and Ethernet switch module 110 connected to the backplane 104 via hot swap connectors. *Id.* at 3:18–23, 32–37.

The '021 patent describes the CPU modules as each functioning as a stand-alone computer. *Id.* at 4:34–35. Each CPU module in the '021 patent includes "a microprocessor 202, memory module 204, bus management chipset including a Northbridge chip 206(a) and a Southbridge chip 206(b), an ethernet interface chip 208, hardware BIOS 210 and a hot swap connector 212 mounted on a PCB." *Id.* at 4:29–33. Hardware BIOS 210 for each CPU module provides remote boot capability, enabling the CPU modules to run different types of operating systems. *Id.* at 4:36–44. Different CPU

IPR2013-00440
Patent 6,948,021 B2

modules operating in the same chassis may be booted with different operating systems and different applications. *Id*. at 4:54–56.

The "health" of each CPU module can be monitored by a microcontroller, so that the CPU modules can be reset remotely in the event of an operating system instability or crash. *Id*. at 4:64–5:6.

D. *Illustrative Claims*

Of challenged claims 1–4, 6–20, 30, and 34–36, claims 1, 20, and 30 are independent. Claims 2–4 and 6–19 depend from claim 1, and claims 34–36 depend from claim 30. Claims 1 and 20 illustrate the claimed subject matter, and are reproduced below:

1. A computer network appliance, comprising:

a plurality of hot-swappable CPU modules, wherein each CPU module is a stand-alone independently-functioning computer;

a hot-swappable power module;

a hot-swappable ethernet switch module; and

a backplane board having a plurality of hot swap mating connectors, wherein the at least one backplane board interconnects each of the CPU modules with the at least one power module and the at least one ethernet switch module, such that the at least one power module and the at least one ethernet switch module can be used as a shared resource by the plurality of CPU modules.

*Id.* at 9:2–15.

20. A computer network appliance comprising:

a hot-swappable CPU module;

a hot-swappable power module;

a hot-swappable ethernet switch module; and

a backplane board having a plurality of hot swap mating connectors; and

a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path is separate from a switched fast ethernet connection and provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module;

wherein each of the CPU module, the power module and the ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board.

*Id.* at 10:18–33.

II.    ANALYSIS

For the challenged claims, Petitioner must prove unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). We begin with a claim construction analysis, and then follow with specific analysis of the prior art.

A. *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable interpretation in light of the specification in which they appear and the understanding of others skilled in the relevant art. 37 C.F.R. § 42.100(b). Applying that standard, we interpret the claim terms of the '021 patent according to their ordinary and customary meaning in the context of the patent's written description. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

After considering the various claim constructions proposed by both Petitioner and Patent Owner, we conclude that no term requires an express

IPR2013-00440
Patent 6,948,021 B2

construction in order to conduct properly our analysis of the prior art.  For example, Patent Owner only offers express constructions for the terms "caddies" and "bays" (PO Resp. 12–15), and Petitioner accepts these constructions (Pet. Reply 3-5; Tr. 17:16–18:6, 23:24–24:18), which we adopt for this decision.  Petitioner's proposed constructions (Pet. 6–11) of terms other than "caddies" or "bays" are not material to our decision.  Only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

### B.  Anticipation by Hipp

We have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers.  We are persuaded, by a preponderance of the evidence, that claims 1–4, 6–9, 13, and 18–20 are anticipated by Hipp under 35 U.SC. § 102, but are not persuaded that claims 14–17 are anticipated by Hipp.

### 1.  Claim 1

Claim 1 is directed to a computer network appliance including "hot-swappable CPU modules," "a hot-swappable power module," and "a hot-swappable ethernet switch module," with a "backplane board interconnect[ing] each of the CPU modules with the at least one power module and the at least one ethernet switch module."  Petitioner contends that Hipp discloses each element of claim 1.  Pet. 14–16.  We have reviewed and are persuaded by Petitioner's contentions regarding the disclosure of Hipp.  For example, Hipp describes web server processing cards 32, network interface card 48, and power supply 280 (Ex. 1004, 2:56–58, 3:54–64, 6:48–53, 8:6–10, 12:37–50, 16:62–64 , 18:48–51), which Petitioner contends

IPR2013-00440
Patent 6,948,021 B2

correspond to the hot-swappable CPU modules, hot-swappable power module, and hot-swappable Ethernet switch module, respectively, recited in claim 1 (Pet. 14–15). Hipp additionally describes midplane 34 as "includ[ing] a plurality of web server processing card connectors 276 which facilitate the installation of up to twenty-four web server processing cards 32" (Ex. 1004, 15:34–37), "distribut[ing] data and/or communications signals between web server processing cards 32 and network interface cards 40, 48 and 68" (*id.* at 15:54–57), and "distribut[ing] power to components of web server processing cards 32 and network interface cards 40, 48 and 68" (*id.* at 15:52–54), which Petitioner contends corresponds to the backplane board recited in claim 1 (Pet. 15–16).

Patent Owner does not dispute Petitioner's contentions regarding Hipp's disclosure of the individual modules or the backplane board recited in claim 1. Patent Owner, instead, contends that Hipp fails to disclose the claimed interconnectivity between the Ethernet switch module and the CPU modules provided by the backplane board. *See* PO Resp. 15–23. Specifically, Patent Owner contends that "*Hipp* fails to disclose, either explicitly or inherently, that the passive midplane 34 interconnects *__each__* web server processing card 32 to a single network interface card 48 such that the same network interface card 48 can be used as a shared resource for all web server processing cards 32." PO Resp. 17. Petitioner responds that the "plurality of hot-swappable CPU modules" recited in the claim only requires two or more CPU modules, and that "the CPU modules" recited later in the claim refers back to the "plurality of hot-swappable CPU modules" (i.e., the two or more CPU modules). Pet. Reply 1-2. For the reasons that follow, we agree with Petitioner.

8

**A8**

IPR2013-00440
Patent 6,948,021 B2

Patent Owner acknowledged at oral hearing that "plurality" means two or more. Tr. 66:2–4. Yet, Patent Owner argues that Hipp fails to disclose the "backplane board interconnect[ing] each of the CPU modules with the at least one power module and the at least one ethernet switch module" recited in claim 1 because "the passive midplane 34 disclosed by Hipp interconnects ***only a limited subset*** of the web server processing cards 32 to a particular network interface card 48, while the passive midplane 34 interconnects the remainder of the web server processing cards 32 to a different network interface card 48." PO Resp. 17.

The "at least one backplane board interconnect[ing] each of the CPU modules with the at least one power module and the at least one ethernet switch module" recited in claim 1 only requires a backplane board interconnecting two or more hot-swappable CPU modules (i.e., the plurality of CPU modules) with the power and Ethernet switch modules. Patent Owner acknowledges that Hipp meets this construction of claim 1. For example, Patent Owner notes that in Hipp, "each network interface card 48 is connected through the passive midplane 34 to only ***twelve*** web server processing cards 32 each." PO Resp. 18–19. The twelve web server processing cards in Hipp are the plurality (i.e., at least two) of hot-swappable CPU modules recited in claim 1. Therefore, the interconnection between the twelve web server processing cards (i.e., each of the plurality) and the network interface card via the passive midplane in Hipp also meets the "backplane board interconnect[ing] each of the CPU modules with the at least one power module and the at least one ethernet switch module" recitation in claim 1.

9

IPR2013-00440
Patent 6,948,021 B2

For the reasons set forth above, Petitioner has established, by a preponderance of the evidence, that claim 1 is anticipated by Hipp.

### 2. Claims 2, 6, 8, 9, 13, 18, and 19

Claims 2, 6, 8, 9, 13, 18, and 19 depend from claim 1. Petitioner identifies portions of Hipp teaching each of the limitations of these claims. Pet. 16, 18–21, 23–25. For example, Petitioner contends that Hipp's server chassis 38 corresponds to the "chassis providing physical support for a CPU module, the power module, the ethernet switch module and the backplane board" recited in claim 2. Pet. 16–17 (citing (Ex. 1004, 7:64–67). Petitioner further contends that Hipp's power supplies 280 including power connectors, shown in Figure 12, and standard RJ-45 connectors correspond to the power connector and data input/output connector, respectively, recited in claim 6. Pet. 18 (citing Ex. 1004, 12:37–45, 16:64–66, 18:39–42; Ex. 1018 ¶¶ 52, 56. Patent Owner does not dispute Petitioner's contentions regarding these claims. Tr. 86:9–12. We have reviewed the cited portions of Hipp and are persuaded by Petitioner's contentions.

Accordingly, we determine that Petitioner has established, based on a preponderance of the evidence, that claims 2, 6, 8, 9, 13, 18, and 19 are anticipated by Hipp.

### 3. Claim 3

Claim 3 ultimately depends from claim 1 and recites that "the chassis comprises caddies providing air flow from the front to the rear of the chassis." Patent Owner contends that a caddy is a "carrier for a module" (PO Resp. 14), and Petitioner agrees with this definition (Pet. Reply 3–5; Tr. 17:16–18:6). Hipp describes mounting mechanisms 278 (Ex. 1004, 16:62–64), which Petitioner contends correspond to the caddies recited in

IPR2013-00440
Patent 6,948,021 B2

claim 3 (Pet. Reply 5).  Specifically, Hipp explains that "[s]erver chassis 38 includes two power supply mounting mechanisms 278, which facilitate the installation of two load-balance, hot-swappable power supplies 280."  Ex. 1004, 16:62–64.

Patent Owner contends that "*Hipp* fails to disclose any structure that is a carrier for a module."  PO Resp. 24.  Although Patent Owner did not address mounting mechanisms 278 specifically in its Response, it did address them during the oral hearing.  *See* Tr. 75:16–76:15.  Patent Owner contends that Hipp's power supply mechanisms 278 are not caddies because "[t]hey are the connectors, where the power supply module plugs into on the midplane board."  *Id.* at 76:9–10.  We are not persuaded by Patent Owner's contentions.

Based on our review of Hipp, we are persuaded by Petitioner's contention that Figure 12 of Hipp illustrates slides that allow the power supply modules to be inserted and removed, and also provide spacing between power supplies 280 and the bottom of chassis 38 to allow air flow along power supplies 280.  Tr. 22:3–19; Ex. 1004, Fig. 12.  Hipp's slides provide carriers for power supply modules, as required by Patent Owner's construction of caddy, and "provid[e] air flow from the front to the rear of the chassis," as recited by claim 3.  Patent Owner's argument that we should not consider this characterization of Hipp because it was raised for the first time at oral hearing is unpersuasive.  Petitioner clearly pointed to this structure in the Petitioner's Reply (*see* Pet. Reply 5, identifying Hipp's structure in Figure 12 facilitating installation of hot-swappable power supplies 280 including power supply mounting mechanisms 278 as corresponding to the claimed caddies).

11

**A11**

IPR2013-00440
Patent 6,948,021 B2

For the reasons set forth above, Petitioner has established, based on a preponderance of the evidence, that claim 3 is anticipated by Hipp.

### 4. Claim 4

Claim 4 ultimately depends from claim 1 and recites that "the chassis comprises bays and slot guides to facilitate mounting and removal of the modules and to ensure proper alignment between hot swap connectors of the modules and the hot swap mating connectors of the backplane board." Patent Owner contends that a bay is "a structure defining a space that receives a module" (PO Resp. 14), and Petitioner agrees with this definition (Tr. 23:24–24:18). Petitioner contends that Hipp discloses the limitations of claim 4. We have reviewed, and are persuaded by, Petitioner's contentions. For example, Petitioner asserts that the bays recited in claim 4 are met in Hipp by the structure defining a space at the front of chassis 38 that receives web server processing cards 32, and the structure defining a space at the back of chassis 38 receiving power supplies 280 and network interface cards 48 shown in Figures 10–12 of Hipp. Pet. 18; Pet. Reply 7.

Patent Owner contends that "it is unreasonable to consider arbitrary areas within the chassis 38 of *Hipp* to be 'bays'" (PO Resp. 31), but does not dispute Petitioner's contentions regarding the "slot guides" recited in claim 4 (*see id.* at 28-31). We are not persuaded by Patent Owner's argument. As noted above, Patent Owner's construction of "bays" simply requires "a structure defining a space that receives a module." The structure in Hipp identified by Petitioner, and discussed above, defines a space that receives a module (power supplies and network interface cards) as required by Patent Owner's construction. Patent Owner offers no persuasive explanation as to why Hipp's chassis 38 fails to provide this structure.

IPR2013-00440
Patent 6,948,021 B2

Accordingly, we conclude that Petitioner has established, based on a preponderance of the evidence, that claim 4 is anticipated by Hipp.

### 5. *Claim 7*

Claim 7 ultimately depends from claim 1 and recites that "the data input/output connector is a standard ethernet connector allowing heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other." Petitioner contends that Hipp discloses the limitations of claim 7. Pet. 19; Pet. Reply 8–9. We have reviewed, and are persuaded by, Petitioner's contentions. For example, Hipp explains that "[s]witch chip 145 monitors and distributes traffic from a respective web server processing card 32 to a corresponding RJ-45 Ethernet connector 144 through an Ethernet communication link 143" (Ex. 1004, 12:47–50), which Petitioner contends discloses the "standard ethernet connector" recited in claim 7 (Pet. 19).

Patent Owner does not dispute that Hipp discloses a "standard ethernet connector," but contends that Hipp does not anticipate claim 7 because it does not disclose heterogeneous CPU modules mounted at the same time. PO Resp. 32–33. We are not persuaded by Patent Owner's argument because it is not commensurate with the scope of claim 7. We agree with Petitioner that claim 7 does not require heterogeneous CPU modules mounted to the same chassis at the same time. *See* Pet. Reply 8. Rather, claim 7 requires "a standard ethernet connector *allowing* heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other" (emphasis added). Patent Owner does not identify, and we do not find, anything in the specification of the '021 patent imposing a requirement that heterogeneous CPU modules of

13

**A13**

IPR2013-00440
Patent 6,948,021 B2

differing CPU architectures must be mounted on the same chassis at the same time.

The '021 patent explains that "[a] byproduct of using a standard fast ethernet . . . is that heterogenous CPU modules . . . may be mounted in the same chassis without affecting the operation of any other CPU module." Ex. 1001, 5:60–64. Hipp explains that "many central processing units with comparable processing power to a 500 MHz, Pentium III . . . may be used within the teachings of the present invention," such as "the Crusoe TM 3200 with speeds in the range of 300-400 MHz, or TM 5400 with speeds in the range of 500-700 MHz." Ex. 1004, 8:16–22. Patent Owner offers no persuasive explanation as to why Hipp's Ethernet connector would not allow "heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other."

Accordingly, Petitioner has established, based on a preponderance of the evidence, that Hipp discloses the limitations of claim 7.

    6. *Claim 14*

Claim 14 depends from claim 1 and recites that "a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot." Patent Owner responds that "*Hipp* fails to disclose, either explicitly or inherently, at least the claim element 'instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot,' as recited in claim 14." PO Resp. 34.

Petitioner contends that Hipp discloses this limitation because Hipp's "hardware BIOS [is] *capable of* booting from a NAS" and Hipp's "NAS *could store* the operating system from which the CPU module boots." Pet.

IPR2013-00440
Patent 6,948,021 B2

Reply 10 (emphases added) (citing *In re Schreiber*, 128 F.3d 1473, 1479 (Fed. Cir. 1997)).  Petitioner's argument implies that even without instructions for "a network attached storage (NAS) to locate an operating system (OS) from which to boot," Hipp's hardware BIOS meets this limitation because the hardware BIOS *could* be programmed with such instructions.  This argument is not persuasive.  The functional language recited in claim 14 requires a hardware BIOS that can "instruct[] a network attached storage (NAS) to locate an operating system (OS) from which to boot."  In order to meet this limitation for purposes of anticipation, the prior art structure must be capable of performing the function without further programming.  *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011) (discussing *Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*, 520 F.3d 1367 (Fed. Cir.2008)).  When functional language is associated with programming or some other structure required to perform the function, that programming or structure must be present in order to meet the claim limitation in an anticipation analysis.  *Id.*  Thus, Hipp cannot meet the "hardware BIOS . . .  instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot" limitation recited in claim 14 by simply having a hardware BIOS that *could* be programmed with such instructions.

Petitioner further contends that "*Hipp* discloses that a BIOS instructs a NAS to locate an operating system from which to boot."  Pet. 22 (citing Ex. 1018 ¶ 59).  In support of this contention, Petitioner notes that "*Hipp* discloses a hardware BIOS on web server processing card 32 that 'contains the appropriate instructions for sending information from a program to the appropriate hardware device within network 30.'"  *Id.* at 21 (quoting Ex.

15

IPR2013-00440
Patent 6,948,021 B2

1004, 10:47–51). Petitioner further contends that Hipp discloses the claimed hardware BIOS because storage server 54 provides network attached storage (NAS), web server processing card 32 includes boot-from-LAN capability, and at least two operating systems are used in Hipp. Pet. 21–22 (citing Ex. 1004, 5:35–38, 8:26–30, 9:61–62). Petitioner later indicates that this limitation is inherent in Hipp. Tr. 40:4–8. We are not persuaded that the cited portions of Hipp expressly or inherently disclose the claimed BIOS programmed to instruct a NAS to locate an operating system from which to boot for the reasons discussed below.

Hipp describes the BIOS generally as "contain[ing] the appropriate instructions for sending information from a program to the appropriate hardware device within network 30." Ex. 1004, 10:48–51. The portions of Hipp cited by Petitioner explain, generally, that "[s]torage server 54 provides network attached storage (NAS)" (*id.* at 5:35–36) and, separately, that web server processing card 32 includes boot from LAN capability (*id.* at 9:57–62). Patent Owner contends that in Hipp, "the mere mention of these two concepts alone cannot lead to the conclusion that booting from a NAS is explicitly or inherently disclosed." PO Resp. 34. We agree. Hipp does not discuss specifically any instructions in BIOS directed to storage server 54 locating an OS from which to boot. Thus, we are not persuaded that Hipp expressly discloses the BIOS recited in claim 14.

We also are not persuaded that Hipp inherently discloses the BIOS recited in claim 14. As Patent Owner notes (PO Resp. 35), Petitioner's expert, Dr. Horst, explains that a boot image is required to initiate an operating system (Ex. 2002, 199:12–14). Patent Owner contends that the boot image is not required to be located in NAS and, instead, a variety of

IPR2013-00440
Patent 6,948,021 B2

other memory locations could be used to store the boot image.  PO Resp. 36
(citing Ex. 2002, 203:7–204:13).  In the cited portion of the deposition
transcript, Dr. Horst acknowledges that these other memory locations could
be used to store a boot image.  Ex. 2002, 203:7–204:13.  Petitioner does not
provide a persuasive explanation as to why the boot image must be located
in Hipp's storage server 54.  Thus, we are not persuaded that Hipp's storage
server 54 necessarily stores the boot image.  Hipp's BIOS, therefore, does
not necessarily include instructions to boot from storage server 54 and,
instead, could include instructions to boot from another location where a
boot image may be stored.  *See In re Robertson*, 169 F.3d 743, 745 (Fed.
Cir. 1999) ("Inherency . . . may not be established by probabilities or
possibilities.  The mere fact that a certain thing may result from a given set
of circumstances is not sufficient.").  For these reasons, we are not
persuaded that Hipp's BIOS inherently includes instructions directing a NAS
to locate an operating system from which to boot.

Petitioner also contends that "a person of skill in the art would
understand Hipp's disclosure to teach booting from NAS."  Pet. Reply 11
(citing Ex. 1018 ¶¶ 52, 59).  Petitioner's citation to the Horst Declaration
does not cure the deficiencies noted above.  Paragraph 52 of the Horst
Declaration is a claim chart.  Paragraph 59 of the Horst Declaration indicates
that "[t]he primary purpose of a BIOS is to boot software, including the
operating system, on start-up" and that "booting remotely over a network
was well-known and was even the subject of standardization," concluding
that one skilled in the art would, therefore, recognize that Hipp discloses the
limitations of claim 14.  Although the primary purpose of a BIOS may be to
boot software on start-up, and while booting over a network may have been

well-known, this does not explain why one skilled in the art would recognize that the arrangement in Hipp *includes* a BIOS programmed to instruct NAS to locate an operating system from which to boot. Instead, as explained above, Hipp's BIOS could have included instructions to boot from a location other than NAS.

Accordingly, we are not persuaded that Petitioner has shown, by a preponderance of the evidence, that claim 14 is anticipated by Hipp.

### 7.  *Claims 15–17*

Claim 15 depends from claim 1 and recites "a CPU module is configured to boot remotely from an OS located in an NAS, and wherein the computer network appliance is free of a local hard disk drive (HDD)." Similar to claim 14, claim 15 requires a CPU module having instructions "to boot remotely from an OS located in an NAS." Petitioner's contentions regarding claim 15 are similar to those discussed above regarding claim 14, and are not persuasive for the same reasons set forth above regarding claim 14. *See* Pet. 22–23; Pet. Reply 11. Claims 16 and 17 depend from claim 15, and Petitioner's contentions with respect to these claims suffer from the same deficiencies discussed above relative to the challenge to claim 15. *See* Pet. 23–24; Pet. Reply 11.

Accordingly, for the reasons discussed above relative to claim 14, we are we are not persuaded, based on a preponderance of the evidence, that claims 15–17 are anticipated by Hipp.

### 8.  *Claim 20*

Claim 20 is directed to a computer network appliance including a variety of "hot-swappable" components and "a backplane board having a plurality of hot swap mating connectors," similar to claim 1. Petitioner cites

portions of Hipp, similar to those discussed above relative to claim 1, as disclosing these limitations.  Pet. 25.  We find those contentions persuasive for the same reasons set forth above regarding claim 1.

Claim 20 additionally recites "a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path is separate from a switched fast ethernet connection and provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module."  Petitioner contends that single board computer 160 on management network interface 49 in Hipp corresponds to the microcontroller module recited in claim 20, and communication link 71 and ethernet connector 186 correspond to the dedicated Ethernet path recited in claim 20.  Pet. 26.  Petitioner further explains that Hipp's I2C bus provides a connection for single board computer 160 that may be used to perform remote polling.  Pet. Reply 13–14 (citing Ex. 2001 ¶ 73).  We have reviewed Petitioner's contentions, and are persuaded that Hipp discloses the microcontroller module and the dedicated Ethernet path recited in claim 20 based on Hipp's disclosure of single board computer 160 on management network interface 49 and communication link 71 with ethernet connector 186, discussed further below.  *See* Pet. 26–27.

Patent Owner responds that "*Hipp* fails to disclose that the communication link 71 provides the single board computer 160 'with a connection to remotely poll the CPU module, the power module and the ethernet switch module,' as recited in claim 20."  PO Resp. 42.  Patent Owner contends that Hipp's "communication link 71 does not provide the single board computer 160 on the management network interface card 68 with a connection to even one of the web server processing cards 32, the hot-

swappable power supplies 280, or the network interface cards 48." *Id.* at 43. Patent Owner further contends that Hipp's I2C bus is not capable of polling. Tr. 73:4–6, 11–12.

Hipp explains that "[c]ommunication link 188 may include an I2C bus coupled with the serial port associated with high density connector 164" and "[a]nother I2C bus may also be provided between single board computer 160 and the serial port associated with high density connector 162." Ex. 1004, 15:9–14. In the portion of the Putnam Declaration cited by Petitioner, noted above, Patent Owner's expert, Mr. Putnam, acknowledges that the I2C bus described in Hipp "may be used to communicate with the web server cards, public and private network interface cards, and power supplies, for control and monitoring purposes." Ex. 2001 ¶ 73. Mr. Putnam testifies, however, that the I2C bus "is not an Ethernet connection." *Id.* This characterization is unpersuasive. Petitioner agrees that, generally, an I2C bus is not considered an Ethernet connector, but contends that this is not consistent with the '021 patent. Tr. 29:4–8. We agree. The '021 patent explains that "[t]he microcontroller module uses a dedicated ethernet path separate from the network data I/O to remotely poll the health of the power module 106, the ethernet switch module 108 and the CPU modules 102(a)-102(e)" and "communicates with other modules using an I2C bus." Ex. 1001, 7:62–67. Claim 21 specifically recites that "the *dedicated ethernet path is an I2C bus*" (emphasis added). Thus, consistent with the '021 patent, the "dedicated ethernet path" recited in claim 20 at least encompasses an I2C bus. We are persuaded, therefore, that Hipp's I2C bus discloses the claimed "dedicated ethernet path."

IPR2013-00440
Patent 6,948,021 B2

Patent Owner further contends that Hipp fails to disclose remotely polling a CPU module, power module, and Ethernet switch module (PO Resp. 42, 44–46). This argument is unpersuasive because claim 20 does not require "polling." The claim simply requires "a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path . . . provides the microcontroller module with a connection to remotely poll." Unlike the "CPU module" recited in claims 14 and 15, discussed above, the "dedicated ethernet path" recited in claim 20 does not require programming to "provide[] the microcontroller module with a connection to remotely poll." Further, there is no requirement in claim 20 that the microcontroller module is programmed to poll, just that the "dedicated ethernet path" would allow polling if such programming were present.

We are persuaded that Hipp's I2C bus could be used for polling. For example, as noted above, Patent Owner's expert, Mr. Putnam, testifies that Hipp's I2C bus can be used "to communicate with the web server cards, public and private network interface cards, and power supplies, for control and monitoring purposes." Ex. 2001 ¶ 73. This communication capability would permit polling.

Accordingly, Petitioner has established, by a preponderance of the evidence, that claim 20 is anticipated by Hipp.

### C. Obviousness over Hipp and Gasparik

We have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers. For the reasons that follow, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that claims 10–12 and 30 would have been obvious over Hipp and Gasparik under 35 U.SC. § 103. We are

21

IPR2013-00440
Patent 6,948,021 B2

not persuaded that claims 34–36 would have been obvious over Hipp and
Gasparik.

### 1. Claims 10–12

Claims 10–12 ultimately depend from claim 1, and further define the
hot swap connectors of the modules recited in claim 1. For example, claim
10 recites the connection order of the "pre-charge power pins" and "ground
pins" of the hot swap connectors of the modules. Petitioner identifies
portions of Hipp and Gasparik teaching each of the limitations of these
claims, and reasons that one skilled in the art would have combined these
teachings of Hipp with those of Gasparik. Pet. 31–34. Patent Owner does
not dispute Petitioner's contentions regarding these claims specifically and,
instead, relies on the arguments presented with respect to claim 1 for the
patentability of claims 10–12, which we find unpersuasive for the reasons
explained above. *See* PO Resp. 49. We have reviewed, and are persuaded
by, Petitioner's contentions regarding claims 10–12.

Accordingly, Petitioner has established, based on a preponderance of
the evidence, that claims 10–12 would have been obvious over the combined
teachings of Hipp and Gasparik.

### 2. Claim 30

Claim 30 is directed to "[a] method of mounting a plurality of hot-
swappable CPU modules in a computer network appliance . . . each CPU
module comprising a hot swap connector including ground pins, power pins
and signal pins, the computer network appliance including a backplane
board having hot swap mating connectors," and recites that "a backplane
board interconnects each of the CPU modules with the ground elements,
power elements, and signal elements, such that the power module and the

IPR2013-00440
Patent 6,948,021 B2

ethernet switch module can be used as a shared resource by the plurality of CPU modules." Petitioner cites Hipp as teaching these limitations. Pet. 34–36. In response, Patent Owner relies on the arguments discussed above relative to the anticipation challenge to claim 1 based on Hipp. PO Resp. 47–49. We are not persuaded by Patent Owner's arguments for similar reasons as discussed above relative to claim 1.

Petitioner cites Gasparik as teaching the remaining limitations of claim 30, which are directed to the connections between the various hot swap connector pins of the CPU modules and the hot swap connectors of the backplane board, and reasons that it would have been obvious to combine the teachings of Gasparik and Hipp. Pet. 31, 35–36. Patent Owner does not dispute Petitioner's contentions regarding these limitations of claim 30.

We have reviewed Petitioner's contentions and Patent Owner's response, and are persuaded that claim 30 would have been obvious over the combined teachings of Hipp and Gasparik.

### 3. *Claims 34–36*

Claim 34 depends from claim 30 and further recites "remotely booting a CPU module in a computer network appliance, comprising: locating an OS in an NAS to boot the CPU module; and remotely booting the CPU module using the located OS; wherein the computer network appliance is free of a local HDD in remotely booting the CPU module." Petitioner's contentions regarding claim 34 are essentially the same as those discussed above regarding claims 14 and 15. *See* Pet. 36–37. We are not persuaded by these contentions for the reasons explained above with respect to claims 14 and 15. Claims 35 and 36 depend from claim 34, and Petitioner's contentions

IPR2013-00440
Patent 6,948,021 B2

with respect to those claims suffer from the same deficiencies as discussed relative to the challenge to claim 34. *See* Pet. 37.

Accordingly, for the reasons discussed above relative to claims 14 and 15, we are not persuaded, based on a preponderance of the evidence, that claims 34–36 would have been obvious over the combined teachings of Hipp and Gasparik.

### D. Motions to Exclude

#### 1. Petitioner

Petitioner filed a Motion to Exclude Evidence seeking to exclude Exhibits 2004 and 2005, the testimony of Mr. Putnam found in the Putnam Declaration, and certain portions of deposition testimony from Dr. Horst. Paper 32, 1–14. The majority of the evidence that Petitioner seeks to exclude, including portions of the Putnam Declaration, Exhibits 2004 and 2005, as well as the portions of deposition testimony from Dr. Horst, is directed to claims 1, 3, and 4 of the '021 patent. *See* Paper 32, 2–6, 10–14. However, even without excluding this evidence, we have determined that Petitioner has established, based on a preponderance of the evidence, the unpatentability of claims 1, 3, and 4 of the '021 patent. Further, Petitioner's arguments on these items go to the weight to be accorded to the evidence. The Board is capable of determining and assigning the appropriate weight to the evidence.

The remaining objections (*id.* at 6–10) are directed to excluding paragraphs 46–49, 51–53, 55, 56, 58, 60–62, 64, 65, 67–69, 71, and 73–75 of the Putnam Declaration "as being unreliable under FRE 702 because Mr. Putnam relied on an incorrect legal standard in formulating his opinions with respect to anticipation under 35 U.S.C. § 102" (*id.* at 6–7), and excluding the

IPR2013-00440
Patent 6,948,021 B2

entire Putnam Declaration because "Mr. Putnam's testimony is based on incorrect legal standards for claim construction, anticipation, and obviousness, has no basis in underlying data or facts, and relies on pure speculation" (*id.* at 9–10). These arguments directed to Mr. Putnam's testimony also go to the weight to be accorded to the evidence. As noted above, the Board is capable of determining and assigning the appropriate weight to the evidence.

For these reasons, we *deny* Petitioner's motion.

### 2. *Patent Owner*

Patent Owner filed a Motion to Exclude Evidence (Paper 29) seeking to exclude certain deposition testimony from Patent Owner's expert, Mr. Putnam. Specifically, Patent Owner seeks to exclude testimony from Mr. Putnam found at page 230, lines 6–11, of Exhibit 1037. Paper 29, 2. As noted by Patent Owner, however, the portion of Mr. Putnam's testimony which Patent Owner seeks to exclude "is used to challenge claim 4 under obviousness in spite of the fact that this proceeding is limited to anticipation with respect to claim 4." *Id.* at 5 n. 1. Patent Owner's arguments go to the weight to be accorded to the evidence. The Board is capable of determining and assigning the appropriate weight to the evidence.

Accordingly, we *deny* Patent Owner's motion.

### III.    SUMMARY

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–4, 6–9, 13, and 18–20 of the '021 patent are anticipated by Hipp and claims 10–12 and 30 would have been obvious over the combination of Hipp and Gasparik, and that these claims are, therefore, unpatentable.

IPR2013-00440
Patent 6,948,021 B2

Petitioner has failed to demonstrate, by a preponderance of the evidence, that claims 14–17 and 34–36 would have been obvious over the combination of Hipp and Gasparik. This is a final written decision of the Board under 35 U.S.C. § 318(a).


IV.    ORDER

For the reasons given, it is

ORDERED that:

A.    Claims 1–4, 6–9, 13, and 18–20 are unpatentable as anticipated by Hipp;

B.    Claims 10–12 and 30 are unpatentable as obvious over the combination of Hipp and Gasparik;

C.    Petitioner's Motion to Exclude Evidence is denied; and

D.    Patent Owner's Motion to Exclude Evidence is denied.

FURTHER ORDERED that parties to the proceeding seeking judicial review of this final written decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

26

**A26**

IPR2013-00440
Patent 6,948,021 B2

For PETITIONER:
Kevin J. Meek
Paula D. Heyman
Nicholas A. Schuneman
Catherine J. Garza
BAKER BOTTS LLP
kevin.meek@bakerbotts.com
paula.heyman@bakerbotts.com
nick.schuneman@bakerbotts.com
catherine.garza@bakerbotts.com


For PATENT OWNER:
N. Andrew Crain
Scott Horstemeyer
Vivek A. Ganti
Robert D. Gravois
THOMAS HORSTEMEYER LLP
andrew.crain@thomashorstemeyer.com
scott.horstemeyer@thomashorstemeyer.com
vivek.ganti@thomashorstemeyer.com
robert.gravois@thomashorstemeyer.com



US006948021B2

(12) **United States Patent** (10) Patent No.: **US 6,948,021 B2**

Derrico et al. (45) Date of Patent: **Sep. 20, 2005**

---

(54) **CLUSTER COMPONENT NETWORK APPLIANCE SYSTEM AND METHOD FOR ENHANCING FAULT TOLERANCE AND HOT-SWAPPING**

(75) Inventors: **Joel Brian Derrico**, Atlanta, GA (US); **Paul Jonathan Freet**, Duluth, GA (US)

(73) Assignee: **Racemi Systems**, Duluth, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 324 days.

(21) Appl. No.: **09/987,917**

(22) Filed: **Nov. 16, 2001**

(65) **Prior Publication Data**

US 2002/0078290 A1 Jun. 20, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/248,834, filed on Nov. 16, 2000.

(51) **Int. Cl.**[7] .............................................. **G06F 13/00**

(52) **U.S. Cl.** ....................................... **710/302**; 710/301

(58) **Field of Search** ................................. 710/301, 302, 710/72, 304, 100; 713/100; 709/222, 227, 219, 203, 223; 361/695, 720, 752, 683, 687; 363/123; 439/92; 307/46, 66; 370/910

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,033,112 A | * | 7/1991 | Bowling et al. ............ | 398/110 |
| 5,161,097 A | * | 11/1992 | Ikeda ......................... | 363/124 |
| 5,555,510 A | * | 9/1996 | Verseput et al. ............ | 710/302 |
| 6,421,777 B1 | * | 7/2002 | Pierre-Louis et al. ...... | 713/2 |
| 6,452,797 B1 | * | 9/2002 | Konstad ...................... | 361/695 |
| 6,535,944 B1 | * | 3/2003 | Johari et al. ................ | 710/302 |
| 6,591,324 B1 | * | 7/2003 | Chen et al. ................. | 710/302 |

OTHER PUBLICATIONS

"Dynamic runtime re–scheduling allowing multiple implementations of a task for platform–based designs" by Tin-Man Lee; Henkel, J.; Wolf, W. (abstract only).*
"Redundant arrays of IDE drives" by Sanders, D.A.; Cremaldi, L.A.; Eschenburg, V>; Lawrence, C.N.; Riley, C.; Summers, DJ Petravick, D..L. (abstract only).*

* cited by examiner

*Primary Examiner*—Gopal C. Ray
(74) *Attorney, Agent, or Firm*—DLA Piper Rudnick Gray Cary US LLP

(57) **ABSTRACT**

Packaging a hot-swappable server module (server blade) in a computer network appliance with shared, hot-swappable power, network, and management modules to provide highly available computer capacity. Distributing power between hot-swappable modules using single DC input voltage.

**36 Claims, 5 Drawing Sheets**



DELL EXHIBIT 1001

U.S. Patent

Sep. 20, 2005

Sheet 1 of 5

US 6,948,021 B2

A29

FIG.1

U.S. Patent

Sep. 20, 2005

Sheet 2 of 5

US 6,948,021 B2

A30

102

VOLTAGE REGULATOR

4 DIMMS (UP TO 2G SDRAM)

204

PC

HOT-SWAP
CONNECTOR

PROCESSOR
370 ZIF SOCKET
(Pentium III)
202

MEMORY
MODULE

212

PC

214

XTAL

ETHERNER
MAC/PHY

208

LAN

NORTH
BRIDGE

SOUTH
BRIDGE

12V

3.3V

FLASH/
PBOOT
BIOS

GND

SYSTEM BUS
100 MHz

PCI BUS

PCI HEADER

ISA BUS

206(a)

206(b)

210



FIG.2



I2C/3.3V/GND
LAN1/LAN2/LAN3/LAN4/LAN5
LAN6/LAN7/LAN8

110

THUMB
SCREW
316

312

QUAD
ETHERNET
PHY    308

MEMORY    306

8-PORT
ETHERNET
SWITCH    302

QUAD
ETHERNET
PHY    308

EEPROM    304

FAN

314

FAN

THUMB
SCREW
316

FIG.3

404

106

THUMB
SCREW
410

406

48V
GND
12V    408

DC-DC
CONVERTER
12V    402

I2C

48V
GND
3.3V

DC-DC
CONVERTER
3.3V    402

FAN

HANDLE

FAN

THUMB
SCREW
410

406

FIG.4

M&C
I2C/3.3V/GND

510

504

502

506

108

512

I2C/
SMBus

FLASH
RAM

uP

ETHERNET
MAC/PHY

512

508

FIG.5

A31



FIG.6



FIG.7

U.S. Patent

Sep. 20, 2005

Sheet 5 of 5

US 6,948,021 B2

A33



FIG.8

US 6,948,021 B2

1

# CLUSTER COMPONENT NETWORK APPLIANCE SYSTEM AND METHOD FOR ENHANCING FAULT TOLERANCE AND HOT-SWAPPING

This application claims priority from U.S. Provisional Application Ser. No. 60/248,834, filed Nov. 16, 2000. The entirety of that provisional application is incorporated herein by reference.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention generally relates to fault tolerant computer systems and, more specifically, to a system and method for enhancing fault tolerance and hot swapping in computer systems.

### 2. Related Art

Computer systems such as file servers and storage servers in computer networks are relied upon by large numbers of users. When a file server or storage server is out of operation, many users are inconvenienced. Thus, technology has been developed which supports maintenance and service of computer systems while they remain operational. One part of maintenance and service includes the replacement of components in the computer systems. "Hot swap" technology allows the replacement of components without turning off the power or resetting the computer system as a whole.

Hot swap enables the insertion and/or removal of components in a computer system while it is still active or operational. In systems that do not support hot swapping of components, each process of component insertion and/or removal requires a complete shutdown of the entire system to prevent damage to other components or to the system. In time critical systems such as communications systems, system downtime is both a financial problem as well as a service quality problem. That is, any downtime means a financial loss and disconnection of service to active lines.

A drawback of hot swapping, however, is it requires trained personnel to insert and/or remove components from a computer system to minimize damages caused by pitting connectors of the components against connectors of the computer system. Another drawback is electrical noise which can adversely affect the performance of the computer system. The noise is caused by the change in current at the instance when connection is made between power pins of a component and corresponding elements of the computer system. The result is voltage transients in the computer system backplane that may cause loss of data, incorrect program execution and damage to delicate hardware components.

Thus, there is a need for a system and method for enhancing fault tolerance and hot swapping in computer systems so as to reduce both the downtime of computer systems and the use of trained personnel to repair and/or maintain computer systems.

## SUMMARY OF THE INVENTION

The present invention is directed to a hot swapping computer network appliance operating in mission critical applications where any computer downtime can result in serious consequences. The computer network appliance comprises a hot-swappable CPU module, a hot-swappable power module, a hot-swappable ethernet switch module and a backplane board having a plurality of hot swap mating connectors. Each of the CPU module, power module and

2

ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board. The computer network appliance further comprises a chassis providing physical support for the modules and the backplane board. The chassis comprises caddies providing air flow in the chassis. The chassis further comprises bays and slot guides to facilitate mounting and removal of the modules and to ensure proper alignment between the hot swap connectors of the modules and the hot swap mating connectors of the backplane board. The computer network appliance comprises a power connector and a data input/output connector, both of which remain connected during mounting or removal of the modules.

Each of the hot swap connectors of the modules comprises pin connections arranged in a specific pattern. The pins include ground pins, power pins and signal pins. The ground pins of a hot swap connector are connected first to corresponding ground elements of a hot swap mating connector, and the signal pins of the hot swap connector are connected last to corresponding signal elements of the hot swap mating connector so as to reduce brown outs in the computer network appliance.

The CPU module of the invention operates as a stand alone computer. The CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot. The CPU module is configured to boot remotely from an OS located in the NAS without user intervention. This remote booting ability of the CPU module allows the CPU module to run different types of operating systems without the need for a local hard disk drive (HDD), which increases the mean time between failure (MTBF) and decreases the mean time to repair (MTTR) of the computer network appliance.

The invention further provides that each of the hot swap connectors of the modules includes an ethernet connection providing communications to all modules attached to the backplane board.

The power module of the invention comprises dual DC—DC converters that perform direct conversion of a facility DC voltage to voltages required for normal operation in the modules. Features of the DC—DC converters include: allowing the modules in the computer network appliance to accept DC power directly from a battery backup source without requiring power inverters; higher MTBF than a typical switched power supply; use less power and generate less heat than a typical switched power supply; and provide better efficiency than a typical switched power supply in converting an input voltage to desired operational voltages of the modules.

## DESCRIPTION OF THE FIGURES

FIG. 1 is an illustration of a cluster computer network appliance arranged on a chassis in accordance with an embodiment of the invention;

FIG. 2 is a block diagram of a CPU module in accordance with an embodiment of the invention;

FIG. 3 illustrates an integrated ethernet switch module in accordance with an embodiment of the invention;

FIG. 4 illustrates a power module in accordance with an embodiment of the invention;

FIG. 5 illustrates a microcontroller module in accordance with an embodiment of the invention;

FIG. 6 illustrates an integration of a cluster computer network appliance, data storage device and standard internet access hardware;

US 6,948,021 B2

3

FIG. **7** illustrates a computer system utilizing multiple network appliances, redundant storage and internet access points; and

FIG. **8** illustrates a computer system providing path redundancy and equipment redundancy to achieve high availability.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

The following detailed description presents a description of certain embodiments of the present invention. However, the present invention can be embodied in different ways as defined by the claims. In this description, reference is made to the drawings wherein like parts are designated with like numerals throughout.

FIG. **1** is an illustration of a cluster computer network appliance **100** arranged on a chassis **150** in accordance with an embodiment of the invention. The cluster computer network appliance **100** includes a plurality of CPU modules **102**(*a*)–**102**(*e*), a passive backplane board **104** with hot swap mating connectors **124**(*a*)–**124**(*i*), a power module **106**, a microcontroller module **108**, an ethernet switch module **110**, power/ground connectors **112** and ethernet connectors **114**. The cluster computer network appliance **100** fits in a 1.75" tall (1RU) metal chassis that fits in a standard 19" rack. The chassis **150** includes a fold down front panel **116** and supports the modules and backplane board of the invention. The chassis has five bays accessed via the front for inserting the CPU modules **102**(*a*)–**102**(*e*) and three bays accessed via the rear **118** for inserting one each of the power module **106**, the ethernet switch module **110** and the microcontroller module **108**. Each module resides in a caddy **152** of the chassis such that when the module is inserted into the chassis the caddy ensures that the hot swap connectors are aligned. Each of the hot swap connectors used in the modules is specific to corresponding hot swap mating connectors in the backplane board. For normal operation, the chassis must be equipped with at least one CPU module, the power module and the ethernet switch module.

The power/ground connectors **112** provide physical connection for power to the chassis. The ethernet connectors **114** provide data input/output (I/O) to and from the chassis. Power is connected such that should the power module **106** fails, it may be replaced without disconnecting the actual power cabling inside the computer network appliance, which saves time and reduces complexity. Similarly, a failed ethernet switch module **110** may be replaced without disconnecting any of the power or data cables. Heat generated by active elements in each of the modules is dissipated using forced air flow from the front to the rear of the chassis using a push-pull method. Fans **120**(*a*)–**120**(*e*) are provided for each CPU module providing a 1:1 ratio of fan to bay and positioned near the front panel **116** of the chassis to push outside air through the chassis. In the rear of the chassis, multiple fans **122**(*a*)–**122**(*d*) are mated to the back of both the power module **106** and the ethernet switch module **110** to draw heated air out of the chassis.

Each module is designed to be hot swapped from the chassis such that there is no need for on/off switches on either the chassis or the modules. The passive backplane board **104** is equipped with hot swap mating connectors **124**(*a*)–**124**(*i*) for each of the modules to be inserted into the computer network appliance. The chassis is installed and wired for power and data I/O such that power is supplied directly to a module as soon as it is inserted.

In order to avoid chassis power drains (brown outs) caused by instantaneous power short to ground through

4

uncharged board capacitance, the hot swap connectors of the modules (shown in FIG. **1** mated to corresponding hot swap mating connectors **124**(*a*)–**124**(*i*)) are designed to make pin connections in a specific pattern to avoid power drains. Each hot swap connector of a module comprises groups of pins (ground pins, pre-charge power pins, power pins and signal pins) of different length that allow the pins to make connections in a prearranged pattern. The first group of pins to make contact with corresponding elements in a mating connector on the passive backplane board is the ground pins (chassis ground and common ground). The next group of pins to make contact with corresponding elements in the mating connector is the pre-charge power pins. The pre-charge power pins connect to a power plane on a printed circuit board (PCB) through resistors to limit the flow of current while pre-charging the capacitance on the PCB. The next group of pins to make contact with corresponding elements in the mating connector is the power pins. The last group of pins to make contact with corresponding elements in the mating connector is the signal pins. By connecting the pins in this fashion, the computer network appliance of the invention avoids brown outs, arching across pins and false grounds that can damage components in the computer network appliance.

FIG. **2** is a block diagram of a CPU module **102** in accordance with an embodiment of the invention. The CPU modules **102**(*a*)–**102**(*e*) do not have moving parts and components defining a direct user interface. Each CPU module comprises a microprocessor **202**, memory module **204**, bus management chipset including a Northbridge chip **206**(*a*) and a Southbridge chip **206**(*b*), an ethernet interface chip **208**, hardware BIOS **210** and a hot swap connector **212** mounted on a PCB. A PCI bus header is included for development and debugging purposes. Each CPU module functions as a stand alone computer.

The hardware BIOS **210** configures the CPU module for normal operation and instructs the ethernet interface chip **208** where to look on an NAS for the OS from which to boot. This remote boot capability of the CPU module enables the system administrator to direct the module to boot from a specific OS stored in a predetermined location in the NAS. This, in turn, enables the CPU modules in a network to run different types of OS (e.g., Unix, BSD, Linux, and Solaris) and removes the necessity for a local hard disk drive (HDD). Under management software control, a CPU module may be booted with an OS along with an "image" including several pre-installed applications (user defined quantity) stored in an NAS or a storage area network (SAN). This diskless booting of the CPU module allows the CPU to run different OS's and applications at different times. For example, a CPU module may be booted with a first OS and a first set of applications at one time and with a second OS and a second set of applications at another time. In another embodiment of the invention, different CPU modules operating in the same chassis may be booted with different OS's and different applications. In yet another embodiment of the invention, the same OS, applications and user data of one CPU module may be installed in another CPU module so as to provide for hot swapping of a failed CPU module or for installation of a redundant CPU module. Removal of the local HDD is a feature of the invention that allows hot swapping of the CPU modules without rebooting the system.

Once the OS is loaded on the CPU module and is operational, the health of the CPU module can be monitored using an I2C bus **214** that provides status information about the CPU module to the optional microcontroller module **108** as shown in FIG. **1**. Along with information such as CPU

A35

5

temperature, fan RPM and voltage levels, a watchdog timer is provided in the hardware design to provide a way of determining if the OS is unstable or has crashed. If the OS is unstable or has crashed, then the microcontroller module **108** has the ability to remotely reset the CPU module **102** and log the failure. Such a reset can be configured to take place automatically or manually under the control of the administrator.

The CPU module **102** is configured to remotely boot without user intervention to allow for the removal of unnecessary user interface hardware such as video and standard I/O chipsets. The removal of this hardware and the HDD as described above reduces the complexity of the design and increases the mean time between failure (MTBF) of the hardware while simultaneously lowering the part count (cost) and power consumption of the module. In addition, the network mean time to repair (MTTR) is lowered through the use of the hot swap design and remote OS boot capability of the module because a failed unit can be removed and replaced rather easily and no user interaction is necessitated once a CPU module has been inserted into the chassis. A CPU module can be inserted in any of the bays in the front of the chassis.

Communications to and from each module is made using a standard fast ethernet connection rather than a complicated external bus structure. That is, a single ethernet connection via the hot swap connection of each module allows the module to communicate with other modules connected in the computer network appliance. The pinout of the hot swap connection is limited to ethernet signal path pins, dedicated power and ground pins, and an I2C bus for out-of-band monitoring of the health of the CPU module and remote rebooting of the microprocessor if the OS is determined to be unstable or have crashed. The process of out-of-band monitoring and control of the CPU module is mediated by the microcontroller module **108**. In-band monitoring processes are used to load applications and data and are controlled by direct communications between the management software and the CPU module microprocessor **202**.

As stated above, each CPU module includes a PCI bus header that is provided for debugging and test purposes only. If a CPU module is suspected of being faulty, then it can be removed and plugged into a test fixture that provides video, keyboard, mouse, and HDD access through a cable connection to the PCI bus header. Power and ethernet I/O are accessed through the hot swap connector **212**. In this fashion, the CPU module combined with the test fixture emulates a desktop computer and the CPU module can be debugged accordingly.

Since only a limited number of modules make up the configuration of the computer network appliance, an end user's spare parts inventory is greatly reduced and configuration variability is low. Each module can be easily replaced and does not require a skilled person, and no spare parts need to be inventoried on-site and can be shipped overnight from the supplier. As a result, the computer network appliance MTTR is greatly reduced through the ease of module replacement and the MTBF is high through the simplified design of the CPU module.

A byproduct of using standard fast ethernet as the method of signal I/O for network communications is that heterogeneous CPU modules having different CPU speeds, memory space and bus chipsets may be mounted in the same chassis without affecting the operation of any other CPU module. Specifically, different generations of CPU modules may operate in the same chassis without requiring an update of existing modules.

6

FIG. **3** illustrates an integrated ethernet switch module **110** in accordance with an embodiment of the invention. The ethernet switch module **110** comprises an ethernet switch **302**, EEPROM **304**, buffer memory **306**, ethernet transceivers **308** and a hot swap connector **312** all mounted on a single PCB. In the preferred embodiment of the invention, the ethernet switch **302** is an unmanaged 8-port ethernet switch. The ethernet switch module **110** operates as a traffic cop for data communications in the computer network appliance, allowing each CPU module to communicate with other CPU modules in the same chassis. The ethernet switch module **110** further includes cooling fans **314** mounted to the rear of the PCB; the cooling fans **314** operate to draw heated air out of the chassis.

Once the ethernet switch module **110** is inserted into the rear of the chassis **150**, it connects to the passive backplane board **104** via the hot swap connector **124**(*h*) to derive power, establish ground and establish all ethernet connections within the computer network appliance. The ethernet switch module **110** is secured to the chassis using thumb screws **316** mounted on the 1RU panel. The ethernet switch module **110** is designed such that if a failure occurs, then the module can be quickly replaced without disconnecting any signal or power cables, thus attaining a low MTTR and allowing the use of less skilled maintenance personnel.

A function of the ethernet switch module **110** is to filter out inappropriate signal traffic so as to limit collisions caused by signal traffic in the computer network appliance. Communications between CPU modules in the same chassis occur without disruption to signal traffic between other CPU modules and the network and does not add to the overall level of network traffic. As a result, the efficiency of the signal bandwidth is increased without sacrificing performance or network cost.

Moreover, the application servers are not signal I/O limited and this allows all network traffic with the computer network appliance to be multiplexed over a switched fast ethernet (up to three connections) and does not require a direct ethernet connection between each CPU module and other modules in the computer network appliance. Consequently, the amount of external wiring required to connect the CPU modules to the computer network appliance is greatly reduced by integrating the switch into the design of the network server appliance. The use of multiple switched ethernet connections permits the computer network appliance to operate with different topologies or software configurations without additional hardware. Since five of the eight switched ethernet ports are dedicated to the five CPU module connections, a typical network connection would dedicate the remaining three ports to a mixture of NAS, network data I/O and an in-band appliance management channel.

FIG. **4** illustrates the power module **106** in accordance with an embodiment of the invention. The power module **106** comprises dual DC—DC converters **402** mounted on a 1RU panel of a printed circuit board, a hot swap connector **404**, cooling fans **406** and thumb screws **410**. The DC—DC converters **402** perform direct conversion of a facility DC voltage (48V) to voltages required for normal operation of the modules that make up the computer network appliance. The hot swap connector **404** operates to draw facility voltage and supply operational voltages to the passive backplane board **104**. The cooling fans **406** operate to draw air out of the chassis across the cooling fins of the heat sinks on the DC—DC converters **402**.

Once the power module **106** is inserted into the rear of the chassis, it connects to the passive backplane board **104** via

7

the hot swap connector **124**(*f*) to derive facility DC power, establish ground and generate all operational voltages used by the other modules in the computer network appliance. The hot swap connector **404** includes an I2C bus **408** that is used to monitor the health of the power module. The power module is secured to the chassis using thumb screws **410**. The power module is designed such that if a failure occurs, then the power module can be quickly replaced without disconnecting any power cables in the computer network appliance. As a result, the MTTR is lowered and less skilled maintenance personnel may be used.

In typical commercial electronics designs, the portion of the design having the lowest MTBF is the switched power supply. A common practice to overcome this drawback to increase the MTBF is to include redundant power supplies in a design so that if one power supply fails, then the redundant unit automatically backs it up. Because typical commercial electronics power supplies run on alternating current (AC) power, the battery backup system must convert power from its normal direct current (DC) state to AC using power inverters. Power inverters, however, are inefficient because of their fundamental operation (generator hysteresis) in converting power from DC to AC. Power inverters are also expensive and do not scale well should additional power capacity is required. Thus, designing an appliance using DC—DC converters instead of a switched AC power supply would allow an appliance to accept DC power directly from the battery backup source and negate the need for power inverters. That is, an appliance using DC—DC converters alone would not require use of expensive power inverters and increase the overall efficiency of the battery backup system. Another compelling reason to use DC—DC converters in a commercial electronics design is the MTBF of a DC—DC converter is much greater than that of a switched power supply. A DC—DC converter is also more efficient than a power supply in converting the input voltage to the desired operational voltages, which means that the appliance will use less power and generate less heat than a power supply.

FIG. **5** illustrates a microcontroller module **108** in accordance with an embodiment of the invention. The microcontroller module **108** is optional and is not required for normal operation; the microcontroller module **108** is employed for monitoring out-of-band communications and for controlling the computer network appliance modules. The microcontroller module **108** comprises a stand-alone microprocessor **502** running an embedded OS, flash RAM **504** including the OS and application software, a dedicated ethernet chip **506** providing connection to the network, an I2C bus chipset **508**, a hot swap connector **510** and thumb screws **512**.

Once the microcontroller module is inserted into the rear of the chassis, it connects to the passive backplane board **104** via the hot swap connector **124**(*g*) to derive power, establish ground and establish ethernet connection with the computer network appliance. The microcontroller module **108** is secured to the chassis using thumb screws **512** mounted on a 1RU at the rear of the module. The microcontroller module is designed such that if a failure occurs, then the microcontroller module can be quickly replaced without disconnecting any signal or power cables so as to attain a low MTTR and to use less skilled maintenance personnel.

The microcontroller module uses a dedicated ethernet path separate from the network data I/O to remotely poll the health of the power module **106**, the ethernet switch module **108** and the CPU modules **102**(*a*)–**102**(*e*). The microcontroller module communicates with other modules using an I2C bus that gathers status information, logs the results and

8

provides the log to the management software either actively (should a failure is detected) or as part of a routine poll. The microcontroller module **108** also gathers information relating to the voltage levels, CPU temperatures, fan RPMs and CPU module OS stability. In addition, the microcontroller module has the ability to perform a remote reset of a CPU module if the OS of the module is determined to be unstable or have crashed. If the integrated ethernet switch fails, then the dedicated ethernet path may still be able to pinpoint the failure and differentiate the failure of the switch from an overall failure of the chassis. The dedicated ethernet path further informs the system administrator of the failure so as to facilitate a timely fix of the switch or a module on the computer network appliance.

FIG. **6** illustrates a system **600** integrating a computer network appliance, a data storage device and standard internet access hardware. The system **600** comprises a router **602**, a computer network appliance **604** connected to the router **602** via a fast ethernet connection **606**, network database **608** connected to the computer network appliance **604** via a fast ethernet connection **610**, and internet backbone **612**. Data switching is performed in the computer network appliance **604**. This simplistic representation provides a framework for more sophisticated forms of clustering configurations based upon specific design criteria, such as availability and fault tolerance.

FIG. **7** illustrates a system **700** integrating multiple computer network appliances, a storage device and redundant internet access hardware. The system **700** comprises a plurality of routers **702**, a plurality of redundant switches **704**, a plurality or cluster of computer network appliances **706**, NAS **708** and internet backbone **710**. Routers **702**, computer network appliances **706** and NAS **708** are connected to redundant switches **704** by fast ethernet connection **712**. A feature of system **700** is the system layer remains flat in that access to the routers, network appliances and NAS are all wired through the redundant switches **704**. The system **700** provides a simple and easy to install/maintain framework for redundant network cabling by minimizing the amount of equipment external to the cluster of computer network appliances. In order to handle the increased traffic associated with the large number of servers in the cluster of computer network appliances, redundant gigabit ethernet paths **714** are introduced to connect internet backbone **710** and redundant switches **704** to redundant routers **702** as illustrated in FIG. **7**.

Alternate forms of configurations can be generated to add other requirements to the system such as high availability and database security. FIG. **8** illustrates a system **800** providing path redundancy and equipment redundancy to achieve high availability. The system **800** comprises **800** a plurality of routers **802**, a plurality of redundant switches **804**, a plurality of cluster computer network appliances **806**, a firewall **808**, NAS **810** and internet backbone **812**. Redundant switches **804** and firewall **808** are connected to cluster computer network appliances **806** by fast ethernet connection **814**. Firewall **808** secures NAS **810** from direct access of internet connection by accepting only secure connections. The increased traffic associated with the large number of servers in the cluster of computer network appliances is addressed by introducing redundant gigabit ethernet paths **816** as the front-end connection between internet backbone **812** and redundant routers **802** and between redundant routers **802** and redundant switches **804**, and as the back-end connection between firewall **808** and NAS **810**.

9

10

What is claimed is:

1. A computer network appliance, comprising:

a plurality of hot-swappable CPU modules, wherein each CPU module is a stand-alone independently-functioning computer;

a hot-swappable power module;

a hot-swappable ethernet switch module; and

a backplane board having a plurality of hot swap mating connectors,

wherein the at least one backplane board interconnects each of the CPU modules with the at least one power module and the at least one ethernet switch module, such that the at least one power module and the at least one ethernet switch module can be used as a shared resource by the plurality of CPU modules.

2. The computer network appliance of claim 1, further comprising a chassis providing physical support for a CPU module, the power module, the ethernet switch module and the backplane board.

3. The computer network appliance of claim 2, wherein the chassis comprises caddies providing air flow from the front to the rear of the chassis.

4. The computer network appliance of claim 2, wherein the chassis comprises bays and slot guides to facilitate mounting and removal of the modules and to ensure proper alignment between hot swap connectors of the modules and the hot swap mating connectors of the backplane board.

5. The computer network appliance of claim 2, wherein the modules and the chassis are free of on/off switches.

6. The computer network appliance of claim 1, further comprising a power connector and a data input/output connector.

7. The computer network appliance of claim 6, wherein the data input/output connector is a standard ethernet connector allowing heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other.

8. The computer network appliance of claim 1, wherein each of the hot swap connectors of the modules comprises pin connections arranged in a specific pattern and includes ground pins, pre-charge power pins, power pins and signal pins.

9. The computer network appliance of claim 8, wherein the ground pins of a hot swap connector of a module make contact with corresponding ground elements of a hot swap mating connector of the backplane board.

10. The computer network appliance of claim 9, wherein pre-charge power pins of the hot swap connector of the module make contact with corresponding pre-charge power elements of the hot swap mating connector of the backplane board after the ground pins have made contact.

11. The computer network appliance of claim 10, wherein the power pins of the hot swap connector of the module make contact with corresponding power elements of the hot swap mating connector of the backplane board after the pre-charge power pins have made contact.

12. The computer network appliance of claim 11, wherein signal pins of the hot swap connector of the module make contact with corresponding signal elements of the hot swap mating connector of the backplane board after the power pins have made contact.

13. The computer network appliance of claim 1, wherein a CPU module operates as a stand alone computer.

14. The computer network appliance of claim 1, wherein a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot.

15. The computer network appliance of claim 1, wherein a CPU module is configured to boot remotely from an OS located in an NAS, and wherein the computer network appliance is free of a local hard disk drive (HDD).

16. The computer network appliance of claim 15, wherein remote booting of a CPU module allows the CPU module to run different types of operating systems.

17. The computer network appliance of claim 15, wherein effects of a lack of a local HDD include increased mean time between failure (MTBF) and decreased mean time to repair (MTTR) of the computer network appliance.

18. The computer network appliance of claim 1, wherein each of a plurality of hot swap connectors of the modules includes an ethernet connection providing communications to all modules attached to the backplane board.

19. The computer network appliance of claim 18, wherein an ethernet connection is a switched fast ethernet connection.

20. A computer network appliance comprising:

a hot-swappable CPU module;

a hot-swappable power module;

a hot-swappable ethernet switch module; and

a backplane board having a plurality of hot swap mating connectors; and

a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path is separate from a switched fast ethernet connection and provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module;

wherein each of the CPU module, the power module and the ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board.

21. The computer network appliance of claim 20, wherein the dedicated ethernet path is an I2C bus.

22. The computer network appliance of claim 20, wherein the microcontroller module polls the CPU module on the status of an OS.

23. The computer network appliance of claim 22, wherein the microcontroller module performs a remote reset of the CPU module if the OS of the CPU module is determined to be unstable or have crashed.

24. A computer network appliance, comprising:

a hot-swappable CPU module;

a hot-swappable power module;

a hot-swappable ethernet switch module; and

a backplane board having a plurality of hot swap mating connectors;

wherein each of the CPU module, the power module and the ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board;

wherein the ethernet switch module filters communications internal and external to the computer network appliance to limit collisions caused by communications traffic.

25. The computer network appliance of claim 18, wherein different software configurations are used in CPU modules free of additional hardware.

26. The computer network appliance of claim 1, wherein the power module comprises dual DC—DC converters performing direct conversion of a facility DC voltage to voltages required for normal operation in the modules.

27. The computer network appliance of claim 26, wherein the DC—DC converters allow the modules to accept DC power directly from a battery backup source free of power inverters.

US 6,948,021 B2

11

**28**. The computer network appliance of claim **26**, wherein effects of using the DC—DC converters in the power module include increased MTBF and decreased MTTR in the computer network appliance as compared to a similar computer network appliance using a switched power supply.

**29**. The computer network appliance of claim **26**, wherein the computer network appliance uses less power and generates less heat due to the use of the DC—DC converters in the power module as compared to a similar computer network appliance using a switched power supply.

**30**. A method of mounting a plurality of hot-swappable CPU modules in a computer network appliance, wherein each CPU module is an independently-functioning stand-alone computer, each CPU module comprising a hot swap connector including ground pins, power pins and signal pins, the computer network appliance including a backplane board having hot swap mating connectors, the method comprising:

connecting the ground pins of the hot swap connector with corresponding ground elements of a hot swap mating connector of the backplane board;

connecting the power pins of the hot swap connector with corresponding power elements of the hot swap mating connector of the backplane board after the ground pins have made contact; and

connecting the signal pins of the hot swap connector of the module with corresponding signal elements of the hot swap mating connector of the backplane board after the power pins have made contact;

wherein a backplane board interconnects each of the CPU modules with the ground elements, power elements, and signal elements, such that the power module and the ethernet switch module can be used as a shared resource by the plurality of CPU modules.

**31**. The method of claim **30**, wherein connecting the ground pins first and the signal pins last reduce brown outs in the computer network appliance.

**32**. A method of interconnecting a plurality of hot swapping CPU modules in a computer network appliance, wherein each CPU module is an independently-functioning computer, comprising (1) a chassis having a plurality of bays for different modules, (2) a backplane board having a plurality of mating connectors, (3) a power connector and (4) a data input/output connector, the method comprising:

placing a module having a hot swap connector in a corresponding bay of the chassis; and

inserting the module into the chassis by connecting the hot swap connector with a mating connector of the backplane board,

wherein the power connector and the data input/output connector remain connected in the computer network appliance during mounting of the module such that the power connector and the data input/output connector can be used as a shared resource by the plurality of CPU modules.

**33**. The method of claim **32**, further comprising removing the module from the chassis by disconnecting the hot swap connector from the mating connector of the backplane board, wherein the power connector and the data input/output connector remain connected in the computer network appliance during removal of the module.

**34**. The method of claim **30**, further comprising remotely booting a CPU module in a computer network appliance, comprising:

locating an OS in an NAS to boot the CPU module; and

remotely booting the CPU module using the located OS;

wherein the computer network appliance is free of a local HDD in remotely booting the CPU module.

**35**. The method of claim **34**, wherein the remote booting of the CPU module allows the CPU module to run different types of operating systems.

**36**. The method of claim **34**, wherein effects of a lack of a local HDD include increased MTBF and decreased MTTR of the computer network appliance.

*    *    *    *    *

**A39**

## CERTIFICATE OF FILING AND SERVICE

I certify that today, June 1, 2015, the foregoing **BRIEF OF APPELLANT** was filed with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system.  I further certify that the foregoing was served on Appellant's counsel by means of email as well as by the Court's CM/ECF system, which should have sent a Notice of Docket Activity to:

Norman Andrew Crain (andrew.crain@thomashorstmeyer.com)
Kenneth Anthony Knox (kenny.knox@thomashorstmeyer.com)
Robert Duncan Gravois (robert.gravois@thomashorstmeyer.com)

THOMAS HORSTEMEYER, LLP
400 Interstate North Parkway SE
Suite 1500
Atlanta, GA 30339
(770) 933-9500

Upon acceptance by the Court of the e-filed document, six (6) paper copies will be filed with the Court within the time provided in the Court's rules.


Dated: June 1, 2015

                                        _____/s/ Kevin Meek_____
                                                  Kevin Meek

                                        BAKER BOTTS L.L.P.
                                        98 San Jacinto Blvd.
                                        Suite 1500
                                        Austin, TX 78701
                                        (512) 322-2500

                                        *Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Federal Circuit Rule 32(b).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B) and Fed. Cir. R. 32(b), the brief contains 6,838 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: June 1, 2015

                            /s/ Kevin Meek
                            Kevin Meek

                    BAKER BOTTS L.L.P.
                    98 San Jacinto Blvd.
                    Suite 1500
                    Austin, TX 78701
                    (512) 322-2500

                    *Attorney for Appellant*