No. 15-1513

# United States Court of Appeals
# For the Federal Circuit

DELL INC., *Appellant*

v.

ACCELERON, LLC, *Cross-Appellant*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, IPR2013-00440

## CORRECTED JOINT APPENDIX

Kevin Meek
(kevin.meek@bakerbotts.com)
Paula Heyman
(paula.heyman@bakerbotts.com)
Brett Thompsen
(brett.thompsen@bakerbotts.com)
Catherine Garza
(cat.garza@bakerbotts.com)

BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Suite 1500
Austin, TX 78701
(512) 322-2500

*Attorneys for Appellant*

N. Andrew Crain
(andrew.crain@thomashorstemeyer.com)
Robert D. Gravois
(robert.gravois@thomashorstemeyer.com)
Kenneth A. Knox
(kenny.knox@thomashorstmeyer.com)

THOMAS | HORSTEMEYER LLP
400 Interstate North Parkway SE
Suite 1500
Atlanta, GA 30339
(770) 933-9500

*Attorneys for Cross-Appellant*

# TABLE OF CONTENTS

No. 15-1513

| Docket No. | Document | Page |
|---|---|---|
| 41 | Final Written Decision of the United States Patent and Trademark Office Patent Trial and Appeal Board filed December 22, 2014 | A1 |
| 1001 | U.S. Patent No. 6,948,021 by Joel Derrico et al. | A28 |
| -- | Certified List | A40 |
| 1 | Excerpt of Petition for *Inter Partes* Review | A73 |
| 7 | Corrected Petition for *Inter Partes* Review | A97 |
| 10 | Excerpts of Decision—Institution of *Inter Partes* Review | A150 |
| 23 | Excerpts of Patent Owner Response and Opposition to Petition | A174 |
| 28 | Excerpts of Petitioner's Reply to Patent Owner's Response | A234 |
| 40 | Excerpts of Oral Hearing Transcript | A327 |
| 1004 | U.S. Patent No. 6,757,748 by Christopher G. Hipp | A449 |
| 1007 | U.S. Patent No. 6,157,974 by Frank Gasparik | A473 |
| 1015 | Excerpts of Preboot Execution Environment (PXE) Specification v2.1, published Sept. 20, 1999 | A535 |
| 1017 | Excerpts of Plaintiff's Opening Brief Regarding Claim Construction in Acceleron, LLC v. Hewlett-Packard Co. et al., 1:10-cv-00128-SLR (D. Del.) | A645 |
| 1018 | Excerpts of Declaration of Robert Horst, Ph. D. (Ex. 1018) | A685 |
| 1030 | Excerpts of Linux Remote—Boot mini—HOWTO: Configuring Remote-Boot Workstations with Linux, DOS, Windows 95/98 and Windows NT v3.19, by Marc Vuilleumier Stückelberg & David Clerc, February 1999 (Ex. 1030) | A1018 |
| 1037 | Excerpts of Deposition Transcript of William Putnam (Ex. 1037) | A1165 |
| 1038 | Excerpts of Deposition Transcript of Robert Horst, Ph. D. (Ex. 1038) | A1414 |
| 2001 | Excerpts of Declaration of William Putnam (Ex. 2001) | A1736 |
| 2004 | Various Examples Depicting Caddy Products (Ex. 2004) | A2094 |

| Docket No. | Document | Page |
|---|---|---|
| 2005 | Excerpts of Dell PowerEdge M620 Systems (Ex. 2005) | A2112 |
| -- | Email re: Conference Call Request | A2256 |
| -- | *SRI Int'l, Inc. v. Dell Inc.*, 2015 U.S. Dist. LEXIS 63022 (D. Del. 2015) | A2258 |
| -- | *Corning Inc. v. DSM IP Assets B.V.*, IPR2013-00048 (PTAB May 9, 2014) (Paper 94) | A2263 |
| -- | *Facebook, Inc. v. Software Rights Archive, LLC*, IPR2013-00478 (PTAB Feb. 2, 2015) (Paper 58) | A2341 |
| -- | *Level 3 Comm's, LLC v. AIP Acquisition LLC*, IPR2013-00296 (PTAB Oct. 8, 2014) (Paper 42) | A2383 |

Trials@uspto.gov
Tel: 571-272-7822

Paper 41
Entered:  December 22, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

DELL INC.,
Petitioner,

v.

ACCELERON, LLC,
Patent Owner.

————————————

Case IPR2013-00440
Patent 6,948,021 B2

————————————

Before THOMAS L. GIANNETTI, TRENTON A. WARD, and
JEREMY M. PLENZLER, *Administrative Patent Judges*.

PLENZLER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
35 U.S.C. § 318(a) and 37 C.F.R. § 42.73

IPR2013-00440
Patent 6,948,021 B2

# I.    INTRODUCTION

## A. Background

Dell Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–4, 6–20, 22–24, 30, and 34–36 of U.S. Patent No. 6,948,021 B2 (Ex. 1001, "the '021 patent"). Paper 7 ("Pet."). The Petition was accompanied by an expert declaration from Robert Horst, Ph.D. Ex. 1018 ("the Horst Declaration"). Acceleron, LLC ("Patent Owner") did not file a Preliminary Response. We granted the Petition and instituted trial on the following grounds: (1) anticipation of claims 1–4, 6–9, and 13–20 by Hipp[1]; and (2) obviousness of claims 10–12, 30, and 34–36 over Hipp and Gasparik.[2] Paper 10 ("Dec. on Inst."). Trial was not instituted for claims 22–24. Dec. on Inst. 3, 11–13, 17.

During trial, Patent Owner filed a Patent Owner Response (Paper 23, "PO Resp."), which was accompanied by an expert declaration from William Putnam (Ex. 2001, "the Putnam Declaration"). Petitioner filed a Reply to the Patent Owner Response. Paper 28 ("Pet. Reply"). Patent Owner and Petitioner each filed a Motion to Exclude Evidence. Papers 29, 32. An oral hearing was held on September 4, 2014. A transcript of the hearing has been entered into the record. Paper 40 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a).

We determine that Petitioner has shown by a preponderance of the evidence that claims 1–4, 6–13, 18–20, and 30 of the '021 patent are unpatentable. We further determine that Petitioner has not shown, by a

---

[1] U.S. Patent No. 6,757,748 B1, issued June 29, 2004 (Ex. 1004, "Hipp").
[2] U.S. Patent No. 6,157,974, issued Dec. 5, 2000 (Ex. 1007, "Gasparik").

IPR2013-00440
Patent 6,948,021 B2

preponderance of the evidence, that claims 14–17 and 34–36 are
unpatentable.

### B. Related Proceedings

The '021 patent is involved in district court litigation: *Acceleron, LLC
v. Hitachi Data Systems Corp.*, Case No. 1:12-cv-02996 (N.D. Ga.); and
*Acceleron, LLC v. Dell, Inc.*, Case No. 1:12-cv-04123 (N.D. Ga.).  Pet. 2.

### C. The '021 Patent

The '021 patent is titled "Cluster Component Network Appliance
System and Method for Enhancing Fault Tolerance and Hot-Swapping," and
generally relates to a computer network appliance including CPU modules, a
power module, and an Ethernet switch module having hot-swappable
connectors corresponding to mating hot swap connectors on a backplane
board.  Ex. 1001, 3:18–23.  The '021 patent describes a computer network
appliance that allows replacement of the various modules via hot swap
connectors in order to reduce the mean time to repair the computer network
appliance.  *Id.* at 5:53–59.

Figure 1 of the '021 patent, reproduced below, illustrates computer
network appliance 100.

IPR2013-00440
Patent 6,948,021 B2



FIG.1

Figure 1 is a schematic illustration of a computer network appliance. As shown above in Figure 1 of the '021 patent, computer network appliance 100 includes CPU modules 102(a)–(e), power module 106, microcontroller module 108, and Ethernet switch module 110 connected to the backplane 104 via hot swap connectors. *Id.* at 3:18–23, 32–37.

The '021 patent describes the CPU modules as each functioning as a stand-alone computer. *Id.* at 4:34–35. Each CPU module in the '021 patent includes "a microprocessor 202, memory module 204, bus management chipset including a Northbridge chip 206(a) and a Southbridge chip 206(b), an ethernet interface chip 208, hardware BIOS 210 and a hot swap connector 212 mounted on a PCB." *Id.* at 4:29–33. Hardware BIOS 210 for each CPU module provides remote boot capability, enabling the CPU modules to run different types of operating systems. *Id.* at 4:36–44. Different CPU

4

modules operating in the same chassis may be booted with different operating systems and different applications. *Id*. at 4:54–56.

The "health" of each CPU module can be monitored by a microcontroller, so that the CPU modules can be reset remotely in the event of an operating system instability or crash. *Id*. at 4:64–5:6.

### D. Illustrative Claims

Of challenged claims 1–4, 6–20, 30, and 34–36, claims 1, 20, and 30 are independent. Claims 2–4 and 6–19 depend from claim 1, and claims 34–36 depend from claim 30. Claims 1 and 20 illustrate the claimed subject matter, and are reproduced below:

> 1. A computer network appliance, comprising:
>
> a plurality of hot-swappable CPU modules, wherein each CPU module is a stand-alone independently-functioning computer;
>
> a hot-swappable power module;
>
> a hot-swappable ethernet switch module; and
>
> a backplane board having a plurality of hot swap mating connectors, wherein the at least one backplane board interconnects each of the CPU modules with the at least one power module and the at least one ethernet switch module, such that the at least one power module and the at least one ethernet switch module can be used as a shared resource by the plurality of CPU modules.

*Id*. at 9:2–15.

> 20. A computer network appliance comprising:
>
> a hot-swappable CPU module;
>
> a hot-swappable power module;
>
> a hot-swappable ethernet switch module; and

IPR2013-00440
Patent 6,948,021 B2

> a backplane board having a plurality of hot swap mating connectors; and
>
> a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path is separate from a switched fast ethernet connection and provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module;
>
> wherein each of the CPU module, the power module and the ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board.

*Id.* at 10:18–33.

## II.    ANALYSIS

For the challenged claims, Petitioner must prove unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). We begin with a claim construction analysis, and then follow with specific analysis of the prior art.

### A. *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable interpretation in light of the specification in which they appear and the understanding of others skilled in the relevant art. 37 C.F.R. § 42.100(b). Applying that standard, we interpret the claim terms of the '021 patent according to their ordinary and customary meaning in the context of the patent's written description. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

After considering the various claim constructions proposed by both Petitioner and Patent Owner, we conclude that no term requires an express

6

IPR2013-00440
Patent 6,948,021 B2

construction in order to conduct properly our analysis of the prior art. For example, Patent Owner only offers express constructions for the terms "caddies" and "bays" (PO Resp. 12–15), and Petitioner accepts these constructions (Pet. Reply 3-5; Tr. 17:16–18:6, 23:24–24:18), which we adopt for this decision. Petitioner's proposed constructions (Pet. 6–11) of terms other than "caddies" or "bays" are not material to our decision. Only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

### B. Anticipation by Hipp

We have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers. We are persuaded, by a preponderance of the evidence, that claims 1–4, 6–9, 13, and 18–20 are anticipated by Hipp under 35 U.SC. § 102, but are not persuaded that claims 14–17 are anticipated by Hipp.

### 1. Claim 1

Claim 1 is directed to a computer network appliance including "hot-swappable CPU modules," "a hot-swappable power module," and "a hot-swappable ethernet switch module," with a "backplane board interconnect[ing] each of the CPU modules with the at least one power module and the at least one ethernet switch module." Petitioner contends that Hipp discloses each element of claim 1. Pet. 14–16. We have reviewed and are persuaded by Petitioner's contentions regarding the disclosure of Hipp. For example, Hipp describes web server processing cards 32, network interface card 48, and power supply 280 (Ex. 1004, 2:56–58, 3:54–64, 6:48–53, 8:6–10, 12:37–50, 16:62–64 , 18:48–51), which Petitioner contends

7

correspond to the hot-swappable CPU modules, hot-swappable power module, and hot-swappable Ethernet switch module, respectively, recited in claim 1 (Pet. 14–15). Hipp additionally describes midplane 34 as "includ[ing] a plurality of web server processing card connectors 276 which facilitate the installation of up to twenty-four web server processing cards 32" (Ex. 1004, 15:34–37), "distribut[ing] data and/or communications signals between web server processing cards 32 and network interface cards 40, 48 and 68" (*id.* at 15:54–57), and "distribut[ing] power to components of web server processing cards 32 and network interface cards 40, 48 and 68" (*id.* at 15:52–54), which Petitioner contends corresponds to the backplane board recited in claim 1 (Pet. 15–16).

Patent Owner does not dispute Petitioner's contentions regarding Hipp's disclosure of the individual modules or the backplane board recited in claim 1. Patent Owner, instead, contends that Hipp fails to disclose the claimed interconnectivity between the Ethernet switch module and the CPU modules provided by the backplane board. *See* PO Resp. 15–23. Specifically, Patent Owner contends that "*Hipp* fails to disclose, either explicitly or inherently, that the passive midplane 34 interconnects **_each_** web server processing card 32 to a single network interface card 48 such that the same network interface card 48 can be used as a shared resource for all web server processing cards 32." PO Resp. 17. Petitioner responds that the "plurality of hot-swappable CPU modules" recited in the claim only requires two or more CPU modules, and that "the CPU modules" recited later in the claim refers back to the "plurality of hot-swappable CPU modules" (i.e., the two or more CPU modules). Pet. Reply 1-2. For the reasons that follow, we agree with Petitioner.

IPR2013-00440
Patent 6,948,021 B2

Patent Owner acknowledged at oral hearing that "plurality" means two or more. Tr. 66:2–4. Yet, Patent Owner argues that Hipp fails to disclose the "backplane board interconnect[ing] each of the CPU modules with the at least one power module and the at least one ethernet switch module" recited in claim 1 because "the passive midplane 34 disclosed by Hipp interconnects _**only a limited subset**_ of the web server processing cards 32 to a particular network interface card 48, while the passive midplane 34 interconnects the remainder of the web server processing cards 32 to a different network interface card 48." PO Resp. 17.

The "at least one backplane board interconnect[ing] each of the CPU modules with the at least one power module and the at least one ethernet switch module" recited in claim 1 only requires a backplane board interconnecting two or more hot-swappable CPU modules (i.e., the plurality of CPU modules) with the power and Ethernet switch modules. Patent Owner acknowledges that Hipp meets this construction of claim 1. For example, Patent Owner notes that in Hipp, "each network interface card 48 is connected through the passive midplane 34 to only _**twelve**_ web server processing cards 32 each." PO Resp. 18–19. The twelve web server processing cards in Hipp are the plurality (i.e., at least two) of hot-swappable CPU modules recited in claim 1. Therefore, the interconnection between the twelve web server processing cards (i.e., each of the plurality) and the network interface card via the passive midplane in Hipp also meets the "backplane board interconnect[ing] each of the CPU modules with the at least one power module and the at least one ethernet switch module" recitation in claim 1.

9

IPR2013-00440
Patent 6,948,021 B2

For the reasons set forth above, Petitioner has established, by a preponderance of the evidence, that claim 1 is anticipated by Hipp.

### 2. *Claims 2, 6, 8, 9, 13, 18, and 19*

Claims 2, 6, 8, 9, 13, 18, and 19 depend from claim 1. Petitioner identifies portions of Hipp teaching each of the limitations of these claims. Pet. 16, 18–21, 23–25. For example, Petitioner contends that Hipp's server chassis 38 corresponds to the "chassis providing physical support for a CPU module, the power module, the ethernet switch module and the backplane board" recited in claim 2. Pet. 16–17 (citing (Ex. 1004, 7:64–67). Petitioner further contends that Hipp's power supplies 280 including power connectors, shown in Figure 12, and standard RJ-45 connectors correspond to the power connector and data input/output connector, respectively, recited in claim 6. Pet. 18 (citing Ex. 1004, 12:37–45, 16:64–66, 18:39–42; Ex. 1018 ¶¶ 52, 56. Patent Owner does not dispute Petitioner's contentions regarding these claims. Tr. 86:9–12. We have reviewed the cited portions of Hipp and are persuaded by Petitioner's contentions.

Accordingly, we determine that Petitioner has established, based on a preponderance of the evidence, that claims 2, 6, 8, 9, 13, 18, and 19 are anticipated by Hipp.

### 3. *Claim 3*

Claim 3 ultimately depends from claim 1 and recites that "the chassis comprises caddies providing air flow from the front to the rear of the chassis." Patent Owner contends that a caddy is a "carrier for a module" (PO Resp. 14), and Petitioner agrees with this definition (Pet. Reply 3–5; Tr. 17:16–18:6). Hipp describes mounting mechanisms 278 (Ex. 1004, 16:62–64), which Petitioner contends correspond to the caddies recited in

10

IPR2013-00440
Patent 6,948,021 B2

claim 3 (Pet. Reply 5). Specifically, Hipp explains that "[s]erver chassis 38 includes two power supply mounting mechanisms 278, which facilitate the installation of two load-balance, hot-swappable power supplies 280." Ex. 1004, 16:62–64.

Patent Owner contends that "*Hipp* fails to disclose any structure that is a carrier for a module." PO Resp. 24. Although Patent Owner did not address mounting mechanisms 278 specifically in its Response, it did address them during the oral hearing. *See* Tr. 75:16–76:15. Patent Owner contends that Hipp's power supply mechanisms 278 are not caddies because "[t]hey are the connectors, where the power supply module plugs into on the midplane board." *Id.* at 76:9–10. We are not persuaded by Patent Owner's contentions.

Based on our review of Hipp, we are persuaded by Petitioner's contention that Figure 12 of Hipp illustrates slides that allow the power supply modules to be inserted and removed, and also provide spacing between power supplies 280 and the bottom of chassis 38 to allow air flow along power supplies 280. Tr. 22:3–19; Ex. 1004, Fig. 12. Hipp's slides provide carriers for power supply modules, as required by Patent Owner's construction of caddy, and "provid[e] air flow from the front to the rear of the chassis," as recited by claim 3. Patent Owner's argument that we should not consider this characterization of Hipp because it was raised for the first time at oral hearing is unpersuasive. Petitioner clearly pointed to this structure in the Petitioner's Reply (*see* Pet. Reply 5, identifying Hipp's structure in Figure 12 facilitating installation of hot-swappable power supplies 280 including power supply mounting mechanisms 278 as corresponding to the claimed caddies).

11

IPR2013-00440
Patent 6,948,021 B2

For the reasons set forth above, Petitioner has established, based on a preponderance of the evidence, that claim 3 is anticipated by Hipp.

### 4. Claim 4

Claim 4 ultimately depends from claim 1 and recites that "the chassis comprises bays and slot guides to facilitate mounting and removal of the modules and to ensure proper alignment between hot swap connectors of the modules and the hot swap mating connectors of the backplane board." Patent Owner contends that a bay is "a structure defining a space that receives a module" (PO Resp. 14), and Petitioner agrees with this definition (Tr. 23:24–24:18). Petitioner contends that Hipp discloses the limitations of claim 4. We have reviewed, and are persuaded by, Petitioner's contentions. For example, Petitioner asserts that the bays recited in claim 4 are met in Hipp by the structure defining a space at the front of chassis 38 that receives web server processing cards 32, and the structure defining a space at the back of chassis 38 receiving power supplies 280 and network interface cards 48 shown in Figures 10–12 of Hipp. Pet. 18; Pet. Reply 7.

Patent Owner contends that "it is unreasonable to consider arbitrary areas within the chassis 38 of *Hipp* to be 'bays'" (PO Resp. 31), but does not dispute Petitioner's contentions regarding the "slot guides" recited in claim 4 (*see id.* at 28-31). We are not persuaded by Patent Owner's argument. As noted above, Patent Owner's construction of "bays" simply requires "a structure defining a space that receives a module." The structure in Hipp identified by Petitioner, and discussed above, defines a space that receives a module (power supplies and network interface cards) as required by Patent Owner's construction. Patent Owner offers no persuasive explanation as to why Hipp's chassis 38 fails to provide this structure.

IPR2013-00440
Patent 6,948,021 B2

Accordingly, we conclude that Petitioner has established, based on a preponderance of the evidence, that claim 4 is anticipated by Hipp.

5. *Claim 7*

Claim 7 ultimately depends from claim 1 and recites that "the data input/output connector is a standard ethernet connector allowing heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other." Petitioner contends that Hipp discloses the limitations of claim 7. Pet. 19; Pet. Reply 8–9. We have reviewed, and are persuaded by, Petitioner's contentions. For example, Hipp explains that "[s]witch chip 145 monitors and distributes traffic from a respective web server processing card 32 to a corresponding RJ-45 Ethernet connector 144 through an Ethernet communication link 143" (Ex. 1004, 12:47–50), which Petitioner contends discloses the "standard ethernet connector" recited in claim 7 (Pet. 19).

Patent Owner does not dispute that Hipp discloses a "standard ethernet connector," but contends that Hipp does not anticipate claim 7 because it does not disclose heterogeneous CPU modules mounted at the same time. PO Resp. 32–33. We are not persuaded by Patent Owner's argument because it is not commensurate with the scope of claim 7. We agree with Petitioner that claim 7 does not require heterogeneous CPU modules mounted to the same chassis at the same time. *See* Pet. Reply 8. Rather, claim 7 requires "a standard ethernet connector *allowing* heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other" (emphasis added). Patent Owner does not identify, and we do not find, anything in the specification of the '021 patent imposing a requirement that heterogeneous CPU modules of

13

**A13**

differing CPU architectures must be mounted on the same chassis at the same time.

The '021 patent explains that "[a] byproduct of using a standard fast ethernet . . . is that heterogenous CPU modules . . . may be mounted in the same chassis without affecting the operation of any other CPU module." Ex. 1001, 5:60–64. Hipp explains that "many central processing units with comparable processing power to a 500 MHz, Pentium III . . . may be used within the teachings of the present invention," such as "the Crusoe TM 3200 with speeds in the range of 300-400 MHz, or TM 5400 with speeds in the range of 500-700 MHz." Ex. 1004, 8:16–22. Patent Owner offers no persuasive explanation as to why Hipp's Ethernet connector would not allow "heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other."

Accordingly, Petitioner has established, based on a preponderance of the evidence, that Hipp discloses the limitations of claim 7.

### 6. *Claim 14*

Claim 14 depends from claim 1 and recites that "a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot." Patent Owner responds that "*Hipp* fails to disclose, either explicitly or inherently, at least the claim element 'instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot,' as recited in claim 14." PO Resp. 34.

Petitioner contends that Hipp discloses this limitation because Hipp's "hardware BIOS [is] *capable of* booting from a NAS" and Hipp's "NAS *could store* the operating system from which the CPU module boots." Pet.

IPR2013-00440
Patent 6,948,021 B2

Reply 10 (emphases added) (citing *In re Schreiber*, 128 F.3d 1473, 1479 (Fed. Cir. 1997)). Petitioner's argument implies that even without instructions for "a network attached storage (NAS) to locate an operating system (OS) from which to boot," Hipp's hardware BIOS meets this limitation because the hardware BIOS *could* be programmed with such instructions. This argument is not persuasive. The functional language recited in claim 14 requires a hardware BIOS that can "instruct[] a network attached storage (NAS) to locate an operating system (OS) from which to boot." In order to meet this limitation for purposes of anticipation, the prior art structure must be capable of performing the function without further programming. *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011) (discussing *Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*, 520 F.3d 1367 (Fed. Cir.2008)). When functional language is associated with programming or some other structure required to perform the function, that programming or structure must be present in order to meet the claim limitation in an anticipation analysis. *Id.* Thus, Hipp cannot meet the "hardware BIOS . . . instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot" limitation recited in claim 14 by simply having a hardware BIOS that *could* be programmed with such instructions.

Petitioner further contends that "*Hipp* discloses that a BIOS instructs a NAS to locate an operating system from which to boot." Pet. 22 (citing Ex. 1018 ¶ 59). In support of this contention, Petitioner notes that "*Hipp* discloses a hardware BIOS on web server processing card 32 that 'contains the appropriate instructions for sending information from a program to the appropriate hardware device within network 30.'" *Id.* at 21 (quoting Ex.

IPR2013-00440
Patent 6,948,021 B2

1004, 10:47–51). Petitioner further contends that Hipp discloses the claimed
hardware BIOS because storage server 54 provides network attached storage
(NAS), web server processing card 32 includes boot-from-LAN capability,
and at least two operating systems are used in Hipp. Pet. 21–22 (citing Ex.
1004, 5:35–38, 8:26–30, 9:61–62). Petitioner later indicates that this
limitation is inherent in Hipp. Tr. 40:4–8. We are not persuaded that the
cited portions of Hipp expressly or inherently disclose the claimed BIOS
programmed to instruct a NAS to locate an operating system from which to
boot for the reasons discussed below.

Hipp describes the BIOS generally as "contain[ing] the appropriate
instructions for sending information from a program to the appropriate
hardware device within network 30." Ex. 1004, 10:48–51. The portions of
Hipp cited by Petitioner explain, generally, that "[s]torage server 54
provides network attached storage (NAS)" (*id.* at 5:35–36) and, separately,
that web server processing card 32 includes boot from LAN capability (*id.* at
9:57–62). Patent Owner contends that in Hipp, "the mere mention of these
two concepts alone cannot lead to the conclusion that booting from a NAS is
explicitly or inherently disclosed." PO Resp. 34. We agree. Hipp does not
discuss specifically any instructions in BIOS directed to storage server 54
locating an OS from which to boot. Thus, we are not persuaded that Hipp
expressly discloses the BIOS recited in claim 14.

We also are not persuaded that Hipp inherently discloses the BIOS
recited in claim 14. As Patent Owner notes (PO Resp. 35), Petitioner's
expert, Dr. Horst, explains that a boot image is required to initiate an
operating system (Ex. 2002, 199:12–14). Patent Owner contends that the
boot image is not required to be located in NAS and, instead, a variety of

16

IPR2013-00440
Patent 6,948,021 B2

other memory locations could be used to store the boot image. PO Resp. 36 (citing Ex. 2002, 203:7–204:13). In the cited portion of the deposition transcript, Dr. Horst acknowledges that these other memory locations could be used to store a boot image. Ex. 2002, 203:7–204:13. Petitioner does not provide a persuasive explanation as to why the boot image must be located in Hipp's storage server 54. Thus, we are not persuaded that Hipp's storage server 54 necessarily stores the boot image. Hipp's BIOS, therefore, does not necessarily include instructions to boot from storage server 54 and, instead, could include instructions to boot from another location where a boot image may be stored. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ("Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient."). For these reasons, we are not persuaded that Hipp's BIOS inherently includes instructions directing a NAS to locate an operating system from which to boot.

Petitioner also contends that "a person of skill in the art would understand Hipp's disclosure to teach booting from NAS." Pet. Reply 11 (citing Ex. 1018 ¶¶ 52, 59). Petitioner's citation to the Horst Declaration does not cure the deficiencies noted above. Paragraph 52 of the Horst Declaration is a claim chart. Paragraph 59 of the Horst Declaration indicates that "[t]he primary purpose of a BIOS is to boot software, including the operating system, on start-up" and that "booting remotely over a network was well-known and was even the subject of standardization," concluding that one skilled in the art would, therefore, recognize that Hipp discloses the limitations of claim 14. Although the primary purpose of a BIOS may be to boot software on start-up, and while booting over a network may have been

IPR2013-00440
Patent 6,948,021 B2

well-known, this does not explain why one skilled in the art would recognize that the arrangement in Hipp *includes* a BIOS programmed to instruct NAS to locate an operating system from which to boot. Instead, as explained above, Hipp's BIOS could have included instructions to boot from a location other than NAS.

Accordingly, we are not persuaded that Petitioner has shown, by a preponderance of the evidence, that claim 14 is anticipated by Hipp.

### 7. *Claims 15–17*

Claim 15 depends from claim 1 and recites "a CPU module is configured to boot remotely from an OS located in an NAS, and wherein the computer network appliance is free of a local hard disk drive (HDD)." Similar to claim 14, claim 15 requires a CPU module having instructions "to boot remotely from an OS located in an NAS." Petitioner's contentions regarding claim 15 are similar to those discussed above regarding claim 14, and are not persuasive for the same reasons set forth above regarding claim 14. *See* Pet. 22–23; Pet. Reply 11. Claims 16 and 17 depend from claim 15, and Petitioner's contentions with respect to these claims suffer from the same deficiencies discussed above relative to the challenge to claim 15. *See* Pet. 23–24; Pet. Reply 11.

Accordingly, for the reasons discussed above relative to claim 14, we are we are not persuaded, based on a preponderance of the evidence, that claims 15–17 are anticipated by Hipp.

### 8. *Claim 20*

Claim 20 is directed to a computer network appliance including a variety of "hot-swappable" components and "a backplane board having a plurality of hot swap mating connectors," similar to claim 1. Petitioner cites

18

portions of Hipp, similar to those discussed above relative to claim 1, as disclosing these limitations. Pet. 25. We find those contentions persuasive for the same reasons set forth above regarding claim 1.

Claim 20 additionally recites "a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path is separate from a switched fast ethernet connection and provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module." Petitioner contends that single board computer 160 on management network interface 49 in Hipp corresponds to the microcontroller module recited in claim 20, and communication link 71 and ethernet connector 186 correspond to the dedicated Ethernet path recited in claim 20. Pet. 26. Petitioner further explains that Hipp's I2C bus provides a connection for single board computer 160 that may be used to perform remote polling. Pet. Reply 13–14 (citing Ex. 2001 ¶ 73). We have reviewed Petitioner's contentions, and are persuaded that Hipp discloses the microcontroller module and the dedicated Ethernet path recited in claim 20 based on Hipp's disclosure of single board computer 160 on management network interface 49 and communication link 71 with ethernet connector 186, discussed further below. *See* Pet. 26–27.

Patent Owner responds that "*Hipp* fails to disclose that the communication link 71 provides the single board computer 160 'with a connection to remotely poll the CPU module, the power module and the ethernet switch module,' as recited in claim 20." PO Resp. 42. Patent Owner contends that Hipp's "communication link 71 does not provide the single board computer 160 on the management network interface card 68 with a connection to even one of the web server processing cards 32, the hot-

IPR2013-00440
Patent 6,948,021 B2

swappable power supplies 280, or the network interface cards 48." *Id.* at 43. Patent Owner further contends that Hipp's I2C bus is not capable of polling. Tr. 73:4–6, 11–12.

Hipp explains that "[c]ommunication link 188 may include an I2C bus coupled with the serial port associated with high density connector 164" and "[a]nother I2C bus may also be provided between single board computer 160 and the serial port associated with high density connector 162." Ex. 1004, 15:9–14. In the portion of the Putnam Declaration cited by Petitioner, noted above, Patent Owner's expert, Mr. Putnam, acknowledges that the I2C bus described in Hipp "may be used to communicate with the web server cards, public and private network interface cards, and power supplies, for control and monitoring purposes." Ex. 2001 ¶ 73. Mr. Putnam testifies, however, that the I2C bus "is not an Ethernet connection." *Id.* This characterization is unpersuasive. Petitioner agrees that, generally, an I2C bus is not considered an Ethernet connector, but contends that this is not consistent with the '021 patent. Tr. 29:4–8. We agree. The '021 patent explains that "[t]he microcontroller module uses a dedicated ethernet path separate from the network data I/O to remotely poll the health of the power module 106, the ethernet switch module 108 and the CPU modules 102(a)-102(e)" and "communicates with other modules using an I2C bus." Ex. 1001, 7:62–67. Claim 21 specifically recites that "the *dedicated ethernet path is an I2C bus*" (emphasis added). Thus, consistent with the '021 patent, the "dedicated ethernet path" recited in claim 20 at least encompasses an I2C bus. We are persuaded, therefore, that Hipp's I2C bus discloses the claimed "dedicated ethernet path."

20

IPR2013-00440
Patent 6,948,021 B2

Patent Owner further contends that Hipp fails to disclose remotely polling a CPU module, power module, and Ethernet switch module (PO Resp. 42, 44–46). This argument is unpersuasive because claim 20 does not require "polling." The claim simply requires "a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path . . . provides the microcontroller module with a connection to remotely poll." Unlike the "CPU module" recited in claims 14 and 15, discussed above, the "dedicated ethernet path" recited in claim 20 does not require programming to "provide[] the microcontroller module with a connection to remotely poll." Further, there is no requirement in claim 20 that the microcontroller module is programmed to poll, just that the "dedicated ethernet path" would allow polling if such programming were present.

We are persuaded that Hipp's I2C bus could be used for polling. For example, as noted above, Patent Owner's expert, Mr. Putnam, testifies that Hipp's I2C bus can be used "to communicate with the web server cards, public and private network interface cards, and power supplies, for control and monitoring purposes." Ex. 2001 ¶ 73. This communication capability would permit polling.

Accordingly, Petitioner has established, by a preponderance of the evidence, that claim 20 is anticipated by Hipp.

C. *Obviousness over Hipp and Gasparik*

We have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers. For the reasons that follow, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that claims 10–12 and 30 would have been obvious over Hipp and Gasparik under 35 U.S.C. § 103. We are

21

not persuaded that claims 34–36 would have been obvious over Hipp and
Gasparik.

### 1. Claims 10–12

Claims 10–12 ultimately depend from claim 1, and further define the
hot swap connectors of the modules recited in claim 1. For example, claim
10 recites the connection order of the "pre-charge power pins" and "ground
pins" of the hot swap connectors of the modules. Petitioner identifies
portions of Hipp and Gasparik teaching each of the limitations of these
claims, and reasons that one skilled in the art would have combined these
teachings of Hipp with those of Gasparik. Pet. 31–34. Patent Owner does
not dispute Petitioner's contentions regarding these claims specifically and,
instead, relies on the arguments presented with respect to claim 1 for the
patentability of claims 10–12, which we find unpersuasive for the reasons
explained above. *See* PO Resp. 49. We have reviewed, and are persuaded
by, Petitioner's contentions regarding claims 10–12.

Accordingly, Petitioner has established, based on a preponderance of
the evidence, that claims 10–12 would have been obvious over the combined
teachings of Hipp and Gasparik.

### 2. Claim 30

Claim 30 is directed to "[a] method of mounting a plurality of hot-
swappable CPU modules in a computer network appliance . . . each CPU
module comprising a hot swap connector including ground pins, power pins
and signal pins, the computer network appliance including a backplane
board having hot swap mating connectors," and recites that "a backplane
board interconnects each of the CPU modules with the ground elements,
power elements, and signal elements, such that the power module and the

IPR2013-00440
Patent 6,948,021 B2

ethernet switch module can be used as a shared resource by the plurality of CPU modules." Petitioner cites Hipp as teaching these limitations. Pet. 34–36. In response, Patent Owner relies on the arguments discussed above relative to the anticipation challenge to claim 1 based on Hipp. PO Resp. 47–49. We are not persuaded by Patent Owner's arguments for similar reasons as discussed above relative to claim 1.

Petitioner cites Gasparik as teaching the remaining limitations of claim 30, which are directed to the connections between the various hot swap connector pins of the CPU modules and the hot swap connectors of the backplane board, and reasons that it would have been obvious to combine the teachings of Gasparik and Hipp. Pet. 31, 35–36. Patent Owner does not dispute Petitioner's contentions regarding these limitations of claim 30.

We have reviewed Petitioner's contentions and Patent Owner's response, and are persuaded that claim 30 would have been obvious over the combined teachings of Hipp and Gasparik.

### 3. *Claims 34–36*

Claim 34 depends from claim 30 and further recites "remotely booting a CPU module in a computer network appliance, comprising: locating an OS in an NAS to boot the CPU module; and remotely booting the CPU module using the located OS; wherein the computer network appliance is free of a local HDD in remotely booting the CPU module." Petitioner's contentions regarding claim 34 are essentially the same as those discussed above regarding claims 14 and 15. *See* Pet. 36–37. We are not persuaded by these contentions for the reasons explained above with respect to claims 14 and 15. Claims 35 and 36 depend from claim 34, and Petitioner's contentions

IPR2013-00440
Patent 6,948,021 B2

with respect to those claims suffer from the same deficiencies as discussed relative to the challenge to claim 34. *See* Pet. 37.

Accordingly, for the reasons discussed above relative to claims 14 and 15, we are not persuaded, based on a preponderance of the evidence, that claims 34–36 would have been obvious over the combined teachings of Hipp and Gasparik.

### D. Motions to Exclude

#### 1. Petitioner

Petitioner filed a Motion to Exclude Evidence seeking to exclude Exhibits 2004 and 2005, the testimony of Mr. Putnam found in the Putnam Declaration, and certain portions of deposition testimony from Dr. Horst. Paper 32, 1–14. The majority of the evidence that Petitioner seeks to exclude, including portions of the Putnam Declaration, Exhibits 2004 and 2005, as well as the portions of deposition testimony from Dr. Horst, is directed to claims 1, 3, and 4 of the '021 patent. *See* Paper 32, 2–6, 10–14. However, even without excluding this evidence, we have determined that Petitioner has established, based on a preponderance of the evidence, the unpatentability of claims 1, 3, and 4 of the '021 patent. Further, Petitioner's arguments on these items go to the weight to be accorded to the evidence. The Board is capable of determining and assigning the appropriate weight to the evidence.

The remaining objections (*id.* at 6–10) are directed to excluding paragraphs 46–49, 51–53, 55, 56, 58, 60–62, 64, 65, 67–69, 71, and 73–75 of the Putnam Declaration "as being unreliable under FRE 702 because Mr. Putnam relied on an incorrect legal standard in formulating his opinions with respect to anticipation under 35 U.S.C. § 102" (*id.* at 6–7), and excluding the

24

IPR2013-00440
Patent 6,948,021 B2

entire Putnam Declaration because "Mr. Putnam's testimony is based on incorrect legal standards for claim construction, anticipation, and obviousness, has no basis in underlying data or facts, and relies on pure speculation" (*id.* at 9–10). These arguments directed to Mr. Putnam's testimony also go to the weight to be accorded to the evidence. As noted above, the Board is capable of determining and assigning the appropriate weight to the evidence.

For these reasons, we *deny* Petitioner's motion.

### 2. Patent Owner

Patent Owner filed a Motion to Exclude Evidence (Paper 29) seeking to exclude certain deposition testimony from Patent Owner's expert, Mr. Putnam. Specifically, Patent Owner seeks to exclude testimony from Mr. Putnam found at page 230, lines 6–11, of Exhibit 1037. Paper 29, 2. As noted by Patent Owner, however, the portion of Mr. Putnam's testimony which Patent Owner seeks to exclude "is used to challenge claim 4 under obviousness in spite of the fact that this proceeding is limited to anticipation with respect to claim 4." *Id.* at 5 n. 1. Patent Owner's arguments go to the weight to be accorded to the evidence. The Board is capable of determining and assigning the appropriate weight to the evidence.

Accordingly, we *deny* Patent Owner's motion.

### III.    SUMMARY

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–4, 6–9, 13, and 18–20 of the '021 patent are anticipated by Hipp and claims 10–12 and 30 would have been obvious over the combination of Hipp and Gasparik, and that these claims are, therefore, unpatentable.

IPR2013-00440
Patent 6,948,021 B2

Petitioner has failed to demonstrate, by a preponderance of the evidence, that claims 14–17 and 34–36 would have been obvious over the combination of Hipp and Gasparik. This is a final written decision of the Board under 35 U.S.C. § 318(a).


IV.     ORDER

For the reasons given, it is

ORDERED that:

> A.     Claims 1–4, 6–9, 13, and 18–20 are unpatentable as anticipated by Hipp;
>
> B.     Claims 10–12 and 30 are unpatentable as obvious over the combination of Hipp and Gasparik;
>
> C.     Petitioner's Motion to Exclude Evidence is denied; and
>
> D.     Patent Owner's Motion to Exclude Evidence is denied.

FURTHER ORDERED that parties to the proceeding seeking judicial review of this final written decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00440
Patent 6,948,021 B2

For PETITIONER:
Kevin J. Meek
Paula D. Heyman
Nicholas A. Schuneman
Catherine J. Garza
BAKER BOTTS LLP
kevin.meek@bakerbotts.com
paula.heyman@bakerbotts.com
nick.schuneman@bakerbotts.com
catherine.garza@bakerbotts.com

For PATENT OWNER:
N. Andrew Crain
Scott Horstemeyer
Vivek A. Ganti
Robert D. Gravois
THOMAS HORSTEMEYER LLP
andrew.crain@thomashorstemeyer.com
scott.horstemeyer@thomashorstemeyer.com
vivek.ganti@thomashorstemeyer.com
robert.gravois@thomashorstemeyer.com



US006948021B2

(12) **United States Patent**
    Derrico et al.

(10) **Patent No.:**      **US 6,948,021 B2**
(45) **Date of Patent:**      **Sep. 20, 2005**

(54) **CLUSTER COMPONENT NETWORK APPLIANCE SYSTEM AND METHOD FOR ENHANCING FAULT TOLERANCE AND HOT-SWAPPING**

(75) Inventors: **Joel Brian Derrico**, Atlanta, GA (US); **Paul Jonathan Freet**, Duluth, GA (US)

(73) Assignee: **Racemi Systems**, Duluth, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 324 days.

(21) Appl. No.: **09/987,917**

(22) Filed: **Nov. 16, 2001**

(65)          **Prior Publication Data**

US 2002/0078290 A1 Jun. 20, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/248,834, filed on Nov. 16, 2000.

(51) **Int. Cl.**$^7$ .............................................. **G06F 13/00**
(52) **U.S. Cl.** ........................................ **710/302**; 710/301
(58) **Field of Search** ................................. 710/301, 302, 710/72, 304, 100; 713/100; 709/222, 227, 219, 203, 223; 361/695, 720, 752, 683, 687; 363/123; 439/92; 307/46, 66; 370/910

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,033,112 A | * | 7/1991 | Bowling et al. | ............ 398/110 |
| 5,161,097 A | * | 11/1992 | Ikeda | ......................... 363/124 |
| 5,555,510 A | * | 9/1996 | Verseput et al. | ............. 710/302 |
| 6,421,777 B1 | * | 7/2002 | Pierre-Louis et al. | .......... 713/2 |
| 6,452,797 B1 | * | 9/2002 | Konstad | ..................... 361/695 |
| 6,535,944 B1 | * | 3/2003 | Johari et al. | ............. 710/302 |
| 6,591,324 B1 | * | 7/2003 | Chen et al. | ................. 710/302 |

OTHER PUBLICATIONS

"Dynamic runtime re–scheduling allowing multiple implementations of a task for platform–based designs" by Tin-Man Lee; Henkel, J.; Wolf, W. (abstract only).*
"Redundant arrays of IDE drives" by Sanders, D.A.; Cremaldi, L.A.; Eschenburg, V>; Lawrence, C.N.; Riley, C.; Summers, D.J Petravick, D.L. (abstract only).*

* cited by examiner

*Primary Examiner*—Gopal C. Ray
(74) *Attorney, Agent, or Firm*—DLA Piper Rudnick Gray Cary US LLP

(57)          **ABSTRACT**

Packaging a hot-swappable server module (server blade) in a computer network appliance with shared, hot-swappable power, network, and management modules to provide highly available computer capacity. Distributing power between hot-swappable modules using single DC input voltage.

**36 Claims, 5 Drawing Sheets**



U.S. Patent

Sep. 20, 2005

Sheet 1 of 5

US 6,948,021 B2



FIG.1

U.S. Patent     Sep. 20, 2005     Sheet 2 of 5     US 6,948,021 B2



FIG.2



FIG.3

FIG.4

FIG.5

A31



FIG.6



FIG.7

U.S. Patent

Sep. 20, 2005

Sheet 5 of 5

US 6,948,021 B2



FIG.8

1

# CLUSTER COMPONENT NETWORK APPLIANCE SYSTEM AND METHOD FOR ENHANCING FAULT TOLERANCE AND HOT-SWAPPING

This application claims priority from U.S. Provisional Application Ser. No. 60/248,834, filed Nov. 16, 2000. The entirety of that provisional application is incorporated herein by reference.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention generally relates to fault tolerant computer systems and, more specifically, to a system and method for enhancing fault tolerance and hot swapping in computer systems.

### 2. Related Art

Computer systems such as file servers and storage servers in computer networks are relied upon by large numbers of users. When a file server or storage server is out of operation, many users are inconvenienced. Thus, technology has been developed which supports maintenance and service of computer systems while they remain operational. One part of maintenance and service includes the replacement of components in the computer systems. "Hot swap" technology allows the replacement of components without turning off the power or resetting the computer system as a whole.

Hot swap enables the insertion and/or removal of components in a computer system while it is still active or operational. In systems that do not support hot swapping of components, each process of component insertion and/or removal requires a complete shutdown of the entire system to prevent damage to other components or to the system. In time critical systems such as communications systems, system downtime is both a financial problem as well as a service quality problem. That is, any downtime means a financial loss and disconnection of service to active lines.

A drawback of hot swapping, however, is it requires trained personnel to insert and/or remove components from a computer system to minimize damages caused by pitting connectors of the components against connectors of the computer system. Another drawback is electrical noise which can adversely affect the performance of the computer system. The noise is caused by the change in current at the instance when connection is made between power pins of a component and corresponding elements of the computer system. The result is voltage transients in the computer system backplane that may cause loss of data, incorrect program execution and damage to delicate hardware components.

Thus, there is a need for a system and method for enhancing fault tolerance and hot swapping in computer systems so as to reduce both the downtime of computer systems and the use of trained personnel to repair and/or maintain computer systems.

## SUMMARY OF THE INVENTION

The present invention is directed to a hot swapping computer network appliance operating in mission critical applications where any computer downtime can result in serious consequences. The computer network appliance comprises a hot-swappable CPU module, a hot-swappable power module, a hot-swappable ethernet switch module and a backplane board having a plurality of hot swap mating connectors. Each of the CPU module, power module and

2

ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board. The computer network appliance further comprises a chassis providing physical support for the modules and the backplane board. The chassis comprises caddies providing air flow in the chassis. The chassis further comprises bays and slot guides to facilitate mounting and removal of the modules and to ensure proper alignment between the hot swap connectors of the modules and the hot swap mating connectors of the backplane board. The computer network appliance comprises a power connector and a data input/output connector, both of which remain connected during mounting or removal of the modules.

Each of the hot swap connectors of the modules comprises pin connections arranged in a specific pattern. The pins include ground pins, power pins and signal pins. The ground pins of a hot swap connector are connected first to corresponding ground elements of a hot swap mating connector, and the signal pins of the hot swap connector are connected last to corresponding signal elements of the hot swap mating connector so as to reduce brown outs in the computer network appliance.

The CPU module of the invention operates as a stand alone computer. The CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot. The CPU module is configured to boot remotely from an OS located in the NAS without user intervention. This remote booting ability of the CPU module allows the CPU module to run different types of operating systems without the need for a local hard disk drive (HDD), which increases the mean time between failure (MTBF) and decreases the mean time to repair (MTTR) of the computer network appliance.

The invention further provides that each of the hot swap connectors of the modules includes an ethernet connection providing communications to all modules attached to the backplane board.

The power module of the invention comprises dual DC—DC converters that perform direct conversion of a facility DC voltage to voltages required for normal operation in the modules. Features of the DC—DC converters include: allowing the modules in the computer network appliance to accept DC power directly from a battery backup source without requiring power inverters; higher MTBF than a typical switched power supply; use less power and generate less heat than a typical switched power supply; and provide better efficiency than a typical switched power supply in converting an input voltage to desired operational voltages of the modules.

## DESCRIPTION OF THE FIGURES

FIG. 1 is an illustration of a cluster computer network appliance arranged on a chassis in accordance with an embodiment of the invention;

FIG. 2 is a block diagram of a CPU module in accordance with an embodiment of the invention;

FIG. 3 illustrates an integrated ethernet switch module in accordance with an embodiment of the invention;

FIG. 4 illustrates a power module in accordance with an embodiment of the invention;

FIG. 5 illustrates a microcontroller module in accordance with an embodiment of the invention;

FIG. 6 illustrates an integration of a cluster computer network appliance, data storage device and standard internet access hardware;

3

FIG. 7 illustrates a computer system utilizing multiple network appliances, redundant storage and internet access points; and

FIG. 8 illustrates a computer system providing path redundancy and equipment redundancy to achieve high availability.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

The following detailed description presents a description of certain embodiments of the present invention. However, the present invention can be embodied in different ways as defined by the claims. In this description, reference is made to the drawings wherein like parts are designated with like numerals throughout.

FIG. 1 is an illustration of a cluster computer network appliance 100 arranged on a chassis 150 in accordance with an embodiment of the invention. The cluster computer network appliance 100 includes a plurality of CPU modules 102(a)–102(e), a passive backplane board 104 with hot swap mating connectors 124(a)–124(i), a power module 106, a microcontroller module 108, an ethernet switch module 110, power/ground connectors 112 and ethernet connectors 114. The cluster computer network appliance 100 fits in a 1.75" tall (1RU) metal chassis that fits in a standard 19" rack. The chassis 150 includes a fold down front panel 116 and supports the modules and backplane board of the invention. The chassis has five bays accessed via the front for inserting the CPU modules 102(a)–102(e) and three bays accessed via the rear 118 for inserting one each of the power module 106, the ethernet switch module 110 and the microcontroller module 108. Each module resides in a caddy 152 of the chassis such that when the module is inserted into the chassis the caddy ensures that the hot swap connectors are aligned. Each of the hot swap connectors used in the modules is specific to corresponding hot swap mating connectors in the backplane board. For normal operation, the chassis must be equipped with at least one CPU module, the power module and the ethernet switch module.

The power/ground connectors 112 provide physical connection for power to the chassis. The ethernet connectors 114 provide data input/output (I/O) to and from the chassis. Power is connected such that should the power module 106 fails, it may be replaced without disconnecting the actual power cabling inside the computer network appliance, which saves time and reduces complexity. Similarly, a failed ethernet switch module 110 may be replaced without disconnecting any of the power or data cables. Heat generated by active elements in each of the modules is dissipated using forced air flow from the front to the rear of the chassis using a push-pull method. Fans 120(a)–120(e) are provided for each CPU module providing a 1:1 ratio of fan to bay and positioned near the front panel 116 of the chassis to push outside air through the chassis. In the rear of the chassis, multiple fans 122(a)–122(d) are mated to the back of both the power module 106 and the ethernet switch module 110 to draw heated air out of the chassis.

Each module is designed to be hot swapped from the chassis such that there is no need for on/off switches on either the chassis or the modules. The passive backplane board 104 is equipped with hot swap mating connectors 124(a)–124(i) for each of the modules to be inserted into the computer network appliance. The chassis is installed and wired for power and data I/O such that power is supplied directly to a module as soon as it is inserted.

In order to avoid chassis power drains (brown outs) caused by instantaneous power short to ground through

4

uncharged board capacitance, the hot swap connectors of the modules (shown in FIG. 1 mated to corresponding hot swap mating connectors 124(a)–124(i)) are designed to make pin connections in a specific pattern to avoid power drains. Each hot swap connector of a module comprises groups of pins (ground pins, pre-charge power pins, power pins and signal pins) of different length that allow the pins to make connections in a prearranged pattern. The first group of pins to make contact with corresponding elements in a mating connector on the passive backplane board is the ground pins (chassis ground and common ground). The next group of pins to make contact with corresponding elements in the mating connector is the pre-charge power pins. The pre-charge power pins connect to a power plane on a printed circuit board (PCB) through resistors to limit the flow of current while pre-charging the capacitance on the PCB. The next group of pins to make contact with corresponding elements in the mating connector is the power pins. The last group of pins to make contact with corresponding elements in the mating connector is the signal pins. By connecting the pins in this fashion, the computer network appliance of the invention avoids brown outs, arching across pins and false grounds that can damage components in the computer network appliance.

FIG. 2 is a block diagram of a CPU module 102 in accordance with an embodiment of the invention. The CPU modules 102(a)–102(e) do not have moving parts and components defining a direct user interface. Each CPU module comprises a microprocessor 202, memory module 204, bus management chipset including a Northbridge chip 206(a) and a Southbridge chip 206(b), an ethernet interface chip 208, hardware BIOS 210 and a hot swap connector 212 mounted on a PCB. A PCI bus header is included for development and debugging purposes. Each CPU module functions as a stand alone computer.

The hardware BIOS 210 configures the CPU module for normal operation and instructs the ethernet interface chip 208 where to look on an NAS for the OS from which to boot. This remote boot capability of the CPU module enables the system administrator to direct the module to boot from a specific OS stored in a predetermined location in the NAS. This, in turn, enables the CPU modules in a network to run different types of OS (e.g., Unix, BSD, Linux, and Solaris) and removes the necessity for a local hard disk drive (HDD). Under management software control, a CPU module may be booted with an OS along with an "image" including several pre-installed applications (user defined quantity) stored in an NAS or a storage area network (SAN). This diskless booting of the CPU module allows the CPU to run different OS's and applications at different times. For example, a CPU module may be booted with a first OS and a first set of applications at one time and with a second OS and a second set of applications at another time. In another embodiment of the invention, different CPU modules operating in the same chassis may be booted with different OS's and different applications. In yet another embodiment of the invention, the same OS, applications and user data of one CPU module may be installed in another CPU module so as to provide for hot swapping of a failed CPU module or for installation of a redundant CPU module. Removal of the local HDD is a feature of the invention that allows hot swapping of the CPU modules without rebooting the system.

Once the OS is loaded on the CPU module and is operational, the health of the CPU module can be monitored using an I2C bus 214 that provides status information about the CPU module to the optional microcontroller module 108 as shown in FIG. 1. Along with information such as CPU

5

temperature, fan RPM and voltage levels, a watchdog timer is provided in the hardware design to provide a way of determining if the OS is unstable or has crashed. If the OS is unstable or has crashed, then the microcontroller module 108 has the ability to remotely reset the CPU module 102 and log the failure. Such a reset can be configured to take place automatically or manually under the control of the administrator.

The CPU module 102 is configured to remotely boot without user intervention to allow for the removal of unnecessary user interface hardware such as video and standard I/O chipsets. The removal of this hardware and the HDD as described above reduces the complexity of the design and increases the mean time between failure (MTBF) of the hardware while simultaneously lowering the part count (cost) and power consumption of the module. In addition, the network mean time to repair (MTTR) is lowered through the use of the hot swap design and remote OS boot capability of the module because a failed unit can be removed and replaced rather easily and no user interaction is necessitated once a CPU module has been inserted into the chassis. A CPU module can be inserted in any of the bays in the front of the chassis.

Communications to and from each module is made using a standard fast ethernet connection rather than a complicated external bus structure. That is, a single ethernet connection via the hot swap connection of each module allows the module to communicate with other modules connected in the computer network appliance. The pinout of the hot swap connection is limited to ethernet signal path pins, dedicated power and ground pins, and an I2C bus for out-of-band monitoring of the health of the CPU module and remote rebooting of the microprocessor if the OS is determined to be unstable or have crashed. The process of out-of-band monitoring and control of the CPU module is mediated by the microcontroller module 108. In-band monitoring processes are used to load applications and data and are controlled by direct communications between the management software and the CPU module microprocessor 202.

As stated above, each CPU module includes a PCI bus header that is provided for debugging and test purposes only. If a CPU module is suspected of being faulty, then it can be removed and plugged into a test fixture that provides video, keyboard, mouse, and HDD access through a cable connection to the PCI bus header. Power and ethernet I/O are accessed through the hot swap connector 212. In this fashion, the CPU module combined with the test fixture emulates a desktop computer and the CPU module can be debugged accordingly.

Since only a limited number of modules make up the configuration of the computer network appliance, an end user's spare parts inventory is greatly reduced and configuration variability is low. Each module can be easily replaced and does not require a skilled person, and no spare parts need to be inventoried on-site and can be shipped overnight from the supplier. As a result, the computer network appliance MTTR is greatly reduced through the ease of module replacement and the MTBF is high through the simplified design of the CPU module.

A byproduct of using standard fast ethernet as the method of signal I/O for network communications is that heterogeneous CPU modules having different CPU speeds, memory space and bus chipsets may be mounted in the same chassis without affecting the operation of any other CPU module. Specifically, different generations of CPU modules may operate in the same chassis without requiring an update of existing modules.

6

FIG. 3 illustrates an integrated ethernet switch module 110 in accordance with an embodiment of the invention. The ethernet switch module 110 comprises an ethernet switch 302, EEPROM 304, buffer memory 306, ethernet transceivers 308 and a hot swap connector 312 all mounted on a single PCB. In the preferred embodiment of the invention, the ethernet switch 302 is an unmanaged 8-port ethernet switch. The ethernet switch module 110 operates as a traffic cop for data communications in the computer network appliance, allowing each CPU module to communicate with other CPU modules in the same chassis. The ethernet switch module 110 further includes cooling fans 314 mounted to the rear of the PCB; the cooling fans 314 operate to draw heated air out of the chassis.

Once the ethernet switch module 110 is inserted into the rear of the chassis 150, it connects to the passive backplane board 104 via the hot swap connector 124(h) to derive power, establish ground and establish all ethernet connections within the computer network appliance. The ethernet switch module 110 is secured to the chassis using thumb screws 316 mounted on the 1RU panel. The ethernet switch module 110 is designed such that if a failure occurs, then the module can be quickly replaced without disconnecting any signal or power cables, thus attaining a low MTTR and allowing the use of less-skilled maintenance personnel.

A function of the ethernet switch module 110 is to filter out inappropriate signal traffic so as to limit collisions caused by signal traffic in the computer network appliance. Communications between CPU modules in the same chassis occur without disruption to signal traffic between other CPU modules and the network and does not add to the overall level of network traffic. As a result, the efficiency of the signal bandwidth is increased without sacrificing performance or network cost.

Moreover, the application servers are not signal I/O limited and this allows all network traffic with the computer network appliance to be multiplexed over a switched fast ethernet (up to three connections) and does not require a direct ethernet connection between each CPU module and other modules in the computer network appliance. Consequently, the amount of external wiring required to connect the CPU modules to the computer network appliance is greatly reduced by integrating the switch into the design of the network server appliance. The use of multiple switched ethernet connections permits the computer network appliance to operate with different topologies or software configurations without additional hardware. Since five of the eight switched ethernet ports are dedicated to the five CPU module connections, a typical network connection would dedicate the remaining three ports to a mixture of NAS, network data I/O and an in-band appliance management channel.

FIG. 4 illustrates the power module 106 in accordance with an embodiment of the invention. The power module 106 comprises dual DC—DC converters 402 mounted on a 1RU panel of a printed circuit board, a hot swap connector 404, cooling fans 406 and thumb screws 410. The DC—DC converters 402 perform direct conversion of a facility DC voltage (48V) to voltages required for normal operation of the modules that make up the computer network appliance. The hot swap connector 404 operates to draw facility voltage and supply operational voltages to the passive backplane board 104. The cooling fans 406 operate to draw air out of the chassis across the cooling fins of the heat sinks on the DC—DC converters 402.

Once the power module 106 is inserted into the rear of the chassis, it connects to the passive backplane board 104 via

7

the hot swap connector 124(f) to derive facility DC power, establish ground and generate all operational voltages used by the other modules in the computer network appliance. The hot swap connector 404 includes an I2C bus 408 that is used to monitor the health of the power module. The power module is secured to the chassis using thumb screws 410. The power module is designed such that if a failure occurs, then the power module can be quickly replaced without disconnecting any power cables in the computer network appliance. As a result, the MTTR is lowered and less skilled maintenance personnel may be used.

In typical commercial electronics designs, the portion of the design having the lowest MTBF is the switched power supply. A common practice to overcome this drawback to increase the MTBF is to include redundant power supplies in a design so that if one power supply fails, then the redundant unit automatically backs it up. Because typical commercial electronics power supplies run on alternating current (AC) power, the battery backup system must convert power from its normal direct current (DC) state to AC using power inverters. Power inverters, however, are inefficient because of their fundamental operation (generator hysteresis) in converting power from DC to AC. Power inverters are also expensive and do not scale well should additional power capacity is required. Thus, designing an appliance using DC—DC converters instead of a switched AC power supply would allow an appliance to accept DC power directly from the battery backup source and negate the need for power inverters. That is, an appliance using DC—DC converters alone would not require use of expensive power inverters and increase the overall efficiency of the battery backup system. Another compelling reason to use DC—DC converters in a commercial electronics design is the MTBF of a DC—DC converter is much greater than that of a switched power supply. A DC—DC converter is also more efficient than a power supply in converting the input voltage to the desired operational voltages, which means that the appliance will use less power and generate less heat than a power supply.

FIG. 5 illustrates a microcontroller module 108 in accordance with an embodiment of the invention. The microcontroller module 108 is optional and is not required for normal operation; the microcontroller module 108 is employed for monitoring out-of-band communications and for controlling the computer network appliance modules. The microcontroller module 108 comprises a stand-alone microprocessor 502 running an embedded OS, flash RAM 504 including the OS and application software, a dedicated ethernet chip 506 providing connection to the network, an I2C bus chipset 508, a hot swap connector 510 and thumb screws 512.

Once the microcontroller module is inserted into the rear of the chassis, it connects to the passive backplane board 104 via the hot swap connector 124(g) to derive power, establish ground and establish ethernet connection with the computer network appliance. The microcontroller module 108 is secured to the chassis using thumb screws 512 mounted on a 1RU at the rear of the module. The microcontroller module is designed such that if a failure occurs, then the microcontroller module can be quickly replaced without disconnecting any signal or power cables so as to attain a low MTTR and to use less skilled maintenance personnel.

The microcontroller module uses a dedicated ethernet path separate from the network data I/O to remotely poll the health of the power module 106, the ethernet switch module 108 and the CPU modules 102(a)–102(e). The microcontroller module communicates with other modules using an I2C bus that gathers status information, logs the results and

8

provides the log to the management software either actively (should a failure is detected) or as part of a routine poll. The microcontroller module 108 also gathers information relating to the voltage levels, CPU temperatures, fan RPMs and CPU module OS stability. In addition, the microcontroller module has the ability to perform a remote reset of a CPU module if the OS of the module is determined to be unstable or have crashed. If the integrated ethernet switch fails, then the dedicated ethernet path may still be able to pinpoint the failure and differentiate the failure of the switch from an overall failure of the chassis. The dedicated ethernet path further informs the system administrator of the failure so as to facilitate a timely fix of the switch or a module on the computer network appliance.

FIG. 6 illustrates a system 600 integrating a computer network appliance, a data storage device and standard internet access hardware. The system 600 comprises a router 602, a computer network appliance 604 connected to the router 602 via a fast ethernet connection 606, network database 608 connected to the computer network appliance 604 via a fast ethernet connection 610, and internet backbone 612. Data switching is performed in the computer network appliance 604. This simplistic representation provides a framework for more sophisticated forms of clustering configurations based upon specific design criteria, such as availability and fault tolerance.

FIG. 7 illustrates a system 700 integrating multiple computer network appliances, a storage device and redundant internet access hardware. The system 700 comprises a plurality of routers 702, a plurality of redundant switches 704, a plurality or cluster of computer network appliances 706, NAS 708 and internet backbone 710. Routers 702, computer network appliances 706 and NAS 708 are connected to redundant switches 704 by fast ethernet connection 712. A feature of system 700 is the system layer remains flat in that access to the routers, network appliances and NAS are all wired through the redundant switches 704. The system 700 provides a simple and easy to install/maintain framework for redundant network cabling by minimizing the amount of equipment external to the cluster of computer network appliances. In order to handle the increased traffic associated with the large number of servers in the cluster of computer network appliances, redundant gigabit ethernet paths 714 are introduced to connect internet backbone 710 and redundant switches 704 to redundant routers 702 as illustrated in FIG. 7.

Alternate forms of configurations can be generated to add other requirements to the system such as high availability and database security. FIG. 8 illustrates a system 800 providing path redundancy and equipment redundancy to achieve high availability. The system 800 comprises 800 a plurality of routers 802, a plurality of redundant switches 804, a plurality of cluster computer network appliances 806, a firewall 808, NAS 810 and internet backbone 812. Redundant switches 804 and firewall 808 are connected to cluster computer network appliances 806 by fast ethernet connection 814. Firewall 808 secures NAS 810 from direct access of internet connection by accepting only secure connections. The increased traffic associated with the large number of servers in the cluster of computer network appliances is addressed by introducing redundant gigabit ethernet paths 816 as the front-end connection between internet backbone 812 and redundant routers 802 and between redundant routers 802 and redundant switches 804, and as the back-end connection between firewall 808 and NAS 810.

US 6,948,021 B2

9

What is claimed is:

1. A computer network appliance, comprising:

a plurality of hot-swappable CPU modules, wherein each CPU module is a stand-alone independently-functioning computer;

a hot-swappable power module;

a hot-swappable ethernet switch module; and

a backplane board having a plurality of hot swap mating connectors,

wherein the at least one backplane board interconnects each of the CPU modules with the at least one power module and the at least one ethernet switch module, such that the at least one power module and the at least one ethernet switch module can be used as a shared resource by the plurality of CPU modules.

2. The computer network appliance of claim 1, further comprising a chassis providing physical support for a CPU module, the power module, the ethernet switch module and the backplane board.

3. The computer network appliance of claim 2, wherein the chassis comprises caddies providing air flow from the front to the rear of the chassis.

4. The computer network appliance of claim 2, wherein the chassis comprises bays and slot guides to facilitate mounting and removal of the modules and to ensure proper alignment between hot swap connectors of the modules and the hot swap mating connectors of the backplane board.

5. The computer network appliance of claim 2, wherein the modules and the chassis are free of on/off switches.

6. The computer network appliance of claim 1, further comprising a power connector and a data input/output connector.

7. The computer network appliance of claim 6, wherein the data input/output connector is a standard ethernet connector allowing heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other.

8. The computer network appliance of claim 1, wherein each of the hot swap connectors of the modules comprises pin connections arranged in a specific pattern and includes ground pins, pre-charge power pins, power pins and signal pins.

9. The computer network appliance of claim 8, wherein the ground pins of a hot swap connector of a module make contact with corresponding ground elements of a hot swap mating connector of the backplane board.

10. The computer network appliance of claim 9, wherein pre-charge power pins of the hot swap connector of the module make contact with corresponding pre-charge power elements of the hot swap mating connector of the backplane board after the ground pins have made contact.

11. The computer network appliance of claim 10, wherein the power pins of the hot swap connector of the module make contact with corresponding power elements of the hot swap mating connector of the backplane board after the pre-charge power pins have made contact.

12. The computer network appliance of claim 11, wherein signal pins of the hot swap connector of the module make contact with corresponding signal elements of the hot swap mating connector of the backplane board after the power pins have made contact.

13. The computer network appliance of claim 1, wherein a CPU module operates as a stand alone computer.

14. The computer network appliance of claim 1, wherein a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot.

10

15. The computer network appliance of claim 1, wherein a CPU module is configured to boot remotely from an OS located in an NAS, and wherein the computer network appliance is free of a local hard disk drive (HDD).

16. The computer network appliance of claim 15, wherein remote booting of a CPU module allows the CPU module to run different types of operating systems.

17. The computer network appliance of claim 15, wherein effects of a lack of a local HDD include increased mean time between failure (MTBF) and decreased mean time to repair (MTTR) of the computer network appliance.

18. The computer network appliance of claim 1, wherein each of a plurality of hot swap connectors of the modules includes an ethernet connection providing communications to all modules attached to the backplane board.

19. The computer network appliance of claim 18, wherein an ethernet connection is a switched fast ethernet connection.

20. A computer network appliance comprising:

a hot-swappable CPU module;

a hot-swappable power module;

a hot-swappable ethernet switch module; and

a backplane board having a plurality of hot swap mating connectors; and

a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path is separate from a switched fast ethernet connection and provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module;

wherein each of the CPU module, the power module and the ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board.

21. The computer network appliance of claim 20, wherein the dedicated ethernet path is an I2C bus.

22. The computer network appliance of claim 20, wherein the microcontroller module polls the CPU module on the status of an OS.

23. The computer network appliance of claim 22, wherein the microcontroller module performs a remote reset of the CPU module if the OS of the CPU module is determined to be unstable or have crashed.

24. A computer network appliance, comprising:

a hot-swappable CPU module;

a hot-swappable power module;

a hot-swappable ethernet switch module; and

a backplane board having a plurality of hot swap mating connectors;

wherein each of the CPU module, the power module and the ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board;

wherein the ethernet switch module filters communications internal and external to the computer network appliance to limit collisions caused by communications traffic.

25. The computer network appliance of claim 18, wherein different software configurations are used in CPU modules free of additional hardware.

26. The computer network appliance of claim 1, wherein the power module comprises dual DC—DC converters performing direct conversion of a facility DC voltage to voltages required for normal operation in the modules.

27. The computer network appliance of claim 26, wherein the DC—DC converters allow the modules to accept DC power directly from a battery backup source free of power inverters.

US 6,948,021 B2

| 11 | 12 |

**28**. The computer network appliance of claim **26**, wherein effects of using the DC—DC converters in the power module include increased MTBF and decreased MTTR in the computer network appliance as compared to a similar computer network appliance using a switched power supply.

**29**. The computer network appliance of claim **26**, wherein the computer network appliance uses less power and generates less heat due to the use of the DC—DC converters in the power module as compared to a similar computer network appliance using a switched power supply.

**30**. A method of mounting a plurality of hot-swappable CPU modules in a computer network appliance, wherein each CPU module is an independently-functioning stand-alone computer, each CPU module comprising a hot swap connector including ground pins, power pins and signal pins, the computer network appliance including a backplane board having hot swap mating connectors, the method comprising:

connecting the ground pins of the hot swap connector with corresponding ground elements of a hot swap mating connector of the backplane board;

connecting the power pins of the hot swap connector with corresponding power elements of the hot swap mating connector of the backplane board after the ground pins have made contact; and

connecting the signal pins of the hot swap connector of the module with corresponding signal elements of the hot swap mating connector of the backplane board after the power pins have made contact;

wherein a backplane board interconnects each of the CPU modules with the ground elements, power elements, and signal elements, such that the power module and the ethernet switch module can be used as a shared resource by the plurality of CPU modules.

**31**. The method of claim **30**, wherein connecting the ground pins first and the signal pins last reduce brown outs in the computer network appliance.

**32**. A method of interconnecting a plurality of hot swapping CPU modules in a computer network appliance, wherein each CPU module is an independently-functioning computer, comprising (1) a chassis having a plurality of bays for different modules, (2) a backplane board having a plurality of mating connectors, (3) a power connector and (4) a data input/output connector, the method comprising:

placing a module having a hot swap connector in a corresponding bay of the chassis; and

inserting the module into the chassis by connecting the hot swap connector with a mating connector of the backplane board,

wherein the power connector and the data input/output connector remain connected in the computer network appliance during mounting of the module such that the power connector and the data input/output connector can be used as a shared resource by the plurality of CPU modules.

**33**. The method of claim **32**, further comprising removing the module from the chassis by disconnecting the hot swap connector from the mating connector of the backplane board, wherein the power connector and the data input/output connector remain connected in the computer network appliance during removal of the module.

**34**. The method of claim **30**, further comprising remotely booting a CPU module in a computer network appliance, comprising:

locating an OS in an NAS to boot the CPU module; and

remotely booting the CPU module using the located OS;

wherein the computer network appliance is free of a local HDD in remotely booting the CPU module.

**35**. The method of claim **34**, wherein the remote booting of the CPU module allows the CPU module to run different types of operating systems.

**36**. The method of claim **34**, wherein effects of a lack of a local HDD include increased MTBF and decreased MTTR of the computer network appliance.

*   *   *   *   *

**A39**

## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

March 31, 2015

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below:

### DELL INC.
### Petitioner

### v.

### ACCELERON, LLC
### Patent Owner

### Case:  IPR2013-00440
### Patent 6,948,021 B2

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE



*Laura J. Peterson*

*Certifying Officer*

## Prosecution History for IPR2013-00440

| Filing Date | Document |
|---|---|
| 07/12/2013 | Petition for *Inter Partes* Review |
| 07/12/2013 | Petitioner's Power of Attorney |
| 07/12/2013 | Petitioner's Mandatory Notices |
| 07/18/2013 | Notice of Filing Date Accorded to Petition |
| 07/22/2013 | Corrected Petition for *Inter Partes* Review |
| 07/24/2013 | Notice of Accepting Corrected Petition |
| 08/08/2013 | Patent Owner's Mandatory Notices |
| 01/16/2014 | Decision - Institute *Inter Partes* Review |
| 01/16/2014 | Scheduling Order |
| 01/28/2014 | Patent Owner's List of Proposed Motions |
| 01/29/2014 | Order - Conduct of the Proceedings § 42.5 |
| 01/30/2014 | Petitioner's Request for Rehearing |
| 02/12/2014 | Order - Conduct of the Proceedings § 42.5 |
| 02/20/2014 | Decision - Request for Rehearing |
| 02/21/2014 | Patent Owner's Power of Attorney |
| 02/21/2014 | Patent Owner's Notice of Additional Backup Counsel |
| 02/21/2014 | Patent Owner's Power of Attorney |
| 03/04/2014 | Patent Owner's Notice of Deposition |
| 03/04/2014 | Joint Notice of Stipulation to Revised Schedule |
| 03/18/2014 | Order - Conduct of the Proceedings § 42.5 |
| 04/09/2014 | Patent Owner's Opposition to Petition |
| 04/16/2014 | Petitioner's Notice of Objections to Exhibits |
| 04/30/2014 | Petitioner's Notice of Deposition |
| 05/06/2014 | Petitioner's Notice of Additional Backup Counsel |
| 05/06/2014 | Petitioner's Power of Attorney |
| 06/17/2014 | Petitioner's Reply to Opposition to Petition |
| 08/07/2014 | Patent Owner's Motion to Exclude Evidence |
| 08/07/2014 | Patent Owner's Request for Oral Argument |
| 08/07/2014 | Petitioner's Request for Oral Argument |
| 08/07/2014 | Petitioner's Motion to Exclude Evidence |
| 08/13/2014 | Order - Trial Hearing Notice |
| 08/21/2014 | Petitioner's Opposition to Motion to Exclude Evidence |
| 08/21/2014 | Patent Owner's Opposition to Motion to Exclude Evidence |
| 08/27/2014 | Patent Owner's Mandatory Notices |
| 08/28/2014 | Petitioner's Notice of Service of Demonstrative Exhibits |

| Filing Date | Document |
|---|---|
| 08/28/2014 | Petitioner's Reply to Opposition to Motion to Exclude Evidence |
| 08/28/2014 | Patent Owner's Reply to Opposition to Motion to Exclude Evidence |
| 11/07/2014 | Oral Hearing Transcript |
| 12/22/2014 | Final Written Decision |

2

poll the CPU module, the power module and the ethernet switch module. *Hipp*
discloses a microcontroller module in management network interface 49, shown in
Figure 7, which includes single board computer 160 coupled to management
network interface card 68. Ex. 1004, 13:50–53; Ex. 1018, ¶ 52.

The '021 Patent describes a system in which the microcontroller module
allows remote polling of the modules by providing a dedicated ethernet path
between the microcontroller module and a system administrator. Ex. 1001, 7:62–
8:14; Ex. 1018, ¶ 65. Similarly, *Hipp* discloses

a "remote management system 70 [that]
include[s] the ability to monitor and manage
components of network 30. Various
measurements and characteristics regarding the
functionality and operation of network 30 are
collected, stored, analyzed and maintained
using single board computer [160]." Ex. 1004,
20:9–16, Ex. 1018, ¶¶ 52, 66. *Hipp*
additionally discloses that management



FIG. 7

network interface 49, including single board computer 160, communicates with
remote management system 70 over an Ethernet connection (i.e., communication
link 71 illustrated in Figure 1) via Ethernet connector 186. Ex. 1004, 14:49–51; Ex.

# UNITED STATES PATENT AND TRADEMARK OFFICE
# BEFORE THE PATENT TRIAL AND APPEAL BOARD

| | | | |
|---|---|---|---|
| In Re: | U.S. Patent 6,948,021 | : | Attorney Docket No. 016295.4954 |
| Inventor: | Joel Brian Derrico et al. | : | |
| Filed: | November 16, 2001 | : | |
| Issued: | September 20, 2005 | : | IPR No. 2013-00440 |
| Assignee: | Acceleron, LLC | | |
| Title: | Cluster Component Network Appliance System and Method for Enhancing Fault Tolerance and Hot-Swapping | | |

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

*Submitted Electronically via the Patent Review Processing System*

## CORRECTED PETITION FOR *INTER PARTES* REVIEW OF CLAIMS 1– 4, 6–20, 22–24, 30, and 34–36 OF U.S. PATENT NO. 6,948,021 UNDER 35 U.S.C. §§ 311–319 and 37 C.F.R. §§ 42.100 *ET SEQ.*

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ...................................................................................1

II.   MANDATORY NOTICES, STANDING, AND FEES................................2

III.  OVERVIEW OF THE '021 PATENT .....................................................3

    A.    Summary of the Claimed Subject Matter ......................................3

    B.    Overview of the Prosecution History ...........................................4

    C.    Effective Priority Date of the Claims of the '021 Patent................5

IV.   OVERVIEW OF CHALLENGE PURSUANT TO 37 C.F.R. 42.104(b) .........6

V.    CLAIM CONSTRUCTION ....................................................................6

    A.    Independently-Functioning Computer...........................................7

    B.    Stand-Alone Computer ...............................................................9

    C.    Ethernet...................................................................................10

    D.    Poll.........................................................................................10

VI.   LEVEL OF ORDINARY SKILL IN THE ART .......................................11

VII.  SUMMARY OF PRIOR ART...............................................................11

    A.    State of the Art........................................................................11

    B.    *Hipp* Discloses a Web Server Chassis Including Web Server Processing Cards, Network Interface Cards, and Power Supplies ....................................12

VIII. THERE IS A REASONABLE LIKELIHOOD THAT THE CHALLENGED CLAIMS ARE UNPATENTABLE................................................................13

    A.    Ground 1: Claims 1–4, 6–9, 13–20 and 22–24 are anticipated by *Hipp* ..............14

    B.    Ground 2: Claims 10–12, 30 and 34–36 are obvious over *Hipp* in view of *Gasparik* ..................................................................31

    C.    Ground 3: Claims 8 and 9 are obvious over *Hipp* in view of the *SCSI Standard* .37

    D.    Ground 4: Claims 10–12 are obvious over *Hipp* in view of the *SCI Standard* and in further view of *Gasparik* ..................................................39

IX.   CONCLUSION ...................................................................................43

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*In re GPAC Inc.*,
    57 F.3d 1573 (Fed. Cir. 1995) ..................................................................11

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...............................................................7

**STATUTES**

35 U.S.C. § 102(e) ....................................................................1, 4, 6, 12, 14

35 U.S.C. § 103 ....................................................................1, 6, 31, 37, 39

35 U.S.C. § 112, ¶ 4 ...........................................................................9

35 U.S.C. §§ 311–319 .........................................................................1

35 U.S.C. § 314(a) ..............................................................................6

35 U.S.C. § 318(b) .............................................................................42

**OTHER AUTHORITIES**

37 C.F.R. 42.104(b) ............................................................................5

37 C.F.R. §§ 42.8(b)(3) and 42.10(a) ...................................................2

37 C.F.R. § 42.10(b) ...........................................................................3

37 C.F.R. §§ 42.22(a)(1) and 42.104(b) ...............................................6

37 C.F.R. § 42.100(b) .........................................................................7

37 C.F.R. § 42.100 *et seq.* ..................................................................1

37 C.F.R. § 42.104(a) .........................................................................3

37 C.F.R. § 42.104(b)(4)–(5) .............................................................13

**A99**

## LIST OF EXHIBITS

| | |
|---|---|
| 1001 | U.S. Patent No. 6,948,021 by Joel Derrico et al. ("the '021 Patent") |
| 1002 | U.S. Provisional Application No. 60/248,834 ("the '834 Provisional") |
| 1003 | U.S. Patent Application No. 09/987,917 ("the '917 Application") |
| 1004 | U.S. Patent No. 6,757,748 by Christopher G. Hipp ("*Hipp*") |
| 1005 | U.S. Patent No. 7,032,119 by Henry T. Fung et al. ("*Fung*") |
| 1006 | U.S. Patent No. 6,950,895 by David A. Bottom et al. ("*Bottom*") |
| 1007 | U.S. Patent No. 6,157,974 by Frank Gasparik ("*Gasparik*") |
| 1008 | U.S. Patent No. 6,742,068 by Brian Gallagher et al. ("*Gallagher*") |
| 1009 | U.S. Patent No. 6,591,324 by Hsiang-Chan Chen et al. ("*Chen*") |
| 1010 | U.S. Patent No. 5,210,855 by Thomas M. Bartol ("*Bartol*") |
| 1011 | '021 Patent Prosecution History: April 21, 2004 Office Action |
| 1012 | '021 Patent Prosecution History: October 21, 2004 Response to Office Action |
| 1013 | '021 Patent Prosecution History: November 8, 2004 Final Office Action |
| 1014 | '021 Patent Prosecution History: November 20, 2005 Notice of Allowability |
| 1015 | Preboot Execution Environment (PXE) Specification v2.1, published Sept. 20, 1999 ("*PXE*") |
| 1016 | Plaintiffs' Disclosure of Infringement Contentions in *Acceleron, LLC v. Dell, Inc.*, No. 1:12-cv-04123-TCB (N.D. Ga.) |
| 1017 | Plaintiff's Response Brief Regarding Claim Construction in *Acceleron, LLC v. Hewlett-Packard Co. et al.*, 1:10-cv-00128-SLR (D. Del.) |
| 1018 | Declaration of Robert Horst, Ph. D. |

| 1019 | Curriculum Vitae of Robert Horst, Ph. D. |
|------|------------------------------------------|
| 1020 | Litigation Experience of Robert Horst, Ph. D. |
| 1021 | CompactPCI PICMG 2.1 R1.0, May 1, 1998 ("*CompactPCI*") |
| 1022 | SFF-8046 Specification for 80-pin SCA-2 Connector of SCSI Disk Drives ("*SCSI Standard*") |
| 1023 | Random House Webster's Computer & Internet Dictionary, 3d ed. (1999) |
| 1024 | Microsoft Computer Dictionary, 4th ed. (1999) |
| 1025 | The Computer Desktop Encyclopedia, 2d ed. (1999) |
| 1026 | Reliable Computer Systems: Design & Evaluation, Daniel P Siewiorek & Robert S. Swaz, 3d ed. (1998) |
| 1027 | Ketris 9000 Press Release, May 1, 2000 |
| 1028 | STARFIRE: Extending the SMP Envelope, by Alan Charlesworth, IEEE Micro, Jan./Feb. 1998 |
| 1029 | Netra ft 1800 White Paper, Sun Microsystems, April 1999 |
| 1030 | Linux Remote—Boot mini—HOWTO: Configuring Remote-Boot Workstations with Linux, DOS, Windows 95/98 and Windows NT v3.19, by Marc Vuilleumier Stückelberg & David Clerc, February 1999 |
| 1031 | Plaintiff's Opposition to Motion for Summary Judgment of Invalidity of for Failure to Comply with the Written Description Requirement of 35 U.S.C. § 112, ¶ 1 in *Acceleron, LLC v. Hewlett-Packard Co. et al.*, 1:10-cv-00128-SLR (D. Del.). |
| 1032 | U.S. Provisional Application No. 60/248,834 ("the '834 Provisional") |
| 1033 | '021 Patent Prosecution History: April 21, 2004 Office Action |
| 1034 | '021 Patent Prosecution History: October 21, 2004 Response to Office Action |
| 1035 | '021 Patent Prosecution History: November 8, 2004 Final Office Action |

iv

Petition for *Inter Partes* Review of U.S. Patent No. 6,948,021

| 1036 | '021 Patent Prosecution History: November 20, 2005 Notice of Allowability |
|------|----------------------------------------------------------------------------|

## I.    INTRODUCTION

Dell Inc. ("Dell" or "Petitioner") requests *inter partes* review ("IPR") under 35 U.S.C. §§ 311–319 and 37 C.F.R. § 42.100 *et seq*. of Claims 1–4, 6–20, 22–24, 30 and 34–36 of U.S. Patent No. 6,948,021 ("the '021 Patent") to Derrico et al., titled "Cluster Component Network Appliance System and Method for Enhancing Fault Tolerance and Hot-Swapping." *See* Ex. 1001.

The '021 Patent relates to a computer network appliance comprising a backplane and various hot-swappable modules (e.g., CPU modules, power modules, switch modules). *See* Ex. 1001, 3:18–23. The '021 Patent claims priority to a provisional application filed on November 16, 2000. Although the '021 Patent is not entitled to the filing date of this provisional, each of the U.S. patents and publications relied upon herein were filed or published prior to this date such that they qualify as prior art.

The primary references relied upon herein qualify as prior art capable of rendering Claims 1–4, 6–20, 22–24, 30 and 34–36 unpatentable under either 35 U.S.C. § 102(e) or 35 U.S.C. § 103(a). For example, U.S. Patent No. 6,757,748 by Christopher G. Hipp ("*Hipp*") discloses a web server chassis including hot-swappable server cards, switched network interface cards and power supplies connected to a midplane. Ex. 1004, 2:56–58, 3:43–67, 12:37–50, 16:62–64, 18:48–51. As shown in detail below, *Hipp*, either alone or in combination with other

references, discloses each and every element of claims 1–4, 6–20, 22–24, 30 and

34–36, and therefore render those claims unpatentable. *See infra*, Section VIII, (A)

and (B).

## II.   MANDATORY NOTICES, STANDING, AND FEES

Real Party in Interest: Dell Inc. is the real party-in-interest.

Related Matters: The '021 Patent is involved in the pending lawsuit entitled

Acceleron, LLC v. Hitachi Data Systems Corp., No. 1:12-cv-02996 (N.D. Ga), and

the pending lawsuit entitled Acceleron, LLC v. Dell, Inc., No. 1:12-cv-04123-TCB

(N.D. Ga). Further, in addition to the present petition, an additional petition for

*Inter Partes Review* of Claims 1–4, 6–19, 30, and 34–36 of the '021 Patent is being

filed concurrently by Dell.

Lead and Backup Counsel: Pursuant to 37 C.F.R. §§ 42.8(b)(3) and 42.10(a),

Dell designates the following: Lead Counsel is Kevin J. Meek (Reg. No. 33,738);

Back-up Counsel are Paula D. Heyman (Reg. No. 48,363) and Nicholas A.

Schuneman (Reg. No. 62,088).

Service Information: Service information is as follows: Baker Botts LLP, 98

San Jacinto Blvd., Suite 1500, Austin, Texas 78701; Tel. (512) 322-5470; Fax

(512) 322-3622. Dell consents to service by electronic mail at

kevin.meek@bakerbotts.com,          paula.heyman@bakerbotts.com          and

nick.schuneman@bakerbotts.com. A Power of Attorney is filed concurrently

herewith under 37 C.F.R. § 42.10(b).

Certification of Grounds for Standing: Dell certifies under 37 C.F.R. § 42.104(a) that the '021 Patent for which review is sought is available for *inter partes review*. Dell is not barred or estopped from requesting *inter partes review* of any claim of the '021 Patent on the grounds set forth herein.

Fees: The below Petition Fee is paid concurrently with the filing of this Petition by Deposit Account 02-0384:

| | | | |
|---|---|---|---|
| *Inter Partes* Review Request (1406): | 1 x | $9,000.00 | $9,000.00 |
| Request Claims in Excess of 20 (1407): | 6 x | $200.00 | $1,200.00 |
| *Inter Partes* Review Post Inst. (1414): | 1 x | $14,000.00 | $14,000.00 |
| Post Inst. Claims in Excess of 15 (1415): | 11 x | $400.00 | $4,400.00 |
| | | **Total Amount Due:** | **$28,600.00** |

The undersigned representative of Petitioner hereby authorizes the Patent Office to charge any additional fees or credit any overpayment to deposit account 02-0384.

## III. OVERVIEW OF THE '021 PATENT

### A. Summary of the Claimed Subject Matter

The '021 Patent was filed on November 16, 2001 and issued on September 20, 2005. According to assignment records filed with the United States Patent and Trademark Office ("USPTO"), the '021 Patent is currently assigned to Acceleron, LLC. The patent discloses "a hot-swappable server module (server blade) in a computer network appliance with shared, hot-swappable power, network, and

management modules to provide highly available computer capacity." Ex. 1001, Abstract. The computer network appliance includes backplane board 104, CPU modules 102(a)-(e), power module 106, and ethernet switch module 110. *Id.* at 3:18–23. The backplane board provides power and data I/O signals to the CPU modules. *Id.* at 3:63–65. *Id.* at 3:18–23. Each of the CPU modules, power module and ethernet switch module include hot swap connectors having pins (*i.e.*, ground, pre-chare power, power and signal) of different length that allow the pins to make connections with the mating connectors of the backplane in a prearranged pattern. *Id.* at 3:66–4:20. Each CPU module includes hardware BIOS 210 that configures the CPU module and instructs network attached storage (NAS) to locate an operating system to perform a remote boot. *Id.* at 3:36–38. The computer network appliance further includes a microcontroller module that uses a dedicated ethernet path separate from the network data I/O to remotely poll the health of the CPU modules, the power module and the ethernet switch module. *Id.* at 7:62–65.

## B.    Overview of the Prosecution History

The '021 Patent was filed as U.S. Patent Application No. 09/987,917 ("the '917 Application") on November 16, 2001. Ex. 1003. On April 21, 2004, the USPTO issued a first Office Action including, among others, rejections of independent Claims 1, 30 and 32 as anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 6,591,324 to Chen et al. ("*Chen*"). Ex. 1033, pp. 5–6.

On October 21, 2004, the applicants filed a Response to Office Action amending, among others, independent Claims 1, 30 and 32. Ex. 1034, pp. 4, 8 & 9. In the Remarks, the applicants argued that, in contrast to *Chen*, which "describes a single computer system comprised of individual, hot-swappable components . . . the present invention describes a cluster computer device that interconnects multiple independently-functioning computers . . . ." *Id.* at p. 12.

On November 8, 2004, the USPTO issued a Final Office Action allowing Claims 1–36. Ex. 1035, p. 5. While the Examiner gave no explicit reasons why Claims 1–36 were allowable over the cited prior art, the Examiner did state that "the prior art of record, alone or in combination, does not teach or fairly anticipate all the limitations of the claims as pointed out by applicant in 'Remarks' filed on 10/21/2004." *Id.* Claims 1–36 were allowed on February 18, 2005 (Ex. 1036) and the '021 Patent issued on September 20, 2005. Ex. 1001.

## C.    Effective Priority Date of the Claims of the '021 Patent

The effective priority date of the claims of the '021 Patent is November 16, 2001. The '021 Patent claims, but is not entitled to, priority to the '834 provisional application, filed November 16, 2000. However, because the filing dates of the references cited in this IPR are before November 16, 2000, the priority date of the '021 Patent is not at issue.

5

## IV.    OVERVIEW OF CHALLENGE PURSUANT TO 37 C.F.R. 42.104(b)

Pursuant to 37 C.F.R. §§ 42.22(a)(1) and 42.104(b), Petitioner challenges Claims 1–4, 6–20, 22–24, 30 and 34–36 of the '021 Patent and requests cancellation of the claims on the following statutory grounds:

Ground 1 - Claims 1–4, 6–9, 13–20 and 22–24 are anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 6,757,748 to Christopher G. Hipp et al. ("*Hipp*").

Ground 2 - Claims 10–12, 30 and 34–36 are obvious under 35 U.S.C. § 103(a) over *Hipp* in view of U.S. Patent No. 6,157,974 to Frank Gasparik ("*Gasparik*").

Ground 3 - Claims 8 and 9 are obvious under 35 U.S.C. § 103(a) over *Hipp* in view of SFF-8046 Specification for 80-pin SCA-2 Connector of SCSI Disk Drives, Rev. 2.7 ("*SCSI Standard*").

Ground 4 - Claims 10–12 are obvious under 35 U.S.C. § 103(a) over *Hipp* in view of *Gasparik* and in further view of the *SCSI Standard*.

As demonstrated below, for each of the grounds, there is a reasonable likelihood that Petitioner will prevail with respect to at least one of the challenged claims. *See* 35 U.S.C. § 314(a).

## V.    CLAIM CONSTRUCTION

This Petition shows that the challenged claims of the '021 Patent (Ex. 1001)

Petition for *Inter Partes* Review of U.S. Patent No. 6,948,021

are unpatentable when the challenged claims are given their "broadest reasonable construction in light of the specification" (*see* 37 C.F.R. § 42.100(b)), and in view of the patent owner's allegations in previous litigation. The constructions set forth below are provided for purposes of this IPR only.[1]

Consistent with the broadest reasonable standard, claim terms "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). Here, the majority of claim terms should be given their plain and ordinary meaning. However, a proposed construction for certain claim terms is provided below.

## A.   Independently-Functioning Computer

The phrase "independently-functioning computer" should be construed to mean "functions independently of the operations or functions of any other CPU in the computer network appliance," which is its plain and ordinary meaning to one of ordinary skill in the art. Ex. 1018, ¶ 27.

---

[1] District Courts employ different standards of proof and analysis to claim construction that are not applied by the USPTO for *inter partes* review. Accordingly, any interpretation or construction of the challenged claims in this Petition, either implicitly or explicitly, should not be viewed as constituting, in whole or in part, Petitioner's own interpretation or construction, except as regards the broadest reasonable construction of the claims presented. Petitioner reserves the right to seek different constructions of these claim terms in a different forum.

"Independently-functioning" does not appear in the specification of the '021 Patent. This phrase was added to the claims during prosecution in order to overcome a rejection over U.S. Patent No. 6,591,324 to Chen ("*Chen*"). *Chen* describes a computer with multiple hot-swappable components, including processor cards that operate in a symbiotic relationship—when a master processor card fails, the slave card undertakes the operations of the second card. Ex. 1009, Fig. 2, 4:46–49; Ex. 1018, ¶ 26. During prosecution of the '021 Patent, the applicants argued that *Chen* "describes a single computer system comprised of individual, hot-swappable components [but that, in] contrast, the present invention describes a cluster computer device that interconnects multiple <u>independently functioning computers,</u> allowing components of the computers to be used as shared resources." Ex. 1034, p. 12 (emphasis added). In other words, the applicants distinguished between CPU modules that work in conjunction with each other, as described in *Chen*, and CPU modules that function independently, as recited in the claims of the '021 Patent.

Moreover, current assignee Acceleron has previously argued in litigation that "independently-functioning computer" should be construed to mean "capable of operating as a computer without depending on the status, operations, or functions of any other CPU module in the computer network appliance," which is broader than the construction Dell proposes. Ex. 1017, pp. 21–22. To the extent

that the prior art discloses an "independently-functioning computer" as construed by Petitioner, it should also disclose that limitation as construed by Acceleron.

## B.    Stand-Alone Computer

The phrase "wherein each CPU module is a stand-alone .. computer" should be construed to mean "wherein each CPU module is capable of operating as a stand-alone computer," where a "stand-alone computer" is a computer that is "configured to operate as a computer when not connected to a computer network appliance or to any other CPU." Ex. 1018, ¶ 28. This construction is required by the claim language and the specification of the '021 Patent. Claim 1 includes the phrase "wherein each CPU module is a stand-alone . . . computer." Ex. 1001, 9:3–5. Claim 13, which depends from Claim 1, adds one additional limitation to Claim 1: "wherein a CPU module operates as a stand-alone computer." Ex. 1001, 9:61–62. As a dependent claim, Claim 13 must "specify a further limitation of the subject matter claimed [in claim 1]." 35 U.S.C. § 112, ¶ 4. In other words, the phrase "is a stand-alone computer" in Claim 1 must be construed to be broader than the phrase "operates as a stand-alone computer" in Claim 13. Thus, "wherein each CPU module is a stand-alone . . . computer" should be construed to mean "wherein each CPU module is capable of operating as a stand-alone computer." Ex. 1018, ¶ 32.

This construction is consistent with the '021 Patent specification, which does not disclose that a CPU module "is a stand-alone computer." Ex. 1018, ¶ 31. The '021 Patent instead teaches a CPU module that is capable of operating or functioning as a stand alone computer when provided with power, ethernet, and an operating system. *See* Ex. 1001, 2:23-24; 4:34-35; and 5:42-49; *see also* Ex. 1018, ¶¶ 31–32.

## C.   Ethernet

The term "ethernet" refers to "a communication standard defined by IEEE 802.3." Ex. 1018, ¶ 33. As such, the claimed "ethernet switch module" is a device that operates in sufficient compliance with the IEEE 802.3 standard such that it can communicate with other ethernet devices. *Id.* Similarly, the term "fast ethernet" refers to "a specific type of Ethernet defined by IEEE 802.3u and IEEE 802.3y, commonly referred to as 100BASE-T, that carries traffic at a nominal rate of 100 Mbit/second." Ex. 1018, ¶ 34.

## D.   Poll

The term "poll" should be given its ordinary meaning in the art, which is "sends routine, periodic requests for health or status information to the other components in the system." Ex. 1018, ¶ 35. Current assignee Acceleron previously advocated a broader construction of the term "poll"—namely, that "polling" means "gather information." Ex. 1017, pp. 31–32. To the extent that prior art discloses

"polling" as construed by Petitioner, it should also disclose that limitation as construed by Acceleron.

## VI.    LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is evidenced by the references. *See In re GPAC Inc.*, 57 F.3d 1573 (Fed. Cir. 1995). A person of ordinary skill in the art of the '021 Patent would have had a B.S. in Electrical or Mechanical Engineering or Computer Science, and at least two years experience in designing multiprocessor computer systems, including the software used with such systems. Ex. 1018, ¶ 47

## VII.   SUMMARY OF PRIOR ART

### A.    State of the Art

According to the '021 Patent, the "invention generally relates to fault tolerant computer systems and, more specifically, to a system and method for enhancing fault tolerance and hot swapping in computer systems." Ex. 1001 at 1:14-17. Neither fault tolerance nor hot-swapping were new ideas when the '021 Patent was filed. Ex. 1018, ¶¶ 40–41. Indeed, by 2001, this was a very crowded and well-developed field.

Fault tolerant computing dates back to at least the 1960s, with the development by AT&T of the fault-tolerant No. 1 ESS telecommunications switch. Ex. 1018, ¶ 42. Additionally, Tandem Computers introduced a fault-tolerant

commercial system, the NonStop system, in 1976— more than 24 years before the '021 Patent was filed. *Id*.

Hot-swapping was also well-known by the time the inventors filed the '021 Patent. For example, the CompactPCI Hot Swap Specification, released in May 1998, set forth industry standards for hot-swap connectors including the specification of a staged connector with different pin lengths. Ex. 1018, ¶ 43. Additionally, hot swappable connectors with three and four stages of pin connection corresponding to varying pin lengths were well-known Ex. 1010, Fig. 5, 77:58–8:24; Ex. 1007, Fig. 3, 4:23–42; Ex. 1018, ¶¶ 44–45.

Moreover, numerous companies (such as RLX Technologies, Ziatech Corp., and Sun Microsystems) had developed fault tolerant server systems including hot-swappable CPU, Ethernet, and power modules before the '021 Patent was filed. Ex. 1018, ¶ 46. Each of these systems predated the filing date of the '021 Patent and included the features recited in the claims of the '021 Patent. *Id*.

## B.   *Hipp* Discloses a Web Server Chassis Including Web Server Processing Cards, Network Interface Cards, and Power Supplies

The *Hipp* reference was filed on July 20, 2000, and issued on June 25, 2002, qualifying it as prior art to the '021 Patent under 35 U.S.C. § 102(e). Ex. 1004. *Hipp* was not considered during the prosecution of the '021 Patent. *Hipp* describes a technology within the same field as the '021 Patent—namely, modular servers. Because *Hipp* discloses each element of independent Claims 1, 20 and 24 of the

'021 Patent (as well as many of the dependent claims), and because *Hipp* was never considered during prosecution of the '021 Patent, the Board should consider *Hipp* material in deciding the patentability of the '021 Patent.



FIG. 1

*Hipp* discloses a web server chassis 38, shown in Figure 1, that includes hot-swappable web server processing cards 32, a switched network interface card 48, and hot-swappable power supplies 280, as well as a midplane 34 that allows the network interface cards and power supplies to be shared by the web server processing cards. Ex. 1004, 2:56–58, 3:45, 16:62–64. Web server processing cards 32 are independent, single board computers containing all "the requisite components and devices" to "operate as a server hosting a wide array of Internet-based applications." Ex. 1004, 7:57–61, 12:9.

## VIII. THERE IS A REASONABLE LIKELIHOOD THAT THE CHALLENGED CLAIMS ARE UNPATENTABLE

Pursuant to 37 C.F.R. § 42.104(b)(4)–(5), all of the challenged claims are unpatentable for the reasons set forth in detail below.

A.    **Ground 1: Claims 1–4, 6–9, 13–20 and 22–24 are anticipated by** ***Hipp***

As shown in the citations to *Hipp* below, and in the claim charts included within the declaration of Dr. Robert Horst, Ph. D., each and every element of Claims 1–4, 6–9, 13–20 and 22–24 are disclosed by *Hipp*. Accordingly, Petitioner respectfully submits that *Hipp* anticipates Claims 1–4, 6–9, 13–20 and 22–24 of the '021 Patent under 35 U.S.C. § 102(e).

**Claim 1[p].** A computer network appliance, *Hipp* discloses "a high density, multiple server network" that includes "a plurality of web server processing cards 32 and 132−135 coupled with a public network 45, a private network 46 and a management network 47." Ex. 1004, 3:42−47, Fig. 1; Ex. 1018, ¶ 52.

**Claim 1[a].** a plurality of hot-swappable CPU modules, wherein each CPU module is a stand-alone independently-functioning computer. *Hipp* discloses a server chassis containing a plurality of web server processing cards where each "[w]eb server card 32 provides the functionality of a single board computer which may be employed as a rack mounted web server." Ex. 1004, 3:54–64, Fig. 1; Ex. 1018, ¶ 52. Further, each "web server processing card 32 includes a printed circuit board 82, coupled with a central processing unit (CPU) 84 . . . ." Ex. 1004, 8:6–10, Fig. 2; Ex. 1018, ¶ 52. Web server processing cards are hot-swappable. Ex. 1004, 18:48–51; Ex. 1018, ¶ 52. Additionally, the web server processing cards may be configured to provide individual server capacity or may be clustered. Ex. 1004,

14

6:48–53; Ex. 1018, ¶ 52. Thus, the hot-swappable web server processing cards are capable of operating as a stand-alone computer and function independently of the operations or functions of any other CPU in the computer network appliance.

**Claim 1[b].** a hot-swappable power module. *Hipp* discloses that the server chassis includes "two load-balance, hot-swappable power supplies 280." Ex. 1004, 16:62–64; Ex. 1018, ¶ 52.

**Claim 1[c].** a hot-swappable ethernet switch module. *Hipp* discloses a "network interface card which is hot swappable within a midplane." Ex. 1004, 2:56–58; Ex. 1018, ¶¶ 52–53. Thus, a hot-swappable ethernet switch module is disclosed as switched network interface card 48, shown in Figure 5, that establishes a "connection between a respective web server processing card 32 and public network switch 42." Ex. 1004, 12:37–40; Ex. 1018, ¶ 52. Switched network interface card 48 includes an eighty pin SCA connector 115, Ethernet communication paths 145, Ethernet communication link 143, and RJ-45 Ethernet connector 144. Ex. 1004, 12:42–50; Ex. 1018, ¶¶ 52–53.

**Claim 1[d].** a backplane board having a plurality of hot swap mating connectors. *Hipp* discloses a passive midplane 34 that "includes a plurality of web server processing card connectors 276 which facilitate the installation of up to twenty-four web server processing cards 32." Ex. 1004, 15:34–37; Ex. 1018, ¶¶ 52, 54. The rear face 277 of midplane 34 includes mount mechanisms for power

15

supplies 280 and "a plurality of network interface card connectors 282–287." Ex. 1004, 15:37–42, Figs. 8 & 9; Ex. 1018, ¶ 52. The connectors on the midplane are hot-swappable. Ex. 1004, 15:58–60; Ex. 1018, ¶ 52.

**Claim 1[e].** wherein the at least one backplane board interconnects each of the CPU modules with the at least one power module and the at least one ethernet switch module such that the at least one power module and the at least one ethernet switch module can be used as a shared resource by the plurality of CPU modules. *Hipp* discloses that midplane 34 interconnects each web server processing card 32 with power supplies 280 and network interface cards 48 such that the power supplies and network interface cards can be used as shared resources by the web server processing cards. Indeed, midplane 34 "distributes data and/or communications signals between web server processing cards 32 and network interface cards 40, 48 and 68." Ex. 1004, 15:54–57; Ex. 1018, ¶ 52. Further, midplane 34 "distributes power to components of web server processing cards 32 and network interface cards 40, 48 and 68." Ex. 1004, 15:52–54; Ex. 1018, ¶ 52.

**Claim 2.** The computer network appliance of claim 1, further comprising a chassis providing physical support for a CPU module, the power module, the ethernet switch module and the backplane board. *Hipp* discloses server chassis 38 that provides physical support to web server processing cards 32 (Ex. 1004, 7:64–67), network interface card 40 (Ex. 1004, 12:12–16) and power supplies 280 (Ex.

1004, 16:62–64). *See also*, Ex. 1004, Figs. 1 & 10–12; Ex. 1018, ¶ 52.

**Claim 3.** The computer network appliance of claim 2, wherein the chassis comprises caddies providing air flow from the front to the rear of the chassis. The '021 Patent does not describe a role for the caddies in providing air flow. In fact, the '021 Patent only states that "[e]ach module resides in a caddy 152 of the chassis such that when the module is inserted into the chassis the caddy ensures that the hot swap connectors are aligned." Ex. 1001, 3:32–34. Air flow in the '021 Patent is generated and controlled by fans 120 and 122. Ex. 1001, 3:51-57; Ex. 1018, ¶ 52. Given this disclosure, claim 3 should be read to mean that the caddies do not block air that flows from the front to the rear of the chassis. Ex. 1018, ¶ 52.

*Hipp* discloses "a plurality of box fans 264–269" that are mounted on articulating door 262 located at the front of server chassis 38. Ex. 1004, Fig. 11, 16:14–15; Ex. 1018, ¶ 52. The articulating door performs the same function as the caddies of the '021 Patent. Ex. 1018, ¶ 55. Box fans 264–269 "draw air from the ambient environment through articulating door 262, and exhaust through a back plate 270." Ex. 1001, 16:15–18; Ex. 1018, ¶ 52. Thus, box fans 264–269 provide air flow from the front to the rear of the chassis. *Hipp*, therefore, discloses the limitation of claim 3.

**Claim 4.** The computer network appliance of claim 2, wherein the chassis comprises bays and slot guides to facilitate mounting and removal of the modules

and to ensure proper alignment between hot swap connectors of the modules and the hot swap mating connectors of the backplane board. As shown in Figures 10–12 of *Hipp*, server chassis 38 contains web server processing cards 32, power supplies 280 and network interface cards 48. Additionally, *Hipp* discloses that each web server processing card connector 94 is able to "blind mate" with midplane connector 276 utilizing ejector levers 96. Ex. 1004, 10:4–5; Ex. 1018, ¶ 52. Further, card guides are installed at "0.7 inch center to center dimensions." Ex. 1004, 16:55–57; Ex. 1018, ¶ 52. Thus, ejector levers 96 and card guides define specific areas (i.e., bays) in the server chassis and facilitate proper alignment of the hot swap connectors during mounting and removal.

**Claim 6.** The computer network appliance of claim 1, further comprising a power connector and a data input/output connector. *Hipp* further discloses that network interface cards 48 include standard RJ-45 connectors as data input/output connectors mounted on backplate 270 of server chassis 38 to establish a connection with a network. Ex. 1004, 12:37–45, 18:39–42; Ex. 1018, ¶¶ 52, 56. Further, power supplies 280 include power connectors as shown in Figure 12. *See* Ex. 1004, 16:64–66; Ex. 1018, ¶¶ 52, 56.

**Claim 7.** The computer network appliance of claim 6, wherein the data input/output connector is a standard ethernet connector allowing heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to

communicate with each other. *Hipp* discloses that the data input/output connector is a standard ethernet connector as RJ-45 connectors are mounted on backplate 270 of server chassis 38. Ex. 1004, 12:46–49, 18:39–42; Ex. 1018, ¶ 52. Further, heterogeneous CPU modules of different architectures are mounted in server chassis 38 because "[m]any types of central processing units with various specifications may be used within the teachings of the present invention." Ex. 1004, 8:13–15; Ex. 1018, ¶ 52. *Hipp* elaborates that "[f]or example, the Crusoe TM 3200 with speeds in the range of 300–400 MHz, or TM 5400 with speeds in the range of 500–700 MHz, may also be used." Ex. 1004, 8:20–22; Ex. 1018, ¶ 52. Midplane 34 allows these heterogeneous web server processing cards 32 mounted in server chassis 38 to communicate with each other by distributing "data and/or communications signals between web server processing cards 32 and network interface cards 40, 48 and 68." Ex. 1004, 15:54–57; Ex. 1018, ¶ 52.

**Claim 8.** The computer network appliance of claim 1, wherein each of the hot swap connectors of the modules comprises pin connections arranged in a specific pattern and includes ground pins, pre-charge power pins, power pins and signal pins. Claim 8 recites that "the hot swap connectors of the modules" include specific pins. One of ordinary skill in the art would read the claim to include the connectors of the CPU modules and ethernet switch module but not the power module. Ex. 1018, ¶ 57. In particular, the inclusion of pre-charge power pins does

not make sense in the context of a power module. Ex. 1018, ¶ 57. The purpose of pre-charge power pins, as described in the '021 Patent is to pre-charge the capacitance on a printed circuit board that receives power. Ex. 1001, 4:11–16; Ex. 1018, ¶ 57. A power supply, in contrast, provides power. Ex. 1018, ¶ 57. As such, one of ordinary skill in the art would not determine that the connector of Claim 8 applies to the claimed power module. Ex. 1018, ¶ 57.

*Hipp* discloses that hot swap connectors 94 of web server processing card 32 and hot swap connectors 115 of network interface cards 48 are eighty (80) pin SCA connectors. Ex. 1004, 10:1–4, 12:40–45; Ex. 1018, ¶ 52. Eighty pin SCA connectors include pins arranged in a specific pattern including ground pins, pre-charge power pins, power pins and signal pins. Ex. 1018, ¶¶ 52, 57. Thus, because Hipp discloses the use of SCA connectors with the web server processing cards and network interface cards, it discloses the limitation of claim 8.

**Claim 9.** The computer network appliance of claim 8, wherein the ground pins of a hot swap connector of a module make contact with corresponding ground elements of a hot swap mating connector of the backplane board. *Hipp* discloses that hot swap connector 94 of web server processing card 32 makes contact with connector 276 on midplane 34. Ex. 1004, 15:34–44; Ex. 1018, ¶ 52. Connections are made with eighty pin SCA connectors that include ground pins that mate with corresponding elements on the midplane. Ex. 1004, 10:1–4, 12:41–44; Ex. 1018,

¶¶ 52, 58. Eighty pin SCA connectors have pins arranged such that the ground pins of the connectors make contact with corresponding ground pins of the midplane. Ex. 1018, ¶¶ 52, 58.

**Claim 13.** The computer network appliance of claim 1, wherein a CPU module operates as a stand alone computer. *See* Section VIII.A.Claim 1[a], *supra*.

**Claim 14.** The computer network appliance of claim 1, wherein a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot. *Hipp* discloses a hardware BIOS on web server processing card 32 that "contains the appropriate instructions for sending information from a program to the appropriate hardware device within network 30." Ex. 1004, 10:47–51; Ex. 1018, ¶ 52. The primary purpose of a BIOS is to boot software, including the operating system, on start-up. Ex. 1018, ¶ 59. Further, *Hipp* discloses that network 30 includes storage server 54 that "provides network attached storage (NAS)." Ex. 1004, 5:35–38; Ex. 1018, ¶ 52. Web server processing card 32 "includes 'boot from LAN' capability." Ex. 1004, 9:61–62; Ex. 1018, ¶¶ 52, 59. This is a type of remote booting. Ex. 1018, ¶ 59. At the time the '021 Patent was filed, booting remotely over a network was well-known and was even the subject of standardization in the Preboot Execution Environment ("PXE") Specification. Ex. 1018, ¶ 59. Additionally, *Hipp* discloses the use of at least two operating systems:

Linux and Windows. Ex. 1004, 8:26–30; Ex. 1018, ¶ 52. Thus, *Hipp* discloses that a BIOS instructs a NAS to locate an operating system from which to boot. Ex. 1018, ¶ 59.

**Claim 15.** The computer network appliance of claim 1, wherein a CPU module is configured to boot remotely from an OS located in an NAS, and wherein the computer network appliance is free of a local hard disk drive (HDD). As noted in Section VIII.A.Claim 14, *Hipp* discloses web server processing card 32 that "includes 'boot from LAN' capability" (Ex. 1004, 9:61–62; Ex. 1018, ¶ 52) and the use of at least two operating systems: Linux and Windows. Ex. 1004, 8:26–30; Ex. 1018, ¶ 52. Booting from a network (such as a LAN) requires that the operating system is obtained for a storage location on the network. Ex. 1018, ¶ 60. As also discussed above in connection with Claim 14, *Hipp* discloses network 30 including storage server 54 that provides network attached storage (NAS). Ex. 1004, 5:35–38; Ex. 1018, ¶ 52. Thus, Hipp discloses that web server processing card is configured to boot remotely from an OS located in a NAS. Ex. 1018, ¶ 60.

The claim further includes the limitation that "the computer network appliance is free of a local hard disk drive (HDD)." The only hard disk drives disclosed by *Hipp* that are a part of the server chassis are drives provided on "web server processing cards 32." Ex. 1001, 8:6–10; Ex. 1018, ¶ 61. However, *Hipp* explicitly states that these hard drives are optional: "[i]n still another embodiment,

web server processing card 32 may be provided without an associated disk drive."
Ex. 1004, 18:54–56; Ex. 1018, ¶ 52. Thus, Hipp discloses at least one embodiment
in which the server chassis has no hard disk drive. Ex. 1018, ¶ 61.

**Claim 16.** The computer network appliance of claim 15, wherein remote
booting of a CPU module allows the CPU module to run different types of
operating systems. As noted in Section VIII.A.Claim 15, *Hipp* discloses remote
booting (i.e., "boot from LAN") (Ex. 1004, 9:61–62; Ex. 1018, ¶ 52) and the use of
at least two operating systems: Linux and Windows. Ex. 1004, 8:26–30; Ex. 1018,
¶ 52. Remote booting, such as booting from LAN, provides the ability to run
different types of operating systems, which is a primary advantage of remote
booting. Ex. 1018, ¶ 62. Thus, *Hipp* discloses that remote booting allows the web
server processing cards to run different types of operating systems. *Id.*

**Claim 17.** The computer network appliance of claim 15, wherein effects of a
lack of a local HDD include increased mean time between failure (MTBF) and
decreased mean time to repair (MTTR) of the computer network appliance. The
'021 Patent describes increased MTBF and decreased MTTR as simple
consequences of the absence of a local hard disk drive (HDD). Ex. 1001, 2:27–34;
Ex. 1018, ¶ 63. The '021 Patent merely describes a well-understood characteristic
of HDDs—it is well known that HDDs are prone to fail more quickly because they
typically include several moving parts. Ex. 1018, ¶ 63. As such, because *Hipp*

discloses that web server processing card 34 and therefore, server chassis 38, "may be provided without an associated disk drive (Ex. 1004, 18:54–56; Ex. 1018, ¶ 52), the effects of increased MBTF and decreased MTTR would necessarily follow. Ex. 1018, ¶ 63. *Hipp*, therefore, discloses the limitations of claim 17.

**Claim 18.** The computer network appliance of claim 1, wherein each of a plurality of hot swap connectors of the modules includes an ethernet connection providing communications to all modules attached to the backplane board. *Hipp* discloses that hot swap connectors 94 of web server processing card 32 are eighty (80) pin SCA connectors that mate with web server processing card connectors 276 on midplane 34. Ex. 1004, 10:1–4, 15:34–37; Ex. 1018, ¶ 52. *Hipp* further discloses that network interface cards 48 include standard RJ-45 connectors as data input/output connectors mounted on backplate 270 of server chassis 38 to establish a connection with a network. Ex. 1004, 12:37–45, 18:39–42; Ex. 1018, ¶¶ 52, 56. Midplane 34 "distributes data and/or communications signals between web server processing cards 32 and network interface cards 40, 48 and 68." Ex. 1004, 15:54–65, *see also* 17:18–21; Ex. 1018, ¶ 52. Thus, the hot swap connectors of the web server cards include an ethernet connection providing communications to the other web server processing card attached to the midplane.

**Claim 19.** The computer network appliance of claim 18, wherein an ethernet connection is a switched fast ethernet connection. As noted in Section

VIII.A.Claim 1[c], *Hipp* discloses a switched network interface card. *Hipp* further discloses that web server processing card 32 comes equipped with multiple "10/100 BaseT network interfaces." Ex. 1004, 9:54–61; Ex. 1018, ¶ 52. Additionally, "switch chip 145 may include an optional twelve or twenty-four port 10/100 Base T switch with fiber gigabit uplinks." Ex. 1004, 12:49–54; Ex. 1018, ¶ 52. "100 Base-T" refers to the Fast Ethernet standards. Ex. 1018, ¶ 64. Thus, Hipp discloses a switched fast ethernet connection.

**Claim 20[p].** A computer network appliance. *See* Section VIII.A.Claim 1[p], *supra*.

**Claim 20[a].** a hot-swappable CPU module. *See* Section VIII.A.Claim 1[a], *supra*.

**Claim 20[b].** a hot-swappable power module. *See* Section VIII.A.Claim 1[b], *supra*.

**Claim 20[c].** a hot-swappable ethernet switch module. *See* Section VIII.A.Claim 1[c], *supra*.

**Claim 20[d].** a backplane board having a plurality of hot swap mating connectors. *See* Section VIII.A.Claim 1[d], *supra*.

**Claim 20[e].** a microcontroller module and a dedicated ethernet path, wherein the dedicated ethernet path is separate from a switched fast ethernet connection and provides the microcontroller module with a connection to remotely

poll the CPU module, the power module and the ethernet switch module. *Hipp* discloses a microcontroller module in management network interface 49, shown in Figure 7, which includes single board computer 160 coupled to management network interface card 68. Ex. 1004, 13:50–53; Ex. 1018, ¶ 52.

The '021 Patent describes a system in which the microcontroller module allows remote polling of the modules by providing a dedicated ethernet path between the microcontroller module and a system administrator. Ex. 1001, 7:62–8:14; Ex. 1018, ¶ 65. Similarly, *Hipp* discloses a "remote management system 70 [that] include[s] the ability to monitor and manage components of network 30. Various measurements and characteristics regarding the functionality and operation of network 30 are collected, stored, analyzed and maintained using single board computer [160]." Ex. 1004, 20:9–16, Ex. 1018, ¶¶ 52, 66. *Hipp* additionally discloses that management



FIG. 7

network interface 49, including single board computer 160, communicates with remote management system 70 over an Ethernet connection (i.e., communication link 71 illustrated in Figure 1) via Ethernet connector 186. Ex. 1004, 14:49–51; Ex.

1018, ¶¶ 52, 66. As illustrated in Figure 7, Ethernet connector 186 is separate from Ethernet connector 174. Ex. 1004, 14:51–63; Ex. 1018, ¶ 52.

Further, Hipp discloses that single board computer 160 "may autonomously detect a CPU which is about to fail" (Ex. 1001, 20:53–54; Ex. 1018, ¶¶ 52, 67) and that "remote management system 70 may monitor the performance of a particular component relative to identical or similar components within network 30, in order to detect and/or predict trouble or potential failures." Ex. 1004, 22:46–49; Ex. 1018, ¶¶ 52, 67. Detection of a module that has failed by single board computer 160 indicates active polling of the modules. Ex. 1018, ¶ 67. Accordingly, management network interface 49 uses a dedicated ethernet path to remotely poll the components of network 30 such that Hipp discloses the recited limitation. Ex. 1018, ¶¶ 65–67.

**Claim 20[f].** wherein each of the CPU module, the power module and the ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board. *Hipp* discloses that midplane 34 includes web server processing card connectors 276, power supply mounting mechanisms 278, and network interface card connectors 282–287. Ex. 1004, 15:33–42; Ex. 1018, ¶ 52. Additionally, web server processing cards 32 include connector 94 for mating with midplane 34 (Ex. 1004, 10:1–4; Ex. 1018, ¶ 52) and switched network interface card 48 includes connector 115 that couples

with midplane 34. Ex. 1004, 12:41–45; Ex. 1018, ¶ 52. Further, hot-swappable

power supplies 280 connect to midplane 24 through power supply mounting

mechanisms 278. Ex. 1004, 16:62–17:3; Ex. 1018, ¶ 52.

**Claim 22.** The computer network appliance of claim 20, wherein the

microcontroller module polls the CPU module on the status of an OS. As noted in

Section VIII.A.Claim 20[e], *Hipp* discloses that management network interface 49,

which includes single board computer 160, can poll the CPU module and

determine that it is about to fail. Ex. 1001, 20:53–54; Ex. 1018, ¶¶ 52, 68. The

information that a CPU module is about to fail indicates the "status of an OS"

because a failing CPU means that the operating system is likewise about to fail.

Ex. 1018, ¶ 68. Additionally, Hipp discloses that "[t]he operating system

associated with CPU 84 also includes information which may be transferred to

single board computer 160 and/or remote management system 70." Ex. 1004,

21:21–23; Ex. 1018, ¶¶ 52, 68. Web server processing card 32 "may transfer this

information to single board computer 160 and/or remote management system 70."

Ex. 1004, 21:28–30; Ex. 1018, ¶¶ 52, 68. Thus, Hipp discloses a microcontroller

module (management network interface 49, which includes single board computer

160) polling a CPU module (web server processing card 32) on the status of an OS.

Ex. 1018, ¶ 68.

**Claim 23.** The computer network appliance of claim 22, wherein the

microcontroller module performs a remote reset of the CPU module if the OS of the CPU module is determined to be unstable or have crashed. *Hipp* discloses that "single board computer 160 may autonomously detect a CPU which is about to fail" (i.e., which is determined to be unstable). Ex. 1004, 20:53–57; Ex. 1018, ¶¶ 52, 69. The remote management system 70 may use information from single board computer 160 of management network interface 49 to "automatically identify a potential system failure, and react accordingly." Ex. 1004, 21:1–5; Ex. 1018, ¶¶ 52, 69. One of ordinary skill in the art would understand that, when a CPU is determined to be unstable, an appropriate response is to reset it. Ex. 1018, ¶ 69. Indeed, Hipp discloses that the "connection between single board computer and high density connector [of management interface network 49] allows single board computer to execute a hardware reset, software reset, or password reset upon any particular web server processing card" (i.e., which is determined to be unstable). Ex. 1004, 15:14–19; Ex. 1018, ¶¶ 52, 69. Thus, management network interface 49, which includes single board computer 160, performs a remote reset of web server processing cards 32 if the OS of web server processing card 32 is determined to be unstable or have crashed. Ex. 1018, ¶ 69.

**Claim 24[p].** A computer network appliance, *See* Section VIII.A.Claim 1[p], *supra*.

**Claim 24[a].** a hot-swappable CPU module. *See* Section VIII.A.Claim 1[a],

*supra.*

**Claim 24[b].** a hot-swappable power module. *See* Section VIII.A.Claim 1[b], *supra.*

**Claim 24[c].** a hot-swappable ethernet switch module. *See* Section VIII.A.Claim 1[c], *supra.*

**Claim 24[d].** a backplane board having a plurality of hot swap mating connectors. *See* Section VIII.A.Claim 1[d], *supra.*

**Claim 24[e].** wherein each of the CPU module, the power module and the ethernet switch module includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board. *See* Section VIII.A.Claim 20[e], *supra.*

**Claim 24[f].** wherein the ethernet switch module filters communications internal and external to the computer network appliance to limit collisions caused by communications traffic. The '021 Patent teaches the use of "an unmanaged 8-port ethernet switch" which "acts as a traffic cop for data communications in the computer network appliance." Ex. 1001, 6:6–10. Thus, to the extent that the '021 Patent teaches filtering, it discloses a kind of "traffic cop" filtering that is inherent to ethernet switches. Ex. 1018, ¶ 70. Similarly, *Hipp* discloses that switched network interface card 48 includes switch chip 145 connected to Ethernet communication links 143 and 148 to establish a connection between web server

processing cards 32 and a network. Ex. 1004, 12:37–47; Ex. 1018, ¶ 52. "Switch chip 145 monitors and distributes traffic from a respective web server processing card 32 to a corresponding RJ-45 Ethernet connector 144 through an Ethernet link 143." Ex. 1004, 12:46–47; Ex. 1018, ¶ 52. Thus, the ethernet "switched network interface card 48" performs the same "traffic cop" filtering as recited in limitation 24[f]. Ex. 1018, ¶ 70.

### B.    Ground 2: Claims 10–12, 30 and 34–36 are obvious over *Hipp* in view of *Gasparik*

As shown in the citations to *Hipp* and *Gasparik* below, and in the claim charts included within the declaration of Dr. Robert Horst, Ph. D., each and every element of Claims 8–12, 30 and 34–36 is taught or suggested by *Hipp* in view of *Gasparik*. Accordingly, Petitioner respectfully submits that *Hipp* in view of *Gasparik* renders obvious Claims 8–12, 30 and 34–36 of the '021 Patent under 35 U.S.C. § 103.

One of ordinary skill in the art would have been motivated to combine *Hipp's* disclosure of hot swap connectors with the four-staged hot-swappable connectors of *Gasparik*. Ex. 1018, ¶ 72. Both *Hipp* and *Gasparik* disclose the use of hot swap connectors to provide "hot plugging" of modules or devices. Ex. 1004, 1:23–26; Ex. 1007, 15:58–60; Ex. 1018, ¶¶ 52, 72–74. Thus, it would have been obvious to combine these teachings in order to provide ESD protection. Ex. 1018, ¶¶ 72, 75.

**Claim 10.** The computer network appliance of claim 9, wherein pre-charge power pins of the hot swap connector of the module make contact with corresponding pre-charge power elements of the hot swap mating connector of the backplane board after the ground pins have made contact. As noted in Section VIII.A.Claim 9, *Hipp* discloses all elements of Claim 9. Additionally *Hipp* discloses the use of a hot swappable SCA-2 connector, which includes long length ground and pre-charge power pins and short length power and signal pins. Ex. 1022, p. 14; Ex. 1018, ¶¶ 52, 57. During connection, therefore, the power and signal pins make contact after the ground and pre-charge power pins. Ex. 1018, ¶ 57. *Gasparik* discloses a hot swappable connector including four different pin types. Ex. 1007, 4:27-32; Ex. 1018, ¶¶ 73–74. Upon connection, the pins connect sequentially in the order ground, power, DIFFSENS signal, and signal. Ex. 1007, 4:32-34; Ex. 1018, ¶¶ 73–74. It would have been obvious to one of skill in the art to combine the teaching in *Gasparik* of a connector having four pin lengths with the disclosure in *Hipp* of a connector having ground, pre-charge power, power, and signal pins. Ex. 1018, ¶ 75. It would further have been obvious to one of skill in the art to assign ground to the longest pins and pre-charge power to the second-longest pins, such that on connection pre-charge pins make contact after the ground pins make contact. *Id.*

**Claim 11.** The computer network appliance of claim 10, wherein the power

pins of the hot swap connector of the module make contact with corresponding power elements of the hot swap mating connector of the backplane board after the pre-charge power pins have made contact. As noted in Section VIII.B.Claim 10, *Hipp* in view of *Gasparik* discloses all elements of claim 10. *Hipp* further teaches the use of a hot swappable eighty pin SCA connector, which includes long length pre-charge power pins and short length power pins. Ex. 1018, ¶¶ 52, 76. During connection, therefore, the power pins of *Hipp* make contact after the pre-charge power pins. *Id.*

**Claim 12.** The computer network appliance of claim 11, wherein signal pins of the hot swap connector of the module make contact with corresponding signal elements of the hot swap mating connector of the backplane board after the power pins have made contact. As noted in Section VIII.B.Claim 11, *Hipp* in view of *Gasparik* discloses all elements of claim 11. *Hipp* teaches the use of a hot swappable eighty pin SCA connector, which includes long length ground and pre-charge power pins and short length power and signal pins. Ex. 1018, ¶¶ 52, 77. *Gasparik* discloses a hot swappable connector including four different pin types, each having different pin lengths such that the four pin types connect sequentially. Ex. 1007 at 4:27-32; Ex. 1018, ¶¶ 73–74. It would have been obvious to one of skill in the art to combine *Gasparik's* teaching of a connector having four pin lengths with *Hipp's* teaching of a SCA connector having ground, pre-charge

power, power, and signal pins. Ex. 1018, ¶ 77. It would further have been obvious to one of skill in the art to assign signal to the shortest pins and power to the second-shortest pins, such that on connection signal pins make contact after the power pins make contact. *Id.*

**Claim 30[p].** A method of mounting a plurality of hot-swappable CPU modules in a computer network appliance, wherein each CPU module is an independently-functioning stand-alone computer, each CPU module comprising a hot swap connector including ground pins, power pins and signal pins, the computer network appliance including a backplane board having hot swap mating connectors. As noted in Section VIII.A.Claim 1[p], Hipp discloses a computer network appliance. Additionally, as noted in Sections VII.A.Claim 1[a] and 1[d], *Hipp* also discloses a plurality of hot-swappable CPU modules, wherein each CPU module is an independently-functioning stand-alone computer and a backplane board having hot swap mating connectors. *Hipp* further discloses mounting web server processing cards 32 in midplane 34 of server chassis 38 (Ex. 1004, 7:59–62; Ex. 1018, ¶ 52) utilizing connector 94 that "includes a "blind mate" feature which provides self-alignment properties for simplified installation and removal of processing card 32 from passive midplane 34." Ex. 1004, 9:62–10:1; Ex. 1018, ¶ 52. Accordingly, *Hipp* discloses a method of mounting web server processing cards 32 in server chassis 38. *See also,* Ex. 1004, 10:59–61; Ex. 1018, ¶ 52.

Furthermore, *Hipp* discloses that the hot swap connectors of the web server processing card 32 are eighty (80) pin SCA connectors. Ex. 1004, 10:1–4, Ex. 1018, ¶ 52. Eighty pin SCA connectors have pins that include ground pins, power pins and signal pins. Ex. 1018, ¶ 57. Further, *Gasparik* discloses the use of a hot-swappable connector with ground pins, power pins, DIFFSENS signal pins, and signal pins. Ex. 1007, 4:23–32; Ex. 1018, ¶¶ 73–74.

**Claim 30[a].** connecting the ground pins of the hot swap connector with corresponding ground elements of a hot swap mating connector of the backplane board. As noted in Section VIII.B.Claim 9, *Hipp* discloses the use of a hot-swappable eighty pin SCA connector in which ground pins connect with corresponding ground elements. *Gasparik* discloses a hot-swappable connector having ground pins. Ex. 1007, 4:23–33; Ex. 1018, ¶¶ 73–74. *Gasparik* further discloses "sequential connection" of ground pins, power pins, DIFFSENS signal pins, and signal pins. Ex. 1007, 4:32-34; Ex. 1018, ¶¶ 73–74.

**Claim 30[b].** connecting the power pins of the hot swap connector with corresponding power elements of the hot swap mating connector of the backplane board after the ground pins have made contact. As explained in Section VII.B.Claims 10-11, *Hipp* discloses the use of a hot-swappable eighty pin SCA connector in which power pins connect with corresponding power elements after the ground pins have made contact. *Gasparik* discloses a hot-swappable connector

having power pins. Ex. 1007 4:23–33; Ex. 1018, ¶¶ 73–74. *Gasparik* further discloses "sequential connection" of ground pins, power pins, DIFFSENS signal pins, and signal pins. Ex. 1007, 4:32-34; Ex. 1018, ¶¶ 73–74.

**Claim 30[c].** connecting the signal pins of the hot swap connector of the module with corresponding signal elements of the hot swap mating connector of the backplane board after the power pins have made contact. *Gasparik* discloses a hot-swappable connector having signal pins. Ex. 1007, 4:23–33; Ex. 1018, ¶¶ 73–74. *Gasparik* further discloses "sequential connection" of ground pins, power pins, DIFFSENS signal pins, and signal pins. Ex. 1007, 4:32-34; Ex. 1018, ¶¶ 73–74.

**Claim 30[d].** wherein a backplane board interconnects each of the CPU modules with the ground elements, power elements, and signal elements, such that the power module and the ethernet switch module can be used as a shared resource by the plurality of CPU modules. *See* Section VIII.A.Claim 1[e]. *Hipp* further discloses that a hot swap connector 94 of web server processing card 32 makes contact with connector 276 on midplane 34. Because connections are made with eighty pin SCA connectors, ground elements, power elements, and signal elements connect the web server processing card 32 when inserted into connector 276. Ex. 1018, ¶¶ 57–58.

**Claim 34[p].** The method of claim 30, further comprising remotely booting a CPU module in a computer network appliance. Section VIII.A.Claim 14, *supra*.

**Claim 34[a].** locating an OS in an NAS to boot the CPU module. *See* Section VIII.A.Claim 14, *supra*.

**Claim 34[b].** and remotely booting the CPU module using the located OS. *See* Section VIII.A.Claim 15, *supra*.

**Claim 34[c].** wherein the computer network appliance is free of a local HDD in remotely booting the CPU module. *See* Section VIII.A.Claim 15, *supra*.

**Claim 35.** The method of claim 34, wherein the remote booting of the CPU module allows the CPU module to run different types of operating systems. *See* Section VIII.A.Claim 16, *supra*.

**Claim 36.** The method of claim 34, wherein effects of a lack of a local HDD include increased MTBF and decreased MTTR of the computer network appliance. *See* Section VIII.A.Claim 17, *supra*.

C.    **Ground 3: Claims 8 and 9 are obvious over *Hipp* in view of the *SCSI Standard***

As shown in the citations to *Hipp* and the *SCSI Standard* below, and in the claim charts included within the declaration of Dr. Robert Horst, Ph. D., each and every element of Claims 8 and 9 is taught or suggested by *Hipp* in view of the *SCSI Standard*. Accordingly, Petitioner respectfully submits that *Hipp* in view of the *SCSI Standard* renders obvious Claims 8 and 9 of the '021 Patent under 35 U.S.C. § 103.

Given the explicit reference in *Hipp* to "80 pin SCA connectors" and hot-

swappability, one of ordinary skill in the art would have been motivated to combine the 80-pin SCA-2 connector of the *SCSI Standard* with *Gasperik*. Ex. 1018, ¶¶57–58.

**Claim 8.** The computer network appliance of claim 1, wherein each of the hot swap connectors of the modules comprises pin connections arranged in a specific pattern and includes ground pins, pre-charge power pins, power pins and signal pins. As noted in Section VIII.A.Claim 8, *Hipp* discloses that hot swap connectors 94 of web server processing card 32 and hot swap connectors 115 of network interface cards 48 are eighty (80) pin SCA connectors.[2] To the extent that disclosure of the eighty pin SCA connectors in *Hipp* does not teach or suggest the claimed pin arrangement, it would have been obvious based on the teachings of *Hipp* in view of the *SCSI Standard*. Ex. 1018, ¶ 57. Specifically, the *SCSI Standard* discloses an 80-pin SCA-2 connector with ground pins (e.g., pins 41-43, "12V GROUND"), pre-charge power pins (e.g., pin 1, "12V CHARGE" and pin 36, "5V CHARGE"), power pins (e.g., pins 2-4 "12V"), and signal pins (e.g., pin 11 "-I/O" and pin 51 "+I/O"). Ex. 1022, p. 14; Ex. 1018, ¶ 57.

**Claim 9.** The computer network appliance of claim 8, wherein the ground pins of a hot swap connector of a module make contact with corresponding ground

---

[2] For the same reasons discussed in Section VIII.A.Claim 8, one of ordinary skill in the art would not determine that the connector of Claim 8 applies to the claimed power module.

elements of a hot swap mating connector of the backplane board. As noted in Section VIII.A.Claim 9, *Hipp* discloses that ground pins of hot swap connector 94 of web server processing card 32 make contact with corresponding ground elements of connector 276 on midplane 34. To the extent that disclosure of the eighty pin SCA connectors in *Hipp* does not teach or suggest the ground pins of the module hot swap connector contacting corresponding ground pin elements of a mating connector, it would have been obvious based on the teachings of *Hipp* in view of the *SCSI Standard*. Ex. 1018, ¶ 58. Specifically, the *SCSI Standard* discloses that the SCA-2 connector includes ground pins (Ex. 1022, p. 14 (pins 41–43, "12V GROUND"); Ex. 1018, ¶ 58) and that these ground pins mate to corresponding elements on the backplane board. Ex. 1022, pp. 6, 9; Ex. 1018, ¶ 58.

**D.    Ground 4: Claims 10–12 are obvious over *Hipp* in view of the *SCI Standard* and in further view of *Gasparik***

As shown in the citations to *Hipp*, the *SCSI Standard* and *Gasparik* below, and in the claim charts included within the declaration of Dr. Robert Horst, Ph. D., each and every element of Claims 10–12 is taught or suggested by *Hipp* in view of the *SCSI Standard* and in further view of *Gasparik*. Accordingly, Petitioner respectfully submits that *Hipp* in view of the *SCSI Standard* and in further view of *Gasparik* renders obvious Claims 10–12 of the '021 Patent under 35 U.S.C. § 103.

Given the explicit reference in *Hipp* to "80 pin SCA connectors" and hot-swappability, one of ordinary skill in the art would have been motivated to

combine *Hipp* with the 80-pin SCA-2 connector of the *SCSI Standard*. Ex. 1018,

¶¶ 57–58. Furthermore, one of ordinary skill in the art would have been motivated

to combine the disclosure of hot swap connectors in *Hipp* with the four-staged hot-

swappable connectors of *Gasparik*. Ex. 1018, ¶ 72. Both *Hipp* and *Gasparik*

disclose the use of hot swap connectors to provide "hot plugging" of modules or

devices. Ex. 1004, 1:23–26; Ex. 1004, 15:58–60; Ex. 1018, ¶¶ 52, 72–74. Thus, it

would have been obvious to combine these teachings in order to provide ESD

protection. Ex. Ex. 1018, ¶¶ 72, 75.

**Claim 10.** The computer network appliance of claim 9, wherein pre-charge

power pins of the hot swap connector of the module make contact with

corresponding pre-charge power elements of the hot swap mating connector of the

backplane board after the ground pins have made contact. As noted in Section

VIII.C.Claim 9, the combination of *Hipp* and *SCSI Standard* teaches all elements

of Claim 9. Moreover, the *SCSI Standard* discloses an 80-pin SCA-2 connector

with ground pins (e.g., pins 41-43, "12V GROUND"), pre-charge power pins (e.g.,

pin 1, "12V CHARGE" and pin 36, "5V CHARGE"), power pins (e.g., pins 2-4

"12V"), and signal pins (e.g., pin 11 "-I/O" and pin 51 "+I/O"). Ex. 1022, p. 14;

Ex. 1018, ¶ 57. The SCA-2 connector of the *SCSI Standard* includes long length

ground and pre-charge power pins and short length power and signal pins. Ex.

1022, p. 14; Ex. 1018, ¶¶ 52, 57. During connection, therefore, the power and

signal pins make contact after the ground and pre-charge power pins.

*Gasparik* discloses a hot swappable connector including four different pin types. Ex. 1007, 4:27-32; Ex. 1018, ¶¶ 73–74. Upon connection, the pins connect sequentially in the order ground, power, DIFFSENS signal, and signal. Ex. 1007, 4:32-34; Ex. 1018, ¶¶ 73–74. It would have been obvious to one of skill in the art to combine the teaching in *Gasparik* of a connector having four pin lengths with the disclosure in *Hipp* of a connector having ground, pre-charge power, power, and signal pins. Ex. 1018, ¶ 75. It would further have been obvious to one of skill in the art to assign ground to the longest pins and pre-charge power to the second-longest pins, such that on connection pre-charge pins make contact after the ground pins make contact. *Id.*

**Claim 11.** The computer network appliance of claim 10, wherein the power pins of the hot swap connector of the module make contact with corresponding power elements of the hot swap mating connector of the backplane board after the pre-charge power pins have made contact. As noted in Section VIII.D.Claim 10, *Hipp* in view of the *SCSI Standard* and in further view of *Gasparik* discloses all elements of claim 10. The 80-pin SCA connector of the *SCSI Standard* includes long length pre-charge power pins and short length power pins. Ex. 1022, p. 14; Ex. 1018, ¶¶ 52, 57. During connection, therefore, the power pins of the *SCSI Standard* make contact after the pre-charge power pins. Ex. 1018, ¶ 76.

**Claim 12.** The computer network appliance of claim 11, wherein signal pins of the hot swap connector of the module make contact with corresponding signal elements of the hot swap mating connector of the backplane board after the power pins have made contact. As noted in Section VIII.D.Claim 11, *Hipp* in view of the *SCSI Standard* and in further view of *Gasparik* discloses all elements of claim 10. The *SCSI Standard* teaches a hot-swappable 80-pin SCA connector, which includes long length ground and pre-charge power pins and short length power and signal pins. Ex. 1022, p. 14; Ex. 1018, ¶¶ 52, 57. *Gasparik* discloses a hot swappable connector including four different pin types, each having different pin lengths such that the four pin types connect sequentially. Ex. 1007 at 4:27-32; Ex. 1018, ¶¶ 73–74. It would have been obvious to one of skill in the art to combine *Gasparik's* teaching of a connector having four pin lengths with *Hipp's* teaching of a SCA connector having ground, pre-charge power, power, and signal pins. Ex. 1018, ¶ 77. It would further have been obvious to one of skill in the art to assign signal to the shortest pins and power to the second-shortest pins, such that on connection signal pins make contact after the power pins make contact. *Id.*

## IX.   CONCLUSION

Petitioner respectfully requests that *inter partes* review of the '021 Patent be instituted and that Claims 1–4, 6–20, 22–24, 30 and 34–36 be cancelled as unpatentable under 35 U.S.C. § 318(b).

Respectfully submitted,
BAKER BOTTS L.L.P.\

July 22, 2013

/Kevin J. Meek/

Date

Kevin J. Meek (Reg. No. 33,738)
Paula D. Heyman (Reg. No. 48,363)
Nicholas A. Schuneman
         (Reg. No. 62,088)
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
512.322.2555
Attorneys for Petitioner, Dell Inc.

**CERTIFICATE OF SERVICE (§§ 42.6(e), 42.51(b)(1), and 42.105)**

In accordance with (§§ 42.6(e)(1) and 42.105, the undersigned certifies that on the 22nd day of July, 2013, a complete and entire copy of the **CORRECTED PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 6,948,021 UNDER 35 U.S.C. §§ 311–319 and 37 C.F.R. §§ 42.100 *ET SEQ*** ("petition") including corrected exhibits and testimony relied upon were served on the patent owner at the correspondence address of record for the subject patent,

Mr. Scott Wharton
Acceleron, LLC
3350 Riverwood Parkway, Suite 800
Atlanta, Georgia 30339

via Federal Express, postage prepaid.[3] Additionally, the same were also served upon counsel for the subject patent's assignee, Acceleron, LLC,

Mr. James Heintz
DLA Piper LLP
One Fountain Square
11911 Freedom Drive
Suite 300
Reston, Virginia 20190

because this is likely to effect service.

---

[3]    Federal Express being "means at least as fast and reliable as EXPRESS MAIL" per § 42.6(e)(1).

In accordance with § 42.51(b)(1), the undersigned certify that petitioner is not aware of, and therefore does not provide any "relevant information that is inconsistent with a position advanced by petitioner[]."

July 22, 2013                                  /Kevin J. Meek/

_____          _____
            Date                          Kevin J. Meek (Reg. No. 33,738)
                                          Paula D. Heyman (Reg. No. 48,363)
                                          Nicholas A. Schuneman
                                                   (Reg. No. 62,088)
                                          98 San Jacinto Blvd., Suite 1500
                                          Austin, Texas 78701
                                          512.322.2555
                                          Attorneys for Petitioner, Dell Inc.

Trials@uspto.gov
Tel: 571-272-7822

Paper 10
Entered: January 16, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

DELL INC.
Petitioner

v.

ACCELERON, LLC
Patent Owner

_____

Case IPR2013-00440
Patent 6,948,021 B2

_____

Before THOMAS L. GIANNETTI, TRENTON A. WARD, and
JEREMY M. PLENZLER, *Administrative Patent Judges*.

PLENZLER, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2013-00440
Patent 6,948,021 B2

For the reasons described below, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing on all but three of the challenged claims. Accordingly, we grant the Petition and institute *inter partes* review as to claims 1-4, 6-20, 30, and 34-36 of the '021 Patent. We deny the Petition as to claims 22-24.

## B. Related Proceedings

Petitioner has filed a related petition challenging the patentability of claims 1-4, 6-19, 30, and 34-36 of the '021 patent based on different grounds. *See* IPR2013-00443.

Petitioner indicates that the '021 patent is the subject of the following co-pending federal district court litigation: *Acceleron, LLC v. Hitachi Data Systems Corp.*, Case No. 1:12-cv-02996 (N.D. Ga.); and *Acceleron, LLC v. Dell, Inc.*, Case No. 1:12-cv-04123-TCB (N.D. Ga.). Pet. 2.

## C. The '021 Patent

The '021 Patent is titled "Cluster Component Network Appliance System and Method for Enhancing Fault Tolerance and Hot-Swapping," and generally relates to a computer network appliance including CPU modules, a power module, and an Ethernet switch module having hot-swappable connectors corresponding to mating hot swap connectors on a backplane board. Ex. 1001, 3:18-23. The '021 patent describes a computer network appliance that allows replacement of the various modules via hot swap connectors in order to reduce the mean time to repair the computer network appliance. *Id.* at 5:53-59.

Figure 1 of the '021 Patent, reproduced below, illustrates computer network appliance 100.

**A152**

IPR2013-00440
Patent 6,948,021 B2

### C. Additional Asserted Grounds

Petitioner contends that claims 8 and 9 are obvious over Hipp and the SCSI Standard. Pet. 38-39. Similar to Petitioner's anticipation challenge based on Hipp, Petitioner relies on Hipp as disclosing eighty-pin SCA connectors. Petitioner additionally relies on the SCSI Standard as disclosing the specific pin arrangement of the eighty-pin SCA connectors. *Id.* Petitioner contends also that claims 10-12 are obvious over Hipp, the SCSI Standard, and Gasparik. *Id.* at 39-42. Petitioner again relies on the SCSI Standard as disclosing the specific pin arrangement of an eighty-pin SCA connector. These additional asserted grounds are redundant in light of our determination that there is a reasonable likelihood that claims 8 and 9 are anticipated by Hipp, and that claims 10-12 are obvious based on Hipp and Gasparik. We therefore decline to institute trial on these redundant grounds.


### III.    CONCLUSION

We institute an *inter partes* review of claims 1-4, 6-20, 30, and 34-36 based on (a) Petitioner's challenge that claims 1-4, 6-9, and 13-20 are anticipated by Hipp under 35 U.S.C. § 102(e), and (b) that claims 10-12, 30, and 34-36 are obvious over Hipp and Gasparik under 35 U.S.C. § 103(a). We decline to institute trial on all other grounds in the Petition. The Board has not made a final determination on the patentability of any challenged claim under 35 U.S.C. § 318(a).

16

IPR2013-00440
Patent 6,948,021 B2

IV.    ORDER

For the reasons given, it is

ORDERED that the Petition is granted as to claims 1-4, 6-20, 30, and 34-36 of the '021 Patent, and denied as to claims 22-24.

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '021 Patent is hereby instituted commencing on the entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

FURTHER ORDERED that the trial is limited to the two grounds listed in the Conclusion.  No other grounds are authorized.

FURTHER ORDERED that an initial conference call with the Board is scheduled for 2 PM Eastern Time on January 30, 2014.  The parties are directed to the Office Trial Practice Guide, 77 Fed. Reg. 48,756, 48,765-66 (Aug. 14, 2012) for guidance in preparing for the initial conference call, and should be prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

Filed on behalf of:  Acceleron, LLC
By: Andrew Crain
Andrew.Crain@thomashorstemeyer.com
(770) 933-9500
_____

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

DELL INC.,

Petitioners

V.

ACCELERON, LLC,

Patent Owner

_____

Case IPR2013-00440

Patent 6,948,021 B2

_____

**PATENT OWNER RESPONSE AND OPPOSITION TO PETITION
PURSUANT TO 37 C.F.R. § 42.120**

Case IPR2013-00440
Patent No. 6,948,021

# TABLE OF CONTENTS

I.      **INTRODUCTION** ...............................................................................1

II.     **BACKGROUND OF THE TECHNOLOGY**...............................2

III.    **PRINCIPLES OF LAW** .................................................................4

      A.    Petitioner's Burden of Proof ..................................................... 4

      B.    Anticipation under 35 U.S.C. § 102 ......................................... 4

      C.    Obviousness under 35 U.S.C. § 103 ......................................... 5

IV.    **SUMMARY OF PATENTABILITY ARGUMENTS**...............6

V.     **ARGUMENT**..................................................................................11

      A.    Claim Construction.................................................................. 11

            1.    "caddies" ......................................................................12

            2.    "bays".............................................................................14

      B.    *Hipp* Fails to Anticipate Claims 1-4, 6-9, and 13-20 ......................... 15

            1.    Independent Claim 1: *Hipp* fails to disclose "wherein the at least one backplane board interconnects each of the CPU modules with the at least one power module and the at least one ethernet switch module, such that the at least one power module and the at least one ethernet switch module can be used as a shared resource by the plurality of CPU modules"...16

            2.    Dependent Claim 3: *Hipp* fails to disclose "caddies"...............23

            3.    Dependent Claim 4: *Hipp* fails to disclose "bays" and "slot guides".................................................................................28

            4.    Dependent Claim 7: *Hipp* fails to disclose "a standard ethernet connector allowing heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other"................................................31

i

5.      Dependent Claim 14: *Hipp* fails to disclose "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot"...................................34

6.      Dependent Claim 15: *Hipp* fails to disclose "boot remotely from an OS located in an NAS"................................39

7.      Dependent Claim 16: *Hipp* fails to disclose "wherein remote booting of a CPU module allows the CPU module to run different types of operating systems"..................................40

8.      Independent Claim 20: *Hipp* fails to disclose "a dedicated ethernet path, wherein the dedicated ethernet path . . . provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module"...........................................42

9.      Claims 2, 6, 8-9, 13, and 17-19 are patentable as depending from a patentable claim.................................................46

C.      *Hipp* and *Gasparik* Fail to Render Obvious Claims 10-12, 30, and 34-36...................................................................... 47

1.      Independent Claim 30: *Hipp* and *Gasparik* fail to show or suggest "wherein a backplane board interconnects each of the CPU modules with the ground elements, power elements, and signal elements, such that the power module and the ethernet switch module can be used as a shared resource by the plurality of CPU modules"..............................47

2.      Claims 10-12 are patentable as depending from a patentable claim.........................................................................49

3.      Claims 34-36 are patentable as depending from a patentable claim.........................................................................50

VI.   CONCLUSION .................................................................51

Due to the Petition's apparent misunderstanding of certain claim elements, Patent Owner proposes the following constructions of the claim elements "caddies" and "bays."

### 1.     "caddies"

A "cadd[y]," as recited in claim 3, means "a carrier for a module." Ex. 2001 (Putnam Decl.), ¶19. This proposed construction of the term "cadd[y]" is the broadest reasonable interpretation in light of the specification. For example, the specification of the '021 Patent states that "[e]ach module *resides in a caddy 152* of the chassis such that when the module *is inserted* into the chassis the caddy ensures that the hot swap connectors are aligned." Ex. 1001 (the '021 Patent), 3:32-34 (emphasis added). According to the specification, the function of a caddy is based on the concept of carrying a module so that it can be inserted or removed. *Id.*

Additionally, this construction of the term "cadd[y]" is consistent with the meaning provided by Petitioner's expert, Dr. Horst, who stated "[t]he word 'caddy' by itself just means carrier and in the context of a computer system I regard a caddy as some kind of mechanical structure that carries components and mounts those components." Ex. 2002 (Horst Dep. Tr.), 137:25-138:3. Therefore, a caddy is something more than a structure that mounts a component; it is something that

functions as a carrier to carry a component, fit the component to a designated location and position, and allow the component to be inserted and removed from a chassis. Ex. 2001 (Putnam Decl.), ¶¶ 23-24.

When asked if he was familiar with a hard drive caddy, Dr. Horst responded affirmatively by stating that, "I'm familiar with many different ways of mounting disk drives in a cabinet and most of those can be considered caddies, yes." Ex. 2002 (Horst Dep. Tr.), 140:17-21. When asked whether or not Dr. Horst would consider the image depicted to the right from Ex. 2004 to be an example of a caddy, Dr. Horst stated, "Yes, that would be called a caddy for a disk drive." Ex. 2002 (Horst Dep. Tr.),141:10-14.



Further, when asked about how the carrier depicted above would work, Dr. Horst explained that a "disk drive is attached to those side rails, the rails carry the disk drive." Ex. 2002 (Horst Dep. Tr.), 141:19-20. Dr. Horst also explained that a module itself may be mounted to a carrier. *Id.* at 146:13-14. Further, dictionaries confirm that a caddy may be described as a "plastic carrier that holds a CD ROM and is inserted into a CD ROM drive." Ex. 2003 (Microsoft Computer Dictionary), p. 4. As demonstrated by Dr. Horst, as well as other evidence, a "cadd[y]" can have rails or a tray component for inserting or installing a device

into a chassis.  Therefore, one of ordinary skill in the art would understand that a "cadd[y]" does not permanently mount a module.  Instead, a "cadd[y]" is a "carrier for a module."

## 2.    "bays"

A "bay[]," as recited in claim 4, means "a structure defining a space that receives a module."  Ex. 2001 (Putnam Decl.), ¶ 19.  Although Petitioner has not provided an explicit construction of this term, Petitioner apparently relies on the construction provided by its expert, Dr. Horst, who stated, "[a] bay is just kind of a general term that says that the general area where the − where something is inserted into a chassis, so the bays are the area for each individual module that gets inserted, or in this case, the web server processing cards."  Ex. 2002 (Horst Dep. Tr.), 158:18-22.  Moreover, Dr. Horst stated that "[t]he bay is the entire volume and the slot guide is the actual mechanical component that guides the module into the bay."  *Id.* at 160:4-6.  Thus, Dr. Horst, Petitioner's expert construes a bay to be any volume or space that a module can occupy.  Dr. Horst improperly construes the structural element "bay[]" to be the absence of a structural element.

Because there is necessarily a volumetric area wherever a module would be inserted, Dr. Horst's interpretation effectively renders the element "bays" meaningless in the claim.  Accordingly, the construction on which Petitioner relies

is unreasonable.  *See In re Wilson*, 424 F.2d 1382, 1385 (C.C.P.A. 1970) ("All words in a claim must be considered in judging the patentability of that claim against the prior art.").

The specification of the '021 Patent states that "[t]he chassis has five bays *accessed via the front* for inserting the CPU modules 102(a)-102(e) and three bays *accessed via the rear* 118 for inserting one each of the power module 106, the ethernet switch module 110 and the microcontroller module 108."  Ex. 1001 (the '021 Patent), 3:28-32 (emphasis added).  Because the bays are *accessed* from the front or the rear of the chassis, a bay is defined by structure and is not merely any arbitrary space.  As such, the broadest reasonable interpretation in light of the specification for the term "bay[]" is a "structure defining a space that receives a module."  Ex. 2001 (Putnam Decl.), ¶ 19.

### B.    *Hipp* Fails to Anticipate Claims 1-4, 6-9, and 13-20

*Hipp* fails to anticipate claims 1-4, 6-9, and 13-20 for at least the following reasons.

32 to a particular network interface card 48. Ex. 2001 (Putnam Decl.), ¶ 48. Thus, even in the embodiments in which twelve web server processing cards 32 are connected to the passive midplane 34, *Hipp* does not disclose that the passive midplane 34 interconnects each of the web server processing cards 32 with ***the same*** network interface card 48 such that a single network interface card 48 is used as a shared resource by all web server processing cards 32. *See also, Trintec Indus.*, 295 F.3d at 1295 (quoting *In re Robertson*, 169 F.3d at 745 ("Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art.")).

Therefore, *Hipp* fails to disclose, either explicitly or inherently, the claim element "wherein the at least one backplane board interconnects each of the CPU modules with the at least one power module and the at least one ethernet switch module, such that the at least one power module and the at least one ethernet switch module can be used as a shared resource by the plurality of CPU modules." For at least this reason, Petitioner has not proven by a preponderance of the evidence that *Hipp* anticipates independent claim 1.

## 2.    Dependent Claim 3: *Hipp* fails to disclose "caddies"

Because claim 3 depends from claim 1, claim 3 is patentable over *Hipp* for at least the reasons discussed above. *See In re Fine*, 837 F.2d at 1076. In addition,

*Hipp* fails to disclose, either explicitly or inherently, at least the claim element "caddies," as recited in claim 3.

> With respect to this claim element, the Petition alleges:

> *Hipp* discloses "a plurality of box fans 264-269" that are mounted on articulating door 262 located at the front of server chassis 38. Ex. 1004, Fig. 11, 16:14-15; Ex. 1018, ¶ 52. The articulating door performs the same function as the caddies of the '021 Patent. Ex. 1018, ¶ 55.

Petition (Paper 7), p. 17. As noted above, Petitioner asserts that *Hipp* anticipates claim 3 by comparing the functionality of components disclosed in *Hipp* with only the functional phrase "providing air flow," as recited in claim 3. However, Petitioner fails to consider the structure of a caddy. Petitioner believes *Hipp* discloses caddies by the mere fact that the fans in *Hipp* provide air flow. Petition (Paper 7), p. 17. By focusing solely on function and ignoring structure, Petitioner's analysis leads to the unreasonable conclusion that an articulating door discloses a caddy.

Claim 3 specifically recites "*caddies* providing air flow" (emphasis added). A proper challenge to claim 3 would demonstrate that *Hipp* discloses a caddy *and* the function of providing air flow. As construed above (*supra* § V(A)(1)), a caddy is a carrier for a module, and *Hipp* fails to disclose any structure that is a carrier for a module.

24

**A202**

For example, the portion of the written description of *Hipp* relied upon by

Petitioner states, "[a]rticulating door 262 includes a plurality of box fans 264-269,

mounted therein." Ex. 1004 (*Hipp*),16:14-15. FIG. 11 of *Hipp* is provided below

and shows the articulating door 262.



A person having ordinary skill in the art would not consider the articulating door

262 to be a caddy because the articulating door 262 does not have the structural or

functional characteristics of a caddy. Ex. 2001 (Putnam Decl.), ¶¶ 51, 53 (stating

that the purpose of a caddy is to carry a module); *see* Ex. 2004 (Caddy Products),

p. 1; *see* Ex. 2005 (Dell PowerEdge M620 Systems), p. 51 (FIG. 18) (depicting

well-established examples of caddies). Instead of disclosing caddies, *Hipp*

discloses that the articulating door 262 "protect[s] web server processing cards 32

and 132-142 from ambient environment." Ex. 1004 (*Hipp*), 16:12-13. *Hipp's*

articulating door 262 does not disclose a carrier because nothing is carried by the articulating door 262. Although fans 264-269 mount onto the articulating door 262, a mount is not the same as a caddy because the purpose of a caddy is to allow a module to be installed and removed. Ex. 2001 (Putnam Decl.), ¶ 51.

Petitioner seems to interpret "cadd[y]" as anything that mounts an object. *See* Petition (Paper 7), p. 17. Under Petitioner's interpretation, any screw, adhesive, or fastener that permanently fixes an object to a chassis is a caddy. This interpretation of caddy is an unreasonably broad one that is divorced from the specification of the '021 Patent. *See* Ex. 2001 (Putnam Decl.), ¶ 53.

Additionally, even assuming, *arguendo*, that the articulating door 262 could somehow be construed to be a caddy, which it is not, *Hipp* fails to disclose the claim element "cadd*ies*" (emphasis added). In other words, the claim recites that the single chassis comprises ***multiple*** caddies. As is readily apparent in FIG. 11 of *Hipp*, the chassis 38 of *Hipp* includes only a ***single*** articulating door 262. Even Petitioner's expert, Dr. Horst, concedes that the articulating door 262 includes only one caddy:

> Q:    I think I understand you to say that articulating door 262 also
>       constitutes the caddy?
>       MS. HEYMAN: Objection to form.
>       THE WITNESS: I have identified articulating 262 as the caddy
>       meeting the claim limitation.

Case IPR2013-00440
Patent No. 6,948,021

Q.    How many caddies does the articulating door 262 disclose?

A.    There's one articulating door 262 in a single instance of the chassis, but there could be multiple chassis.

Q.    Are you telling me there could be multiple chassis 38?

A.    In an instance where you have more than one of the entire device there would be more than one chassis.  I'm not saying there is more than one chassis in a single instance of what is shown in Figure 1.

Q.    If you're using more than one chassis, do you mean to say more than one caddy?

A.    The claim says that the chassis comprises caddies which means the chassis includes caddies, and so *if you have more than one chassis, you also have more than one caddy*.

Ex. 2002 (Horst Dep. Tr.), 149:3-25 (emphasis added).  Thus, even Petitioner's expert, Dr. Horst, acknowledges that there would need to be multiple chassis in order for multiple articulating doors 262 to exist.  But more importantly, this skewed construction of "caddy" is clearly inconsistent with well-established use, which is also not disclosed by *Hipp*.

Therefore, *Hipp* fails to disclose, either explicitly or inherently, the claim element "caddies," as recited in claim 3.  For at least this additional reason, Petitioner has not proven by a preponderance of the evidence that *Hipp* anticipates dependent claim 3.

Case IPR2013-00440
Patent No. 6,948,021

5.    **Dependent Claim 14:** *Hipp* **fails to disclose "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot"**

Because claim 14 depends from claim 1, claim 14 is patentable over *Hipp* for at least the reasons discussed above. *See In re Fine*, 837 F.2d at 1076. In addition, *Hipp* fails to disclose, either explicitly or inherently, at least the claim element "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot," as recited in claim 14.

The declaration of Petitioner's expert, Dr. Horst, alleges that *Hipp's* mentioning of wake on LAN discloses this element of claim 14. Ex. 1018 (Horst Decl.), p. 40. Regarding, "wake on LAN," *Hipp* states "[w]ake on LAN refers to the ability of a chipset which is not experiencing network traffic to remain idle until a request and/or traffic is received from the associated network." Ex. 1004 (*Hipp*), 9:62-65. However, Dr. Horst later acknowledged that "[t]he wake on LAN by itself doesn't directly refer to booting." Ex. 2002 (Horst Dep. Tr.) 205:6-9.

Petitioner also alleges that *Hipp* discloses this element because *Hipp* mentions two concepts: 1) a boot from LAN capability and 2) a storage server 54 that provides network attached storage (NAS). Petition (Paper 7), p. 21. However, the mere mention of these two concepts alone cannot lead to the conclusion that booting from a NAS is explicitly or inherently disclosed. *Net MoneyIN,* 545 F.3d at 1369 (holding that a prior art reference must not only disclose all elements of the

**A212**

claim, but must also disclose those elements as arranged in the claim in order to anticipate the claim).

Petitioner's expert, Dr. Horst, explained that booting from a remote location requires a "boot image" to be stored in the remote location. Ex. 2002 (Horst Dep. Tr.), 199:12-24. According to Dr. Horst, a "boot image is the image required to be loaded into main memory in order to initiate the operating system." *Id.*

While one portion of *Hipp* mentions "boot from LAN" and another, unrelated portion of *Hipp* mentions a NAS, *Hipp* does not explicitly disclose storing a boot image *in the NAS*. Ex. 2001 (Putnam Decl.), ¶ 60. The purpose of the storage server 54 is to provide "mass storage to support web server processing cards of various users" or to store information "regarding measurements and characteristics of components of network 30." Ex. 1004 (*Hipp*), 5:25-26 and 22:30-31. There is no explicit disclosure in *Hipp* that storage server 54 receives an instruction "to locate an operating system (OS) from which to boot," as required by claim 14.

*Hipp* does not inherently disclose this limitation either. FIG. 1 of *Hipp* is provided below.

Case IPR2013-00440
Patent No. 6,948,021



FIG. 1

(arrows and box added). FIG. 1 of *Hipp* depicts a storage server 54 (indicated by a red box), which can be a NAS, and other memory locations (indicated by various arrows). Ex. 1004 (*Hipp*), 5:35-36, 6:37-38, 4:20-21, 7:22-24, 4:12-14. These other memory locations include a non-volatile storage device 72, a secondary non-volatile storage device 74, a management console 70, an application server 56, a database server 58, and a legacy system 60. *Id.* According to Petitioner's expert, Dr. Horst, *any* of these memory locations can be used to store a boot image. Ex.

2002 (Horst Dep. Tr.), 203:7-204:13 ("[A]ny kind of server can be used to store a boot image."); *see also* Ex. 2001 (Putnam Decl.), ¶ 61. In other words, the boot image is not necessarily present in the NAS in *Hipp*. "Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present." *Trintec Indus.*, 295 F.3d at 1295 (quoting *In re Robertson*, 169 F.3d at 745). Because it is possible for a web server processing card 32 in *Hipp* to boot from LAN using any of these other memory locations, *Hipp* does not inherently disclose "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot," as recited in the claim. Dr. Horst explained:

> Q.   But you said it is possible to store the boot image in memory storage device 74; isn't that correct?
>
> A.   You could store a boot image there, yes.
>
> Q.   Is memory storage device 74 a network attached storage?
>
> A.   It could potentially be a network attached storage device if the – that connection 78 is a network that supports network attached storage devices.
>
> Q.   Is it possible that connection 78 does not support network attached storage protocols while having a boot image stored in memory storage device 74?
>
> MS. HEYMAN: Objection to form.
>
> THE WITNESS: So as drawn if – if 78 was a bus or a – another type of network, it wouldn't necessarily support a

> network attached storage device.  If it's a network, then it
> potentially could.

Ex. 2002 (Horst Dep. Tr.), 209:22-210:12.  As evidenced above, Dr. Horst demonstrates that *Hipp's* "boot from LAN" does not explicitly or inherently disclose booting from a NAS.

Finally, *Hipp* mentions "boot from LAN" without providing any details about what this entails.  Based on a reading of *Hipp*, it is possible that "boot from LAN" means nothing more than booting a local web server processing card using a remotely located web server processing card of a different chassis that is connected via a LAN.  This possibility is supported by *Hipp's* disclosure of "a mirror web server processing card such that two web server processing cards are performing the exact same functionality." Ex. 1004 (*Hipp*), 23:50-54.  Petitioner's expert, Dr. Horst, even suggested that remote booting can include booting from a remote web server processing card 32:

> Q.    Limiting the discussion to just what *Hipp* discloses, *Hipp* would
>       permit booting from one web server processing card to another
>       web server processing card; isn't that correct?
>
> A.    *Hipp* doesn't explicitly exclude it, so it would be possible to
>       configure it that way.  It may be possible to configure it that
>       way.

Paper No. \_\_\_\_\_
Date Filed: June 17, 2014

Filed by: Petitioner Dell Inc.

By:
Kevin J. Meek (kevin.meek@bakerbotts.com)
512-322-5471
Paula D. Heyman (paula.heyman@bakerbotts.com)
512-322-2555
Nicholas A. Schuneman (nick.schuneman@bakerbotts.com)
512-322-2631
Catherine J. Garza (cat.garza@bakerbotts.com)
512-322-2645

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

DELL INC.,
Petitioner

v.

ACCELERON, LLC,
Patent Owner

_____

Case IPR2013-00440
Patent 6,948,021 B2

_____

**PETITIONER DELL INC.'S REPLY TO PATENT OWNER'S RESPONSE**

Active 16188617.2

# TABLE OF CONTENTS

PAGE(S)

I.      INTRODUCTION ...................................................................................1

II.     CLAIMS 1, 2, 6, 8–13, 18, AND 19 ARE UNPATENTABLE....................1

        A.      Acceleron admits that *Hipp* discloses Element 1[e] .............................1

        B.      Acceleron attempts to improperly circumvent *Hipp's* disclosure by
                misapplying "comprising"...................................................................2

III.    CLAIM 3 IS UNPATENTABLE ...............................................................3

IV.     CLAIM 4 IS UNPATENTABLE ...............................................................6

V.      CLAIM 7 IS UNPATENTABLE ...............................................................8

VI.     CLAIMS 14, 15, AND 17 ARE UNPATENTABLE....................................10

VII.    CLAIM 16 IS UNPATENTABLE .............................................................11

VIII.   CLAIM 20 IS UNPATENTABLE .............................................................12

        A.      *Hipp* discloses a "dedicated ethernet path" as described in the '021
                Patent and as previously construed by Acceleron.................................13

        B.      *Hipp* discloses "polling" according to Acceleron's own construction
                ..............................................................................................14

IX.     CLAIMS 30 AND 34–36 ARE UNPATENTABLE......................................15

A235

# TABLE OF AUTHORITIES

**CASES**                                                                       **PAGE(S)**

*ArthroCare v. Smith & Nephew, Inc.*,
　　406 F.3d 1365 (Fed. Cir. 2005) ............................................................11

*Dayco Prods., Inc. v. Total Containment, Inc.*,
　　258 F.3d 1317 (Fed. Cir. 2001) ..............................................................2

*Genentech, Inc. v. Chiron Corp.*,
　　112 F.3d 495 (Fed. Cir. 1997) ................................................................3

*In re Schreiber*,
　　128 F.3d 1473 (Fed. Cir. 1997) ...........................................9, 10, 12, 14

*IPXL Holdings v. Amazon.com, Inc.*,
　　430 F.3d 1377 (Fed. Cir. 2005) ...............................................10, 12, 14

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
　　545 F.3d 1359 (Fed. Cir. 2008) ............................................................10

**OTHER AUTHORITIES**

37 C.F.R. § 42.100(b) ..............................................................................5, 6

MPEP 2173.05(e) ........................................................................................2

MPEP 2111.03 .............................................................................................3

# LIST OF EXHIBITS

| 1001 | U.S. Patent No. 6,948,021 by Joel Derrico et al. ("the '021 Patent") |
|---|---|
| 1002 | U.S. Provisional Application No. 60/248,834 ("the '834 Provisional") |
| 1003 | U.S. Patent Application No. 09/987,917 ("the '917 Application") |
| 1004 | U.S. Patent No. 6,757,748 by Christopher G. Hipp ("Hipp") |
| 1005 | U.S. Patent No. 7,032,119 by Henry T. Fung et al. ("Fung") |
| 1006 | U.S. Patent No. 6,950,895 by David A. Bottom et al. ("Bottom") |
| 1007 | U.S. Patent No. 6,157,974 by Frank Gasparik ("Gasparik") |
| 1008 | U.S. Patent No. 6,742,068 by Brian Gallagher et al. ("Gallagher") |
| 1009 | U.S. Patent No. 6,591,324 by Hsiang-Chan Chen et al. ("Chen") |
| 1010 | U.S. Patent No. 5,210,855 by Thomas M. Bartol ("Bartol") |
| 1011 | '021 Patent Prosecution History: April 21, 2004 Office Action |
| 1012 | '021 Patent Prosecution History: October 21, 2004 Response to Office Action |
| 1013 | '021 Patent Prosecution History: November 8, 2004 Final Office Action |
| 1014 | '021 Patent Prosecution History: November 20, 2005 Notice of Allowability |
| 1015 | Preboot Execution Environment (PXE) Specification v2.1, published Sept. 20, 1999 ("PXE") |
| 1016 | Plaintiffs' Disclosure of Infringement Contentions in Acceleron, LLC v. Dell, Inc., No. 1:12-cv-04123-TCB (N.D. Ga.) |
| 1017 | Plaintiff's Opening Brief Regarding Claim Construction in Acceleron, LLC v. Hewlett-Packard Co. et al., 1:10-cv-00128-SLR (D. Del.) |
| 1018 | Declaration of Robert Horst, Ph. D. |

iii

| 1019 | Curriculum Vitae of Robert Horst, Ph. D. |
|------|------------------------------------------|
| 1020 | Litigation Experience of Robert Horst, Ph. D. |
| 1021 | CompactPCI PICMG 2.1 R1.0, May 1, 1998 ("CompactPCI") |
| 1022 | SFF-8046 Specification for 80-pin SCA-2 Connector of SCSI Disk Drives ("SCSI Standard") |
| 1023 | Random House Webster's Computer & Internet Dictionary, 3d ed. (1999) |
| 1024 | Microsoft Computer Dictionary, 4th ed. (1999) |
| 1025 | The Computer Desktop Encyclopedia, 2d ed. (1999) |
| 1026 | Reliable Computer Systems: Design & Evaluation, Daniel P Siewiorek & Robert S. Swaz, 3d ed. (1998) |
| 1027 | Ketris 9000 Press Release, May 1, 2000 |
| 1028 | STARFIRE: Extending the SMP Envelope, by Alan Charlesworth, IEEE Micro, Jan./Feb. 1998 |
| 1029 | Netra ft 1800 White Paper, Sun Microsystems, April 1999 |
| 1030 | Linux Remote—Boot mini—HOWTO: Configuring Remote-Boot Workstations with Linux, DOS, Windows 95/98 and Windows NT v3.19, by Marc Vuilleumier Stückelberg & David Clerc, February 1999 |
| 1031 | Plaintiff's Opposition to Motion for Summary Judgment of Invalidity of for Failure to Comply with the Written Description Requirement of 35 U.S.C. § 112, ¶ 1 in Acceleron, LLC v. Hewlett-Packard Co. et al., 1:10-cv-00128-SLR (D. Del.). |
| 1032 | U.S. Provisional Application No. 60/248,834 ("the '834 Provisional") |
| 1033 | '021 Patent Prosecution History: April 21, 2004 Office Action |
| 1034 | '021 Patent Prosecution History: October 21, 2004 Response to Office Action |

iv

| 1035 | '021 Patent Prosecution History: November 8, 2004 Final Office Action |
| 1036 | '021 Patent Prosecution History: November 20, 2005 Notice of Allowability |
| 1037 | Deposition Transcript of Robert Putnam |
| 1038 | Deposition Transcript of Robert Horst, Ph. D. |

v

## I.    INTRODUCTION

Acceleron misunderstands basic claim interpretation principles, advocates narrow and unsupported claim constructions, attempts to read method steps into apparatus claims, and contradicts constructions it advocated in an earlier litigation. Accordingly, Acceleron has failed to show that Claims 1–4, 6–20, 30, and 34–36 are patentable over *Hipp* and/or the combination of *Hipp* and *Gasparik*.

## II.    CLAIMS 1, 2, 6, 8–13, 18, AND 19 ARE UNPATENTABLE

Acceleron does not dispute that Claim Elements 1[p]–1[d] are present in *Hipp*. Patent Owner Response (Paper No. 23) ("P.O.R."), pp. 6, 10; Ex. 1037, 82:5–84:17 (admitting that *Hipp* discloses Elements 1[a]–1[d]). Acceleron only argues that a portion of Element 1[e][1] is absent from *Hipp*. Acceleron's argument, however, is based on a fundamental misunderstanding of patent law.

### A. Acceleron admits that *Hipp* discloses Element 1[e]

Element 1[e] recites that "backplane board interconnects each of *the* CPU modules with ... the at least one ethernet switch module such that ... the at least one ethernet switch module can be used as a shared resource by *the* plurality of CPU modules." The antecedent basis for "the CPU modules" and "the plurality of CPU modules" in Element 1[e] is "a plurality of hot-swappable CPU modules" in

---

[1] Acceleron calls this element "1[d]." Petitioner will refer to the elements as numbered in the Petition. *See, e.g.,* Petition (Paper No. 7) ("Pet."), pp. 14–16.

Element 1[a]. *See, e.g.,* MPEP 2173.05(e). Acceleron's expert, William Putnam, admitted as much. Ex. 1037, 60:14–19. Furthermore, it is a basic concept of patent law that "plurality" means "more than one." *Dayco Prods., Inc. v. Total Containment, Inc.,* 258 F.3d 1317, 1327–28 (Fed. Cir. 2001); *see also* Ex. 1037, 56:12–13. Thus, Element 1[e] requires that the backplane board connects the more than one CPU module of Element 1[a] with an ethernet switch module, which can be used as a shared resource by the more than one CPU module.

Despite arguing that *Hipp* does not disclose Element 1[e], Acceleron repeatedly admits that *Hipp* discloses a group of more than one CPU modules that satisfies the requirements of this element. Specifically, Acceleron states that *Hipp* discloses that "each network interface card 48 is connected through the passive midplane 34 to only *twelve* web server processing cards each." P.O.R., pp. 18–19 (emphasis in original); *see also id.* at 20. Acceleron thus admits that *Hipp* discloses a plurality of (i.e., twelve) CPU modules that satisfy Element 1[e].

## B. Acceleron attempts to improperly circumvent *Hipp's* disclosure by misapplying "comprising"

Despite these admissions, Acceleron nevertheless argues that *Hipp* does not disclose Element 1[e] because "only twelve" of *Hipp's* twenty-four web server processing cards share a network interface card—i.e., *Hipp* discloses other CPU modules beyond the plurality of twelve CPU modules that satisfies Element 1[e]. P.O.R., pp. 17–18. Reduced to its core, Acceleron's argument is that Claim 1,

2

which recites the transitional term "comprising," cannot include other elements beyond those specifically recited in the claim.

Acceleron misunderstands the fundamentals of claim interpretation. "The transitional term 'comprising' ... is inclusive or open-ended and does not exclude additional, unrecited elements." MPEP 2111.03. A prior art reference that discloses all recited elements anticipates a "comprising" claim, even if the reference also discloses additional elements not recited in the claim. *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). As Acceleron admits, *Hipp* discloses a plurality of hot-swappable CPU modules (i.e., twelve web server processing cards) interconnected by a backplane board such that the plurality of CPU modules share an ethernet switch module. *See* P.O.R., pp. 17–18. *Hipp* thus discloses the only limitation of Claim 1 that Acceleron argues is not present.

Because Acceleron does not dispute that *Hipp* discloses the additional limitations of Claims 2, 6, 8, 9, 13, 18 and 19, those claims are also anticipated by *Hipp*. Further, because Acceleron does not dispute that *Hipp* and *Gasparik* discloses the additional limitations of Claims 10–12, those claims are obvious.

## III. CLAIM 3 IS UNPATENTABLE

Acceleron's sole argument that *Hipp* does not disclose Claim 3 is based on a flawed construction of "caddies." Acceleron nominally construes "caddy" as "a carrier for a module." P.O.R., p. 12. As shown in the Petition, *Hipp* discloses such

3

caddies. *See, e.g.,* Pet., p. 17; *see also* Ex. 1038, 137:19–139:21. Despite paying lip service to the "carrier for a module" construction, however, Acceleron actually applies a much narrower construction in its analysis. Specifically, Acceleron's argument is based on the unsupported premise that a "caddy" must (1) "allow a component to be inserted and removed from the chassis" (P.O.R., p. 13), (2) "fit the component to a designated location and position" (*id.*), and (3) "not permanently mount a module" (*id.* at 14). Using these requirements as its construction, Acceleron argues that *Hipp* does not disclose caddies that meet all of these additional requirements Acceleron tacks onto the claim. *See, e.g., id.* at 25.

None of the laundry list of additional requirements Acceleron reads into "caddies" has any basis in the specification, which refers to caddies only twice. Ex. 1001, 2:5–6 ("[t]he chassis comprises caddies providing air flow in the chassis") and 3:32–34 ("module resides in a caddy 152 of the chassis such that when the module is inserted into the chassis the caddy ensures the hot swap connectors are aligned"). Indeed, Acceleron ignores the only requirement Claim 3 places on caddies—that the caddies "provid[e] air flow from the front to the rear of the chassis." *Id.* at Claim 3; *see also* Ex. 1018, ¶ 55. Moreover, the dictionary definition cited by Acceleron merely states that a "caddy" is "a plastic carrier that holds a CD-ROM and is inserted into a CD-ROM drive." Ex. 2003, p. 4. This definition does not support the litany of additional limitations Acceleron

4

improperly reads into the claim. Because Acceleron's construction imports limitations into the claim, none of which are taught by the specification, it cannot satisfy the "broadest reasonable construction in light of the specification" standard. 37 C.F.R. § 42.100(b).

Regardless, *Hipp* discloses "caddies" that are carriers for modules, that provide "air flow from the front to the rear of the chassis." For example, as explained in the Petition and by Dell's expert, Dr. Robert Horst, *Hipp* discloses box fans mounted to an articulating door that provide "air flow from the front to the rear of the chassis." Pet., p. 17; Ex. 1018, ¶ 55. *See also* Ex. 1037, 109:16–110:5 (admitting that the fans of *Hipp* provide air flow). Dr. Horst testified that the mounting hardware for these box fans are "caddies," in the sense that they are carriers for the fans. Ex. 1038, 137:27–138:3; 150:5–151:7. The fan hardware are not the only caddies taught by *Hipp*. *Hipp* also discloses "two power supply mounting mechanisms 278, which facilitate the installation of two load-balance, hot-swappable power supplies 280." Ex. 1004, 16:62–64. The power supply mounting mechanisms are illustrated in Fig. 12, partially reproduced below:



5

Finally, even if caddies were not disclosed in *Hipp* (they are), testimony by Acceleron's expert shows that it would have been obvious to one of ordinary skill in the art to use caddies in combination with the apparatus disclosed in *Hipp*. Ex. 1037, 113:11–15 (agreeing that "caddies" were not new prior to filing of the '021 Patent and that many types of caddies were known and available at the time).

## IV. CLAIM 4 IS UNPATENTABLE

Like its arguments with respect to "caddies," Acceleron's argument that *Hipp* does not disclose Claim 4 is also based on a flawed construction of "bays." In its Response, Acceleron construes "bay" as "a structure defining a space that receives a module." This construction has no basis in the specification. *See* Ex. 1001, 2:6–10; 3:51–54; and 5:21–23. Even Acceleron's cited dictionary definition does not require "a structure." Ex. 2003, p. 3 (defining "bay" as "a shelf or ***opening*** used for the installation of electronic equipment" (emphasis added)). Because Acceleron's construction imports requirements not taught by the specification, it is not the "broadest reasonable construction in light of the specification." 37 C.F.R. § 42.100(b).

As explained in the Petition, *Hipp* discloses bays that satisfy the requirements taught in the '021 Patent, including the requirement of Claim 4 that bays and slot guides "facilitate mounting and removal of the modules" and "ensure proper alignment between hot swap connectors of the modules and hot swap

6

mating connectors of the backplane board." *See* Pet., p. 18. But, even if Acceleron's construction of "bays" were adopted, *Hipp* would still anticipate Claim 4 because, as shown in annotated Figures 10 and 11 below, *Hipp* discloses at least (A) structure defining a space at the front of the chassis that receives web server processing cards and (B) structure defining a space at the back of the chassis that receives power supplies and network interface cards:



Indeed, *Hipp* discloses openings (one at the front and one at the back of the chassis) for the installation of the modules, thus conforming to the dictionary definition of "bay" offered by Acceleron.

Finally, even if bays were not disclosed in *Hipp* (they are), Mr. Putnam's testimony shows that it would have been obvious to one of ordinary skill in the art to combine *Hipp* with bays. Ex. 1037, 230:6–11 (agreeing that "bays" were not new prior to filing of the '021 Patent and that bays were known at the time).

7

## V.  CLAIM 7 IS UNPATENTABLE

Acceleron misinterprets Claim 7. According to Acceleron, *Hipp* does not anticipate Claim 7 because it does not teach heterogeneous CPU modules mounted in the same chassis at the same time. P.O.R., p. 32. Claim 7, however, does not recite a new "heterogeneous CPU modules" structural element. Rather, Claim 7 recites a new limitation on the "data input/output connector" first recited in Claim 6—specifically, Claim 7 requires that "the data input/output connector *is* a standard ethernet connector *allowing* heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other." *See* Ex. 1017, p. 27 (Acceleron: "Claim 7 ... adds the additional limitation that the 'data input/output connector' be a 'standard ethernet connector.'").

The '021 Patent makes clear that the "allowing" clause of Claim 7 simply describes a functional byproduct of using a standard ethernet connector. Ex. 1001, 5:60–64 ("A *byproduct of using standard fast ethernet* as the method of signal I/O for network communications is that heterogeneous CPU modules having different CPU speeds, memory space and bus chipsets may be mounted in the same chassis..."). This function of standard ethernet connectors was not new to the '021 Patent. Indeed, as Acceleron's expert explains, allowing diverse components to work together is the entire purpose of a *standard* ethernet interface:

8

You're using a standard networking technology, Ethernet. And as long as your CPU modules conform with that standard for communication, then they don't necessarily know what the other modules look like. That's one of the benefits, I guess you would say, that are touted in the specification here.

Ex. 1037, 240:23–241:4. As discussed in the Petition, *Hipp* discloses standard ethernet connectors. *See* Pet., p. 19 (*Hipp* discloses RJ-45 connectors); *see also* Ex. 1004, Figure 12, 18:37–42. Because the ability for heterogeneous CPU modules to communicate with each other is simply a "byproduct" of such standard ethernet connectors, *Hipp* discloses the limitation of Claim 7. *See, e.g., In re Schreiber*, 128 F.3d 1473, 1479 (Fed. Cir. 1997) (finding anticipation where the disclosed structure "would be capable of performing all of the functions recited").

But even if Claim 7 recited as structural elements heterogeneous CPU modules mounted in the same chassis at the same time, as argued by Acceleron (it does not), *Hipp* would still anticipate Claim 7. *Hipp* describes CPU modules having differing architectures in the same way the '021 Patent does.[2] *See, e.g.,* Ex. 1004, 8:13–15; *see also* Pet., p. 19; Ex. 1018, ¶ 52.

---

[2] The '021 Patent does not use the term "architecture," but describes heterogeneous CPU modules in terms of CPU speed, memory space, and bus chipsets. Ex. 1001, 5:60–64. *Hipp* discloses cards with different CPU speeds. *See* Ex. 1004, 8:20–22.

9

## VI. CLAIMS 14, 15, AND 17 ARE UNPATENTABLE

Acceleron misinterprets what Claim 14 requires. According to Acceleron, *Hipp* does not disclose "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot." P.O.R, pp. 34–35. Claim 14, however, is not a method claim. It is an ***apparatus*** claim that recites a "hardware BIOS" capable of certain functionality. Acceleron's argument would convert Claim 14 into an indefinite mixed method/apparatus claim, rendering the claim invalid. *See IPXL Holdings v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).

*Hipp* discloses a hardware BIOS capable of booting from a NAS, as required by Claim 14. Ex. 1018, ¶ 59; Ex. 1004, 10:47–48. Acceleron does not dispute that *Hipp* discloses this capability. Indeed, Mr. Putnam has admitted that NAS could store the operating system from which the CPU module boots. Ex. 1037, 122:10–14. Because *Hipp* discloses a hardware BIOS capable of performing the recited function, it anticipates Claim 14. *In re Schreiber*, 128 F.3d at 1479.

Even if Claim 14 required the step of "instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot" (it does not), Acceleron's argument still misses the point. In the *Net MoneyIN* case cited by Acceleron, the court found no anticipation because, although a prior art reference disclosed the elements of the asserted claim as parts of two distinct embodiments ("protocols"), neither embodiment alone included all elements of the claim. *Net*

10

*MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) (cited at P.O.R., p. 34). That is not true here. *Hipp* discloses a single embodiment in which the web server processing cards include a hardware BIOS that can "boot from LAN" (Ex. 1018, pp. 40–41; Ex. 1004, 9:61–65) and are connected over a LAN to a "storage server 54" that provides "network attached storage (NAS)" Ex. 1018, pp. 40–41; Ex. 1004, Figure 1, 5:22–41. Dr. Horst has explained that a person of skill in the art would understand *Hipp*'s disclosure to teach booting from NAS. Pet., pp. 21–22; Ex. 1018, ¶¶ 52, 59. Acceleron does not dispute Dr. Horst's opinion on this point. *Hipp* would therefore anticipate Claim 14 even if it required the step of booting from NAS. *ArthroCare v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1373–74 (Fed. Cir. 2005) (a reference anticipates if a person of ordinary skill in the art would understand it to disclose the limitation and could combine the prior art description with his own knowledge to make the claimed invention).

Because Acceleron argues merely that Claim 15 is patentable for the same reasons advanced with regard to Claim 14, Claim 15 is also anticipated by *Hipp*. Because Claim 17 depends from Claim 15 and Acceleron does not dispute that *Hipp* discloses the additional limitations of Claim 17, it is also anticipated by *Hipp*.

## VII. CLAIM 16 IS UNPATENTABLE

Acceleron also misinterprets Claim 16. Specifically, Acceleron argues that *Hipp* does not anticipate Claim 16, an apparatus claim, because it does not teach

11

the *step* of remotely booting multiple operating systems. P.O.R., pp. 40 ("*Hipp* does not disclose that both of these operating systems are remotely booted onto the same web server processing card") and 41 ("[T]here is no disclosure ... regarding multiple types of operating systems ever being remotely booted on a particular web server processing card 32."). Acceleron's view cannot be correct. *See IPXL Holdings*, 430 F.3d at 1384. Claim 16 merely places an additional requirement on the CPU module of Claim 15—namely, Claim 15 states that the CPU module is "*configured to* boot remotely from an OS located in an NAS" and Claim 16 further requires that this remote booting "*allows* the CPU module to run different types of operating systems." Dr. Horst has explained that the remote booting disclosed in *Hipp* "provides the ability to run different types of operating systems." Ex. 1018, ¶ 62; *see also*, Pet., p. 23.[3] Because *Hipp* discloses a CPU module with the capability to remotely boot from NAS such that it can run different operating systems, *Hipp* anticipates Claim 16. *See, e.g., In re Schreiber*, 128 F.3d at 1479.

## VIII. CLAIM 20 IS UNPATENTABLE

With respect to Claim 20, Acceleron argues merely that *Hipp* does not disclose the portions of Element 20[e] that relate to polling over a "dedicated

---

[3] Moreover, as discussed in the Petition, *Hipp* teaches that the web server processing cards are capable of using different types of operating systems (Linux and Windows). Pet., p. 23; Ex. 1004, 8:26–30, Ex. 1018, p. 40.

ethernet path." Acceleron's argument, however, ignores the teachings of the '021 Patent and contradicts its own prior claim constructions.

## A. *Hipp* discloses a "dedicated ethernet path" as described in the '021 Patent and as previously construed by Acceleron

Acceleron first argues that Hipp does not disclose a dedicated ethernet path. Acceleron's narrow view of "dedicated ethernet path," which excludes I2C buses and requires an internal Ethernet connection between the microcontroller module and the other modules, is not supported by the '021 Patent. The '021 Patent discloses two types of dedicated ethernet paths—(1) an external ethernet connection between the microcontroller module and the system administrator; and (2) an internal I2C bus connection between the microcontroller module and the other modules. *Hipp* discloses both of these connections.

As stated in the Petition, *Hipp* discloses a separate external ethernet connection (i.e., communication link 71) between the single board computer 160 and remote management system 70. Pet., pp. 26–27. This tracks the disclosure of the '021 Patent for a dedicated ethernet path "separate from" the data I/O connections (Ex. 1001, 7:62–63) that allows communication with an external "system administrator" (*id.* at 8:11–14; *see also* Ex. 1037, 162:4–163:9). *Hipp* thus discloses the "dedicated ethernet path" of Claim 20 for at least this reason.

Moreover, Acceleron's expert admits that *Hipp* discloses an I2C bus connection that may be used to perform remote polling:

13

> The I2C bus is described by *Hipp* as a serial port connection. This serial connection may be used to communicate with the web server cards, public and private network interface cards, and power supplies, for control and monitoring purposes.

Ex. 2001, ¶ 73. Although Mr. Putnam argues that an I2C bus is "not an Ethernet connection" (*id.*), his opinion directly contradicts the teachings of the '021 Patent and Acceleron's prior argument that an I2C bus is a type of dedicated ethernet path. Ex. 1001, 10:34–35 (Claim 21: "the dedicated ethernet path is an I2C bus") and 7:65–8:2 ("The microcontroller module communicates with other modules using an I2C bus that gathers status information ... as part of a routine poll."); Ex. 1017, pp. 37–38 (Acceleron: an "'I2C bus' is a type of 'dedicated ethernet path.'"). Thus, the I2C bus of *Hipp* is also a "dedicated ethernet path."

**B. *Hipp* discloses "polling" according to Acceleron's own construction**

Acceleron further argues that *Hipp* does not disclose the step of polling. *See* P.O.R., pp. 44–45. As an initial matter, Acceleron's view of Element 20[e] runs afoul of *IPXL Holdings*, 430 F.3d at 1384. Claim 20 is an apparatus claim that recites a "dedicated ethernet path" ***capable of*** use in remote polling. Because *Hipp* discloses a dedicated ethernet path capable of polling (*e.g.*, the I2C bus), it anticipates Claim 20. *In re Schreiber*, 128 F.3d at 1479.

Moreover, Acceleron takes a narrow view of "polling" that contradicts the construction of that term previously proposed by Acceleron. Specifically,

14

Acceleron dismisses *Hipp*'s teaching that "snapshot" information about the voltage, temperature, wattage, and utilization of the CPU on the web server processing cards is collected and sent to the management network interface card (*see* Ex. 1004, 20:11–32) as "not the same as ... polling." P.O.R., p. 45. In an earlier lawsuit, however, Acceleron argued that "poll" merely means "gather information." Ex. 1017, p. 32. As shown above, *Hipp* discloses a microcontroller module that gathers information about the web server processing cards, and thus discloses "polling" as Acceleron previously construed that term. Ex. 1018, ¶ 52 (at p. 45); Ex. 1004, 20:11–32 and 15:25–27 ("[S]ingle board computer 160 **collects telemetry data** regarding the use, performance, and operation of many components of each web server processing card.") (emphasis added).

## IX.  CLAIMS 30 AND 34–36 ARE UNPATENTABLE

With respect to Claim 30, Acceleron argues only that the combination of *Hipp* and *Gasparik* does not disclose Element 30[d] for the same reasons that *Hipp* does not disclose Element 1[e]. P.O.R., pp. 47–48. As discussed above, *Hipp* discloses Element 1[e] and thus discloses Element 30[d] as well. Claim 30 is thus obvious in view of *Hipp* and *Gasparik*. Because Acceleron does not dispute that *Hipp* and *Gasparik* discloses the additional limitations of dependent Claims 34–36, those claims are also obvious.

15

Respectfully submitted,
BAKER BOTTS L.L.P.

June 17, 2014                              **/Kevin J. Meek/**

_____          _____
        Date                              Kevin J. Meek (Reg. No. 33,738)
                                          Paula D. Heyman (Reg. No. 48,363)
                                          Nicholas A. Schuneman
                                                     (Reg. No. 62,088)
                                          Catherine J. Garza (Reg. No. 62,149)
                                          98 San Jacinto Blvd., Suite 1500
                                          Austin, Texas 78701
                                          512.322.2500
                                          Attorneys for Petitioner, Dell Inc.

16

**A255**

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 17, 2014, a complete and entire copy of **PETITIONER DELL INC.'S REPLY TO PATENT OWNER'S RESPONSE** was served on the below referenced Counsel for Patent Owner via email:

N. Andrew Crain
Scott Horstemeyer
Vivek A. Ganti
Robert D. Gravois
andrew.crain@thomashorstemeyer.com
scott.horstemeyer@thomashorstemeyer.com
vivek.ganti@thomashorstemeyer.com
robert.gravois@thomashorstemeyer.com

THOMAS / HORSTEMEYER, LLP
400 Interstate North Parkway, SW
Suite 1500
Atlanta, Georgia 30339
Phone: 770.933.9500

June 17, 2014                                   **/Kevin J. Meek/**

_____          _____
Date                                       Kevin J. Meek (Reg. No. 33,738)
                                            Paula D. Heyman (Reg. No. 48,363)
                                            Nicholas A. Schuneman
                                                    (Reg. No. 62,088)
                                            Catherine J. Garza (Reg. No. 62,149)
                                            98 San Jacinto Blvd., Suite 1500
                                            Austin, Texas 78701
                                            512.322.2555
                                            Attorneys for Petitioner, Dell Inc.

17

**A256**

Trials@uspto.gov                                          Paper No. 40
571-272-7822                              Entered:  November 7, 2014

1                    RECORD OF ORAL HEARING

2          UNITED STATES PATENT AND TRADEMARK OFFICE

3                            - - - - - -

4          BEFORE THE PATENT TRIAL AND APPEAL BOARD

5                            - - - - - -

6

7                            DELL, INC.

8                            Petitioner

9                               v.

10                         ACCELERON, LCC

11                         Patent Owner

12                           - - - - - -

13          Oral Hearing Held: Thursday, September 4, 2014

14

15                       Case IPR2013-00440

16                       Patent 6,948,021

17

18                           - - - - - -

19          BEFORE:  TRENTON A. WARD, THOMAS L. GIANNETTI, and

20    JEREMY M. PLENZLER (via video link), Administrative Patent

21    Judges.

22          The above-entitled matter came on for hearing on

23    Thursday, September 4, 2014, at 1:00 p.m., Hearing Room B, at

24    the U.S. Patent and Trademark Office, 600 Dulany Street,

25    Alexandria, Virginia.

Case IPR2013-00440
Patent 6,948,021

1          JUDGE GIANNETTI:  Yes.

2          MR. MEEK:  This is clearly the outer wall of the

3    chassis.

4          JUDGE GIANNETTI:  I see.

5          MR. MEEK:  You see it extends all of the way out

6    and has the mounting brackets on here and here?

7          JUDGE GIANNETTI:  Right.

8          MR. MEEK:  Yeah.  Bottom line is the figures don't

9    help very much.  We don't know much about what a caddy is

10    from the drawing.

11          JUDGE WARD:  Well, Mr. Meek, you said that a caddy

12    provides air flow and helps to align a module.  Is that your

13    proposed construction for that term?

14          MR. MEEK:  No, sir.

15          JUDGE WARD:  What is your proposed construction?

16          MR. MEEK:  Our proposed construction is on slide

17    28.  Mr. Putnam, the expert from Acceleron, gave a perfectly

18    good construction of caddy as a carrier for a module.

19          We think that is reasonable.  We think it is

20    consistent with the claim and the specification.  And we

21    proposed that the Board would adopt that.  The most important

22    thing about it is that it is from their expert.  It is in

23    their response, stated as the construction.

24          It is reasonable.  It is the broadest construction

25    presented to the Board to date.  And under Rule 42.100(b),

17

**A343**

Case IPR2013-00440
Patent 6,948,021

1   the broadest reasonable construction is the one the Board

2   should adopt.

3        It is not overly broad, though.  It makes sense.

4   A caddy carries a module is fine.  Everything we know from

5   the specification is consistent with that.

6        Yes, Judge Plenzler.

7        JUDGE PLENZLER:  If you are agreeing that a caddy

8   is a carrier for a module, doesn't that cause problems with

9   the position you have in your petition where you cite to a

10  structure that is supporting a fan?

11       Is a fan a module or how does, I guess, the

12  structure that you are saying the caddy supports in your

13  petition tie into being a module?

14       MR. MEEK:  Yes.  No, Judge Plenzler, it does not

15  create problems.  And I will talk about this.  I brought up

16  slide 29, which shows two of the three things that we have

17  identified as caddies.

18       The first one, Judge Plenzler, as you said, is the

19  box around the fans.  We know the box around the fans is

20  carrying the fan itself.  The fan is a module.

21       We know that it is positioning the fan in a

22  correct place.  We know that it is helping provide air flow

23  from the front to the rear.  And we know that the alignment

24  of the fan with the spaces between the boards is established

25  by the pitch of those boxes carrying the fans.

18

**A344**

1        JUDGE GIANNETTI:  So doesn't this come down to

2    what a module is?

3        MR. MEEK:  It could, but there has been no

4    discussion of a module other than it is some sort of

5    electronic component.  I don't think that anybody is trying

6    to limit the term module.

7        JUDGE GIANNETTI:  A fan is an electronic

8    component?

9        MR. MEEK:  Yes.

10        JUDGE GIANNETTI:  I don't think of it as that.  I

11    think of it as an electromechanical device.  When I think of

12    an electronic component, I think of something like a circuit.

13        MR. MEEK:  Your Honor, if I said electronic

14    component, I didn't mean to imply that I was limiting it to

15    any sort of active circuitry.

16        I think of module -- I'm not sure that a power

17    supply would be deemed as active circuitry.  It is basically,

18    as you say, electromagnetic.  I think of anything that you

19    are trying to place in a particular position as a module.

20        So I would argue that limiting module is not

21    appropriate at this phase because neither side has asked you

22    to, and trying to -- the term module should be given a broad

23    construction to mean anything you are trying to position that

24    is going to be a component.

25        JUDGE PLENZLER:  So Patent Owner's position, their

19

**A345**

Case IPR2013-00440
Patent 6,948,021

1    construction that defines it, in the previous slide as a

2    carrier for a module, they didn't mean a carrier for like a

3    CPU module.  They meant that it could be open to any kind of

4    electronic device.  Is that what you are saying?

5        MR. MEEK:  I think that's the appropriate

6    construction of module.  I think that's the appropriate way

7    to approach this.

8        Now, I will tell you that the third example that

9    we have is a module.  It is labeled a module.  It is the

10    power supply.  So I'm not certain that this is going to

11    matter with respect to Hipp.

12        JUDGE PLENZLER:  Could I ask real quick, though, I

13    know you mentioned power supply.  I see that in your reply.

14    I couldn't find it in the petition, though.  I thought in the

15    petition all you were relying on was support for the fans.

16        Did you in the petition point to this power module

17    as being a component supported by the caddy?

18        MR. MEEK:  Your Honor, no, the reply adds

19    additional examples and it is directly responsive to the

20    construction that was offered by the Patent Owner.

21        The Patent Owner gave us a construction which in

22    some respects is divorced from the areas of the specification

23    that I referred to earlier, in the sense that it doesn't talk

24    about air flow and it doesn't talk about alignment.  But it

25    is, we think, appropriate in the sense that it is a broad,

20

**A346**

Case IPR2013-00440
Patent 6,948,021

1    reasonable construction of the very broad term caddy.

2         So we, in our reply, we broadened our look, we

3    broadened our view to find carriers for modules, and we found

4    the door and the squares around the fans and the trays in

5    which the power supplies were resting.

6         JUDGE GIANNETTI:  Counsel, I want to come back to

7    this module question.  So I'm looking at the patent, Exhibit

8    1001, the '021 patent.  And actually in the portion that you

9    cite on slide 26.

10        MR. MEEK:  Yes, we're on slide 26 now.

11        JUDGE GIANNETTI:  So in column 3, around line

12   29-30, and it talks there about the caddy and the modules

13   that are residing in the caddy.  Do you see that?

14        It calls out specifically the power module, the

15   Ethernet switch module and the micro-controller module.  I

16   don't see any reference there to the fan.  And these strike

17   me as being different kinds of modules than the

18   electromechanical fan.  Would you agree with that?

19        MR. MEEK:  I think they are different in

20   character.  Once again, I'm not sure that limiting the term

21   module to a particular class of things is appropriate, but

22   once again I don't think it is going to matter.  These are

23   clearly called out as power modules.

24        JUDGE GIANNETTI:  Yes.

25        MR. MEEK:  Okay.  This is the Hipp reference,

21

**A347**

Case IPR2013-00440
Patent 6,948,021

1    figure 12.  These are shown in other figures.  Judge

2    Plenzler, I'm on slide 30.

3            You can clearly see there are slides provided to

4    allow the power supply modules to be inserted and removed.

5    You can see on the side that there are small tabs to make

6    sure that you hit the rails correctly.

7            These are aligning the bottom of this power supply

8    module 280 to a connector on the midplane.  It is

9    specifically stated.  And there is no question that this has

10   to do with air flow as well.  It is jacking up the power

11   supply module away from the chassis to allow for air flow

12   beneath it.

13           And this, module 280, power supply module 280 is

14   specifically taught in Hipp to be hot-swappable.  In other

15   words, this is designed to come out and be put in.

16           So there is no permanence to it.  It complies,

17   Judge Giannetti, with everything you are talking about.  It

18   is defined as a module.  It is non-permanent.  It is

19   aligning.  And it is dealing with air flow.

20           So if you don't like the fans and you don't like

21   the door, I understand.  And if the reason that is is because

22   you want to limit the term module, I don't agree with that,

23   but in the end, at the end of the day it doesn't matter.  We

24   have two power supplies, we have two caddies, where Hipp

25   clearly shows it.  Okay?

22

Case IPR2013-00440
Patent 6,948,021

1      I'm going to move on then to my -- oh, just one

2    point.  It is a little strange that we spend a lot of time on

3    caddies.  Nobody in this case, neither side, contends that

4    caddies are new.  Everybody agrees that caddies were well

5    known.

6       So the art knew about caddies long, long before,

7    and here is Mr. Putnam, their expert's deposition, where he

8    admits to that fact.

9       We will now turn to slide 35.  We are now going to

10   turn to whether or not Hipp discloses bays.  This is claim 4.

11   We believe Hipp anticipates claim 4.  Claim 4 adds to this

12   chassis we talked about earlier bays and slot guides to

13   facilitate mounting and removal of the modules.

14      This claim is a little confusing because we don't

15   know whether it is the bays or the slot guides or both that

16   facilitate the mounting and removal.  That is not clear from

17   the claim.  And nobody has argued that Hipp doesn't have slot

18   guides.  There is no argument present.

19      So the only thing that is pending before the Board

20   today is whether or not Hipp has bays or doesn't have bays.

21   Once again, it is a construction issue.  What does bay mean

22   and what does it not?  I don't, and very similar to the caddy

23   situation, I'm not sure that there is any real argument.

24      The construction offered in the response is that a

25   bay is a structure defining a space that receives a module.

Case IPR2013-00440
Patent 6,948,021

1    the module is inserted in the chassis and the caddy ensures

2    the hot-swap connectors are aligned.

3        This helps us understand what the purpose of the

4    caddy is.  And this slide here I think was subject to some

5    debate.  But in deposition with both experts, both understood

6    the concept of a caddy to be one that is well understood, and

7    one that I understand for the first time that Petitioner

8    agrees is a carrier for a module.

9        The expert for Acceleron indicated that, while

10   these are more recent carriers for modules, that they are,

11   you know, not substantially different from carriers for

12   modules that have been around for even prior to the patent,

13   that the notion of a caddy is one that is, you know, where a

14   carrier, it can serve as a carrier for a module.

15       Now, when we look at how the Petitioner has sought

16   to point to Hipp with respect to what is the caddy, a carrier

17   for a module, and, again, the claim requires caddies, plural,

18   the first thing that was pointed to was articulating door.

19   I'm on slide 24 now.

20       And in slide 24 articulating door was pointed to

21   as the caddies of claim 3.  Well, one problem is that this

22   doesn't carry a module as the patent is understood.  I think

23   that was one of the questions or the line of questions that

24   was brought up earlier with respect to CPU modules, power

25   modules and such.  So we don't see how an articulating door

74

Case IPR2013-00440
Patent 6,948,021

1    can constitute a caddy as this term is understood in the art.

2         So in the reply we got a changed argument, and

3    this changed argument was, well, so I wasn't sure if

4    articulating door was still the case, but I understand it is

5    now, but in addition to that there is this mounting hardware

6    for box fans.

7         Now, what that appears to be referencing are the

8    four screws or however many screws that you might have in the

9    fan hardware as the caddy, where the screws themselves would

10   constitute a caddy.

11        Again, I think this is divorced from what the term

12   is understood to mean, as a carrier for a module.  I'm not

13   sure that the screws would constitute a carrier for a module

14   even under the construction for Hipp.  So we don't see how

15   this constitutes a caddy as well.

16        The last thing now, in the reply, and this is the

17   first time we have had an opportunity to speak to this, is

18   the two power supply mounting mechanisms.

19        Now, in the reply brief it was pointed out two

20   power supply mounting mechanisms 48 -- 278.  However, in

21   Petitioner's opening argument he also pointed to something

22   here at the bottom.  We haven't had an opportunity to address

23   that.  We don't believe that that discloses a caddy.

24        We think it is inappropriate at the oral argument

25   for that to be raised for the first time.  I don't believe

Case IPR2013-00440
Patent 6,948,021

1   that was found anywhere in the papers where, whatever he was

2   referring to at the bottom, this slide or whatever it is, but

3   it doesn't seem to be, even still, meeting the carrier for

4   the module as much as something that, you know, holds it into

5   position.

6          But this 278, this power supply mounting

7   mechanism, what they are essentially referring to, and I need

8   to go back several slides, are the plugs, 278.  These are the

9   plugs.  They are the connectors, where the power supply

10   module plugs into on the midplane board.

11          I referred back to slide 18.  So we are not sure

12   that this can constitute a caddy as well.  So we don't

13   believe that Hipp discloses any type of caddy as the term is

14   well understood.  And so, therefore, this claim would not be

15   anticipated.

16          I also would like to in my remaining time -- how

17   much time do I have left, if I may ask?

18          JUDGE WARD:  12 minutes.

19          MR. CRAIN:  Okay.  I would like to move to slide

20   27, if I may, and talk about claim 4.

21          In claim 4 we see the claim of the computer

22   network appliances depends upon claim 2, so for at least the

23   reason that we believe that claim 1 should be deemed

24   patentable and not anticipated by Hipp, claim 4 would as

25   well, but for the additional reason that the Hipp reference

76

US006757748B1

(12) **United States Patent**
Hipp

(10) Patent No.: **US 6,757,748 B1**
(45) Date of Patent: **Jun. 29, 2004**

(54) **MODULAR NETWORK INTERFACE SYSTEM AND METHOD**

(75) Inventor: **Christopher G. Hipp**, Dallas, TX (US)

(73) Assignee: **RLX Technologies, Inc.**, The Woodlands, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) bydays.days.

(21) Appl. No.: **09/620,409**

(22) Filed: **Jul. 20, 2000**

(51) Int. Cl.[7] ................................................. **G06F 3/00**
(52) U.S. Cl. ............................ **710/2**; 710/62; 709/238; 709/249; 370/419
(58) Field of Search ......................... 710/1, 2, 62, 300; 709/218, 238, 249; 370/419

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,222,385 | A | | 9/1980 | Backhouse .................. 128/674 |
| 4,511,950 | A | | 4/1985 | Bunner et al. .............. 361/413 |
| 4,885,741 | A | * | 12/1989 | Douskalis ................... 370/362 |
| 4,918,572 | A | | 4/1990 | Tarver et al. ............... 361/395 |
| 5,031,075 | A | | 7/1991 | Casanova et al. ........... 361/415 |
| 5,034,915 | A | | 7/1991 | Styrna et al. ............... 364/900 |
| 5,051,096 | A | | 9/1991 | Cooke et al. ................. 439/61 |
| 5,214,567 | A | | 5/1993 | Feightner et al. ........... 361/393 |
| 5,317,477 | A | | 5/1994 | Gillett ....................... 361/683 |
| 5,504,638 | A | | 4/1996 | Kinoshita et al. ........ 360/98.08 |
| 5,579,204 | A | | 11/1996 | Nelson et al. .............. 361/685 |
| 5,603,044 | A | | 2/1997 | Annapareddy et al. ..... 395/800 |
| 5,606,664 | A | * | 2/1997 | Brown et al. ............... 709/224 |
| 5,615,211 | A | * | 3/1997 | Santore et al. ............. 370/419 |
| 5,661,631 | A | | 8/1997 | Crane, Jr. ................... 361/683 |
| 5,682,298 | A | | 10/1997 | Raynham ................... 361/794 |
| 5,754,869 | A | | 5/1998 | Holzhammer et al. . 395/750.01 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

EP        0 816 977 A2    1/1998    ............. G06F/1/18

WO        WO 99/57639    11/1999    ........... G06F/11/14

OTHER PUBLICATIONS

"Cabinet PC in 'book format' with one free combislot," LS–IC/BASIC1 Brochure, XP–002202891, *Leukhardt Systemelektronik GmbH*, 1999, 2 pages.
"Hardware Matchbox Webserver," Brochure, XP–002203094, *Wearables Lab*, Jan. 1999, 4 pages.
"SP2500 Series EtherFast 10/100 Mbps NICs," Brochure, Xp–002203092, *Micronet® Communications Inc.,* Sep. 1999, 2 pages.
WebEngines Blazer Platform Version 1.0 Hardware Reference Guide, XP–002202892, *NetWork Engines, Inc.,* Jun. 1, 2000, 92 pages.
"New Products," *Electronic Design* web site (http://www.elecdesign.com), XP–002203093, Jun. 21, 2002, 1 page.
PCT Invitation to Pay Additional Fees in International Application No. PCT/US 01/22289, Jul. 29, 2002, 9 pages.

*Primary Examiner*—Jeffrey Gaffin
*Assistant Examiner*—Eron Sorrell
(74) *Attorney, Agent, or Firm*—Baker Botts L.L.P.

(57) **ABSTRACT**

A network interface card including a printed circuit board is provided. First and second connectors may be coupled with the printed circuit board. A plurality of ethernet communication links form at least a portion of a coupling between the first and second connectors, wherein the first connector is configured to receive a third connector associated with a midplane. A chip may be coupled with the printed circuit board wherein the plurality of ethernet communication links couple the first connector with the chip. A second communication link may also be provided which couples the chip and the second connector. In accordance with one embodiment of the present invention the chip consolidates data received through the first connector for distribution of the data to the second connector. In a particular embodiment, the chip may include a hub chip. In accordance with another aspect of the present invention, the chip may include a switch chip.

**20 Claims, 9 Drawing Sheets**



US 6,757,748 B1

Page 2

**U.S. PATENT DOCUMENTS**

| | | | | |
|---|---|---|---|---|
| 5,793,610 A | | 8/1998 | Schmitt et al. | 361/695 |
| 5,850,562 A | | 12/1998 | Crump et al. | 395/800 |
| 5,913,037 A | * | 6/1999 | Spofford et al. | 709/226 |
| 5,953,340 A | * | 9/1999 | Scott et al. | 370/401 |
| 5,960,035 A | | 9/1999 | Sridhar et al. | 375/219 |
| 6,046,912 A | | 4/2000 | Leman | 361/784 |
| 6,115,755 A | | 9/2000 | Krishan | 709/250 |
| 6,115,788 A | | 9/2000 | Thowe | 711/114 |
| 6,163,464 A | | 12/2000 | Ishibashi et al. | 361/788 |
| 6,175,490 B1 | | 1/2001 | Papa et al. | 361/686 |
| 6,192,399 B1 | * | 2/2001 | Goodman | 725/78 |
| 6,208,522 B1 | | 3/2001 | Manweiler et al. | 361/752 |
| 6,243,756 B1 | * | 6/2001 | Whitmire et al. | 709/232 |
| 6,260,155 B1 | | 7/2001 | Dellacona | 714/4 |
| 6,313,988 B1 | | 11/2001 | Pham | 361/687 |
| 6,314,501 B1 | | 11/2001 | Gulick et al. | 711/153 |
| 6,324,062 B1 | | 11/2001 | Treiber et al. | 361/727 |
| 6,325,636 B1 | | 12/2001 | Hipp et al. | 439/61 |
| 6,374,329 B1 | * | 4/2002 | McKinney et al. | 711/141 |
| 6,381,239 B1 | * | 4/2002 | Atkinson et al. | 370/362 |
| 6,397,292 B1 | | 5/2002 | Venkatesh et al. | 711/114 |
| 6,411,506 B1 | | 6/2002 | Hipp et al. | 361/686 |
| 6,418,120 B1 | | 7/2002 | Yona et al. | 370/236 |
| 6,421,730 B1 | | 7/2002 | Narad et al. | 709/236 |
| 6,433,568 B1 | | 8/2002 | Whipple et al. | 324/760 |
| 6,447,726 B1 | | 9/2002 | Delucas et al. | 422/99 |
| 6,459,700 B1 | | 10/2002 | Hoang | 370/401 |
| 6,493,825 B1 | | 12/2002 | Blumenau et al. | 713/168 |
| 2001/0036191 A1 | | 11/2001 | Borchering | 370/401 |

* cited by examiner



*FIG. 1*

U.S. Patent

Jun. 29, 2004

Sheet 2 of 9

US 6,757,748 B1

**A452**



FIG. 2



*FIG. 3*

82



FIG. 4



FIG. 5



FIG. 6



FIG. 7



A455

U.S. Patent       Jun. 29, 2004       Sheet 6 of 9       US 6,757,748 B1



FIG. 10

U.S. Patent

Jun. 29, 2004     Sheet 7 of 9

US 6,757,748 B1



FIG. 11

U.S. Patent     Jun. 29, 2004     Sheet 8 of 9     US 6,757,748 B1



FIG. 12



FIG. 13

US 6,757,748 B1

1

# MODULAR NETWORK INTERFACE SYSTEM AND METHOD

## RELATED APPLICATIONS

The present application is related to co-pending U.S. patent applications: Ser. No. 09/620,105, entitled Single Board Web Server System and Method, filed Jul. 20, 2000; Ser. No. 09/620,106, entitled Web Server Network System and Method, filed Jul. 20, 2000; Ser. No. 09/625,002, entitled Passive Midplane System and Method, filed Jul. 20, 2000, now U.S. Pat. No. 6,325,636; Ser. No. 09/620,107, entitled High Density Web Server Chassis System and Method, filed Jul. 20, 2000, now U.S. Pat. No. 6,411,506; and Ser. No. 09/620,108, entitled Data I/O Management System and Method, filed Jul. 20, 2000.

## TECHNICAL FIELD OF THE INVENTION

The present invention relates generally to the field of network servers, and more particularly to a data input/output system and method.

## BACKGROUND OF THE INVENTION

A critical component of both private intranets and the publicly accessible internet is what is commonly referred to as a web server. A web server is typically a computer which is capable of receiving requests for information and returning data or performing specialized processing upon the receipt of a network request for such processing. Conventional network architectures envision servers as large scale computing platforms. For example, large commercial entities may include very large systems acting as web servers fielding requests for processing. Alternatively, these entities might employ large parallel server operations where a multitude of individual server computers all service requests for information and processing in parallel.

In today's network architectures, smaller users such as individuals or small businesses that require server systems will typically be forced to share part of the processing capability of one of these large scale systems. In many cases this sharing of resources does not provide adequate processing capability for the individual or small business user. Further, the sharing of a large processing system means that all parties utilizing that server processing capability are vulnerable to the failure of that system. These large processing platforms are also more difficult to customize if one small user needs specific features or components that other small users do not need. Further, as Internet and intranet traffic have grown, it has become apparent that even the largest processing platforms reach a limit to their processing capability especially in light of the increased traffic in large multimedia content and the necessity for real time processing of transactions.

Another difficulty in providing server technology to individual or small business users is associated with the difficulties in maintaining provisioning and administrating the server technology. Conventional server systems are typically very complex to administer. Software development efforts have not focused on providing simple user interfaces because the typical personnel that are tasked with maintaining servers are typically very sophisticated network technicians.

Large scale servers that are shared by multiple small users present difficulties in monitoring and metering traffic for individual users. For example, if a server provider desired to bill a user of a large scale system according to the processing

2

time or the transaction count that occurred relative to that particular user, it is very difficult to arrive at an accurate assessment of that activity when the server hardware is shared by that user and many other users.

In the past, it has been difficult to provide server capability close to the end user. This is in large part because the typical larger server architectures require special environmental conditions and special hardware environments to supply power and large bandwidth communication links. The environment of a telephone company's central office is typically very close to the end user, however, the space power and environmental constraints within these facilities make it completely impractical to co-locate large server platforms within these facilities.

## SUMMARY OF THE INVENTION

The present invention provides a data input/output system and method that substantially eliminates or reduces the problems and disadvantages associated with previous methods and systems. In particular, a network interface card is provided which consolidates network traffic between a plurality of web server processing cards and one or more networks.

In accordance with a particular embodiment of the present invention, a network interface card including a first printed circuit board is provided. First and second connectors may be coupled with the printed circuit board and a plurality of ethernet communications links may form at least a portion of a coupling between the first and second connectors. The first connector may be configured to receive a third connector associated with a midplane. In one embodiment a chip may be coupled with the first printed circuit board such that the plurality of ethernet communications links couple the first connector with the chip. A second communication link may also be provided coupling the chip and the second connector. The chip of the present invention may be operable to consolidate data received through the first connector for distribution of the data to the second connector.

In accordance with another embodiment of the present invention, the chip may include a hub chip.

In accordance with yet another embodiment of the present invention, the chip may include a switch chip.

Technical advantages of the present invention include providing a network interface card operable to consolidate data received from a plurality of web server processing cards. The network interface card provides a single point of data communications, simplifying troubleshooting, operations, administration, management, provisioning and traffic metering and measurement regarding the associated web server processing cards.

Another technical advantage of the present invention includes providing a network interface card which includes plug and play capability within a midplane.

Yet another technical advantage of the present invention includes providing a network interface card which is hot swappable within a midplane.

Other technical advantages will be readily apparent to one skilled in the art from the following figures, description, and claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention and its advantages, reference is now made to the following description, taken in conjunction with the accompanying drawings, in which:

3

FIG. 1 is a schematic drawing illustrating a plurality of web server processing cards coupled with a public network, a private network, and a management network, in accordance with one embodiment of the present invention;

FIG. 2 is a plan view taken from above, with portions broken away, illustrating a web server processing card;

FIG. 3 is a plan view taken from below, with portions broken away, illustrating the web server processing card of FIG. 2;

FIG. 4 is a plan view taken from above, illustrating a network interface card in accordance with one embodiment of the present invention;

FIG. 5 is a plan view taken from above with portions broken away, illustrating an alternative embodiment network interface;

FIG. 6 is a plan view taken from above, illustrating another alternative embodiment network interface card;

FIG. 7 is a plan view taken from above, illustrating yet another alternative embodiment network interface card;

FIG. 8 is an elevation view illustrating a front portion of a passive midplane, in accordance with one embodiment of the present invention;

FIG. 9 is an elevation view, illustrating a rear portion of the passive midplane of FIG. 8;

FIG. 10 is an isometric view, with portions broken away, illustrating a server chassis, in accordance with one embodiment of the present invention;

FIG. 11 is an isometric view, with portions broken away, illustrating additional components of the web server chassis of FIG. 10;

FIG. 12 is an isometric view, with portions broken away, illustrating additional components of the web server chassis of FIG. 10; and

FIG. 13 is an isometric view, illustrating a web server rack, in accordance with one embodiment of the present invention.

## DETAILED DESCRIPTION OF THE DRAWINGS

Referring to FIG. 1, a high density, multiple server network of the present invention is illustrated and generally designated by the reference number 30. Network 30 includes a plurality of web server processing cards 32 and 132–135 coupled with a public network 45, a private network 46 and a management network 47. Each web server processing card 32 and 132–135 are configured and function similarly. Therefore, web server processing card 32 will be described in detail, for illustrative purposes. However, all web server processing cards described within this specification may include all components and functionality described with regard to web server processing card 32.

Web server processing card 32 provides the functionality of a single board computer which may be employed as a rack mounted web server. Networks 45, 46 and 47 may be configured, maintained and operated independently of one another, and cooperate to provide distributed functionality of network 30.

Each web server processing card 32 is coupled with a passive midplane 34 which is coupled with a base 36 of a server chassis 38. Additional components regarding web server chassis 38 are illustrated and described with respect to FIG. 10. A network interface card 40 couples passive midplane 34, and therefore web server processing cards 32 with a public network switch 42, via communication links 44. Throughout this specification, the term "switch" may be

4

used to indicate any switch, router, bridge, hub or other data/communication transfer point. Public switch 42 distributes data between web server processing cards 32 and public network 45. In a particular embodiment, public network 45 may include the Internet. Public network 45 may include a variety of networks including, without limitation, local area networks (LANs), wide area networks (WANs), and/or Metropolitan Area Networks (MANs).

A second network interface card 48 is coupled with passive midplane 34 and distributes data to a private network switch 50 via communication link 52. A plurality of private network applications including a storage server 54, application server 56, database server 58, and legacy systems 60 are coupled with private network switch 50 through communication links 62, 63, 64 and 65, respectively.

A management network interface 49, which is illustrated in more detail in FIG. 7, distributes data between passive midplane 34 and remote management system 70 of management network 47, through communication link 71. One or more online/nearline memory storage devices, including non-volatile storage device 72 and secondary non-volatile storage device 74 communicate with management console 70 using communication links 76 and 78, respectively. Memory storage devices 72 and 74 communicate with one another through communication link 80.

## PUBLIC NETWORK

In the illustrated embodiment public network switch 42 includes a Cisco® Catalyst 5500, an industry standard Ethernet switch. Alternatively, a Black Diamond public switch, as manufactured by Extreme Networks® may be provided as public switch 42.

A high density connector 43 may be coupled with public switch 42 to facilitate communication between public switch 42 and communications link 44. In one embodiment, high density connector 43 may include an RJ-21 high density telco (telephone company) type connector for consolidating at least twelve 10/100/1000 megabits per second Ethernet connections through a single cable. The use of high density telco style connectors, like high density connector 43 allows the consolidation of twelve, twenty-four or forty-eight Ethernet connections, at a twelve to one ratio, through a single cable.

Communication link 44 is operable to provide gigabit Ethernet over fiber. In another embodiment, communication link 44 may include gigabit Ethernet over copper. The coupling between public switch 42 and network interface card 40 may be accomplished using a single communication link 44. However, in another embodiment a second communication link 44 may be provided to accomplish a redundant configuration. This allows a back-up communication link between public switch 42 and network interface card 40, in case of failure of the primary communication link. Accordingly, redundant fiber connections to public switch 42 or other high density data center switches capable of aggregating hundreds of gigabit connections in a single switch 42, are provided.

Public switch 42 is coupled with public network 45 over communications link 51. In a particular embodiment, communication link 51 may include a high bandwidth transport, for example and without limitation T3 or OC48, in order to serve a plurality of servers on an internet service provider (ISP) or application service provider (ASP) network.

## PRIVATE NETWORK

Similar to public network switch 42, private network switch 50 may also include either a Catalyst 5500, as

US 6,757,748 B1

5

manufactured by Cisco®, or a Black Diamond, as manufactured by Extreme Networks®. A high density connector 53 may be provided to facilitate communication between private network switch 50 and communications link 52, and ultimately, network interface card 48. In a particular embodiment, high density connector 53 may include an RJ-21 high density telco type connector for consolidating at least twelve 10/100/1000 megabits per second Ethernet connections through a single cable. As previously described, the use of high density telco style connectors, like high density connector 53 allows the consolidation of twelve, twenty-four or forty-eight Ethernet connections at a twelve to one ratio, through a single cable.

High density connectors, for example 43 and 53, facilitate the consolidation of 10/100/1000 megabits per second Ethernet cabling for large numbers of web server processing cards. Accordingly, private switch network switch 50 is cable of aggregating forty-eight or more 10/100/1000 megabits per second Ethernet ports in a single network interface card, and seven hundred sixty-eight ports (web server processing cards) in a single private network switch.

Private network switch 50 is coupled with a plurality of "back office" network applications including storage server 54, applications server 56, database server 58 and legacy systems 60. Storage server 54 provides mass storage to support web server processing cards of various users. This is a private connection because server 54 is not linked directly to public network 45. Throughout this specification, "back office" will be used to indicate operations, management and support tasks used to support the operation of web server processing cards, which are accomplished at remote locations from server chassis 38. Communication links 62–65 provide private 10/100/1000 megabits per second Ethernet supporting various high volume business transaction processing systems (HVBTPS). Storage server 54 provides network attached storage (NAS). Application server 56 may be rented, or provided by an application service provider (ASP). Database server 58 provides transaction processing, and legacy systems 60 may include various database servers, etc.

Private network 46 is considered "private," because there is no physical connection between private network 46 and public network 45. Accordingly, security is provided to data and communications of private network 46 because private network 46 is protected from a security breach initiated from public network 45.

Private network 46 may be configured to provide a plurality of "back-end" network applications. For example, private network 46 may provide end users with secure internet voicemail, internet fax, a "personal" web server, electronic mail accounts, MP-3 servers and/or digital photo collection servers.

In another embodiment, private network 46 may be configured to provide groupware and other associated applications. For example, private network 46 may include the necessary hardware and software to provide users of network 30 with "chat rooms" and other on-line meeting applications. Wireless Application Protocols (WAPs) applications may also be provided. In fact, the WAP applications may be synchronized to groupware associated with the web server processing cards.

## MANAGEMENT NETWORK

Remote management system 70 of management network 47 includes the ability to monitor, manage, back-up, restore, activate and operate many of the components of high density

6

server network 30. For example, an operator of a remote management system 70 can control all of the functions and operations of web server processing cards 32. In fact, remote management system 70 includes control software and other applications which accomplish these functions and operations automatically, without operator intervention. Many of the software and other applications which may reside upon remote management system 70 will be described later, in more detail.

In a particular embodiment, remote management system 70 performs metering, including without limitation packet level metering, and bandwidth monitoring of web server processing cards 32. Other characteristics and measurements which remote management system 70 collects, evaluates and stores include operating data and other information regarding web server processing cards 32.

Remote management system 70 identifies each web server processing card 32 according to at least two identifiers. For example, during start-up of each web server processing card 32, remote management system 70 is informed of a hardware address associated with each web server processing card 32. The hardware address is analogous to the IP address assigned by the server to each client, in a client/server network system. The hardware address of each web server processing card 32 may be referred to as the "logical" address of a particular web server processing card.

Also during the startup of web server processing cards 32, remote management system 70 is informed of a chassis/slot address identifier unique to each web server processing card 32. The chassis/slot address may also be referred to as the physical identifier, or physical address of a particular web server processing card. The physical address allows remote management system 70 to identify a particular web server processing card 32 in a manner which is more readily identifiable to an operator of remote management system 70 or other user of server network 30.

Remote management system 70, non-volatile storage device 72 and secondary non-volatile storage device 74 also provide in-line/near-line storage support for web server processing cards 32. Storage devices 72 and 74 may include high capacity redundant array of inexpensive disks (RAID)/ optical/tape subsystem controlled by hierarchical storage management software which enables automatic back-up and restoration of user data from all servers via remote management system 70.

Remote management system 70 has the ability to provide a single point of management for thousands of servers. The servers under the control of remote management system 70 may include thousands of web server processing cards 32. These servers may be configured to provide individual server capacity. In another embodiment, the servers may be "clustered." In other words a plurality of web server processing cards 32 may be joined logically in order to provide a sealed level of service to a user.

Accordingly, remote management system 70 provides management functionality over a private, back end network, which may include thousands of web servers. In a particular embodiment, software associated with remote management system 70 may be installed upon a high capacity Linux server or workstation with enough storage capacity to provide back-up functionality to all servers on any particular network.

Management software, applications and functionality associated with remote management system 70 typically reside on a server. However, remote management system 70 may be accessed remotely by various electronic devices

US 6,757,748 B1

7

including laptops, desktops and handheld personal digital assistants ("PDAs"). Devices used to access remote management system 70 may also include a secure web browser or other security applications.

A web browser based, graphical user interface 69 associated with remote management system 70 provides the operator of management network 47 with a user-friendly, easy to read overview of operational functions in graphical formats, suitable for "at a glance" monitoring and diagnosis.

As will be described later in more detail, remote management system 70 includes various software, applications and functionality which simplify and improve the operation of associated web servers, including without limitation web server processing cards 32. For example, remote management system 70 provides "automated preemptive failover" functionality. Automated preemptive failover includes an automated system which monitors and predicts component failures, issues notification to the network operator or administrator and initiates fail-over to a "warm spare" before catastrophic failures occur, without much, if any user intervention.

Remote management system 70, along with storage devices 72 and 74 provide automated back-up of client data for automated restoration of a web server processing card, or a spare web server processing card to its original state, in the event of a failure.

In a particular embodiment, a software agent residing upon remote management system 70 may be used to collect, store, and analyze measurements and data regarding hardware, software and bandwidth usage measurements for billing purposes. These measurements and data may be exported to a variety of applications including data mining and decision support systems.

Remote management system 70 provides the functionality of a browser-based user administrative graphical user interface. This includes an intuitive user interface for controlling basic functionality of servers on a single server level. Accordingly, a network operator or administrator may add, delete, configure or modify virtual servers and/or web server processing cards 32. Similarly, remote management system 70 may be used to add, delete, configure and modify users who are granted access to web server processing cards 32 of public network 45. Remote management system 70 also provides operations, administration, management and provisioning (OAM&P) functionality to the network administrator. Traffic metering and measurement (TM&M) and performance measurements are also collected, stored, analyzed and maintained by remote management system 70.

Similar to private network 46, management network 47 is considered a "private" network. Since there is no physical connection between management network 47 and public network 45, management network 47 is protected from a security breach initiated from public network 45.

WEB SERVER PROCESSING CARDS

Referring now to FIGS. 1–3, each web server processing card 32 will be described in more detail. Web server processing card 32 is a single board computer upon which all of the requisite components and devices are mounted to enable processing card 32 to function and operate as a server hosting a wide array of Internet-based applications. Each web server processing card 32 within a particular chassis 38, share a common passive midplane 34 through which all power and connectivity passes. Server chassis 38 is intended for rack mount in server rack 39 (See FIG. 13), and includes passive midplane 34 and all the associated web server processing cards 32.

8

In one embodiment, web server processing card 32 includes a powerful computer connected to the Internet and operable to store audio, video, data graphics and/or text files in order to display to a user of public network 46 via protocols including, without limitation, hypertext transfer protocol (http). Each web server processing card 32 includes a printed circuit board 82, coupled with a central processing unit (CPU) 84, a disk drive 86, a dynamic memory integrated circuit 88, and network interface integrated circuitry 90–92.

Central processing unit 84 performs the logic, computational and decision making functions of processing card 32. Many types of central processing units with various specifications may be used within the teachings of the present invention. In the illustrated embodiment, CPU 84 includes a Crusoe 667 MHz CPU, as manufactured by Transmeta. In fact, many central processing units with comparable processing power to a 500 MHz, Pentium III, as manufactured by Intel, may be used within the teachings of the present invention. For example, the Crusoe TM 3200 with speeds in the range of 300–400 MHz, or TM 5400 with speeds in the range of 500–700 MHz, may also be used.

The clock speed of central processing unit 84 will depend in part upon the operating system resident upon web server processing card 32. In the illustrated embodiment, web server processing card 32 includes a version of the Linux operating system. The clock speed of central processing unit 84 may diminish by as much as twenty percent if a version of the Windows operating system is substituted for the Linux operating system.

CPU 84 of the present invention may include the ability to adapt its processing speed to the processing load placed upon it. In other words, CPU 84 may vary its speed as appropriate to handle any given processing load, whereas many other processors simply include ON or OFF capabilities. The CPU of the present invention preferably includes a maximum continuous power consumption of no more than 4.5 watts, and a maximum operating temperature of below 150 degrees Fahrenheit.

In the illustrated embodiment, the maximum operating temperature of CPU 84 is approximately 120° Fahrenheit. Due to its variable speed feature CPU 84 of the present invention will typically consume significantly less than 4.5 watts of power. CPU 84 of the illustrated embodiment is compatible with the Intel instruction set such that CPU 84 supports standard X86 operating system.

Disk drive 86 includes electronics, motors, and other devices operable to store (write) and retrieve (read) data on a disk. In the illustrated embodiment, disk drive 86 includes a two and one-half inch IBM 9.5 mm notebook hard drive. A second two and one-half inch disk drive 87 may be installed upon a given web server processing card 32. The use of disk drive 87 is optional, and increases the capacity and functionality of web server processing card 32.

A plurality of hardware connectors 97 are provided upon printed circuit board 82, to allow for the installation of up to two, two and one-half inch disk drives. For example, communications ports 95 are affixed to printed circuit board 82, to allow for the installation of disk drives 86 and/or 87. Each disk drive 86 and 87 is also affixed to printed circuit board 82, using connectors 97.

The use of web server processing card 32 having two, two and one-half inch disk drives allows for the installation of three hundred and thirty-six servers within an industry standard rack having 42U of usable interior space (standard industry rack). For purposes of this specification, a standard

US 6,757,748 B1

9

industry rack has the approximate dimensions nineteen inches wide by six feet high by thirty to thirty-four inches deep.

Furthermore, at least two, 6 to 25 gigabyte—two and one-half inch hard drives may be provided with web server processing card 32, in accordance with the teachings of the present invention. Alternatively, a 10 to 75 gigabyte, three and one-half inch hard drive may be installed upon web server processing card 32, in lieu of two and one-half inch hard drives 86 and 87. Many other hard drives are suitable for use within the teachings of the present invention. In fact, many hard drives having a maximum operating temperature of 125 degrees Fahrenheit and a maximum continuous power output of 2.5 watts may be substituted for disk drive 86 of the present invention. Accordingly, a plurality of configurations for web server processing cards 32 are envisioned within the teachings of the present invention.

In another embodiment, each web server processing card 32 is equipped with a single, three and one-half inch disk drive, which offers greater spindle speed and product life. Alternatively, two and one-half inch disk drives provide greater density and lower power requirements. In a particular embodiment, the three and one-half inch disk drive may include an IBM DeskStar or the two and one-half inch disk drives may include an IBM TravelStar hard drive. A total of one hundred and sixty-eight web server processing cards having a three and one-half inch disk drive may be mounted in a standard industry rack. In a particular embodiment, for efficiency purposes, each web server processing card may be based upon the same motherboard design, regardless of the number and size of the associated disk drives provided with the web server processing card.

Web server processing card 32 also includes a dynamic memory integrated circuit, or memory 88. Memory 88 includes a dual in-line memory module ("DIMM"), to provide the appropriate speed and bandwidth for network communication. In a particular embodiment, memory 88 includes a one hundred and sixty-eight pin connector. The storage capacity of memory 88 may be approximately 64 MB RAM, or greater.

Three interface integrated circuit chip sets 90, 91 and 92 are coupled with printed circuit board 82. Chip set 90 may be referred to as public network interface integrated circuit since it corresponds with the operation of the public network. Similarly, chip set 91 may be referred to as the private network interface integrated circuit and chip set 92 may be referred to as the management network interface integrated circuit since they correspond with the private network and management network operations, respectively. Collectively, chip sets 90, 91 and 92 provide three 10/100/1000 megabits per second Ethernet network interfaces. Additional chip sets may be included with web server processing card 32 in order to support more than three independent networks.

Chip sets 90, 91, and 92 include "auto sensing" capability from ten megabytes and higher, such that they may operate anywhere within the range of 10/100 Ethernet to gigabit Ethernet. Accordingly, each web server processing card 32 may come equipped with three, 10/100 BaseT network interfaces, one to support public network 45, one to support private network 46, and one to support management network 47. Each chip set 90, 91 and 92 also includes "boot from LAN" capability. Wake on LAN refers to the ability of a chipset which is not experiencing network traffic to remain idle until a request and/or traffic is received from the associated network. This feature significantly reduces the power consumption associated with chipsets 90, 91 and 92, and ultimately web server processing card 32.

10

A high density, 80 pin SCA connector 94 is used to couple web server processing card 32 with a corresponding high density, 80 pin SCA connector 276 associated with passive midplane 276 (see FIG. 8). Connector 94 includes a "blind mate" feature which provides self-alignment properties for simplified installation and removal of processing card 32 from passive midplane 34. Connectors 94 and 276 also include built-in serial connectors for managing network traffic. In other words, connector 94 and 276 are appropriately sized and configured to accommodate a serial connection independent of the above referenced Ethernet connections and any other required power/communications ports.

The installation and removal of web server processing card 32 from passive midplane 34 may be accomplished using ejector levers 96. Levers 96 facilitate zero force insertion of connector 94 within connector 276. The proper mechanical connection between connectors 94 and 276 may be verified by an operator of network 30, using the relative location and orientation of ejector levers 96.

Status and operation module 102 provides a user interface for determining the status and configuring web server processing cards 32. A plurality of LED indicator lights 104–108 are included with status and operation module 102. LED 104 indicates pass/fail, LED 105 indicates hard disk activity and LEDs 106–108 each indicate activity regarding an associated LAN. Server reset button 112 is also coupled with status and operation module 102, and may be used to accomplish a "hard" local reset of the associated processing card 32. A password reset button 114 is provided upon status and operation module 102 and may be used to locally reset the administrative password. In other words, password reset button 114 may be used to erase the existing administrative password such that an operator of network 30 may redefine the administrative password.

A dual in-line memory module (DIMM) connector 93 is also provided upon web server processing card 32. In the illustrated embodiment, DIMM connector 93 includes a multiple pin connector. The size and configuration of DIMM connector 93 may be significantly altered, within the teaching of the present invention. DIMM connector 93 facilitates the installation of a dual in-line memory module(s) DIMM (s). Accordingly, web server processing card 32 can accommodate significantly more bandwidth than traditional systems which incorporate a single in-line memory module (SIMM).

Web server processing card 32 also includes a custom Basic Input/Output System ("BIOS") which contains the appropriate instructions for sending information from a program to the appropriate hardware device within network 30. The BIOS of the illustrated embodiment is capable of supporting at least three independent networks, i.e., public network 45, private network 46, and management network 47. The BIOS is also configured to support the "wake on LAN" capability described above. Many of the other components of web server processing card 32 are similar in structure and function to a typical motherboard, although support for video, keyboard and a mouse may be removed. Each web server processing card 32 may include two megabytes of flash read-only-memory (ROM) for BIOS storage.

Each web server processing card 32 includes the appropriate hardware and software to facilitate plug-n-play capability for web server processing cards 32. All of the components necessary for the operation of a web server processing card 32 are mounted upon a single printed circuit board. Accordingly, an unsophisticated user or operator of

US 6,757,748 B1

11

network 30 may install, remove and/or replace a web server processing card in a single step.

In a particular embodiment, each web server processing card 32 may include a battery backed-up real time clock.

In the illustrated embodiment, each web server processing card 32 is configured to operate at "low power." In this context, low power refers to a web server processing having a performance standard exceeding 0.5 BIPS/WATTS.

As described above, web server processing card 32 may include a three and one-half inch disk drive, in lieu of disk drives 86 and 87. Accordingly, printed circuit board 82 includes the appropriate hardware to accommodate the three and one-half inch drive. For example, a plurality of connectors 98 are provided to accommodate a three and one-half inch disk drive. Also, a communications port 99 is provided to facilitate the incorporation of the three and one-half inch disk drive. These "future" connectors are optional, as web server processing card 32 may be provided without appropriate connectors to accommodate the three and one-half inch disk drive.

Printed circuit board 82 includes printed circuitry operable to detect the location and presence of any disk drive(s) installed upon printed circuit board 82. For example, web server processing card 32 includes three communications ports 95(x2) and 99. When one or more disk drives are installed in communications ports 95 and/or 99, printed circuit board 82 automatically detects the presence and exact port location of the disk drives. This allows web server processing card 32 to route data/communications traffic according to the specific configuration of disk drive(s) present.

As previously described, each web server processing card may have either a three and one-half inch disk drive installed, a two and one-half disk drive, or two, two and one-half inch disk drives installed. Standard three and one-half inch disk drives use primarily 12 volt power and standard two and one-half inch disk drives use 5 volt power. Accordingly, 5 and 12 volt loading by each web server processing card may be very different depending on the type and/or size of disk drives installed. In previous web servers, the variation in loading between the 5 and 12 volt supplies would have required the use of different power supplies depending on the type of disk drives installed, or the use of much larger power supplies to compensate for the wide variation in 5 and 12 volt loading. In addition, mixing web servers with two and one-half inch disk drives with web servers with three and one-half inch disk drives, in a single system, was difficult.

Web server processing cards 32 eliminate these problems by balancing to some degree the loading on the 5 and 12 volt supplies as follows:

The input power to a CPU DC to DC converter, installed upon web server processing card 32, is 12 volts when a two and one-half inch disk drive is installed.

The input power to the CPU DC to DC converter is 5 volts when a three and one-half inch disk drive is installed.

The input power for the CPU DC to DC converter is controlled by a disk drive power cable and is automatically configured when the appropriate cable is installed. Accordingly, web server processing card 32 includes the ability to detect which type/size of disk drive is installed, and change the voltage provided to the DC to DC converter, based upon the disk drive(s) present.

This technique ensures that the power source for the CPU DC to DC converter will be properly configured

12

because the assembly process of disk drive installation causes the DC to DC converter power source to be configured properly and no additional configuration steps are required.

NETWORK INTERFACE CARDS

Public network interface card 40 is illustrated in more detail in FIG. 4. Each network interface card 40 may support up to twelve independent web server processing cards 32. In one embodiment, network interface card 40 may include twelve independent Ethernet communication paths 117 between a front connector 115 and rear connector 116. In this embodiment, network interface card 40 provides modular connectivity, such that an operator of network 30 may access rear connector 116 at a convenient location upon server chassis 38. Accordingly, a standard RJ-21 connector coupled with communication link 44 may be connected with rear connector 116 in order to distribute data between network interface cards 40, corresponding web server processing cards 32, and public network switch 42. In the illustrated embodiment of FIG. 4, communication link 44 may include twelve groups of two twisted pair category 5 cable, for a total of twenty-four different Ethernet connections, or forty-eight wires total. The connection between public network switch 42 and network interface card 40 may be accomplished with high density Ethernet connectors. In another embodiment, integrated 10/100/1000 switches may be incorporated using octopus cables which "fan-out" from a high density connector to multiple RJ-45 connectors.

Rear connector 116 is appropriately sized to handle network traffic for up to twelve web server processing cards 32. Since each Ethernet communication link includes two twisted pairs, rear connector 116 is configured to receive up to forty-eight individual wires.

In another embodiment, a switched network interface card 48 may be used in lieu of network interface card 40 to establish the connection between a respective web server processing card 32 and public network switch 42. Switched network interface card 48 is illustrated in more detail in FIG. 5. Similar to network interface card 40, switch network interface card 48 includes an eighty pin SCA connector 115, which couples network interface card 48 with passive midplane 34. Each Ethernet communication path 145 associated with switched network interface card 48 terminates at a switch chip 145. Switch chip 145 monitors and distributes traffic from a respective web server processing card 32 to a corresponding RJ-45 Ethernet connector 144 through an Ethernet communication link 143. In a particular embodiment, switch chip 145 may include an optional twelve or twenty-four port 10/100 Base T switch with fiber gigabit uplinks. In another embodiment, switch chip 145 may include an optional twelve or twenty-four port 10/100 Base T switch with copper gigabit uplinks.

A redundant configuration may also be included having a second RJ-45 connector 146 and Ethernet communication link 148. This provides the network operator with the ability to include redundant communication links 44 in separate physical locations, for emergency operation in the event of a failure of one of the communications systems.

As illustrated in FIG. 1, private network interface card 48 may be used to establish connectivity between corresponding web server processing cards 32 and private network switch 50. In another embodiment, interface card 48 may be configured similarly to public network interface card 40. Accordingly, either the straight pass-through configuration

A465

13

of network interface card **40** or the switched pass-through configuration of network interface card **48** may be used for private network interface card **48** and/or public network interface card **40**.

The configuration and operation of an alternative embodiment network interface card **66** is illustrated in more detail in FIG. 6. Network interface card **66** includes an eighty pin SCA connector **118** in order to couple management network interface card **66** with passive mid-plane **34**. Ethernet communication links **119** distribute data between a respective web-server processing card **32** and a hub chip **120**. A communication link **122** provides a communication path between hub chip **120** and an RJ-45 connector **124**. Accordingly, communication link **71** (FIG. 1) may be coupled with RJ-45 connector **124** in order to distribute data between management network interface card **68** and management console **70**.

A second RJ-45 connector **126** may be coupled with hub chip **120** through a communication link **128**. RJ-45 connector **126** provides the network operator with the ability to "daisy-chain" management network interface cards from a plurality of web server chassis **38**. Accordingly, RJ-45 connector **126** is useful when multiple web server chassis are employed in a single network, and daisy-chain ability is desired. In another embodiment, RJ-45 connector **126** may be used to provide a redundant communication path between management console **70** and interface card **68**.

Hub chip **120** consolidates management network traffic from corresponding web server processing cards **32**, for distribution throughout the network. In a particular embodiment, hub chip **120** may include an integrated network hub, for example a sixteen port repeater chip integrated upon interface card **66** for aggregating all management communications through a single 10/100/1000 megabits per second Ethernet connection. Hub chip **120** may be referred to as a repeater because it broadcasts, or repeats every message it receives to all ports of the management network. In another embodiment, hub chip **120** may be replaced with a switch chip which would provide the ability to address and distribute messages according to a packet header, to the appropriate port within the management network.

In a particular embodiment, a hub chip may be employed, in lieu of a switch chip, at the network interface card due to its reduced cost, and simplified operation. In one embodiment, RJ-45 connectors **124**, **126**, **144** and **146** may include gigabit RJ-45 connectors. In another embodiment connectors **124**, **126**, **144** and **146** may be replaced with fiber optic or copper gigabit interface connectors ("GBIC").

Referring now to FIG. 7, management network interface **49** is illustrated in more detail. Management network interface **49** includes a single board computer **160**, coupled with management network interface card **68**. Single board computer **160** may also be referred to as a "daughter card" to management network interface card **68**. Single board computer **160** includes similar hardware and components to web server processing card **32**, except single board computer **160** does not include a disk drive. Conversely, web server processing card **32** includes disk drive **86**.

Management network interface card **68** includes a pair of high density connectors **162** and **164**. Each high density connector **162** and **164** includes at least twelve Ethernet connectors, a serial port, and a power interface. In a particular embodiment, the serial port associated with each high density connector **162** and **164** includes an I2C bus.

The power interface associated with each high density connector **162** and **164** is configured to provide 3.3, or 5.0

14

volt power source to management network interface **49**. Accordingly, power may be distributed to various components of management network interface **49**, including single board computer **160**, and a hub chip **166**.

The twelve Ethernet connectors, associated with each high density connector **162** and **164**, enable each high density connector **162** and **164** to interface with twelve web server processing cards. Accordingly, in the illustrated embodiment, each management network interface can collect, interpret and manage communications and data transfer with twenty-four web server processing cards.

Twelve Ethernet connectors **168** are used to couple high density connector **162** with hub chip **166**. Similarly, twelve Ethernet connectors **170** are used to couple high density connector **164** with hub chip **166**. Hub chip **166** consolidates management network traffic from up to twenty-four web server processing cards, for distribution to single board computer **160** and/or throughout network **30**. In another embodiment, a switch chip may be used in lieu of hub chip **166** in order to provide management network interface **49** with the ability to selectively switch and distribute network management information rather than simply broadcasting all messages received to every node coupled with management network interface **49**.

A communications link **172** distributes data between hub chip **166** and an Ethernet connector **174**. Accordingly, Ethernet connector **174** may be coupled with remote management system **70**, of management network **47**. In a particular embodiment, management network interface **49** may be provided without single board computer **160**. In this embodiment, communication between web server processing cards **32** and remote management system **70** may be conducted according to the preceding description.

In another embodiment, single board computer **160** may be provided with management network interface **49**, or management network interface **49** may be upgraded in the future to include single board computer **160**. Accordingly, connectors **176** and **178** are typically provided upon management network interface card **48**, to facilitate the installation of single board computer **160**.

A communication link **182** couples hub chip **166** with an Ethernet connector **184** associated with single board computer **160**. Accordingly, when properly installed, single board computer **160** receives all broadcast signals which are received by hub chip **166**. Single board computer **160** collects, stores, calculates, analyzes and communicates this information to remote management system **70** and/or other components of high density server network **30**. Communication between single board computer **160** and remote management system **70** occurs via Ethernet connector **186**.

When single board computer **160** and its associated Ethernet connector **186** are present upon management network interface **49**, Ethernet connector **174** is no longer required to communicate with remote management system **70**. However, in the event of a failure of single board computer **160** and/or its associated components, including without limitation Ethernet connector **186**, Ethernet connector **174** provides an alternative path of communication between management network interface **49** and remote management console **170**. In an alternative embodiment, Ethernet connector **174** may be omitted from management network interface **49**.

Connectors **174** and **186** provide the network operator with the ability to "daisy-chain" management network interface **49** with a plurality of additional components of network **30**, for example, additional management network interfaces

US 6,757,748 B1

15

associated with other server chassis 38. Accordingly, connectors 174 and 186 are useful when multiple web server chassis are employed in a single network, and daisy-chain ability is desired. In another embodiment, connectors 174 and 186 may be used to provide a redundant communication path between management console 70 and interface 49.

In the illustrated embodiment, another communications link 188 is provided in order to couple single board computer 160 and high density connector 164. Communication link 188 may include an I2C bus coupled with the serial port associated with high density connector 164. Another I2C bus may also be provided between single board computer 160 and the serial port associated with high density connector 162. As will be described later in more detail, the direct serial connection between single board computer 160 and high density connector 164 allows single board computer 160 to execute a hardware reset, software reset, or password reset upon any particular web server processing card with which high density connector 164 is coupled.

Management network interface 40 includes the ability to perform a hardware reset of any particular web server processing card. Management network interface 40 also includes the ability to perform software resets of various components of network 30. In a particular embodiment, single board computer 160 collects telemetry data regarding the use, performance and operation of many components of each web server processing card 32, which will be described later in more detail. Such data may be stored within single board computer 160 and/or forwarded to remote management system 70, for further processing.

## PASSIVE MIDPLANE

Referring now to FIGS. 8 and 9, passive midplane 34 is illustrated in more detail. On its front face 275, passive midplane 34 includes a plurality of web server processing card connectors 276 which facilitate the installation of up to twenty-four web server processing cards 32. Rear face 277 of passive midplane 34 includes a pair of power supply mounting mechanisms 278 which accommodate power supplies 280, which will be described later in more detail. Rear face 277 of passive midplane 34 also includes a plurality of network interface card connectors 282–287. In the illustrated embodiment, connectors 286 and 287 accommodate a single network interface 49.

Passive midplane 34 is considered "passive" because it includes no active components which can fail. Instead, passive midplane 34 includes the necessary wiring to connect each respective web server 32 with its corresponding network interface card. Passive midplane 34 includes a printed circuit board with the appropriate printed circuitry to distribute data and power necessary for the operation of network 30. For example, passive midplane 34 distributes power to components of web server processing cards 32 and network interface cards 40, 48 and 68. Additionally, passive midplane 34 distributes data and/or communications signals between web server processing cards 32 and network interface cards 40, 48 and 68.

Passive midplane 34 provides a high-density, hot pluggable connector for as many as twenty-four web server processing cards. It consolidates power, three separate Ethernet networks and serial connections all through a single connector. Passive midplane 34 "auto-senses" web server processing cards and available slots, to allow automatic configuration of networks via remote management system 70.

Passive midplane 34 also includes a ribbon cable connector 290. Connector 290 is operable to distribute power and

16

control signals from passive midplane 34 to articulating door 262 of chassis 38. This accommodates the operation of the LEDs and built in fans associated with articulating door 262.

## SERVER CHASSIS

Referring now to FIGS. 10–12, server chassis 38 is illustrated in more detail. Server chassis 38 includes a box build 260 having a base 36 forming a lower portion thereof. Box build 260, of the illustrated embodiment, is fabricated from plated steel. An articulating door 262 is coupled to box build 260. Articulating door 262 and box build 260, in combination, provide the ability to protect web server processing cards 32 and 132–142 from ambient environment.

Articulating door 262 includes a plurality of box fans 264–269, mounted therein. Box fans 264–269 draw air from the ambient environment through articulating door 262, and exhaust through a back plate 270 associated with box build 262. In the illustrated embodiment, box fans 264–269 include a bank of six, three-inch fans. It will be recognized by those or ordinary skill in the art that the number, size, and configuration of fans associated with server chassis 38 may be significantly altered within the teachings of the present invention. In a particular embodiment, each box fan 264–269 will include a tachometer output having an interface coupled with passive midplane 34 such that interruption of service of any particular fan may be promptly detected.

Articulating door 262 includes a printed circuit board 272 which allows for the viewing of LED indicator lights associated with web server processing cards 32 and 132–142, by persons standing in front of articulating door 262. Recessed windows 272 include slightly "smoked" translucent material, such that the associated LED indicator lights shall be reasonably visible through the door.

The interior of articulating door 262, which faces web server processing cards 32 and 132–142 when articulating door is in the closed position, is fabricated from a metallic material. In a particular embodiment, an RF gasket may be installed between articulating door 262 and box build 260, at their interface. An injection molded plastic bezel is attached to articulating door 262 in order to achieve a leading-edge industrial design. A pair of mounting ears 274 are installed at the edges of box build 262, to provide easy installation of server chassis 38 within server rack 39.

In the illustrated embodiment, server chassis 38 measures 17.3 inches wide (without mounting ears) by 25.5 inches deep by 5.25 inches high. The environmental operating temperature is within the approximate range of 0 to 40 degrees Celsius (32 to 104 degrees Fahrenheit). Server chassis 38 may be operated at altitudes exceeding 10,000 feet above sea level.

Server chassis 38, and the associated web server processing card connector of midplane 34 contain web server processing card connectors 276 (see FIG. 8) which accommodate up to 24 web server processing cards. In the illustrated embodiment, web server processing card guides are installed at 0.7 inch center to center dimensions. Up to 12 web server processing cards 32, including optional three and one-half inch disk drives may be installed upon passive midplane 34 using every other web server processing card guide 276.

Server chassis 38 includes two power supply mounting mechanisms 278, which facilitate the installation of two load-balance, hot-swappable power supplies 280. Power supplies 280 are installed upon backplate 270 with mechanical fasteners, for example, thumbscrews. No other mounting hardware is required to attach/detach power supplies 280

US 6,757,748 B1

17

to/from server chassis 38. Each power supply 280 connects to passive midplane 34 using only power supply connecting mechanisms 278.

Each power supply 280 includes enough power to operate a fully populated passive midplane 34, in the event that one of the two power supplies 280 fails. Accordingly, server chassis 38 may be offered and operated using a single power supply 280, with an optional upgrade to a second power supply.

Each power supply 280 shall be designed to be compliant with the MPS SSI power supply specification. This is a publicly released specification developed by the Server System Infrastructure organization (SSI). In a particular embodiment, power supplies 280 may include power supplies as manufactured Delta Corporation (model #DPS-450CB-1B).

Power supplies 280 are load balanced and hot swappable. Passive midplane 34 includes integrated printed circuitry which distributes power and signals to components of web server processing cards 32, 132–142, and components of the associated network interface cards 40, 48 and 68. Since each power supply 280 is sized appropriately to operate an entire chassis 38, a single power supply 280 may be removed from its associated power supply mounting mechanism 276 and replaced with a new power supply, without powering OFF server chassis 38, or affecting the operation of network 30.

Power supplies 280 are considered load balanced because they include "auto sensing" capabilities. Each power supply 280 has the ability to sense the load required of it. The printed circuitry associated with midplane 34 evenly distributes the necessary power consumption load between power supplies 280. Therefore, power supplies 280 will automatically supply one half of the necessary power (voltage) to midplane 34 when each power supply 280 is properly installed and fully operational. If service from one power supply 280 is diminished, or becomes unavailable, the other power supply 280 will sense this and supply the power necessary for passive midplane 34 to operate at full capacity. In another embodiment, power supplies 280 and midplane 34 may be provided with the printed circuitry necessary to allow power supplies 280 to communicate with one another regarding their load sharing responsibilities, and report trouble and/or diminished capacity to one another.

Power supplies 280 also include interfaces which allow management network interface card 48 and remote management system 70 to monitor voltage and temperature of each power supply 280. Accordingly, remote management system 70 includes the ability to monitor each power supply 280, and determine "trouble" situations which require intervention of the network operator or administrator. Furthermore, management network interface card 48 and remote management console 70 may use the data collected from the interface with power supplies 280 to predict an impending failure of one or more power supplies 280. Remote management console 70 may then take corrective action including without limitation, distributing the power load to another power supply 280, notifying the network administrator with a trouble alarm, and/or distributing network traffic away from the affected web server chassis 38, to another server chassis. The latter may be accomplished by mirroring the operation of the affected server chassis using back-up data stored upon another server chassis, or private network 46.

Detailed power supply specifications regarding power supplies 280, of the illustrated embodiment, are indicated below, for illustrative purposed only, and not by way of limitation:

18

Features
    Meet SSI MPS Standard
    Power factor correction >95%
    Automatic fan speed control
    Auto recovery after an AC power failure
    Harmonic current meet IEC1000-3-2
    Low output ripple and noise
    FanC signal meets ATX standard
    Redundancy with active current sharing
    Remote on/off control
    Over voltage, over current, over temperature, and short-circuit protection
Environmental
    Operating temperature: 0 C. to 50 C.
    Storage temperature: −40 C. to 70 C.
    MTBF: >100,000 hours
Cooling: Self-contained fan with speed control based on ambient temperature
Electrical Specifications
    Input
        Input range: 90–264 VAC
        Frequency: 47–63 Hz
        Input current: 7.6A low line input at full load
        Efficiency: >60% @ full load, nominal line
        EMI/RFI FCC Part 15J Class B; VDE 243
        Level B, CISPR 22 Class B
    Output
        Maximum power: 450 watts
        Holdup time: >20 ms @ full load, nominal line @ full load, nominal line
        Rise time: <200 ms
        Overvoltage protection: +3.3V, +5V, +12V, +5Vsb
        Leakage current: <0.75 mA

As previously discussed, a plurality of RJ-21 style connectors may be mounted on backplane 270 of server chassis 38. Additionally, up to two RJ-45 style connectors may also be mounted on backplane 270. These connectors are intended to facilitate daisy chaining of server chassis 38 within server rack 39.

Passive midplane 34, of server chassis 38 includes all of the power and connectivity requirements to accommodate web server processing cards 32 and 132–142. Furthermore, passive midplane 34 can accommodate an additional twelve web server processing cards.

Server chassis 38 is referred to as "hot swappable" because each web server processing card 32 and 232–243 may be replaced from within chassis 38 while chassis 38 is powered on. Chassis 38 may include as many as twelve web server processing cards having a three and one-half inch disk drive, or as many as twenty-four web server processing cards having two, two and one-half inch disk drives. In still another embodiment, web server processing card 32 may be provided without an associated disk drive.

Web server processing cards 32 each include a serial port 294 which facilitates local debugging via a laptop computer or other portable electronic device.

A parallel command bus associated with each web server processing card extends through the midplane and allows an operator of the network to perform a hardware reset (boot from LAN, boot from hard disk) of a targeted web server processing card and/or force a password reset. Serial port 294 also facilitates local debugging of web server processing cards 32 associated with web server chassis 38. For example, when private network 46 and/or management

19

network 47 are unable to establish proper communication with web server processing cards 32 within a given server chassis 38, a local PC may be coupled with server chassis 38 in order to establish communications via serial port 294. In a particular embodiment, another serial port may be coupled directly (serially) to network management cards 40, 48 and/or 68, through passive midplane 34. Accordingly, hardware and software resets and other debugging techniques may be employed to communicate with web server processing cards 32 and network interface cards 40, 48 and 68, until network communications are restored.

Each power supply 280 includes an associated built in fan to facilitate airflow through, and cooling of, each power supply 280. Each fan includes variable speed capability. The fan speed can be adjusted from a constant speed, to a variable speed, temperature control setting. In a particular embodiment, the fans associated with power supplies 280 are used to provide airflow, and therefore cooling to web server processing cards 32, as described below.

Articulating door 262 of chassis 38 includes a chassis intrusion sensor associated with an LED board. When articulating door 262 is opened, a circuit is closed which forces the fan to a full speed setting. Each power supply 280 includes an associated interface which allows this configuration. This is done to compensate for the loss of airflow from fans 264–269 due to articulating door 262 being opened. In this manner, additional airflow through power supplies 280 at least partially compensates for the loss of airflow through fans 264–269, and additional airflow is drawn across each web server processing card 32. When articulating door 262 is closed, the fans associated with power supplies 280, return to their previous setting.

In a particular embodiment, each server chassis 38 consumes a total of 3U (1U=1.75 inches) of space. Accordingly, as many as fourteen server chassis 38 may be installed in an industry standard 42U rack. Each chassis 38 comes equipped with the ability to support redundant, load-balanced power supplies and RJ-21 style connectors which allow the consolidation of the requisite Ethernet cables to a significantly smaller number of cables than those required through the use of conventional RJ-45 connectors.

The teachings of the present invention may be used to provide more than three hundred and thirty-six servers in a standard six foot equipment rack (See FIG. 13). The design and configuration of web server processing cards 32 accommodate an extremely low total cost of ownership (TCO). For example, twelve or twenty-four web server processing cards 32 which are ultra-compact, low-power single board computers which share a common passive midplane, power and cable management system.

Server rack 39 is configured to provide a user friendly operating environment. For example, server rack 39 may be co-located at the physical location of an internet service provided (ISP) or an applications service provider (ASP). Moreover, due to the ease of use and operation, unsophisticated employees of the ISP/ASP can easily operate and maintain all of the components associated with web server rack 39.

Web server processing cards 32 of the present invention provide a fully scalable and inexpensive alternative to much larger, commercial web servers. There is practically no limit to the amount of web server processing cards any given ISP/ASP may add to their operations, as demand requires. Further, scalability is achieved at minimal increments. Network operators may add a single web server processing card, or an entire server rack including as many as three hundred and thirty six individual web server processing cards, as

20

necessary. Accordingly, multiple web server processing cards operating in parallel can be deployed to achieve equal or better performance than larger commercial servers, without the significant financial investment associated with other commercial servers.

NETWORK MANAGEMENT

As previously described, management network interface card 68 and remote management system 70 include the ability to monitor and manage components of network 30. Various measurements and characteristics regarding the functionality and operation of network 30 are collected, stored, analyzed and maintained using single board computer 166 of network management card 68, and remote management system 70.

In a particular embodiment, CPU 84 includes an interface which collects and stores information regarding the operation of CPU 84. This information includes "snapshot" and historical measurements including, without limitation the CPU voltage, CPU temperature, CPU wattage, and CPU utilization. Snapshot measurements include those measurements which represent the value at a given point in time. Historical information includes measurements which have been collected over time. For example, information regarding the temperature of the CPU may include the temperature at the time of the communication, or coordinates regarding the temperature of the CPU over predetermined intervals of time.

The embedded circuitry of web server processing card 32 transfers this information through passive midplane 34 to management network interface card 68. This information is captured and stored within single board computer 160. Single board computer 160 includes the hardware and software components required to collect, store and analyze this information. Single board computer 160 may also include the ability to react to information collected. For example, single board computer 160 may be pre-programmed to power off a CPU that exceeds a given temperature. Furthermore, single board computer 160 may instruct another component of network 30 to "back-up", or replicate to another component of network 30, all data, state information and functionality associated with a web server processing card having a CPU operating at an excessive temperature, and/or suffering from some other problematic malady. In fact, single board computer 160 may cause the "back-up" information associated with such a web server processing card to be uploaded to a spare web server processing card which can eventually take over all operations of the affected web server processing card. The identification and autonomous correction of such trouble and potential failures may be referred to as "predictive failover".

In this manner, single board computer 160 may autonomously detect a CPU which is about to fail and seamlessly transfer the operation of the CPU and its associated web server processing card to the spare web server processing card. All of these steps are possible without any user intervention. Also, all of these steps are possible without any service interruption, "downtime" or adverse affect upon the overall operations of network 30. A network operator may then be notified of the trouble situation, such that the affected web server processing card can be replaced with another spare.

In another embodiment, single board computer may transfer the information it collects to remote management system 70. Accordingly, at predetermined intervals, remote management system 70 downloads this information from single

US 6,757,748 B1

21

board computer **160** for further processing. Remote management console **70** may then use this information in a similar manner as single board computer **160**, in order to automatically identify a potential system failure, and react accordingly, without user intervention.

In a similar manner, information regarding operating disk drives, may be collected by single board computer **160** and/or remote management system **70**. For example, single board computer **160** may collect measurements from an interface associated with disk drive **86**. Information available to single board computer **160** regarding disk drive **86** may include, without limitation, disk drive voltage, disk drive temperature, disk drive spindle speed, and/or disk drive utilization. Disk drive utilization may be made available according to bytes used and/or bytes available. In a particular embodiment, this information may be supplied in percentages, for example, 65% used, 35% available. Single board computer **160** may also collect information regarding disk drive's **86** soft error bit rate, a measure of the soft errors over a specific period of time.

The operating system associated with CPU **84** also includes information which may be transferred to single board computer **160** and/or remote management system **70**. For example, the operating system of web server processing card **32** collects information regarding disk drive utilization (bytes used, bytes available), CPU utilization (used/available), and network traffic (megabits/second). Accordingly, web server processing card **32** may transfer this information to single board computer **160** and/or remote management system **70** for use as described above.

Dynamic memory integrated circuit **88** also includes information which may be collected and analyzed by single board computer **160** and/or remote management system **70**. In a particular embodiment, dynamic memory integrated circuit **88** may include an interface which transfers this information through web server processing card **32** and passive midplane **34**, to single board computer **160** and/or remote management system **70**. In another embodiment, this information may be obtained through the operating system. Information regarding dynamic memory integrated circuit **88** includes, without limitation the amount of memory used (bytes), the amount of memory available, the percentage of memory used, and/or the percentage of memory available.

Various other measurements and characteristics regarding the operation of components of network **30** may be monitored, collected, stored, calculated and analyzed in a similar manner. For example, each power supply **280** may include an interface which includes this information and makes it available to single board computer **160** and/or remote management system **70**. Information regarding power supplies **280** includes, without limitation, the voltage, temperature and/or fan speed associated with power supplies **280**.

A temperature sensor may also be installed on or near web server processing cards **32**, server chassis **38**, power supplies **280** and/or server rack **39**. In the illustrated embodiment, each web server processing card includes an associated temperature sensor. Accordingly, the ambient temperature on or near components of web server processing cards **32** may be used to predict trouble or failure of a given web server processing card **32**, or component thereof. In a particular embodiment, the temperature sensor may be located on the web server processing card side of passive midplane **34**.

In a particular embodiment, single board computer **160**, and/or remote management system **70** may monitor the

22

operation of one or more box fans **264**. Information regarding the box fans may include, without limitation, fan speed, voltage and/or temperature.

Additional measurements and information regarding the operation of various components of network **30** include the age of the component, the service life, history of trouble or failures and historical data regarding the life expectancy and previous trouble or failure associated with identical or similar components. All of these measurements and information may be collected, calculated or generated by components of network **30**, and/or input into management system **70** and/or single board computer **160** by the network operator/administrator.

As previously discussed, management network interface **49** may be provided without single board computer **160**. In this embodiment, all of the information discussed above regarding components of network **30** may be sent directly to remote management system **70**. When network interface **49** is provided without single board computer **160**, remote management system **70** may be configured to "sample" or collect measurements and information regarding components of network **30** at less frequent intervals, than those where a single board computer **160** is provided. This will help decrease network traffic. Accordingly, any data processing, collection of information, analysis and reaction to such information discussed with regard to either management network interface **49** or remote management system **70** may be processed, collected, stored, calculated or analyzed by one, or the other, or both.

Information collected regarding measurements and characteristics of components of network **30** may be used in a variety of ways. In a particular embodiment, this type of information may be collected and stored in a database associated with network **30**, for example non-volatile storage device **72** or storage server **54**. This information may be used in order for the network administrator to evaluate the performance of the system and/or predict service and maintenance needs prior to failure of a given component.

In another embodiment, remote management system **70** may use this information to establish a baseline for system performance and guidelines, or parameters that determine acceptable ranges of operation for all components of network **30**. In this manner, remote management system **70** can use historical data regarding previous component failures to detect potential trouble or failures in the future. In one embodiment, remote management system **70** may monitor the performance of a particular component relative to identical or similar components within network **30**, in order to detect and/or predict trouble or potential failures. In a particular embodiment, remote management system **70** may employ various techniques in order to detect or predict potential failures. For example, remote management system **70** may use logistic regression and/or neural networks to detect or predict potential failures.

Once remote management system **70** determines that one or more components of network **30** are susceptible to failure due to the information collected by remote management system **70**, various actions may be taken. For example, remote management system **70** may be configured to sound an alarm or provide another form of communication to the network administrator regarding the potential failure. The identification of a component operating outside of standard, or baseline performance characteristics, which indicate potential trouble or failure, may be referred to as a "threshold trigger".

Alternatively, remote management system **70** may increase the security, or surveillance of a component that

23

exhibits characteristics outside of the normal range. For example, remote management console may be configured to sample the CPU voltage of every CPU associated with a given server chassis, at one hour intervals. If remote management system **70** detects a CPU with a voltage outside of a predefined range, remote management system **70** may then increase the frequency of voltage measurement regarding that particular CPU. In fact, remote management console **70** may begin to monitor all components of the web server processing card which includes the affected CPU at more frequent intervals, to ensure that the performance of the web server processing card has not deteriorated due to the performance of the CPU.

Furthermore, remote management system **70** may be configured to respond to potential trouble situations in order to prevent a system failure. The active autonomous response or corrective measure to a threshold trigger by remote management system **70** and/or single board computer **160**, may be referred to as a "failover event". For example, if remote management system **70** detects a temperature reading outside a predefined "normal" range for a given web server processing card, remote management system **70** may cause another component to "back-up" all data residing on the web server processing card in order to prevent the loss of such data.

If remote management system **70** determines that the affected web server processing card is likely to fail, remote management system **70** may cause a "spare" web server processing card to begin operations and transfer all of the data, state information and functionality of the affected web server processing card to the spare. Accordingly, once a potential failure is predicted, a seamless transfer of data, state information and operations from one web server processing card to another may be accomplished, without affecting the operation of network **30**, and without user intervention.

Due to the configuration and operation of network **30**, network operators, for example telephone companies, ISPs and/or ASPs may provide varying levels of disaster recovery to customers utilizing server chassis **38**. In one embodiment, the operator will simply receive notification of a failure of a component, and repair or replace the affected component. In another embodiment, a threshold trigger may be received, indicating trouble and/or potential failure of a component, and the operator may take the corrective action necessary to continue operation of server chassis **38**. In another embodiment, the operator may provide a user with predictive failover functionality, such that network **30** may detect and correct potential problems before the operation of server chassis **38** is affected. In yet another embodiment, the operator may provide a customer with a mirror web server processing card such that two web server processing cards are performing the exact same functionality, in case of the failure of one or the other. Similarly, a user may be provided with an entire "mirror" chassis to back up all of the web server cards in a particular server chassis, simultaneously.

In one embodiment, server chassis **38** may be used as a "cache farm". In other words, caching software may be provided on one or more web server processing cards which may be used as independent, or clustered caching devices.

Network **30** and all associated components are configured with minimized points of failure. Since each web server processing card includes the ability to independently detect system status information, the failure of a single web server processing card will not affect network operations.

Although the present invention has been described with several embodiments, various changes and modifications

24

may be suggested to one of ordinary skill in the art. It is intended that the present invention encompass such changes and modifications as fall within the scope of the appended claims.

What is claimed is:

**1.** A network interface card, comprising:

a printed circuit board;

first and second connectors coupled with the printed circuit board;

a plurality of ethernet communications links forming at least a portion of a coupling between the first and second connectors, each ethernet communication link being associated with a respective single board web server;

wherein the first connector is configured to receive a third connector associated with a midplane;

a chip coupled with the printed circuit board wherein the plurality of ethernet communications links couples the first connector with the chip;

a second communication link coupling the chip and the second connector; and

wherein the chip consolidates data received through the first connector for distribution of the data to the second connector.

**2.** The network interface card of claim **1**, wherein the chip includes a repeater chip.

**3.** The network interface card of claim **2**, wherein the repeater chip includes an integrated network hub and the repeater chip is operable to aggregate all 10/100/1000 megabits per second ethernet communications received through the first and second connectors.

**4.** The network interface card of claim **3**, wherein the integrated network hub includes a repeater chip having at least ten ports.

**5.** The network interface card of claim **1**, wherein the chip includes a switch chip.

**6.** The network interface card of claim **5**, wherein the switch chip includes an integrated network switch and the switch chip is operable to aggregate all 10/100/1000 megabits per second ethernet communications received through the first and second connectors.

**7.** The network interface card of claim **6**, wherein the integrated network switch includes a switch chip having at least ten ports.

**8.** The network interface card of claim **5**, wherein the switch chip includes a multiple port 10/100 Base T switch having fiber gigabit uplinks.

**9.** The network interface card of claim **5**, wherein the switch chip includes a multiple port 10/100 Base T switch having copper gigabit uplinks.

**10.** The network interface card of claim **5**, wherein the switch chip is operable to address and distribute messages according to packet headers including port addresses associated with network components.

**11.** The network interface card of claim **1**, wherein the number of ethernet communications links is equal to or greater than ten.

**12.** The network interface card of claim **1**, further comprising:

a third connector coupled with the printed circuit board;

a third communication link coupling the chip with the third connector; and

wherein the third communication link and the third connector provide at least a portion of a redundant communication path between the chip and a network router.

US 6,757,748 B1

25 26

**13**. The network interface card of claim **1**, further comprising:

a third connector coupled with the printed circuit board;

a third communication link coupling the chip with the third connector; and

wherein the third connector is operable to receive a fourth connector associated with at least a second network interface card.

**14**. The network interface card of claim **1**, wherein the second connector includes an RJ-21 connector adapted to receive a third connector associated with a network router.

**15**. The network interface card of claim **1**, wherein the first connector includes a built-in serial port.

**16**. The network interface card of claim **1**, wherein the chip consolidates data received through the plurality of ethernet communication links for distribution of the data to the second communication link.

**17**. A method for consolidating data communications through a network interface card, comprising:

providing a printed circuit board;

coupling first and second connectors with the printed circuit board;

providing a plurality of ethernet communication links which form at least a portion of the coupling between the first and second connectors, wherein the first connector is configured to receive a third connector associated with a midplane, and wherein each ethernet communication link is associated with a respective single board web server;

coupling a chip with the printed circuit board, wherein the plurality of ethernet communications links couple the first connector with the chip;

providing a second communication link which couples the chip and a second connector; and

wherein the chip consolidates data received through the first connector for distribution of the data to the second connector.

**18**. The method of claim **17**, further comprising:

coupling a third connector with the printed circuit board;

providing a third communication link which couples the chip with the third connector; and

wherein the communication link and the third connector provide at least a portion of a redundant communication path between the chip and a network router.

**19**. The method of claim **17**, further comprising:

coupling a third connector with the printed circuit board;

providing a third communication link which couples the hub chip with the third connector; and

wherein the third connector is operable to receive a fourth connector associated with at least a second network interface card.

**20**. The method of claim **17**, further comprising consolidating data received through the plurality of ethernet communication links for distribution to the second communication link.

* * * * *



US006157974A

# United States Patent [19]

## Gasparik

[11] **Patent Number:** 6,157,974

[45] **Date of Patent:** Dec. 5, 2000

[54] **HOT PLUGGING SYSTEM WHICH PRECHARGING DATA SIGNAL PINS TO THE REFERENCE VOLTAGE THAT WAS GENERATED FROM VOLTAGE DETECTED ON THE OPERATING MODE SIGNAL CONDUCTOR IN THE BUS**

[75] Inventor: **Frank Gasparik**, Monument, Colo.

[73] Assignee: **LSI Logic Corporation**, Milpitas, Calif.

[21] Appl. No.: **08/996,841**

[22] Filed: **Dec. 23, 1997**

[51] Int. Cl.[7] ............................................. **G06F 13/00**
[52] U.S. Cl. ................................. **710/103; 710/102**
[58] Field of Search ........................... 712/1; 710/103, 710/102

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,210,855 | 5/1993 | Bartol | 395/500 |
| 5,268,592 | 12/1993 | Bellany et al. | 307/43 |
| 5,432,916 | 7/1995 | Hahn et al. | 710/103 |
| 5,473,499 | 12/1995 | Weir | 361/58 |
| 5,515,515 | 5/1996 | Kennedy et al. | 395/283 |
| 5,530,810 | 6/1996 | Bowman | 710/103 |
| 5,568,610 | 10/1996 | Brown | 714/48 |
| 5,572,395 | 11/1996 | Rasums et al. | 361/58 |
| 5,579,491 | 11/1996 | Jeffries et al. | 395/283 |
| 5,604,873 | 2/1997 | Fite et al. | 395/283 |
| 5,625,593 | 4/1997 | Kimura | 365/189.05 |
| 5,634,132 | 5/1997 | Pearce et al. | 326/80 |
| 5,668,770 | 9/1997 | Itoh et al. | 365/227 |
| 5,726,592 | 3/1998 | Schulte et al. | 327/65 |
| 5,784,576 | 7/1998 | Guthrie et al. | 710/103 |

### FOREIGN PATENT DOCUMENTS

WO 99/24908   5/1999   WIPO .

### OTHER PUBLICATIONS

XP 000586553—Author(s)—Filliter et al.

*Primary Examiner*—Meng-Ai T. An
*Assistant Examiner*—Mackly Monestime

[57] **ABSTRACT**

Data signal pins for a peripheral device are adaptively precharged during hot plugging to a voltage level depending on both the mode of operation (low voltage differential, high voltage differential, or single ended) and the actual signal voltages being employed for a particular mode. An active terminator bus provides an operating mode sensing signal, from which the operating mode of the bus and the actual signal voltage levels being employed may be determined. Signal pins on an edge connector for the device are connected, in sequence, to the corresponding ground, power supply, operating mode sensing signal, and data signal conductors of the bus. During the gap in time between connection of non-data signal pins (ground, power supply, and operating mode sensing pins) of the edge connector to the corresponding bus conductors and connection of the data signal pins to those conductors while hot plugging, the precharge voltage level is generated on-board the peripheral device from the actual signal voltage levels being employed on the bus, and the data signal pins are precharged. The precharge voltage level is centered between the differential signal voltage levels for differential operating modes and centered between the hysteresis trip points for single ended operation modes. By precharging the parasitic capacitances of the data signal pins on the device to this voltage level, signal voltage levels on bus conductors are drawn toward this voltage level without changing the polarity of a differential signal or crossing a hysteresis trip point for a single ended signal.

**27 Claims, 2 Drawing Sheets**





*FIG. 1*



*FIG. 2*



*FIG. 2A*



FIG. 3



FIG. 4



$$V_{REF} = +1.25V$$
$$|V_N - V_A| \leq 400mV$$

FIG. 5

$$V_{REF} = +1.25V$$
$$|V_N - V_A| \leq 400mV$$

FIG. 6
(PRIOR ART)

6,157,974

1

## HOT PLUGGING SYSTEM WHICH PRECHARGING DATA SIGNAL PINS TO THE REFERENCE VOLTAGE THAT WAS GENERATED FROM VOLTAGE DETECTED ON THE OPERATING MODE SIGNAL CONDUCTOR IN THE BUS

### BACKGROUND OF THE INVENTION

#### 1. Technical Field

The present invention relates generally to hot plugging of peripheral devices and in particular to hot plugging peripheral devices to a bus operating selectively in low voltage differential mode, high voltage differential mode, or single-ended mode. Still more particularly, the present invention relates to preserving the integrity of data signals through adaptable precharging when hot plugging a peripheral device to a bus operating in a selectable transmission mode.

#### 2. Description of the Related Art

Many modern data processing employ buses conforming to the small computer system interface (SCSI) standard to connect disk drives or redundant array of inexpensive disk (RAID) devices to a system bus. The replacement of peripheral devices, such as disk drives in personal computers or RAID boxes, connected to a SCSI bus during a data transfer on that bus is called "hot plugging." Since the device being connected to the bus is normally without power, external pins in the device represent discharged capacitors. At the instant when the pin comes in contact with a transmission line within the bus (a bus conductor), the pin capacitor will act as an ideal short to ground. This will disrupt the signal level at the instant of connection, which may cause an interruption of the data transfer.

An example of the problem caused by hot plugging peripheral devices to a SCSI bus is depicted in FIG. 6. The example depicted relates to low voltage differential (LVD) transmission in a SCSI environment, in which a differential signal between a pair of cable wires carrying two signals $V_X$ and $V_A$, centered around a reference voltage $V_{REF}$ of approximately 1.25 V, has a magnitude which is typically about 400 mVpp (millivolts, peak-to-peak). At a time $t_1$, a peripheral device pin makes contact with the cable connector and pulls the signal level to ground. The differential signal $V_X$–$V_A$ changes polarity, which may be interpreted by the receiver as an ordinary data transition, resulting in a data transfer error.

The prior art typically addresses the problems associated with hot plugging after the fact, by re-transmission of data after the interruption. However, the standard SCSI connector SCA-2 provides a mechanical means, through pins of different lengths, for connecting the ground and power supply bus conductors to the corresponding signal pins on the SCSI board or other peripheral device before the data signal conductors are connected to the corresponding data signal pins. This mechanism may be employed, as suggested in the prior art, to precharge the signal pins on a SCSI card during hot plugging. Typically, however, such precharging is concerned with preventing signal surges during hot plugging and not with preserving data integrity. Therefore, most conventional precharging schemes propose precharging the pins to a fixed, predefined voltage to limit current and power consumption during hot plugging.

Precharging pins to a fixed, predefined voltage may limit current consumption during hot-plugging but does not necessarily preserve data integrity since actual signal voltages during operation are not fixed and may vary across a wide range defined tolerances. In the case of LVD SCSI, for

2

instance, the actual reference voltage $V_{REF}$, around which the data signals $V_X$ and $V_A$ are centered may vary from 0.7 V to 1.8 V, with the typical value being 1.25 V. The tolerance for the reference voltage $V_{REF}$ or thus more than twice the magnitude of the differential signal $|V_X$–$V_A| \leq 400$ mV. Any predefined precharge voltage having a constant or fixed value will not necessarily prevent changes in the differential signal which may be interpreted by a receiver as a data transition.

Additionally, some devices are designed to selectively operate in more than one transmission mode. A single device, such as the Symbios Model 53C895 Universal Transceiver available from Symbios, Inc. of Fort Collins, Colo., may be configured to operate in either the LVD SCSI mode, the high voltage differential SCSI mode, or the single ended (SE) SCSI mode, depending on the transmission mode of the bus to which the device is connected. The different transmission modes employ different voltages and voltage ranges. For example, LVD SCSI employs a differential signal centered on a reference signal somewhere in the range of 0.7 V to 1.8 V, as noted above, which SE SCSI employs a voltage swing of 0 V to 3.3 V.

Even the single ended SCSI transmission mode is sensitive to data signal fluctuations during hot-plugging. SE SCSI signals swing from $V_{SS}$ to $V_{TERM}$, as defined by the external terminator and loaded bus. To improve noise immunity, the front-end of an SE SCSI receiver may be implemented in the form of a Schmitt Trigger with hysteresis centered around the TTL trip point of 1.4 V. Thus, for a typical hysteresis window of about $\pm 150$ mV, the trip point is 1.55 V for the positive signal transition and 1.25 V for the negative signal transition. Fluctuations of the data signal conductor voltages during hot-plugging may cross these trip points. The hysteresis may also be variable. Therefore, a fixed precharge voltage will not suffice to preserve data integrity.

It would be desirable, therefore, to provide adaptable precharging of data signal pins based on actual operating voltages for preservation of data integrity. It would further be advantageous for the adaptable precharging to automatically accommodate any of several selectable transmission modes.

### SUMMARY OF THE INVENTION

Data signal pins for a peripheral device are adaptively precharged during hot plugging to a voltage level depending on both the mode of operation (low voltage differential, high voltage differential, or single ended) and the actual signal voltages being employed for a particular mode of operation. An active terminator on the bus provides an operating mode sensing signal from which the operating mode of the bus may be determined. The operating mode sensing signal also provides an indication of the actual signal voltage levels being employed, from which the voltage level for precharging of data signal pins on the peripheral device may be generated. Signal pins on an edge connector for the device are connected, in sequence, to the corresponding ground, power supply, operating mode sensing signal, and data signal conductors of the bus. During the gap in time between connection of ground, power supply, and operating mode sensing pins of the edge connector to the corresponding bus conductors and connection of the data signal pins while hot plugging, the voltage level to be employed for precharging is generated on-board the peripheral device and the data signal pins are precharged. The precharge voltage level is centered between the differential signal voltage levels for differential operating modes and centered between the hys-

6,157,974

teresis trip points for single ended operation modes. By precharging the parasitic capacitances of the data signal pins on the device to this voltage level, signal voltage levels on bus conductors are drawn toward this voltage level without changing the polarity of a differential signal or crossing a hysteresis trip point for a single ended signal. Data integrity is thus preserved during hot plugging.

BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the invention are set forth in the appended claims. The invention itself, however, as well as a preferred mode of use, further objectives and advantages thereof, will best be understood by reference to the following detailed description of an illustrative embodiment when read in conjunction with the accompanying drawings, wherein:

FIG. 1 depicts a block diagram of a data processing system in which a preferred embodiment of the present invention may be implemented;

FIG. 2 is a circuit diagram of a SCSI bus employing adaptive precharging in accordance with a preferred embodiment of the present invention;

FIG. 3 depicts a pictorial representation of an edge connector for device which employs adaptive precharging of data signal pins during hot plugging in accordance with a preferred embodiment of the present invention;

FIG. 4 is a circuit diagram for a circuit providing adaptive precharging of data signal pins on a SCSI bus connector in accordance with a preferred embodiment of the present invention;

FIG. 5 is a timing diagram for hot plugging a device within a low voltage differential (LVD) SCSI bus employing adaptive precharging of data signal pins in accordance with a preferred embodiment of the present invention; and

FIG. 6 is a timing diagram of hot plugging a device within an LVD SCSI bus without precharging.

DETAILED DESCRIPTION

With reference now to the figures, and in particular with reference to FIG. 1, a block diagram of a data processing system in which a preferred embodiment of the present invention may be implemented is depicted. Data processing system 100 includes a processor 102 connected to a level two (L2) cache 104, which is connected in turn to a system bus 106. Memory 108 in the depicted example is also connected to system bus 106, as is memory-mapped graphics adapter 110, which is further connected to a display device (not shown).

Also connected to system bus 106 is a SCSI bus bridge 112 providing a connection between system bus 106 and SCSI bus 114. SCSI bus 112 is connected to hard disk drive 116 and to RAID device 118 including a plurality of disk drives 118a–118n, in accordance with the known art. The embodiment depicted in FIG. 1 is presented merely for the purposes of explaining the invention and is not intended to imply architectural limitations. Those skilled in the art will recognize that many variants of the embodiment depicted may be utilized in connection with the present invention. However, devices connected to SCSI bus 114 include a mechanism for adaptive precharging of data signal pins during hot plugging as described in greater detail below.

Referring to FIG. 2, a circuit diagram of a SCSI bus employing adaptive precharging in accordance with a preferred embodiment of the present invention is illustrated. Driver 202 drives SCSI cable 204 to transmit signals to

receiver 206. SCSI cable 204 in the depicted embodiment includes two conductors 204a and 204b carrying complementary portions of the differential signal. SCSI cable 204 is terminated with an active terminators 208, such as a Unitrode model UC5630 27-line SCSI Source/Sink Regulator.

Active terminator 208 provides an operating mode sensing signal DIFFSENS (not shown) indicating the mode of operation. For LVD SCSI operation, the DIFFSENS voltage is from 0.7 V to 1.9 V; for HVD SCSI operation, the DIFFSENS voltage is from 2.4 V to $V_{DD}+0.3$ V (greater than 2.4 V); and for SE SCSI operation, the DIFFSENS voltage is from $V_{SS}-0.3$ V to 0.5 V (less than 0.5 V). The actual DIFFSENS voltage may vary within the defined ranges, depending on the actual operating conditions. The value of the actual DIFFSENS signal and the three voltage ranges defined for different modes of operation are employed during hot plugging of a peripheral device to recognize the SCSI mode of operation and to generate the data signal precharge voltage, as described below. A simple circuit for determining the operating mode of a SCSI bus during hot-plugging is shown in FIG. 2A.

With reference now to FIG. 3, a pictorial representation of an edge connector for device which employs adaptive precharging of data signal pins during hot plugging in accordance with a preferred embodiment of the present invention is illustrated. The edge connector 302 of a peripheral device supporting hot plugging includes a signal pins of varying lengths. The longest are ground pins 304, followed by power pins 306, DIFFSENS signal pins 308, and data signal pins 310. This allows for sequential connection of grounds pins 304, power pins 306, DIFFSENS signal pins 308, and data signal pins 310, in that order, during hot plugging. During the period of time between connection of non-data signal pins (including ground pins 304, power pins 306, and DIFFSENS signal pins 308) to the bus and connection of data signal pins 310 to the bus, data signal pins 310 are precharged as described in further detail below. DIFFSENS pins 308 are driven like power pins 306, with low impedance voltage source and capable of tolerating hot plugging of a 0.1 µF filter capacitor, as compared to a maximum capacitance of 20 pF for data signal pins 310.

Referring to FIG. 4, a circuit diagram for a circuit providing adaptive precharging of data signal pins on a SCSI bus connector in accordance with a preferred embodiment of the present invention is depicted. A voltage $V_{REF}$ is provided, adaptively generated from the DIFFSENS voltage supplied by the active terminator. For LVD mode buses, $V_{REF}$ should be approximately 1.25 V. For SE mode buses, $V_{REF}$ should be approximately 1.4 V. A multiplexer-type device (not shown) may be employed to select a voltage source having the appropriate voltage level for the operating mode determined from the DIFFSENS voltage, with the DIFFSENS voltage level being employed to adjust the output voltage of the selected voltage source to the actual voltage level being employed.

A plurality of MOS switches 402 connect voltage $V_{REF}$ to the data signal pins 404 of the peripheral device being connected to the bus. All pins on the peripheral device other than the ground, power supply, and DIFFSENS pins are connected to $V_{REF}$ by MOS switches 402. Resistors 406, having a resistance of approximately 1 KΩ or an other suitable value for specific implementations, are connected between the MOS switches and the pin connections.

Switches 402 are controlled by enable signal En, which may be derived from the power-on-reset signal of the

6,157,974

| 5 | 6 |

peripheral device connected to the bus by hot plugging. Once asserted, enable signal En may be maintained in an asserted state for a predefined period corresponding to the time required to complete insertion. Alternatively, enable signal En may be deasserted as a result of detecting data signals from the bus through one or more of the data signal pins on the peripheral device, indicating that the peripheral device is completely connected to the bus.

With reference now to FIG. 5, a timing diagram for hot plugging a device within an LVD SCSI bus employing adaptive precharging of data signal pins in accordance with a preferred embodiment of the present invention is illustrated. During hot plugging of a peripheral device, the connection of ground, power supply, and operating mode sensing pins of the device to the corresponding bus conductors is employed to precharge the data signal pins. The power supply voltage is employed to generate a voltage level on-board the peripheral device equal to the actual reference voltage being employed by the bus. Each data signal pin is connected to this voltage level for a period of time needed to charge the parasitic capacitance associated with these data signal pins. For differential modes of operation, the data signal pins are precharged to a reference voltage $V_{REF}$ centered between the actual voltages being employed for differential signals $V_X$ and $V_A$. For the single ended mode of operation, the data signal pins are precharged to the reference voltage $V_{REF}$ centered between the hysteresis trip points.

As a result of precharging the data signal pins to the reference voltage, during hot plugging both the $V_X$ and $V_A$ signals on the data signal bus conductors will be pulled toward the reference voltage $V_{REF}$ at the time of connection of the data signal pins. The variations of $V_X$ and $V_A$ when precharged data signal pins are connected to corresponding bus conductors will be in opposite directions but similar magnitudes. The magnitudes of variations in $V_X$ and $V_A$ will be less than the full differential voltage range of the operating mode, preventing any receiving device from interpreting the variations as a change in polarity or a data transition and preserving data integrity.

Due to differences in device speeds, these variations in $V_X$ and $V_A$ may occur at different times $t_1$ and $t_2$ as depicted. However, even in the worst case where the variations occur at times $t_1$ and $t_2$ spaced far apart, a polarity change of the differential signal will not occur.

The present invention provides adaptive precharging of data signal pins on a peripheral device during hot plugging depending both on the bus operating mode and the actual signal voltage levels being employed within the defined tolerances of a particular operating mode. An operating mode sensing signal provided by an active terminator on the bus is utilized to generate the voltage level to which the data signal pins are precharged.

Signal pins on an edge connector for the peripheral device are connected, in sequence, to the corresponding ground, power supply, operating mode sensing signal, and data signal conductors of the bus. During the gap in time between connection of ground, power supply, and operating mode sensing pins of the edge connector to the corresponding bus conductors and connection of the data signal pins while hot plugging, the voltage level to be employed for precharging is generated on-board the peripheral device and the data signal pins are precharged for a period of time required to charge the associated parasitic capacitance. The precharge voltage is centered between the differential signal voltage levels for differential operating modes and centered between the hysteresis trip points for single ended operation modes.

By precharging the parasitic capacitances of the data signal pins on the peripheral device to this voltage level during hot plugging, signal voltage levels on bus conductors are drawn toward this voltage level without changing the polarity of a differential signal or crossing a hysteresis trip point for a single ended signal. Such changes in polarity or crossing of hysteresis trip points may be mistakenly interpreted as ordinary data transitions by a receiving device, particularly for high speed buses. Thus, adaptive precharging in accordance with the present invention preserves data integrity during hot plugging.

The description of the preferred embodiment of the present invention has been presented for purposes of illustration and description, but is not intended to be exhaustive or limit the invention in the form disclosed. Many modifications and variations will be apparent to those of ordinary skill in the art. The embodiment was chosen and described in order to best explain the principles of the invention and the practical application to enable others of ordinary skill in the art to understand the invention for various embodiments with various modifications as are suited to the particular use contemplated.

What is claimed is:

1. A method of preserving data integrity while hot plugging a peripheral device, comprising:

    connecting ground, power supply, and operating mode signal pins on the peripheral device to corresponding ground, power supply, and operating mode signal conductors in a bus;

    generating a reference voltage from a voltage detected on the operating mode signal conductor in the bus; and

    precharging data signal pins on the peripheral device to the reference voltage before connecting the data signal pins to corresponding data signal conductors in the bus.

2. The method of claim 1, wherein the step of connecting ground, power supply, and operating mode signal pins on the peripheral device to corresponding ground, power supply, and operating mode signal conductors in a bus further comprises:

    sequentially connecting the ground pin to the ground conductor, the power supply pin to the power supply conductor, and the operating mode signal pin to the operating mode signal conductor.

3. The method of claim 1, wherein the step of precharging data signal pins on the peripheral device to the reference voltage before connecting the data signal pins to corresponding data signal conductors in the bus further comprises:

    connecting the data signal pins on the peripheral device to the reference voltage for a period of time sufficient to charge a capacitance associated with the data signal pins; and

    connecting the charged data signal pins to the corresponding data signal conductors in the bus.

4. A method of preserving data integrity while hot plugging a peripheral device, comprising:

    connecting ground, power supply, and operating mode signal pins on the peripheral device to corresponding ground, power supply and operating mode signal conductors in a bus; and

    generating a reference voltage from a voltage detected on the operating mode signal conductor in the bus;

    precharging data signal pins on the peripheral device to the reference voltage before connecting the data signal pins to corresponding data signal conductors in the bus, wherein the step of generating a reference voltage from

6,157,974

| 7 | 8 |

a voltage detected on the operating mode signal conductor in the bus further comprises:

determining an operating mode of the bus from the voltage detected on the operating mode signal conductor; and

selecting a voltage level corresponding to the detected operating mode for the reference voltage.

5. The method of claim 4, wherein the step of generating a reference voltage from a voltage detected on the operating mode signal conductor in the bus further comprises:

adjusting the selected voltage level to a level which is substantially equal an actual voltage level detected on a bus conductor.

6. The method of claim 4, wherein the step of selecting a voltage level corresponding to the detected operating mode for the reference voltage further comprises:

responsive to detecting a low voltage differential mode of operation on the bus, selecting a first voltage source having a first voltage output level;

responsive to detecting a high voltage differential mode of operation on the bus, selecting a second voltage source having a second voltage output level different from the first voltage output level; and

responsive to detecting a single ended mode of operation on the bus, selecting a third voltage source having a third voltage output level different from the first and second voltage output levels.

7. A method of adaptively precharging signal pins for hot plugging a peripheral device without disrupting a data transfer on a bus, comprising:

connecting ground and power supply pins on the peripheral device to corresponding ground and power supply bus conductors;

generating a precharge voltage from an actual voltage detected on a bus conductor;

connecting data signal pins on the peripheral device to the precharge voltage for a period of time sufficient to charge a capacitance associated with the data signal pins; and

connecting the charged data signal pins to corresponding data signal conductors in the bus.

8. The method of claim 7, wherein the precharge voltage is a voltage centered between signal voltages for a differential signal.

9. The method of claim 7, wherein the precharge voltage is approximately 1.25 V.

10. The method of claim 7, wherein the precharge voltage is a voltage centered between hysteresis trip points for a single ended signal.

11. The method of claim 7, wherein the precharge voltage is approximately 1.4 V.

12. An peripheral device suitable for hot plugging, comprising:

an edge connector having a ground pin, a power supply pin, an operating mode signal pin, and at least one data signal pin, wherein the ground, power supply, and operating mode signal pins extend closer to an edge of the edge connector than the at least one data signal pin, wherein the ground, power supply, and operating mode signal pins contact corresponding ground, power supply, and operating mode signal conductors for a bus before the at least one data signal pin contacts a corresponding data signal conductor for the bus during insertion of the edge connector into a slot for the bus;

a reference voltage generated from a voltage detected on the operating mode signal conductor for the bus; and

a precharge circuit connecting the at least one data signal pin on the peripheral device to the reference voltage before connecting the at least one data signal pin to the corresponding data signal conductor for the bus.

13. The peripheral device of claim 12, wherein the ground pin extends closer to the edge of the edge connector than the power supply pin and the power supply pin extends closer to the edge of the edge connector than the operating mode signal pin, and wherein the ground, power supply and operating mode signal pins are sequentially connected to the corresponding ground, power supply, and operating mode signal conductors for the bus during insertion of the peripheral device into the slot for the bus.

14. The peripheral device of claim 12, wherein the precharge circuit further comprises:

switches connecting the data signal pins on the peripheral device to the reference voltage for a period of time sufficient to charge a capacitance associated with the data signal pins.

15. A peripheral device suitable for hot plugging comprising:

an edge connector having a ground pin, a power supply pin, an operating mode signal pin, and at least one data signal pin, wherein the ground, power supply, and operating mode signal pins extend closer to an edge of the edge connector than the at least one data signal pin, wherein the ground, power supply, and operating mode signal conductors for a bus before the at least one data signal pin contacts a corresponding data signal conductor for the bus during insertion of the edge connector into a slot for the bus;

a reference voltage generated from a voltage detected on the operating mode signal conductor for the bus; and

a precharge circuit connecting the at least one data signal pin on the peripheral device to the reference voltage before connecting the at least one data signal pin to the corresponding data signal conductor for the bus, wherein the reference voltage is selected to correspond to an operating mode of the bus determined from a voltage detected on the operating mode signal conductor.

16. The peripheral device of claim 15, wherein the reference voltage is substantially equal to an actual voltage detected on a bus conductor.

17. The peripheral device of claim 15, wherein the reference voltage further comprises:

a first voltage level selected if a low voltage differential mode of operation is detected on the bus;

a second voltage level different from the first voltage level selected if a high voltage differential mode of operation is detected on the bus; and

a third voltage level different from the first and second voltage levels selected if a single ended mode of operation is detected on the bus.

18. An apparatus for adaptively precharging signal pins while hot plugging a peripheral device, comprising:

means for connecting ground and power supply pins on the peripheral device to corresponding ground and power supply bus conductors;

means for generating a precharge voltage from an actual voltage detected on a bus conductor;

means for connecting data signal pins on the peripheral device to the precharge voltage for a period of time sufficient to charge a capacitance associated with the data signal pins; and

6,157,974

**9**

means for connecting the charged data signal pins to corresponding data signal conductors in the bus.

19. The apparatus of claim **18**, wherein the precharge voltage is a voltage centered between signal voltages for a differential signal.

20. The apparatus of claim **18**, wherein the precharge voltage is approximately 1.25 V.

21. The apparatus of claim **18**, wherein the precharge voltage is a voltage centered between hysteresis trip points for a single ended signal.

22. The apparatus of claim **18**, wherein the precharge voltage is approximately 1.4 V.

23. A data processing system including adaptive precharging of peripheral device signal pins during hot plugging, comprising:

a processor;

a bus connected to the processor, the bus including at least one slot for receiving a peripheral, the bus including a ground conductor, a power supply conductor, an operating mode signal conductor, and a data signal conductor;

a peripheral device, the peripheral device including:

a ground pin;

a power supply pin;

an operating mode signal pin;

a data signal pin, wherein the data signal pin contacts the data signal conductor after at least one other pin

**10**

contacts a corresponding conductor during insertion of the peripheral device into the bus slot; and

a precharge circuit detecting a voltage on the operating mode signal conductor during insertion of the peripheral device into the bus slot and charging the data signal pin to a reference voltage corresponding to the detected voltage.

24. The data processing system of claim **23**, wherein the operating mode signal pin contacts the operating mode signal conductor prior to the data signal pin contacting the data signal conductor during insertion of the peripheral device into the bus slot.

25. The data processing system of claim **23**, wherein the reference voltage is centered between two signal voltages employed for low voltage differential signaling on the data signal conductor.

26. The data processing system of claim **23**, wherein the reference voltage is centered between two signal voltages employed for high voltage differential signaling on the data signal conductor.

27. The data processing system of claim **23**, wherein the reference voltage is centered between two trip points employed for single ended signaling on the data signal conductor.

\* \* \* \* \*

# Preboot Execution Environment (PXE) Specification

## Version 2.1

September 20, 1999

**Intel Corporation**

with special contributions from

**SYSTEMSOFT™**

This document is for informational purposes only. **INTEL MAKES NO WARRANTIES, EXPRESS OR IMPLIED, IN THIS DOCUMENT.**

Intel Corporation may have patents or pending patent applications, trademarks, copyrights, or other intellectual property rights covering subject matter in this document. The furnishing of this document does not give you any license to the patents, trademarks, copyrights, or other intellectual property rights except as expressly provided in any written license agreement from Intel Corporation.

**Intel does not make any representation or warranty regarding specifications in this document or any product or item developed based on these specifications. INTEL DISCLAIMS ALL EXPRESS AND IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OR MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND FREEDOM FROM INFRINGEMENT. Without limiting the generality of the foregoing, Intel does not make any warranty of any kind that any item developed based on these specifications, or any portion of a specification, will not infringe any copyright, patent, trade secret or other intellectual property right of any person or entity in any country. It is your responsibility to seek licenses for such intellectual property rights where appropriate. Intel shall not be liable for any damages arising out of or in connection with the use of these specifications, including liability for lost profit, business interruption, or any other damages whatsoever. Some states do not allow the exclusion or limitation of liability or consequential or incidental damages; the above limitation may not apply to you.**

† Other product and corporate names may be trademarks of other companies and are used only for explanation and to the owners' benefit, without intent to infringe.

Copyright © 1998, 1999 Intel Corporation. All rights reserved.

# 1. Introduction

A common problem faced by IT managers is to ensure that client systems in their enterprises can boot appropriate software images using appropriate configuration parameters. These selected boot images and configuration parameters must be acquired from selected servers in the enterprise as dictated by the needs of the particular environment, the capabilities or mission of the user, the resources available within the client, etc. Furthermore, these clients should boot consistently and in an interoperable manner regardless of the sources or vendors of the software and the hardware of both client and server machines.

This goal can be accomplished only through a uniform and consistent set of pre-boot protocol services within the client that ensure that network-based booting is accomplished through industry standard protocols used to communicate with the server. In addition, to ensure interoperability, the downloaded Network Bootstrap Program (NBP) must be presented with a uniform and consistent pre-boot operating environment within the booting client, so it can accomplish its task independent of, for example, the type of network adapter implemented in the system. This capability is useful in enhancing the manageability of the client machine in several situations; for example:

- **Remote new system setup**. If the client does not have an OS installed on its hard disk, or the client has no hard disk at all, downloading an NBP from a server can help automate the OS installation and other configuration steps.
- **Remote emergency boot**. If the client machine fails to boot due to a hardware or software failure, downloading an executable image from a server can provide the client with a specific executable that enables remote problem notification and diagnosis.
- **Remote network boot**. In instances where the client machine has no local storage, it can download its system software image from the server in the course of normal operation.

This document specifies the **Preboot Execution Environment (PXE)**. PXE embodies three technologies that will establish a common and consistent set of pre-boot services within the boot firmware of Intel Architecture systems:

- A uniform protocol for the client to request the allocation of a network address and subsequently request the download of an NBP from a network boot server.
- A set of APIs available in the machine's pre-boot firmware environment that constitutes a consistent set of services that can be employed by the NBP or the BIOS.
- A standard method of initiating the pre-boot firmware to execute the PXE protocol on the client machine.

In summary, using the capabilities described above, a newly installed networked client machine should be able to enter a heterogeneous network, acquire for itself a network address from a DHCP server, and then download an NBP to set itself up. This sets the stage to enable IT managers to customize the manner in which their network client machines go through a network-based booting process.

**Version 2.1 September 20, 1999**
**Copyright © 1998, 1999 Intel Corporation. All rights reserved.**

## 1.1  Structure of this Document

This document is organized in a top down manner from the point of view of the PXE client "boot behavior". This section contains an overview. The next two sections specify the external behavior of PXE in platform architecture independent terms, so both sections specify the functionality PXE provides, and are of interest to all system providers regardless of platform or BIOS type. The last two sections specify implementation details and required platform support for PXE in the Intel Architecture PC platform.

Section 2 begins with a description of the network protocol used by the booting PXE client and the Redirection and Boot servers that provide the client with boot information and files. This section covers the network visible behavior of PXE and is defined in terms of network protocol.

Section 3 describes the PXE APIs available to the boot program(s) downloaded from the Boot Server. This section specifies the standard interface provided by PXE to the downloaded boot program. With the exception of finding the API entry point, this section is platform architecture independent.

Section 4 specifies the procedure a standard Intel Architecture PC BIOS uses to find and load the boot ROM code (the PXE Initial Program Load) and the PXE loader behavior in this environment.

Section 5 PXE BIOS Support, specifies the BIOS support required to support PXE in a standard Intel® Architecture PC.

Three new capabilities, described for the first time in this document, have been added to the PXE specification:

- Boot Server Discovery.
- Protected Remote Boot.
- The ability to split PXE Base Code and UNDI code into separate ROMs.

## 1.2  Related Documents

After referring to a related specification the first time, this document uses the [TAG] reference from this section to refer to related specifications.

### 1.2.1  Wired for Management

***Wired for Management (WfM) Baseline***                              *[WFM]*
***Version 2.0, December 23, 1998***
http://developer.intel.com/ial/wfm/wfmspecs.htm

***PXE PDK***
http://www.intel.com/ial/wfm/tools/pxe/index.htm

***PXE Powerpoint Presentation***
http://www.intel.com/ial/wfm/class/index.htm

Copyright © 1998, 1999 Intel Corporation. All rights reserved.

*Boot Integrity Services API Specification*          *[BIS]*
Version 1.0

http://www.intel.com/ial/wfm/wfmspecs htm

## 1.2.2  BIOS Specifications

*System Management BIOS Reference Specification*          *[SM BIOS]*
Version 2.2, March 16, 1998
ftp://download.intel.com/ial/wfm/smbios.pdf
http://www.phoenix.com/techs/specs.html

*BIOS Boot Specification*          *[BBS]*
Version 1.01, January 11, 1996
http://www.phoenix.com/techs/specs.html

*POST Memory Manager Specification*          *[PMM]*
Version 1.01, January 8, 1998
http://www.phoenix.com/techs/specs.html

*Plug and Play BIOS Specification*          *[PnP BIOS]*
Version 1.0A, May 5, 1994
http://www.phoenix.com/techs/specs.html

## 1.2.3  UUID Documents

*CAE Specification*          *[UUID]*
DCE 1.1: Remote Procedure Call
Document Number: C706
Universal Unique Identifier Appendix
Copyright (c) 1997 The Open Group
http://www.opengroup.org/onlinepubs/9629399/toc.htm

## 1.2.4  Other PC System Documents

*PC 9x System Design Guide, v1.0*          *[PC98]*
http://developer.intel.com/design/pc98
*Network PC Design Guidelines, v1.0b*          *[NETPC]*
http://developer.intel.com/design/netpc/netovr.htm
ftp://download.intel.com/ial/wfm/netpc.pdf

## 1.3    Data Types and Terms Used in This Guide

The following conventions and terms are used in this specification:

| | | |
|---|---|---|
| !PXE | | Acronym for the !PXE structure. This structure is used by protocol drivers that need to locate and use PXE services. |
| BAID | | Acronym for a BIOS Aware IPL Device. The BIOS contains all code required to IPL from the device. |
| Base Memory | | The first 640K bytes of memory in the system. |
| BCV | | Acronym for Boot Connection Vector. A field in the PnP header for a device with an associated option ROM |

Version 2.1 September 20, 1999
Copyright © 1998, 1999 Intel Corporation. All rights reserved.

| | |
|---|---|
| BEV | Acronym for Boot Entry Vector. A field in the Plug and Play (PnP) Header of a device with an associated option ROM. PXE is implemented as a BEV option ROM. |
| BIOS | Acronym for Basic Input/Output System, also known as ROM BIOS when resident in Read Only Memory or ROM. |
| BOOTP | This is an earlier IETF-defined booting protocol that is much less flexible than DHCP. However, DHCP has been defined to be upwardly compatible with BOOTP and both these protocols can co-exist and function simultaneously in the same network. RFC 1534 defines how DHCP and BOOTP must be implemented to ensure they can co-exist in the same network and inter-operate |
| Bootstrap | Also known as the Initial Program Load (IPL). The initial code loaded by the BIOS to initiate a client operating environment. |
| BUSD | Bus/Device. A BUSD option ROM may contain code to locate and initialize devices on a bus that is not supported in the BIOS Core. The BUSD API calls are used by the UNDI IPL routine and NBPs to enable and disable bus components and devices. |
| Client | In this document, the Client is usually the machine receiving the NBP. The client machine hosts the PXE boot ROM. |
| DDIM | Device Driver Initialization Model. Under this model, all Option ROMs installed in a Plug and Play system which indicate that they support DDIM will be copied into RAM by the System BIOS. Documented in the [PnP] specification |
| DHCP | Dynamic Host Configuration Protocol. An industry standard Internet protocol defined by the IETF. DHCP was defined to dynamically provide communications-related configuration values such as network addresses to network client computers at boot time. DHCP is specified by IETF RFCs 1534, 2131, and 2132 |
| Extended Memory | Typically used to describe memory on an Intel architecture system above 1 MB. |
| GUID | Globally unique identifier; a synonym for UUID. |
| IETF | Internet Engineering Task Force. The open industry body that owns the technical specifications for Internet standards (protocols, APIs, etc.) |
| IPL | Acronym for Initial Program Load, also known as the bootstrap or boot process |
| MTFTP | Multicast Trivial File Transfer Protocol. PXE implements a proprietary implementation of MTFTP. |
| NBP | Acronym for Network Bootstrap Program. The remote boot image downloaded by the PXE client via TFTP or MTFTP. |
| Option ROM | ROM associated with a plug and play device. May be located on the device or in non-volatile storage on a system. |

**Version 2.1 September 20, 1999**
**Copyright © 1998, 1999 Intel Corporation. All rights reserved.**

| POST | Acronym for Power On Self-Test. POST processing in the BIOS is responsible for initializing the system hardware and starting IPL. |
| --- | --- |
| PXE | Acronym for Pre-boot Execution Environment |
| PXENV+ | Acronym for the PXENV+ structure. This structure was used by protocol drivers that need to locate and use PXE services. New protocol drivers must be written to use !PXE. |
| RFC | Request for Comment. This is a class of document used by the IETF for proposing technologies for adoption by the IETF and setting these technologies on a standards track. Each RFC is assigned a unique integer document number. When a technology is adopted by the IETF as a standard, the corresponding RFC becomes the document that formally specifies the technology. |
| ROM | Acronym for Read-Only Memory |
| Shadow | A technique for mapping RAM into UMB space, potentially on top of ROM already occupying this space. Shadow memory may be write protected after initialization. |
| System | The host computer |
| TFTP | Trivial File Transfer Protocol. An industry standard Internet protocol defined by the IETF to enable the transmission of files across the Internet. Trivial File Transfer Protocol (TFTP, Revision 2) to support NBP download is specified by IETF RFC 1350. |
| UDP | User Datagram Protocol. |
| UNDI | Universal Network Device Interface. |
| Upper Memory | An area of system memory between the video buffers and the system ROM BIOS. Typically between real mode segments C000 and F000. |
| UUID | Universally Unique ID. This is a 128-bit identifier generated via a specific algorithm that is extremely unlikely to be generated by the algorithm in another place or at another time. Thus UUIDs can safely be used to uniquely name entities in computer systems (e.g. software images, APIs, machines, sessions, etc.). It is specified in [UUID]. |

**Version 2.1 September 20, 1999**
<span>**Copyright © 1998, 1999 Intel Corporation. All rights reserved.**</span>

manageability, or add functionality supported by the operating systems or software layers below the operating system, such as the BIOS. They are not required, but it is strongly suggested that they be implemented. It is generally expected that "Recommended" features may become "Required" in future revisions of this specification.

| | |
|---|---|
| Optional | These features are not required. |
| Must | Required |
| Should | Recommended |
| May | Optional |

## 1.5  Overview

### 1.5.1  PXE Protocol

PXE is defined on a foundation of industry-standard Internet protocols and services that are widely deployed in the industry, namely TCP/IP, DHCP, and TFTP. These standardize the *form* of the interactions between clients and servers. To ensure that the *meaning* of the client-server interaction is standardized as well, certain vendor option fields in DHCP protocol are used, which are allowed by the DHCP standard. The operations of standard DHCP and/or BOOTP servers (that serve up IP addresses and/or NBPs) will not be disrupted by the use of the extended protocol. Clients and servers that are aware of these extensions will recognize and use this information, and those that do not recognize the extensions will ignore them.

In brief, the PXE protocol operates as follows. The client initiates the protocol by broadcasting a DHCPDISCOVER containing an extension that identifies the request as coming from a client that implements the PXE protocol. Assuming that a DHCP server or a Proxy DHCP server implementing this extended protocol is available, after several intermediate steps, the server sends the client a list of appropriate Boot Servers. The client then discovers a Boot Server of the type selected and receives the name of an executable file on the chosen Boot Server. The client uses TFTP to download the executable from the Boot Server. Finally, the client initiates execution of the downloaded image. At this point, the client's state must meet certain requirements that provide a predictable execution environment for the image. Important aspects of this environment include the availability of certain areas of the client's main memory, and the availability of basic network I/O services.

### 1.5.1.1  Deployment of servers

On the server end of the client-server interaction there must be available services that are responsible for providing redirection of the client to an appropriate Boot Server. These redirection services may be deployed in two ways:

1.  **Combined standard DHCP and redirection services.** The DHCP servers that are supplying IP addresses to clients are modified to become, or are replaced by servers that serve up IP addresses for all clients and redirect PXE-enabled clients to Boot Servers as requested.

2.  **Separate standard DHCP and redirection services.** PXE redirection servers (Proxy DHCP servers) are added to the existing network environment. They respond only to PXE-enabled clients, and provide only redirection to Boot Servers.

Each PXE Boot Server must have one or more executables appropriate to the clients that it serves.

Version 2.1 September 20, 1999
Copyright © 1998, 1999 Intel Corporation. All rights reserved.

### 1.5.1.2  Deployment of Clients

PXE does not specify the operational details and functionality of the NBP that the client receives from the server. However, the intent is that running this executable will result in the system's being ready for use by its user. At a minimum, this means installing an operating system, drivers, and software appropriate to the client's hardware configuration. It might also include user-specific system configuration and application installation.

PXE specifies the protocols by which a client requests and downloads an executable image from a Boot Server and the minimum requirements on the client execution environment when the downloaded image is executed.

### 1.5.2  PXE APIs

To enable the interoperability of clients and downloaded bootstrap programs, the client PXE code provides a set of services for use by the BIOS or a downloaded NBP.

The API services provided by PXE for use by the BIOS or NBP are:

- **Preboot Services API.** Contains several global control and information functions.
- **Trivial File Transport Protocol (TFTP) API.** Enables opening and closing of TFTP connections, and reading packets from and writing packets to a TFTP connection.
- **User Datagram Protocol (UDP) API.** Enables opening and closing UDP connections, and reading packets from and writing packets to a UDP connection.
- **Universal Network Driver Interface (UNDI) API.** Enables basic control of and I/O through the client's network interface device. This allows the use of universal protocol drivers such that the same universal driver can be used on any network interface that implements this API.

The following diagram illustrates the relationship between the NBP (the remote boot program) and the PXE APIs.



**Figure 1-1  PXE APIs**

Version 2.1 September 20, 1999
Copyright © 1998, 1999 Intel Corporation. All rights reserved.

# 2. PXE Client / Server Protocol

The description of PXE Client / Server Protocol assumes knowledge of the standard DHCP/BOOTP protocols.

## 2.1 Relationship to the Standard DHCP Protocol

The initial phase of this protocol piggybacks on a subset of the DHCP protocol messages to enable the client to discover a Boot Server, that is, a server that delivers executables for new system setup. The client *may* use the opportunity to obtain an IP address, which is the expected behavior, but it is not required. Clients that do obtain an IP address using DHCP or BOOTP must implement the protocol as specified in RFC 2131, even though not all possible messages and states of that protocol are described or mentioned in this protocol specification. The points at which this protocol piggybacks or otherwise interacts with the standard DHCP protocol are also noted.

The second phase of this protocol takes place between the client and a Boot Server, and uses the DHCP message format simply as a convenient format for communication. This second phase of the protocol is otherwise unrelated to the standard DHCP services.

## 2.2 Protocol Details

The protocol is a combination of an extension of DHCP (through the use of several new DHCP Option tags) and the definition of simple packet transactions that use the DHCP packet format and options to pass additional information between the client and server. This added complexity is introduced by the requirement to operate without disturbing existing DHCP services.

In this protocol, DHCP options fields are used to do the following:

- Distinguish between DHCPDISCOVER and DHCPREQUEST packets sent by a client as part of this extended protocol from other packets that the DHCP server or Boot Server might receive.
- Distinguish between DHCPOFFER and DHCPACK packets sent by a DHCP or Proxy DHCP server as part of this extended protocol from other packets that the client may receive.
- Convey the client system's ID to the DHCP and Boot Server (in other words, UUID).
- Convey the client system's architecture type to the DHCP and Boot Server.
- Convey the Boot Server type from which the client is requesting a response.

Based on any or all of the client network adapter type, system architecture type, and client system ID, the Boot Server returns to the client the file name (on the server) of an appropriate executable. The client downloads the specified executable into memory and executes it. The function of this executable is not specified by these guidelines.

Version 2.1 September 20, 1999
Copyright © 1998, 1999 Intel Corporation. All rights reserved.

### 2.2.1 PXE Boot

This section gives a step-by-step synopsis of the PXE protocol. A detailed description of packet formats and client and server actions appears later in this section. Note that this version of the PXE specification introduces remote-boot authentication. PXE remote-boot authentication relies on the presence of platform security capabilities as described in the [BIS] specification.



**Figure 2-1  PXE Boot**

**Step 1.** The client broadcasts a DHCPDISCOVER message to the standard DHCP port (67). An option field in this packet contains the following:

- A tag for client identifier (UUID).
- A tag for the client UNDI version.
- A tag for the client system architecture.
- A DHCP option 60, Class ID, set to "PXEClient:Arch:xxxxx:UNDI:yyyzzz".

**Step 2.** The DHCP or Proxy DHCP Service responds by sending a DHCPOFFER message to the client on the standard DHCP reply port (68). If this is a Proxy DHCP Service, then the client IP address field is null (0.0.0.0). If this is a DHCP Service, then the returned client IP address field is valid.

At this point, other DHCP Services and BOOTP Services also respond with DHCP offers or BOOTP reply messages to port (68). Each message contains standard DHCP parameters: an IP address for the

# 5. PXE BIOS Support

This section discusses host system BIOS support required for PXE compliance and how PXE boot devices (ROMs) and PXE Network Boot Programs (NBPs) use it.

## 5.1 BIOS Support

### 5.1.1 BIOS Requirements

PXE-compliant BIOS's implementations *must*:

- Locate and configure all PXE-capable boot devices (UNDI Option ROMs) in the system, both built-in and add-ins.
- Supply a PXE per this specification, if the system includes a built-in network device.
- Implement the following specifications:
  - *Plug-and-Play BIOS Specification v1.0a or later.*
  - *System Management BIOS (SMBIOS) Reference Specification v2.2 or later.*
  - The requirements defined in Sections 3 and 4 of the *BIOS Boot Specification (BBS) v1.01* or later, to support network adapters as boot devices.
- Supply a valid UUID and Wake-up Source value for the system via the [SMBIOS] structure table.
  Note: An implementation might also choose to supply the UUID via the _SYSID_ structure (see Section 5.2.1) because [PC98] requires the interface.

### 5.1.2 BIOS Recommendations

PXE-compliant BIOSes *should* implement:

- PXE support for CardBus via the PXE BUSD option ROM if the host system supports CardBus.
  PXE support for non-industry standard boot devices, such as CardBus, requires Host System support for locating and initializing PXE Boot Devices and loading expansion/option ROMs for those devices.

- *POST Memory Manager Specification v1.01 or later*
  PMM is strongly recommended. PMM provides a straightforward way for LAN on Motherboard PXE implementations to move their ROM image from UMB to extended memory. While methods to do this exist outside of PMM, their use is undefined and unreliable. Placing PXE ROM images into UMB space reduces the available UMB space by approximately 32 KB. This is sufficient to compromise or even prevent successful operation of some downloaded programs

- *Boot Integrity Services (BIS) API Specification v1.0 or later*

Copyright © 1998, 1999 Intel Corporation. All rights reserved.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ACCELERON, LLC,

        Plaintiff,

v.

HEWLETT-PACKARD COMPANY., and
INTEL CORPORATION,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

**REDACTED
PUBLIC VERSION**

C.A. No. 10-128-SLR

## PLAINTIFF'S OPENING BRIEF REGARDING CLAIM CONSTRUCTION

*Of Counsel:*

Patrick J. Flinn
George D. Medlock, Jr.
Jennifer Liotta
Eric Andalman
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7000

Jason W. Cook
ALSTON & BIRD LLP
2200 Ross Ave.
Suite 3601
Dallas, Texas 75214
214.922.3400

Dated: November 1, 2010

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
Lauren E. Maguire (I.D. #4261)
Caroline Hong (I.D. #5189)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
lmaguire@ashby-geddes.com
chong@ashby-geddes.com

*Attorneys for Plaintiff Acceleron, LLC*

"dedicated ethernet path" limitation by its plain meaning indicates that there is a route between the microcontroller module and the modules that it is polling.

While Acceleron does not believe that this term is complicated, construction beyond the plain meaning is necessary to prevent either or both of the "dedicated ethernet path" and "remotely poll" limitations from being rendered superfluous or interpreted contrary to their plain meanings. *See, e.g., Wenger*, 239 F.3d at 1233. For example, Acceleron believes that Intel may argue that the microcontroller module can also be a CPU module. However, this would be contrary to the plain meaning of "remotely poll," as it would be nonsensical, if not impossible, for a module to "remotely poll" itself. Such a construction would also be contrary to the plain meaning of "dedicated ethernet path" as the remote polling is required to occur over this path, therefore implying a route between separate modules.

### K.    Poll (Claims 20)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| *Plain meaning* | *Send routine, periodic requests for health or status information* |

No construction of the term "poll" is necessary and it should be given its plain meaning, as it is straightforward and readily understood by one of ordinary skill in the art. *See Acumed*, 483 F.3d at 805. Defendants have proposed a construction for this term that imports limitations from a preferred embodiment into this term (*See* Exh A. FIG 5, 7:40 – 8:8). As with other claim terms, Defendants attempt to import only those limitations of their choosing (*see id.*). There is no support in the prosecution history or the specification for Defendants' interpretation of "poll" as either limited to "send[ing] routine, periodic requests" or limited to requests for "health or status information."

First, Defendants' construction of "poll" as limited to "routine, periodic requests" is not supported by the specification. Figure 5 describes an embodiment in which the "microcontroller module" polls modules and in which information may be reported to management software as "part of a routine poll" (Exh. A 7:62-64; 8:1-2). The use in the specification of "poll" and "routine poll" supports the inference that a poll is not necessarily routine.

Next, the patent discloses an embodiment of a microcontroller module that performs a variety of management and monitoring functions, and the language of Claim 20 does not constrain the functions of the microcontroller to the Defendants' limited interpretation of "polling" to only encompass requests for "health or status information". One of ordinary skill would appreciate that polling can be used to gather many different types of information for use by a microcontroller module. The polling examples set forth in the preferred embodiment of Figure 5 are explicitly not limiting, and the prosecution history does not contain any clear disavowal of the scope of "remotely poll" in claim 20 as Defendants propose (*see* Exh.A 3:9-15). If "poll" requires any construction, Acceleron would be amenable to "gather information".[6]

## L.    Chassis (Claims 2-5, 7, 32, 33)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| *Plain meaning* | *A rack-mountable housing* |

Acceleron does not believe that the term "chassis" requires construction, as it is an uncomplicated claim term whose plain meaning is readily obvious to a person of ordinary skill in the art. As with "backplane board" above, Defendants seek to bolster their non-infringement and

---

[6] This construction is consistent with Defendants' treatment of the preferred embodiment of microcontroller module in Figure 5, which "gathers status information" from and "remotely poll[s] the health" of modules; Defendants tacitly acknowledge that "gathering" is interchangeable with "polling" as their proposed construction of "polling" includes requests for *health or status* information (*see* Exh. A, 7:62-67).

**A677**

# UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE PATENT TRIAL AND APPEAL BOARD

| | | | |
|---|---|---|---|
| In Re: | U.S. Patent 6,948,021 | : | Attorney Docket No. 016295.4954 |
| Inventor: | Joel Brian Derrico et al. | : | |
| Filed: | November 16, 2001 | : | |
| Issued: | September 20, 2005 | : | IPR No. Unassigned |
| Assignee: | Acceleron, LLC | | |
| Title: | Cluster Component Network Appliance System and Method for Enhancing Fault Tolerance and Hot-Swapping | | |

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

*Submitted Electronically via the Patent Review Processing System*

# DECLARATION OF ROBERT HORST

- A microcontroller module ("management network interface" 49, illustrated in Figure 7)

- A backplane (midplane 34) that has hot swap connectors (*e.g.,* "web server processing card connectors" 276 and "network interface card connectors" 282-287, illustrated in Figures 8 and 9) and interconnects the modules.

Ex. 1004 at Figure 1 and 3:42-4:25. The chassis is connected to a private network 46, a public network 45, and a management network 47. Ex. 1004 at 3:44-47, Fig. 1.



FIG. 1

52.    The following Hipp claim chart illustrates Hipp's disclosure (either literally or inherently) of the recited claim limitations. The discussion that follows

the claim chart provides further explanation of my opinion that Hipp discloses

certain limitations.

| Claim Limitations | *Hipp (Ex. 1004)* |
|---|---|
| 1[p] A computer network appliance, comprising: | *See, e.g.,* Fig. 1, 3:42–47, "Referring to FIG. 1, a high density, multiple server network of the present invention is illustrate and generally designated by the reference number 30. Network 30 includes a plurality of web server processing cards 32 and 132–135 coupled with a public network 45, a private network 46 and a management network 47." <br><br> *See also, e.g.,* Figs. 10–12, 2:18–24. |
| 1[a]  a plurality of hot-swappable CPU modules, wherein each CPU module is a stand-alone independently-functioning computer; | *See, e.g.,* 3:54–56, "Web server processing card 32 provides the functionality of a single board computer which may be employed as a rack mounted web server." <br><br> *See, e.g.,* 6:48–55, "The servers under the control of remote management system 70 may include thousands of web server processing cards 32. These servers may be configured to provide individual server capacity. In another embodiment, the servers may be "clustered." In other words a plurality of web server processing cards 32 may be joined logically in order to provide a sealed level of service to a user." <br><br> *See, e.g.,* 7:57–61, "Web server processing card 32 is a single board computer upon which all of the requisite components and devices are mounted to enable processing card 32 to function and operate as a server hosting a wide array of Internet-based applications." <br><br> *See, e.g.,* 8:6–10, "Each web server processing card 32 includes a printed circuit board 82, coupled with a central processing unit (CPU) 84, a disk drive 86, a dynamic memory integrated circuit 88, and network interface integrated circuitry 90–92." <br><br> *See, e.g.,* 10:1–4, "A high density, 80 pin SCA connector 94 is used to couple web server processing card 32 with a corresponding high density, 80 pin SCA connector 276 |

| Claim Limitations | *Hipp (Ex. 1004)* |
|---|---|
| | associated with passive midplane 276 (see FIG. 8)." |
| | *See, e.g.,* 12:9–10, "Each network interface card 40 may support up to twelve independent web server processing cards 32. |
| | *See, e.g.,* 18:48–51, "Server chassis 38 is referred to as 'hot swappable' because each web server processing card 32 and 232–243 may be replaced from within chassis 38 while chassis 38 is powered on." |
| | *See, e.g.,* 23:61–65, "Network 30 and all associated components are configured with minimized points of failure. Since each web server processing card includes the ability to detect system status information, the failure of a single web server processing card will not affect network operations." |
| | *See also, e.g.,* Figs. 1–3 and 8, 2:21–24, 3:44–47, 8:1–6, 9:57–67, 10:47–54, 10:62–11:2; 15:49–65, 16:62–17:3, 19:46–50. |
| 1[b]  a hot-swappable power module; | *See, e.g.,* 16:62–64, "Server chassis 38 includes two power supply mounting mechanisms 278, which facilitate the installation of two load-balance, hot-swappable power supplies 280." |
| | *See, e.g.,* 17:17–26, "Power supplies 280 are load balanced and hot swappable. . . . Since each power supply 280 is sized appropriately to operate an entire chassis 38, a single power supply 280 may be removed from its associated power supply mounting mechanism 276 and replaced with a new power supply, without powering OFF server chassis 38, or affecting the operation of network 30." |
| | *See also, e.g.,* Fig. 1, 11 and 12, 16:62–17:9, 17:45–18:36. |
| 1[c]  a hot-swappable ethernet switch module; and | *See, e.g.,* 2:56–58, "Yet another technical advantage of the present invention includes providing a network interface card which is hot swappable within a midplane." |
| | *See, e.g.,* 12:37–50, "In another embodiment, a switched network interface card 48 may be used in lieu of network interface card 40 to establish the connection between a |

| Claim Limitations | *Hipp (Ex. 1004)* |
|---|---|
| | respective web server processing card 32 and public network switch 42. Switched network interface card 48 is illustrated in more detail in FIG. 5. Similar to network interface card 40, switch network interface card 48 includes an eighty pin SCA connector 115, which couples network interface card 48 with passive midplane 34. Each Ethernet communication path 145 associated with switched network interface card 48 terminates at a switch chip 145. Switch chip 145 monitors and distributes traffic from a respective web server processing card 32 to a corresponding RJ-45 Ethernet connector 144 through an Ethernet communication link 143." *See also, e.g.,* Figs. 1, 5 and 12, 2:21–24, 2:42–55, 3:64–4:2, 4:9–11, 12:7–30, 12:61–66. |
| 1[d] a backplane board having a plurality of hot swap mating connectors, | *See, e.g.,* 15:33–44, "Referring now to FIGS. 8 and 9, passive midplane 34 is illustrated in more detail. On its front face 275, passive midplane 34 includes a plurality of web server processing card connectors 276 which facilitate the installation of up to twenty-four web server processing cards 32. Rear face 277 of passive midplane 34 includes a pair of power supply mounting mechanisms 278 which accommodate power supplies 280, which will be described later in more detail. Rear face 277 of passive midplane 34 also includes a plurality of network interface card connectors 282–287." *See, e.g.,* 15:58–62, "Passive midplane 34 provides a high-density, hot pluggable connector for as many as twenty-four web server processing cards. It consolidates power, three separate Ethernet networks and serial connections all through a single connector." *See also, e.g.,* Figs. 8–9, 3:60–67, 7:57–67, 10:1–4, 15:45–65, 18:42–47. |
| 1[e] wherein the at least one backplane board interconnects each of the CPU | *See, e.g.,* 7:61–64, "Each web server processing card 32 within a particular chassis 38, share a common passive midplane 34 through which all power and connectivity passes. Server chassis 38 is intended for rack mount in |

| Claim Limitations | *Hipp (Ex. 1004)* |
|---|---|
| modules with the at least one power module and the at least one ethernet switch module, such that the at least one power module and the at least one ethernet switch module can be used as a shared resource by the plurality of CPU modules. | server rack 39 (See FIG. 13), and includes passive midplane 34 and all the associated web server processing cards 32." *See, e.g.,* 15:44–57, "Passive midplane 34 is considered "passive" because it includes no active components which can fail. Instead, passive midplane 34 includes the necessary wiring to connect each respective web server 32 with its corresponding network interface card. Passive midplane 34 includes a printed circuit board with the appropriate printed circuitry to distribute data and power necessary for the operation of network 30. For example, passive midplane 34 distributes power to components of web server processing cards 32 and network interface cards 40, 48 and 68. Additionally, passive midplane 34 distributes data and/or communications signals between web server processing cards 32 and network interface cards 40, 48 and 68." *See, e.g.,* 17:18–21, "Passive midplane 34 includes integrated printed circuitry which distributes power and signals to components of web server processing cards 32, 132–142, and components of the associated network interface cards 40, 48 and 68." *See also, e.g.,* Figs 1, 11 and 12, 2:21–24, 2:44–51, 3:60–4:4, 10:1–19, 16:62–17:3, 19:46–50. |
| 2. The computer network appliance of claim 1, further comprising a chassis providing physical support for a CPU module, the power module, the ethernet switch module and the backplane board. | *See, e.g.,* 7:64–67, "Each web server processing card 32 within a particular chassis 38, share a common passive midplane 34 thorough which all power and connectivity passes. Server chassis 38 is intended for rack mount in server rack 39 (See FIG. 13), and includes passive midplane 34 and all the associated web server processing cards 32." *See, e.g.,* 12:12–16, "In this embodiment, network interface card 40 provides modular connectivity, such that an operator of network 30 may access rear connector 116 at a convenient location upon server chassis 38." *See, e.g.,* 16:62–17:1, "Server chassis 38 includes two power supply mounting mechanisms 278, which facilitate the installation of two load-balance, hot-swappable power supplies 280. Power supplies 280 are installed upon |

| Claim Limitations | *Hipp (Ex. 1004)* |
|---|---|
| 12. The computer network appliance of claim 11, wherein signal pins of the hot swap connector of the module make contact with corresponding signal elements of the hot swap mating connector of the backplane board after the power pins have made contact. | *See Claim 9.*<br><br>This claim is obvious over Hipp in view of Gasparik, as explained in the section below on the combination of Hipp and Gasparik. |
| 13.  The computer network appliance of claim 1, wherein a CPU module operates as a stand alone computer. | *See Claim 1[a].* |
| 14.  The computer network appliance of claim 1, wherein a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot. | *See, e.g.,* 5:35–36, "Storage server 54 provides network attached storage (NAS)."<br><br>*See, e.g.,* 8:26–30, "In the illustrated embodiment, web server processing card 32 includes a version of the Linux operating system. The clock speed of central processing unit 84 may diminish by as much as twenty percent if a version of the Windows operating system is substituted for the Linux operating system."<br><br>*See, e.g.,* 9:61–65, "Each chip set 90, 91 and 92 also includes "boot from LAN" capability. Wake on LAN refers to the ability of a chipset which is not experiencing network traffic to remain idle until a request and/or traffic is received from the associated network." |

| Claim Limitations | *Hipp (Ex. 1004)* |
|---|---|
| | *See, e.g.,* 10:47–61, "Web server processing card 32 also includes a custom Basic Input/Output System ("BIOS") which contains the appropriate instructions for sending information from a program to the appropriate hardware device within network 30. The BIOS of the illustrated embodiment is capable of supporting at least three independent networks, i.e., public network 45, private network 46, and management network 47. The BIOS is also configured to support the "wake on LAN" capability described above. Many of the other components of web server processing card 32 are similar in structure and function to a typical motherboard, although support for video, keyboard and a mouse may be removed. Each web server processing card 32 may include two megabytes of flash read-only-memory (ROM) for BIOS storage." |
| | *See, e.g.,* 18:60–64, "A parallel command bus associated with each web server processing card extends through the midplane and allows an operator of the network to perform a hardware reset (boot from LAN, boot from hard disk) of a targeted web server processing card and/or force a password reset." |
| | *See also, e.g.,* Figs. 1 and 2, 5:65–6:9. |
| 15.  The computer network appliance of claim 1, wherein a CPU module is configured to boot remotely from an OS located in an NAS, and wherein the computer network appliance is free of a local hard disk drive (HDD). | *See Claim 14.*<br><br>*See, e.g.,* 18:54–56, "In still another embodiment, web server processing card 32 may be provided without an associated disk drive." |
| 16.  The computer | *See Claim 14.* |

| **Claim Limitations** | *Hipp (Ex. 1004)* |
|---|---|
| network appliance of claim 15, wherein remote booting of a CPU module allows the CPU module to run different types of operating systems. | |
| 17. The computer network appliance of claim 15, wherein effects of a lack of a local HDD include increased mean time between failure (MTBF) and decreased mean time to repair (MTTR) of the computer network appliance. | *See, e.g.,* 18:54–56, "In still another embodiment, web server processing card 32 may be provided without an associated disk drive." |
| 18. The computer network appliance of claim 1, wherein each of a plurality of hot swap connectors of the modules includes an ethernet connection providing communications to all modules attached to the backplane board. | *See, e.g.,* 10:1–12, "A high density, 80 pin SCA connector 94 is used to couple web server processing card 32 with a corresponding high density, 80 pin SCA connector 276 associated with passive midplane 276 (see FIG. 8). Connector 94 includes a "blind mate" feature which provides self-alignment properties for simplified installation and removal of processing card 32 from passive midplane 34. Connectors 94 and 276 also include built-in serial connectors for managing network traffic. In other words, connector 94 and 276 are appropriately sized and configured to accommodate a serial connection independent of the above referenced Ethernet connections and any other required power/communications ports." <br><br> *See, e.g.,* 12:40–50, "Switched network interface card 48 is illustrated in more detail in FIG. 5. Similar to network |

| Claim Limitations | *Hipp (Ex. 1004)* |
|---|---|
| | *See also, e.g.,* Figs. 1 and 8–9, 12:61–13:9, 13:60–65, 14:18–24, 15:58–65. |
| 34[p]. The method of claim 30, further comprising remotely booting a CPU module in a computer network appliance, comprising: | This claim is obvious over Hipp in view of Gasparik, as explained in the section below on the combination of Hipp and Gasparik. |
| | *See, e.g.,* 5:35–36, "Storage server 54 provides network attached storage (NAS)." |
| | *See, e.g.,* 9:61–65, "Each chip set 90, 91 and 92 also includes "boot from LAN" capability. Wake on LAN refers to the ability of a chipset which is not experiencing network traffic to remain idle until a request and/or traffic is received from the associated network." |
| | *See, e.g.,* 10:47–55, "Web server processing card 32 also includes a custom Basic Input/Output System ("BIOS") which contains the appropriate instructions for sending information from a program to the appropriate hardware device within network 30. The BIOS of the illustrated embodiment is capable of supporting at least three independent networks, i.e., public network 45, private network 46, and management network 47. The BIOS is also configured to support the "wake on LAN" capability described above." |
| | *See, e.g.,* 18:60–64, "A parallel command bus associated with each web server processing card extends through the midplane and allows an operator of the network to perform a hardware reset (boot from LAN, boot from hard disk) of a targeted web server processing card and/or force a password reset." |
| | *See also, e.g.,* Figs. 1 and 2, 5:65–6:9. |
| 34[a] locating an OS in an NAS to boot the CPU module; | *See Claim 34[p].* |
| | *See, e.g.,* 8:26–30, "In the illustrated embodiment, web server processing card 32 includes a version of the Linux operating system. The clock speed of central processing unit 84 may diminish by as much as twenty percent if a version of the Windows operating system is substituted for the |

| Claim Limitations | *Hipp (Ex. 1004)* |
|---|---|
| | Linux operating system." |
| 34[b] and remotely booting the CPU module using the located OS; | *See Claim 15.* |
| 34[c] wherein the computer network appliance is free of a local HDD in remotely booting the CPU module | *See Claim 15.* |
| 35. The method of claim 34, wherein the remote booting of the CPU module allows the CPU module to run different types of operating systems. | This claim is obvious over Hipp in view of Gasparik, as explained in the section below on the combination of Hipp and Gasparik.<br><br>*See Claim 16.* |
| 36. The method of claim 34, wherein effects of a lack of a local HDD include increased MTBF and decreased MTTR of the computer network appliance. | This claim is obvious over Hipp in view of Gasparik, as explained in the section below on the combination of Hipp and Gasparik.<br><br>*See Claim 17.* |

53.    Claim limitation 1[c] of the '021 patent recites a hot-swappable ethernet switch module.    Hipp discloses this limitation.    Hipp states that a "technical advantage of the present invention includes providing a network

interface card which is hot swappable within a midplane." Ex. 1004 at 2:55-57. Moreover, Hipp discloses that the switched network interface card 48, like the hot-swappable "web server processing card 32," connects to the backplane via an "eighty pin SCA connector 115"—i.e., the web server processing card 32's "hot pluggable connector." Ex. 1004 at 10:1-4; 12:41-44; 15:58-60. One of ordinary skill in the art would recognize the phrase "eighty pin SCA connector" to refer to an SCA Type-2 connector. Limitation 1[c] is thus literally satisfied by Hipp.

54.    Claim limitation 1[d] of the '021 patent recites "a backplane board having a plurality of hot swap mating connectors." Hipp discloses this limitation. Specifically, Hipp discloses a midplane satisfying this limitation. The terms "midplane" and "backplane" are often used interchangeably. When boards are plugged into both the front and the back of the interconnecting circuit board, it may be called either a midplane or a backplane. The prior art disclosures of a midplane therefore also disclose a backplane.

55.    Claim 3 of the '021 patent recites that "the chassis comprises caddies providing air flow from the front to the rear of the chassis." Hipp discloses this limitation. The specification of the '021 patent does not describe a role for caddies related to air flow through the chassis. In fact, the '021 specification only says the following regarding caddies: "Each module resides in a caddy 152 of the chassis such that when the module is inserted into the chassis the caddy ensures that the

56

**A740**

hot swap connectors are aligned." Ex. 1001 at 3:32-34. In the '021 patent, the air

flow is generated and controlled by fans 120 and 122. *See, e.g.,* Ex. 1001 at 3:51-

57 ("Fans 120(a)-120(e) are provided for each CPU module providing a 1:1 ratio

of fan to bay and positioned near the front panel 116 of the chassis to push outside

air through the chassis. In the rear of the chassis, multiple fans 122(a)-122(d) are

mated to the back of both the power module 106 and the ethernet switch module

110 to draw heated air out of the chassis."). Given this disclosure in the

specification, I read claim 3 to recite that the caddies are aligned such that air is

allowed to flow from the front to the rear of the chassis (in other words, the caddies

do not block the flow of air). As shown in the Hipp claim chart above, Hipp

discloses air flow from the front to the rear of the chassis and thus also discloses

that the caddies "provide" for this air flow. Specifically, Hipp states:

> Referring now to FIGS. 10-12, server chassis 38 is illustrated in more
> detail. Server chassis 38 includes a box build 260 having a base 36
> forming a lower portion thereof. Box build 260, of the illustrated
> embodiment, is fabricated from plated steel. An articulating door 262
> is coupled to box build 260. Articulating door 262 and box build 260,
> in combination, provide the ability to protect web server processing
> cards 32 and 132-142 from ambient environment.

> Articulating door 262 includes a plurality of box fans 264–269,
> mounted therein. Box fans 264–269 draw air from the ambient
> environment through articulating door 262, and exhaust through a
> back plate 270 associated with box build 262.

Ex. 1004 at 16:6-18. The "articulating door 262" of Hipp performs the same

function as the caddies in the '021 patent.

58.    Claim 9 of the '021 patent recites that "the ground pins of a hot swap connector of a module make contact with corresponding ground elements of a hot swap mating connector of the backplane board." Hipp discloses this limitation. As discussed above, Hipp discloses the use of the 80-pin SCA-2 connector. This SCA-2 connector includes ground pins. *See, e.g.,* Ex. 1022 at p. 14 (pins 41-43, "12V GROUND"). Further, these ground pins mate to corresponding elements on the board. Ex. 1022 at p. 6 ("The SCA-2 mechanical definition allows the device to be plugged into a board socket.") and p. 9 ("The SCA-2 connector will allow drive-to-board mating."). Hipp therefore discloses this limitation. At the very least, given Hipp's explicit reference to "80 pin SCA connectors" and hot-swappability, one of ordinary skill in the art would have been motivated to combine the 80-pin SCA-2 connector of the SCSI standard with Hipp. This combination discloses all elements of claim 9 of the '021 patent.

59.    Claim 14 of the '021 patent recites that "a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot" and claim limitation 34[a] recites "locating an OS in an NAS to boot the CPU module." These limitations are disclosed in Hipp. First, Hipp discloses that the CPU module comprises a hardware BIOS: "the web server processing card 32 also includes a custom Basic Input/Output System ('BIOS')." Ex. 1004 at 10:47-48.

60

**A744**

The primary purpose of a BIOS is to boot software, including the operating system, on start-up. *See e.g.* exs. 1024 at 50 and 1025 at 74-75. Hipp also discloses a storage server 54 that provides network attached storage (NAS) (Ex. 1004 at 5:35-38). Hipp further describes the capability of the "web server processing card 32" to "boot from LAN" (Ex. 1004 at 9:57-62), where "boot" refers to initial operations a computer undergoes on power-up, which include loading the operating system, and "LAN" is an acronym for "local area network." Ex. 1004 at 4:4-5. At the time the '021 patent was filed, booting remotely over a network was well-known and was even the subject of standardization. *See, e.g.,* Ex. 1015. Additionally, Hipp discusses two example operating systems: Microsoft Windows and Linux. *See* Ex. 1004 at 8:25-30. Taken together, one of ordinary skill in reading the portions of Hipp cited in the claim chart above would recognize that Hipp teaches that "a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot" and that "a CPU module is configured to boot remotely from an OS located in an NAS."

60.    Claim 15 of the '021 patent recites, among other things, that "a CPU module is configured to boot remotely from an OS located in an NAS" and claim limitation 34[b] recites "remotely booting the CPU module using the located OS." These limitations are disclosed in Hipp. As discussed above in connection with

61

**A745**

claim 14, Hipp discloses "boot from LAN" capability, a type of remote booting. Ex. 1015. Booting from a network (such as a LAN) requires that the operating system is obtained from a storage location on the network. Hipp discloses a particular type of network-based storage: a storage server 54 that provides network attached storage (NAS). Ex. 1004 at 5:35-38. Thus, one of ordinary skill in reading Hipp would recognize that Hipp discloses "a CPU module is configured to boot remotely from an OS located in an NAS."

61. Claim 15 and claim limitation 34[c] of the '021 patent each recite that "the computer network appliance is free of a local hard disk drive (HDD)." Hipp discloses this limitation. The only hard disk drives disclosed by Hipp that are part of the disclosed server appliance are drives provided on the "web server processing cards 32." However, Hipp explicitly states that these hard disk drives are optional: "[i]n still another embodiment, web server processing card 32 may be provided without an associated disk drive." Ex. 1004 at 18:54-56. Thus, Hipp discloses at least one embodiment in which the server appliance has no hard disk drive—i.e., "the computer network appliance is free of a local hard disk drive (HDD)."

62. Claims 16 of the '021 patent recites that "remote booting of a CPU module allows the CPU module to run different types of operating systems." Hipp discloses this limitation. As discussed above in conjunction with claims 14 and 15, Hipp discloses remote booting (i.e. "boot from LAN"). Hipp also teaches that the

62

**A746**

web server processing card 32 may run either a Linux or Windows operating system. *See* Ex. 1004 at 8:25-30. Remote booting, such as booting from LAN, provides the ability to run different types of operating systems. *See generally* Ex. 1030. In fact, the ability to run different types of operating systems is a primary advantage of remote booting. *See generally* Ex. 1030 at pp. 4-5 ("Every computer should be able to run under Linux, DOS, Windows 3.1, Windows 95 or Windows NT. One should be able to choose the desired operating system for each session."). Thus, one of ordinary skill in the art would recognize that Hipp teaches that the boot from LAN, which allows running at least two different operating systems. Hipp therefore discloses the additional limitation of claims 16 and 35.

63.    Claim 17 of the '021 patent recites that the "effects of a lack of a local HDD include increased mean time between failure (MTBF) and decreased mean time to repair (MTTR) of the computer network appliance." This limitation is inherent in Hipp. As an initial matter, the '021 patent describes increased MTBF and decreased MTTR as simple consequences of the absence of a local hard disk drive (HDD). Ex. 1001 at 2:27-34. The '021 patent describes a well-understood characteristic of HDDs. Because HDDs typically include several moving parts, it is well known that they are prone to fail more quickly than electronic components that lack moving parts (such as processors and semiconductor memory). *See* Ex. 1026 at 28 (Table 2-2 and "Both in hardware and maintenance, disks and

63

communications are the most probable sources of outage"). Hipp discloses that "web server processing card 32 may be provided without an associated disk drive" (Ex. 1004 at 18:54-56), and therefore teaches an embodiment that lacks a local HDD. In this embodiment, the effects of increased MBTF and decreased MTTR would be inherent, as those are simply consequences of the absence of a HDD.

64.   Claim 19 of the '021 patent recites that "an ethernet connection is a switched fast ethernet connection." Hipp discloses this limitation. Specifically, Hipp discloses "switch chip 145 [which] may include an optional twelve or twenty-four port 10/100 Base T switch." Ex. 1004 at 12:49-52. As discussed in the section on claim construction above, "100 Base-T" is a term that refers to the fast ethernet standards; the "100" refers to the 100 Mbit/s speed of the fast ethernet connection. Ex. 1025 at 310. Thus, Hipp discloses fast ethernet.

65.   Claim limitation 20[e] of the '021 patent recites, among other things, that a "dedicated ethernet path ... provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module." This limitation is disclosed in Hipp. The '021 patent describes a system in which the microcontroller module allows remote polling of the CPU module by providing a "dedicated ethernet path" between the microcontroller module and a "system administrator:"

The microcontroller module uses a dedicated ethernet path separate from the network data I/O to remotely poll the health of the power

64

**A748**

module 106, the ethernet switch module 108 and the CPU modules 102(*a*)-102(*e*). ... ***The dedicated ethernet path further informs the system administrator*** of the failure so as to facilitate a timely fix of the switch or a module on the computer network appliance.

Ex. 1001 at 7:62 - 8:14 (emphasis added).

66.    Similarly, Hipp discloses a "remote management system 70 [that] include[s] the ability to monitor and manage components of network 30.  Various measurements and characteristics regarding the functionality and operation of network 30 are collected, stored, analyzed and maintained using single board computer [160]."  Ex. 1004 at 20:9-14; 20:64-66 ("[S]ingle board computer may transfer the information it collects to remote management system 70").  Hipp further discloses that the microcontroller module ("management network interface 49," which includes "single board computer 160") and remote management system 70 communicate over an Ethernet connection.  Ex. 1004 at 14:49-51 ("Communication between single board computer 160 and remote management system 70 occurs via Ethernet connector 186."); Fig. 1 ("communication link 71"); Fig. 7 (reproduced below).



FIG. 7

67.    Further, Hipp discloses that the single board computer 160, which is part of the management network interface, "may autonomously detect a CPU which is about to fail" (Ex. 1004 at 20:53-54) and that "remote management system 70 may monitor the performance of a particular component relative to identical or similar components within network 30, in order to detect and/or predict trouble or potential failures" (Ex. 1004 at 22:46-49).    That the single board computer 160 and remote management system 70 of Hipp can detect that a module has failed indicates active polling of the modules, as opposed to other monitoring techniques that rely on the modules to self-report problems.    After all, a failed module cannot report a problem.    Hipp therefore teaches claim limitation 20[e].

68.    Claim 22 of the '021 patent recites that "the microcontroller module polls the CPU module on the status of an OS."    This limitation is disclosed in Hipp.    As discussed above in conjunction with claim limitation 20[e], Hipp

66

**A750**

pins 310. Ex. 1007 at 4:27-32. "This allows for sequential connection of ground pins 304, power pins 306, DIFFSENS signal pins 308, and signal pins 310, in that order, during hot plugging." Ex. 1007 at 4:32-34. In other words, Gasparik discloses connecting ground pins 304, after which power pins 306 are connected, after which signal pins 310 are connected.

80.    Claim 34 of the '021 patent depends from claim 30; claim 35 and claim 36, in turn, each depend from claim 34. As shown in the Hipp claim chart (and the further discussion of Hipp's disclosure of claims 14-17, above), Hipp discloses the additional limitations of claims 34-36. Thus, these claims are also obvious over Hipp in view of Gasparik.

## B. Claims 1-4, 6-19, 30, and 34-36 of the '021 patent are unpatentable in view of Bottom and/or combinations of Bottom with other references

### (1) Claims 1-4, 6-9, 13, 18, and 19 are anticipated by Bottom

81.    Bottom discloses, among other things, a modular server system 100 that includes:

- Hot-swappable CPU modules ("server blades" 110)

- Hot-swappable Ethernet switch modules (Ethernet "switch blades" 120)

- Hot-swappable power modules ("power supplies" 130)

- A microcontroller module (a server blade may be "designated as the Active Manager," as discussed at Ex. 1006 at 5:6-24)

80

**A764**

# Linux Remote−Boot mini−HOWTO:

# Linux Remote-Boot mini-HOWTO: Configuring Remote-Boot Workstations with Linux, DOS, Windows 95/98 and Windows NT

## Marc Vuilleumier Stückelberg, David Clerc

v3.19, February 1999

*This document describes how to set up a very robust and secure server-based configuration for a cluster of PCs, allowing each client to choose at boot-time which operating system to run. The key of this configuration is a bootprom based program, which let the user choose at boot time one of several boot images. This configuration is applicable using InCom TCP/IP Bootprom (add-on for most network cards) or any PXE-compliant Boot ROM (ready-to-use in most recent PC with built-in network cards). The most up-to-date version of this document, with hypertext links to downloadable software and other related materials, can be found at the address*
*http://cuiwww.unige.ch/info/pc/remote-boot/howto.html. Linuxdoc-SGML, DVI and PostScript versions are available in the same directory. If you are interested in getting info on further developpments, send an E-mail to David.Clerc@cui.unige.ch.*

## 1. Disclaimer and Copyrights

## 2. What has changed...

- 2.1 ...since version 2.x ?
- 2.2 ...since version 3.0 ?

## 3. Introduction

- 3.1 Boot ROM and Hard-disk
- 3.2 The Network
- 3.3 How it Works
- 3.4 Related non-commercial documentations

## 4. The Configuration How-To

- 4.1 Server-side configuration
- 4.2 Client-side configuration
- 4.3 Setting Up the Boot Process
- 4.4 Setting Up Linux
- 4.5 Setting up DOS 6 and Windows 3.1
- 4.6 Setting up Windows 95
- 4.7 Setting up Windows NT
- 4.8 Troubleshooting (FAQ)

Linux Remote-Boot mini-HOWTO: Configuring Remote-Boot Workstations with Linux, DOS, Windows 95.

A1021

In our latest configuration, we do not any more use IPX. There is a single Unix server (which could be Linux as well as a SUN), sharing software and user files using NFS for Linux clients and using SMB (NetBIOS) over TCP/IP for Dos and Windows clients. In this way, we have a single home directory used by all operating systems.

# 3.3 How it Works

1. When a client PC is turned on, it first performs the traditional system checks before the TCP/IP Bootprom or PXE Boot ROM takes the control.
2. The bootprom issues a BOOTP/DHCP request in order to get its IP configuration parameters.
3. If the server knows the PC issuing the request, it will send back a BOOTP/DHCP reply with informations such as the client's IP address, the default gateway, and which bootdisk image to use.
4. In case of a PXE boot ROM, there might be some more exchanges between the client and the server to determine installation parameters.
5. The bootprom then downloads the boot image from the server using the TFTP protocol. The boot image happens to be a small program called `bpbatch`, our boot−time batch file interpreter.
6. The batch interpreter is started. At this time, it is almost alone in the computer memory. There is no operating system loaded, except the preboot execution environment (offered by the Boot ROM).
7. The batch interpreter look in the BOOTP/DHCP reply for command−line options, and in particular for the name of the batch to execute.
8. According to the instructions in the batch file, it will for instance:
    1. Load a national keyboard mapping
    2. Authenticate the user according to a remote server (Unix, Radius or Windows NT)
    3. Let the user choose between the available operating systems
    4. According to the operating system choosen, repartition the hard−disk and quick−format some partitions
    5. Check if an up−to−date compressed image of the selected OS is present at the end of the disk. If not, it download it using TFTP
    6. Uncompress the selected OS to the main partition
    7. If the selected OS is Linux, load a kernel and start it
    8. If the selected OS is DOS or Windows, simply let the computer boot on its fresh new hard−disk

    For **DOS and Windows 3.1**, we use the freely available Microsoft LanManager for DOS (search the network for the mirror nearest to you; the distribution consists of three files named `disk1` to `disk4`) as SMB client. Microsoft LanManager supports dynamic configuration using DHCP. After logging in, the user is faced to DOS, and can start Windows 3.1 by typing the traditional `win` command. Note that at this point, DOS and Windows 3.1 appear to be installed locally. For **Windows 95 and Windows NT**, we also use Microsoft SMB client (called *Client for the Microsoft Network*), that supports dynamic configuration using DHCP. We reduce network load using [Shared LAN Cache](#), a nice and powerful network−to−disk cache program.

Students computers can be turned off *the hard way* at any time without risks, since the hard disk is reinitialized at each start.

For "safe" computers (ie. for assistants computers), once the computer has been booted once using the above described system, the boot script simply redirect the boot to the local hard−disk, without cleaning it again. This allow users to leave data on their local hard disk. But whenever the configuration gets corrupted, the user can simply choose from the boot menu in order to have a fresh installation.

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE PATENT TRIAL AND APPEAL BOARD

DELL, INC.,

     Petitioner,

                           Case IPR2013-00440

v.                        Patent 6,948,021 B2

ACCELERON, LLC,

     Patent Owner.


VIDEO DEPOSITION OF WILLIAM O. PUTNAM

May 15, 2014

9:01 a.m.

Thomas Horstemeyer, LLP

400 Interstate Parkway SE

Suite 1500

Atlanta, Georgia


Jennifer A. Davis, RPR, CRR, CCR-2496

DELL 1037
Dell Inc. v. Acceleron, LLC
IPR 2013-00440

William Putnam, 5/15/2014
Dell, Inc. v. Acceleron, LLC

```
 1              INDEX TO EXHIBITS                    08:58:06

 2    EXHIBIT    DESCRIPTION                  PAGE    08:58:06

 3    #1         Notice of deposition          7      08:58:06

 4    #2         Declaration of William O. Putnam  12 08:58:06

 5    #3         Supplemental declaration of          08:58:06

 6               William O. Putnam            46      08:58:06

 7    #4         Patent Owner Response and Opposition 08:58:06

 8               to Petition                  48      08:58:06

 9    #5         United States Patent No. 6,948,021 B2 54  08:58:06

10    #6         United States Patent No. 6,757,748 B1 75  08:58:06

11    #7         Microsoft Computer Dictionary, Fourth 08:58:06

12               Edition, excerpt            96      08:58:06

13    #8         How Computers Work, Millennium Edition, 08:58:06

14               excerpt                     102     08:58:06

15    #9         Plaintiff's Response Brief Regarding 08:58:06

16               Claim Construction and in Opposition 08:58:06

17               to Defendants' Motion for Summary   08:58:06

18               Judgment of Invalidity Based on      08:58:06

19               Indefiniteness              132     08:58:06

20    #10        McGraw-Hill Dictionary of Scientific 08:58:06

21               and Technical Terms, Sixth Edition,  08:58:06

22               excerpt                     208     08:58:06

23

24

25
                                                2
```

| | | |
|---|---|---|
| 1 | VIDEOGRAPHER:  We are on the record, and | 09:02:43 |
| 2 | the time is approximately 9:01 a.m.  This is the | 09:02:43 |
| 3 | beginning of the videotaped deposition for William | 09:02:46 |
| 4 | Putnam. | 09:02:51 |
| 5 | Will counsel present please identify | 09:02:51 |
| 6 | themselves and who they represent. | 09:02:53 |
| 7 | MS. HEYMAN:  Paula Heyman with Baker Botts | 09:02:55 |
| 8 | for Dell.  And also with me is Cat Garza. | 09:02:56 |
| 9 | MR. CRAIN:  Andrew Crain of Thomas | 09:03:00 |
| 10 | Horstemeyer -- also Vivek Ganti of Thomas | 09:03:01 |
| 11 | Horstemeyer and Robert Gravois of Thomas | 09:03:03 |
| 12 | Horstemeyer -- for Acceleron and the witness. | 09:03:06 |
| 13 | VIDEOGRAPHER:  Thank you, Counsel. | 09:03:12 |
| 14 | Will the court reporter please swear in | 09:03:13 |
| 15 | the witness. | 09:03:14 |
| 16 | WILLIAM O. PUTNAM, | 09:03:15 |
| 17 | having been first duly sworn, was examined and | 09:03:15 |
| 18 | testified as follows: | 09:03:15 |
| 19 | EXAMINATION | 09:03:15 |
| 20 | BY MS. HEYMAN: | 09:03:25 |
| 21 | Q.   Good morning.  We met earlier, but can you | 09:03:26 |
| 22 | please state your name for the record. | 09:03:27 |
| 23 | A.   Yes.  My name is William Putnam. | 09:03:30 |
| 24 | Q.   Okay.  And I think that you've been | 09:03:32 |
| 25 | through some depositions before, but I just wanted | 09:03:35 |

5

| | | |
|---|---|---|
| 1 | Q.    -- that? | 01:17:39 |
| 2 | A.    -- that. | 01:17:39 |
| 3 | Q.    And around line maybe 31 it starts | 01:17:40 |
| 4 | discussing system 700.  System 700 is illustrated in | 01:17:47 |
| 5 | Figure 7.  Correct? | 01:17:53 |
| 6 | A.    That's what it says here.  "Figure 7 | 01:17:58 |
| 7 | illustrates a system 700." | 01:18:00 |
| 8 | Q.    Okay.  Based on the description here in | 01:18:05 |
| 9 | the paragraph of Figure 7, would that help you | 01:18:09 |
| 10 | determine whether the NAS 708 is located outside of | 01:18:16 |
| 11 | the cluster network appliances 706 in Figure 7? | 01:18:23 |
| 12 | A.    It's somewhat helpful.  Not entirely | 01:18:30 |
| 13 | dispositive on its own. | 01:18:34 |
| 14 | Q.    Why is it not entirely dispositive? | 01:19:07 |
| 15 | A.    Well, it doesn't actually say in that | 01:19:11 |
| 16 | paragraph where the NAS 708 is located.  So this | 01:19:13 |
| 17 | paragraph, this text, is not entirely dispositive of | 01:19:19 |
| 18 | that question.  As I said, the figure shows an | 01:19:22 |
| 19 | illustration which suggests that at least it could | 01:19:27 |
| 20 | be in a separate enclosure.  That would make sense | 01:19:29 |
| 21 | in some embodiments. | 01:19:35 |
| 22 | On the other hand, we're talking about | 01:19:39 |
| 23 | with a network appliance with an internal network. | 01:19:39 |
| 24 | So there might be other possibilities, but I don't | 01:19:43 |
| 25 | think I've fully considered that enough to tell you | 01:19:47 |

118

| | | |
|---|---|---|
| 1 | if that would be really feasible. | 01:19:50 |
| 2 | But a network-attached storage is | 01:19:55 |
| 3 | generally accessed over a network.  It makes sense | 01:19:58 |
| 4 | for it to be external to the computer network | 01:20:00 |
| 5 | appliance in the context of this patent. | 01:20:04 |
| 6 | Q.   You said that the -- you made the | 01:20:12 |
| 7 | statement "That would make sense in some | 01:20:18 |
| 8 | embodiments" in discussing that the NAS 708 is | 01:20:20 |
| 9 | located outside of the computer network appliances | 01:20:25 |
| 10 | 706 in Figure 7.  I believe that was your testimony. | 01:20:30 |
| 11 | MR. CRAIN:  Object to form. | 01:20:34 |
| 12 | A.   Well, that's a -- perhaps a paraphrase. | 01:20:35 |
| 13 | What I'm getting at is that the system 700 is | 01:20:38 |
| 14 | characterized as the private network or sometimes a | 01:20:41 |
| 15 | back-end network, and it has a number of elements. | 01:20:44 |
| 16 | One of which is the network-attached storage.  So | 01:20:48 |
| 17 | that is an example of embody -- an embodiment of the | 01:20:51 |
| 18 | type I was referring to. | 01:20:56 |
| 19 | BY MS. HEYMAN: | 01:21:00 |
| 20 | Q.   Are there embodiments disclosed in the | 01:21:00 |
| 21 | '021 patent where the network-attached storage would | 01:21:03 |
| 22 | be located inside the cluster network appliances? | 01:21:07 |
| 23 | MR. CRAIN:  Object to form. | 01:21:12 |
| 24 | A.   I don't recall seeing an embodiment | 01:21:13 |
| 25 | described that would place the network-attached | 01:21:15 |

119

| | | |
|---|---|---|
| 1 | storage inside.  But then I did see, as I said, the | 01:21:17 |
| 2 | one that suggests it's external.  I don't recall | 01:21:30 |
| 3 | seeing a description of when it was inside the | 01:21:32 |
| 4 | network appliance. | 01:21:36 |
| 5 | BY MS. HEYMAN: | 01:22:09 |
| 6 | Q.   Okay.  Moving on to Claim 15. | 01:22:10 |
| 7 | A.   Okay.  I found that. | 01:22:32 |
| 8 | Q.   Okay.  Claim 15 states, "wherein a CPU | 01:22:33 |
| 9 | module is configured to boot remotely from an OS | 01:22:41 |
| 10 | located in an NAS, and wherein the computer network | 01:22:45 |
| 11 | appliance is free of a local hard disk drive (HDD)." | 01:22:48 |
| 12 | Did I read that right? | 01:22:56 |
| 13 | A.   Did you start at the "wherein"?  I | 01:22:58 |
| 14 | think -- maybe I missed the first part, but -- | 01:23:01 |
| 15 | Q.   Yes. | 01:23:04 |
| 16 | A.   -- I heard you from there.  So there's a | 01:23:04 |
| 17 | little bit of a preamble there referencing Claim 1, | 01:23:07 |
| 18 | but for the part -- the portion that you read | 01:23:09 |
| 19 | sounded right. | 01:23:11 |
| 20 | Q.   Okay.  And the "NAS" referenced in | 01:23:11 |
| 21 | Claim 15 -- is that a network-attached storage? | 01:23:17 |
| 22 | MR. CRAIN:  Object to form. | 01:23:20 |
| 23 | A.   It's my understanding that that would be a | 01:23:22 |
| 24 | reasonable interpretation of the claim that the NAS | 01:23:27 |
| 25 | referred to in Claim 15 would be a network-attached | 01:23:29 |

120

| | | |
|---|---|---|
| 1 | storage as described in the specification. | 01:23:32 |
| 2 | BY MS. HEYMAN: | 01:23:43 |
| 3 | Q.   If a computer is free of a local hard disk | 01:23:44 |
| 4 | drive, in your understanding, would there need to be | 01:23:52 |
| 5 | some type of remote storage from which that computer | 01:23:58 |
| 6 | would boot? | 01:24:13 |
| 7 | MR. CRAIN:  Object to form.  Foundation. | 01:24:15 |
| 8 | A.   Not necessarily. | 01:24:18 |
| 9 | BY MS. HEYMAN: | 01:24:25 |
| 10 | Q.   Where would the operating system be | 01:24:25 |
| 11 | stored -- or excuse me. | 01:24:32 |
| 12 | Where would an operating system to boot | 01:24:33 |
| 13 | from be stored on a computer network appliance that | 01:24:35 |
| 14 | does not have a hard disk drive? | 01:24:45 |
| 15 | MR. CRAIN:  Object to form.  Foundation. | 01:24:47 |
| 16 | A.   There are a number of places that you | 01:24:49 |
| 17 | could store an operating system or a boot file for | 01:24:50 |
| 18 | an operating system. | 01:24:54 |
| 19 | BY MS. HEYMAN: | 01:24:54 |
| 20 | Q.   What are those places? | 01:24:55 |
| 21 | A.   Well, I could give you some examples.  I | 01:24:57 |
| 22 | don't know that it would be a conclusive -- | 01:24:59 |
| 23 | all-inclusive list, but one example might be in | 01:25:03 |
| 24 | firmware on the computer.  Another might be in some | 01:25:06 |
| 25 | solid state memory. | 01:25:10 |

121

| | | |
|---|---|---|
| 1 | Q.   Does the '021 patent disclose the use of | 01:25:21 |
| 2 | solid state memory? | 01:25:25 |
| 3 | MR. CRAIN:  Object to form. | 01:25:28 |
| 4 | A.   After a form, there are a number of | 01:25:29 |
| 5 | devices shown on the private network that are | 01:25:31 |
| 6 | secondary storage and representative of those types | 01:25:35 |
| 7 | of memory systems.  I think there's a tape drive and | 01:25:37 |
| 8 | a secondary hard drive and some other things. | 01:25:44 |
| 9 | There's also memory and a work station. | 01:25:47 |
| 10 | So those are some additional examples, as | 01:25:50 |
| 11 | well as the network-attached storage shown on that | 01:25:51 |
| 12 | network, that could potentially be storage locations | 01:25:53 |
| 13 | for boot files or operating systems that one could | 01:25:59 |
| 14 | use. | 01:26:03 |
| 15 | BY MS. HEYMAN: | 01:26:18 |
| 16 | Q.   I guess my question was -- I asked about | 01:26:18 |
| 17 | solid state memory.  Are any of those examples that | 01:26:21 |
| 18 | you just gave solid state memory? | 01:26:23 |
| 19 | MR. CRAIN:  Object to form. | 01:26:27 |
| 20 | A.   Some of the memory chips that are used in | 01:26:27 |
| 21 | that network are used in solid state memory devices | 01:26:30 |
| 22 | specifically today that you can buy.  So, yes, I | 01:26:34 |
| 23 | think some of them would be considered to include | 01:26:36 |
| 24 | solid state memory. | 01:26:39 |
| 25 | | |

122

| | | |
|---|---|---|
| 1 | network, which is inside the switches and -- well, | 01:30:29 |
| 2 | it's located closer to the network appliances. | 01:30:36 |
| 3 | So I think my previous answer may have | 01:30:41 |
| 4 | sort of confused the two, and, now that I think | 01:30:44 |
| 5 | about it, I don't think it was accurate. | 01:30:46 |
| 6 | Q.   Your previous answer you think may have | 01:30:49 |
| 7 | been based on Hipp? | 01:30:51 |
| 8 | A.   No.  I think all of the discussion we had | 01:30:52 |
| 9 | related to that Figure 7 -- I'd have to go back and | 01:30:55 |
| 10 | look at it to see where I might have confused the | 01:30:58 |
| 11 | two, because I do remember making reference to some | 01:31:00 |
| 12 | of the -- to the private network of Hipp and some of | 01:31:04 |
| 13 | the devices on there.  But you actually were asking | 01:31:08 |
| 14 | about the '021 patent, and, because we've been going | 01:31:10 |
| 15 | back and forth, I answered incorrectly. | 01:31:15 |
| 16 | Q.   Okay.  Thank you for clearing that up. | 01:31:17 |
| 17 | But back to the Web server processing | 01:31:22 |
| 18 | card.  That has a CPU.  Correct? | 01:31:25 |
| 19 | MR. CRAIN:  Object to form. | 01:31:29 |
| 20 | A.   I believe in the Hipp patent the Web | 01:31:30 |
| 21 | server processing cards are described as having a | 01:31:34 |
| 22 | CPU. | 01:31:36 |
| 23 | BY MS. HEYMAN: | 01:31:48 |
| 24 | Q.   In the Hipp patent -- I think that's the | 01:31:49 |
| 25 | one you have in front of you now -- if you go to | 01:31:52 |

125

| | | |
|---|---|---|
| 1 | Column 5, line 35, and it starts with the -- the | 01:31:57 |
| 2 | sentence starting with "Storage server 54."  Do you | 01:32:20 |
| 3 | see that? | 01:32:23 |
| 4 | A.    I believe so. | 01:32:23 |
| 5 | Q.    Is this sentence maybe what you were | 01:32:28 |
| 6 | referring back to in your previous answer with | 01:32:32 |
| 7 | respect to the Figure 7 of the '021 patent -- | 01:32:35 |
| 8 | A.    Well, it may have been -- | 01:32:40 |
| 9 | Q.    -- or -- | 01:32:41 |
| 10 | A.    -- this section.  Beginning at about | 01:32:41 |
| 11 | line 22 is directed to portions of the private | 01:32:43 |
| 12 | network in the Hipp patent.  And that's one of the | 01:32:47 |
| 13 | places that I was thinking about and the place that | 01:32:53 |
| 14 | the network-attached storage is described as | 01:32:56 |
| 15 | residing in Hipp.  So it might have been. | 01:33:00 |
| 16 | Again, I would have to go back and look at | 01:33:02 |
| 17 | the questions and the answers to see exactly what | 01:33:03 |
| 18 | corresponds.  I think I kind of made a hash of the | 01:33:08 |
| 19 | two patents and the two figures and the two networks | 01:33:11 |
| 20 | in responding to your question.  So I think the | 01:33:15 |
| 21 | whole discussion is probably suspect in terms of | 01:33:16 |
| 22 | accuracy.  I'd have to go back and look at it. | 01:33:22 |
| 23 | Q.    Okay.  Sticking with Hipp right now.  Take | 01:33:30 |
| 24 | a look at Column 9, if you could, and around | 01:33:39 |
| 25 | line 61.  It states -- there is a sentence there | 01:33:45 |

126

| | | |
|---|---|---|
| 1 | that says, "Each chip set 90, 91, and 92 also | 01:33:55 |
| 2 | includes 'boot from LAN' capability." | 01:34:01 |
| 3 | Did I read that correct? | 01:34:06 |
| 4 | A.    I believe so. | 01:34:07 |
| 5 | Q.    So Hipp discloses that the chip sets 90, | 01:34:12 |
| 6 | 91, and 92 include boot from LAN. | 01:34:17 |
| 7 | MR. CRAIN:  Object to form. | 01:34:22 |
| 8 | A.    Well, the literal words of this sentence | 01:34:25 |
| 9 | at 61 -- "Each chip set . . . also includes boot | 01:34:29 |
| 10 | from LAN capability" -- would suggest that they're | 01:34:33 |
| 11 | capable of doing that. | 01:34:36 |
| 12 | BY MS. HEYMAN: | 01:34:44 |
| 13 | Q.    Based on the disclosure of Hipp, one of | 01:34:44 |
| 14 | ordinary skill in the art would understand that | 01:34:51 |
| 15 | network-attached storage would be used by boot from | 01:34:53 |
| 16 | LAN to boot a Web processing -- Web server | 01:35:03 |
| 17 | processing card.  Correct? | 01:35:09 |
| 18 | MR. CRAIN:  Object to form. | 01:35:11 |
| 19 | A.    No, I don't think I could agree with that. | 01:35:12 |
| 20 | BY MS. HEYMAN: | 01:35:17 |
| 21 | Q.    Why not? | 01:35:17 |
| 22 | A.    Well, you said "would," for one reason. | 01:35:19 |
| 23 | In my previous answer when I said this sentence | 01:35:22 |
| 24 | suggests that a Web server processing card would be | 01:35:25 |
| 25 | able to do that, I was referring to boot from LAN, | 01:35:32 |

127

| | | |
|---|---|---|
| 1 | which means boot over a local area network. | 01:35:34 |
| 2 | Now, there are many places and many | 01:35:37 |
| 3 | configurations that you could boot a computer from | 01:35:39 |
| 4 | over a local area network.  So certainly not limited | 01:35:42 |
| 5 | to a network-attached storage and not really even | 01:35:46 |
| 6 | suggestive of one. | 01:35:50 |
| 7 | Q.   But it's possible to boot from LAN using a | 01:35:54 |
| 8 | network-attached storage.  Correct? | 01:35:58 |
| 9 | MR. CRAIN:  Object to form. | 01:36:01 |
| 10 | A.   That would depend on a lot of factors. | 01:36:02 |
| 11 | BY MS. HEYMAN: | 01:36:06 |
| 12 | Q.   What factors? | 01:36:06 |
| 13 | A.   Well, among others, the configuration of | 01:36:09 |
| 14 | the network, the type of CPU, the type of interface | 01:36:11 |
| 15 | card, the type of network-attached storage, the | 01:36:15 |
| 16 | features it had, the operating system, details of | 01:36:17 |
| 17 | the boot file, and probably more. | 01:36:24 |
| 18 | Q.   Was network-attached storage new in 2001? | 01:36:53 |
| 19 | A.   To the best of my recollection, it was | 01:37:04 |
| 20 | relatively new, but there had been concepts similar | 01:37:06 |
| 21 | to that previously. | 01:37:14 |
| 22 | Q.   Was boot from LAN new in 2001? | 01:37:19 |
| 23 | A.   No. | 01:37:23 |
| 24 | Q.   Okay.  I'd like to take a look at the -- | 01:38:09 |
| 25 | back to the '021 patent and focus on Claim 20. | 01:38:15 |

128

1          UNITED STATES PATENT AND TRADEMARK OFFICE

2            BEFORE THE PATENT TRIAL AND APPEAL BOARD

3                         DELL INC.

4                        PETITIONERS

5                            V.

6                      ACCELERON, LLC,

7                       Patent Owner

8

9                    Case IPR2013-00440

10                   Patent 6,948,021 BE

11        -----------------------------------------

12           VIDEOTAPED AND ORAL DEPOSITION OF

13                     ROBERT HORST

14                    MARCH 19, 2014

15        -----------------------------------------

16           VIDEOTAPED AND ORAL DEPOSITION OF ROBERT

17   HORST, produced as a witness at the instance of the

18   RESPONDENT, and duly sworn, was taken in the

19   above-styled and numbered cause on the 19th of March,

20   2014, beginning at 9:06 a.m. and concluding at

21   6:04 p.m., before Karen Geddes, CSR in and for the State

22   of Texas, reported by machine shorthand, at the offices

23   of Baker Botts, 98 San Jacinto Avenue, Suite 1500,

24   Austin, Texas, pursuant to the Federal Rules of Civil

25   Procedure.

1   the next moment.  So I prefer, if we can, to let's go

2   ahead and go back to wherever it was that you may have

3   recalled some information and then once we feel like we

4   have exhausted that we can jump back to where we may

5   have been at the time; is that fair?

6       A.  Yes.

7       Q.  Okay.  Great.  When answering the questions,

8   you may think of some documents that may be beneficial

9   to you answering questions, such as your declaration and

10  some other documents that perhaps have been filed in

11  this inter partes review.  If you think a document will

12  be helpful to your response of a question, if you'd let

13  me know, I may have it here and I may be able to share

14  it with you in order to help you fully frame a response.

15  Is that okay?

16      A.  Yes.

17      Q.  Dr. Horst, can you think of any reason today

18  that it might make it difficult for you to understand

19  and answer the questions that will be asked of you

20  today?

21      A.  No.

22      Q.  Is there any reason that you can think of,

23  Dr. Horst, why you may not be able to answer the

24  questions that will be posed to you truthfully and fully

25  today?

1       A.  No.

2       Q.  Do you understand that you are under oath?

3       A.  Yes.

4       Q.  I'd like to hand you what has previously been

5   marked as Horst Exhibit 1.

6               MR. CRAIN:  Counsel, I believe you have

7   that.

8               MS. HEYMAN:  I do.

9   BY MR. CRAIN:

10      Q.  Dr. Horst, would you please take a moment to

11  review Exhibit No. 1 and let me know when you are ready

12  to proceed.

13      A.  Yes, I'm ready.

14      Q.  Dr. Horst, can you please identify if you are

15  able to, what has been marked as Exhibit No. 1?

16      A.  This is a document that's describing the

17  proceedings today.

18      Q.  Do you see on the front page of Exhibit No. 1

19  the text that is in all caps and highlighted -- not

20  highlighted -- in bold text and underlined?

21      A.  Patent Owners Notice of Deposition of

22  Dr. Robert Horst.

23      Q.  Do you recall ever having seen a copy of

24  Exhibit No. 1 before?

25      A.  I don't recall seeing this exact document

1      Q.  Do you understand the Hipp patent to disclose a

2  chassis?

3      A.  Yes.

4      Q.  Can you identify what that appears to be to

5  you?  You are welcome to refer to your declaration, if

6  that would be of assistance to you.

7      A.  Yeah.  Here it is.  Server chassis 38, which is

8  shown in Figure 10.

9      Q.  Figure 10.  In Figure 10, do you see the item

10  that's referenced as 260?

11      A.  Yes.

12      Q.  I understand that the Hipp patent references

13  that as box build 260.  Does that sound familiar to you?

14      A.  Yes.

15      Q.  Is box build 260 part of the chassis?

16      A.  Yes, I would say that's part of the chassis.

17      Q.  If you go back and look at Figure 1, you see

18  item 36, I believe that's referred to in column 16 of

19  the Hipp patent as "base 36"?

20      A.  Yes, I see that.

21      Q.  Is base 36 part of chassis 38 according to your

22  understanding?

23      A.  It's certainly part of what I would call the

24  broad definition of "chassis."  In the quote that I give

25  on page 35 of my report is "server chassis 38 includes a

1  box build 260 having a base 36 forming a lower portion
2  thereof."
3           So that says that the base 36 is part of
4  the box build which is part of the chassis.
5      Q.  And it goes on to say -- well, the next
6  sentence talks about how it's fabricated from plated
7  steel and then the following sentence says, "An
8  articulating door 262 is coupled to box build 260."
9           Is articulating door 262 part of chassis?
10     A.  The articulating door can be considered part of
11  the chassis or it can be considered something that's
12  added or connected to the chassis.
13     Q.  Well, what is your understanding of how it's
14  disclosed in the Hipp patent?
15     A.  The -- the way -- since it's connected to the
16  chassis I would consider it -- or connected to the rest
17  of the mounting hardware, I would consider that part of
18  the chassis.
19     Q.  In claim 3, looking a little further down on
20  page 35, it references the term "caddies."
21           What is your understanding of the term
22  "caddy" -- and let me back up a minute.
23           Do you have a general understanding of a
24  caddy with respect to computer architecture and design?
25     A.  The word "caddy" by itself just means carrier

1  and in the context of a computer system I regard a caddy

2  as some kind of mechanical structure that carries

3  components and mounts those components.

4      Q.  Can you think of some examples of caddies from

5  general computer architecture and design?

6      A.  Sure.

7              Is there a question?

8      Q.  I'm sorry.  Yes.  What are some of those

9  examples?

10     A.  Caddies can be used to mount disk drives in

11 cabinets, they can be used to mount PC boards, they can

12 be used to mount fans, so there's a lot of different

13 examples of caddies.

14     Q.  So is a caddy actually some piece of physical

15 structure?

16             MS. HEYMAN:  Objection to form.

17             THE WITNESS:  The caddy is I consider a

18 mechanical element, so it's something that components

19 are attached to.

20 BY MR. CRAIN:

21     Q.  If We go back to Exhibit 9 and turn to page 70,

22 we're still looking at the Microsoft Computer

23 Dictionary, Fourth Edition, and do you see in the

24 right-hand column a definition for the term "caddy"?  Do

25 you see that?

**DELL INC. v. ACCELERON, LLC**
**Robert Horst on 03/19/2014**                    Page 139

1      A.  Which page are you on?

2      Q.  On page 70, right column about middle of the

3  page.

4      A.  Oh, yes, I see it.

5      Q.  Take a moment to read that, if you would,

6  please.

7      A.  It says a plastic carrier that holds a CD ROM

8  and is inserted into a CD ROM drive.  Some PCs

9  especially older models have CD ROM drives that require

10  the use of a caddy.  Most current CD ROM drives do not

11  require a caddy.

12      Q.  Okay.  So we see a specific implementation of a

13  caddy with respect to CD ROM drive.  Are you familiar

14  with what is being talked about here as it pertains to

15  CD ROM drives?

16      A.  Yes.  This is something that used to be used to

17  mount CD ROM drives, haven't been used for a while now.

18      Q.  Right.  Is this definition -- I mean, it uses

19  the term "carrier."  I think you had used that yourself

20  as the definition of a caddy?

21      A.  I said that a caddy is a carrier, yes.

22              (Exhibit 10 was

23              marked for identification.)

24  BY MR. CRAIN:

25      Q.  Dr. Horst, I've given you a document that has

1  been -- actually it's a collection of documents that's

2  been marked as Exhibit 10.

3              Please take a few moments to look at those

4  and then I'd like to ask you some questions.

5              MS. HEYMAN:  Andrew, could I have a

6  standing objection that this is outside the scope of his

7  declaration?

8              MR. CRAIN:  That's -- I mean, it's

9  certainly your objection.  I would disagree with that.

10             MS. HEYMAN:  I mean, that's fine, but can I

11 just -- so I don't have to repeat it every single

12 question?

13             MR. CRAIN:  Sure.

14             THE WITNESS:  I haven't seen this document

15 before, but I have looked through it.

16 BY MR. CRAIN:

17    Q.  Okay.  Are you familiar with what may be known

18 as a hard drive caddy?

19    A.  I'm familiar with many different ways of

20 mounting disk drives in a cabinet and most of those

21 could be considered caddies, yes.

22    Q.  And I think you'd mentioned disk drive as an

23 instance where you might have a caddy earlier, so I

24 guess the question I have for you with respect to

25 Exhibit 10, can you at least identify what the first

1  four pages of Exhibit 10 appear to be to you?

2      A.  These are a couple different ways of mounting

3  disk drives, so there are a couple different types of

4  rails that are attached to the disk drive for mounting

5  in a cabinet.

6      Q.  Where would the disk drive go, according to

7  your understanding, if this means anything to you?

8      A.  The disk drive is mounted between those two

9  side rails in this type of caddy.

10      Q.  So on the first page of Exhibit 10, do you

11  agree that the image depicted there is an example of a

12  hard drive tray caddy?

13      A.  Yes.  That could be called a caddy for a disk

14  drive.

15      Q.  And you used the term "carrier" also in

16  connection with caddy.  How would the notion of a

17  carrier work with what we see in Exhibit 10 on the first

18  page?

19      A.  When the disk drive is attached to those side

20  rails, the rails carry the disk drive.

21      Q.  Would you turn to the third page in -- well,

22  the first four pages are front and back, so it would be

23  technically the fifth page in.  The page that looks like

24  this (indicating).

25      A.  Yes.  That's the page titled "Dell F238F" --

1  and so on -- "Caddy."

2      Q.  Does the image in the center of the page appear

3  to be recognized by you as another example of a hard

4  drive caddy?

5      A.  Yes.  This is another type of hard drive caddy.

6      Q.  From your observations as one of ordinary skill

7  in the art, what differences do you see between the one

8  shown on the first page and the one shown as Dell F238F?

9      A.  It's hard to see that image carefully, but it

10  at least has a bottom plate where the other one only had

11  side rails.

12      Q.  Would you turn further back to a page that has

13  the heading "Dell F463R."  It looks like this

14  (indicating).

15      A.  Yes.  I'm on that page.

16      Q.  Is this another example, according to your

17  understanding of a hard drive tray caddy, as depicted

18  on --

19      A.  Yes, this is another type of caddy.

20      Q.  And then the second page from the last, the one

21  that has the heading "Genuine Dell F238F," do you see

22  that?

23      A.  Yes.

24      Q.  Is this, yet, another instance of a hard drive

25  caddy tray as depicted there?

1      A.  Yes.

2      Q.  Are the examples that we see in Exhibit 10

3  consistent with your understanding of the term "caddy"?

4      A.  They fall within the definition but don't

5  express the full range of types of things that could be

6  caddy.

7              MS. HEYMAN:  Andrew, is this a good place

8  to stop?  We've been going for about an hour.

9              MR. CRAIN:  Okay.  Sure.  I'm happy to stop

10  here.

11              THE VIDEOGRAPHER:  We're off the record at

12  2:45 p.m.  This is the end of tape 4.

13              (Recess 2:45 p.m. to 2:57 p.m.)

14              (Exhibit 11 was

15              marked for identification.)

16              THE VIDEOGRAPHER:  We're back on the record

17  at 2:57 p.m.  This is the beginning of Tape 5.

18  BY MR. CRAIN:

19      Q.  Dr. Horst, you have in front of you what's been

20  marked as Exhibit 11.  Can you take a moment -- I'm not

21  going to test you or ask you to read the entire

22  document.  Feel free to look at whatever you feel you

23  need to look at, but when you're ready to proceed, let

24  me know.

25              MS. HEYMAN:  Andrew, again for Exhibit 11,

1  can I have a standing objection that this is outside the

2  scope and that it's not relevant?

3                    MR. CRAIN:  And I appreciate that in

4  response, I think we're just trying to understand, you

5  know, what a caddy pertains to so we would certainly

6  submit that it does speak to what one of ordinary skill

7  in the art understands a caddy to be.

8                    MS. HEYMAN:  Okay, then.  That's fine.

9                    THE WITNESS:  This is a 143-page document I

10 haven't seen before, so I've glanced at it now.

11                   MS. HEYMAN:  Andrew, do you have the date

12 as 2013?

13                   MR. CRAIN:  It shows the copyright date of

14 2013.  Hey, I get your objections.

15 BY MR. CRAIN:

16    Q.  On the first page of what's been marked

17 Exhibit 11 what does the title appear to be to you?

18    A.  The title is "Dell PowerEdge M620 Owners

19 Manual."

20    Q.  I believe you testified a moment ago you have

21 never seen the document that is Exhibit 11?

22    A.  That's right.

23    Q.  Do you own know what a PowerEdge M620 system

24 is?

25    A.  Only in very general terms.

1      Q.   What are those terms?

2      A.   That it a server that is all I know.

3      Q.   Any type of server that you believe it to be?

4      A.   I don't really know anything about it just the

5  name.

6      Q.   Would you turn to page 51 of Exhibit 11.  Do

7  you see the image at Figure 18 on page 51 of Exhibit 11?

8      A.   Yes.

9      Q.   And you're welcome to read that but based on

10  your understanding, what does that appear to be to you

11  if you have any understanding?

12     A.   This appears to be something you attach to a

13  disk drive to install it in the server.

14     Q.   Do you see reference numeral 3 in Figure 18?

15     A.   Yes.

16     Q.   And the index below that that appears to state

17  hard drive slash SSD carrier do you see that?

18     A.   Yes.

19     Q.   Is it this hard drive SSD carrier appear to be

20  similar to what we were talking about a moment ago with

21  respect to Exhibit 10 the hard drive tray caddies?

22          MS. HEYMAN:  Objection to form.

23          THE WITNESS:  This looks similar to some of

24  those that you showed me earlier, yes.

25  BY MR. CRAIN:

1      Q.  So based on that similarity I think you had

2  testified earlier that a caddy could be a carrier so

3  therefore would you in your opinion refer to the item

4  shown by reference numeral 3 as a type of caddy?

5      A.  This could be a type of caddy, yes.

6      Q.  Would you turn to page 54.  Do you see the

7  figure 20 shown on the top of page 54?

8      A.  Yes.

9      Q.  Please take a moment and study if you need to

10  but when you are able to would you let me know what you

11  understand to be depicted in Figure 20 on 54 of

12  Exhibit 11?

13      A.  This looks like a way of mounting some type of

14  system board into a carrier.

15      Q.  Is the carrier the black and white portion

16  below what is identified as the system board?

17              MS. HEYMAN:  Objection, form.

18              THE WITNESS:  Yes it's the part to the

19  bottom of that figure.

20  BY MR. CRAIN:

21      Q.  And when I say system board I'm referring to

22  item that's delineated by reference numeral 3 do you see

23  that?

24      A.  Yes.

25      Q.  What do you understand a system board to be?

1  a local area network?

2     A.  Yes.

3     Q.  A desktop computer?

4     A.  Yes.

5     Q.  And is it correct to say that all these

6  different devices on a local area network have their own

7  memory?

8           MS. HEYMAN:  Objection, form.

9           THE WITNESS:  The devices on a local area

10  network generally have their own memory and may or may

11  not have their own storage.

12  BY MR. GANTI:

13     Q.  And switching gears a little bit, in general,

14  can you explain what it means to boot a CPU?

15     A.  Booting a CPU is the process of initializing

16  that CPU and bringing in the image into its main memory

17  so that it can begin running the operating system.

18     Q.  So what's one of the first things that happens

19  when a CPU is booted?

20     A.  Well, the boot process is fairly complicated.

21  I'm not sure what you're asking about.

22     Q.  Okay.  Have you heard something called a "boot

23  loader"?

24           MS. HEYMAN:  Objection to form.

25           THE WITNESS:  The processors generally have

1  something called a "boot loader" or a BIOS which is used

2  to initiate and run the boot process.

3  BY MR. GANTI:

4      Q.  So is it possible to boot a CPU using a

5  remotely connected work station?

6      A.  I'm not sure what you mean by "using," if

7  you're referring to where the boot image is or how

8  you -- what the user interface is, or what you mean by

9  "using."

10      Q.  Maybe you can help me understand.  What do you

11  mean when you say a "boot image"?

12      A.  The boot image is the image required to be

13  loaded into main memory in order to initiate the

14  operating system.

15      Q.  So after the boot image is loaded, then an

16  operating system is loaded?

17      A.  The boot process is usually a multistage

18  process.  That's why it's called boot or boot strap,

19  because you bring a little bit into memory and that

20  makes the processor a little bit more intelligent so

21  that it can bring more into memory and it may go through

22  several phases until it eventually talks to a disk,

23  typically, which brings in the rest of the boot image

24  and loads the operating system.

25      Q.  Okay.  So if two work stations are in

1   communication over a local area network, can the first

2   work station boot using a boot image that's stored in a

3   second work station?

4                   MS. HEYMAN:  Objection to form.

5                   THE WITNESS:  There may be ways of

6   configuring the work station to run programs that make

7   it into a boot server.  Typically a work station

8   wouldn't have that software loaded, but it would be

9   possible to load that software on a work station.

10  BY MR. GANTI:

11      Q.  You mentioned a boot server.  Can you explain

12  what that is?

13      A.  If -- if a computer is booting from LAN or

14  doing a remote boot, it has to get the image across the

15  network from something, and wherever it gets the image

16  from would be the boot server or the remote server

17  that's handling the boot.

18      Q.  So would it be correct to say that a boot

19  server stores the location of an image?

20                  MS. HEYMAN:  Objection, form.

21                  THE WITNESS:  The location of the image

22  is -- it would be located inside the boot server and

23  there would be a process for locating the appropriate

24  image to load if a remote system was doing a boot from

25  LAN.

1  BY MR. GANTI:

2      Q.  Okay.  Yeah.  Maybe I can clarify my question.

3  It was a little confusing.

4              Is it correct to say a boot server can

5  store the image?

6              MS. HEYMAN:  Objection to form.

7              THE WITNESS:  The boot server in that

8  context would store the image, yes.

9  BY MR. GANTI:

10     Q.  Okay.  I'd like to direct your attention to

11 Hipp, the Hipp reference.  Do you believe that Hipp

12 discloses a LAN, or a local area network, in, let's say,

13 Figure 1?

14     A.  Are you referring to LAN as it's defined in one

15 of the claim limitations, or just the generic term

16 "LAN"?

17     Q.  When I say "LAN," I mean local area network as

18 understood by one of ordinary skill in the art.

19     A.  The term "LAN" can apply to almost any Ethernet

20 connection, so any of the Ethernet connections in

21 Figure 1 might be considered a LAN.

22     Q.  If I can draw your attention to item number 47

23 in Figure 1, I believe Hipp refers to that as the

24 management network.

25              Can the management network be considered

1   part of the local area network?

2                  MS. HEYMAN:  Objection, form.

3                  THE WITNESS:  It can connect to the local

4   area network, and potentially it could have parts of the

5   network internally, but you wouldn't normally think of

6   the management as the network itself.

7   BY MR. CRAIN:

8       Q.  How about the various components found in the

9   management network 47, could those be considered

10  components on a local area network?

11      A.  The connection 78 is a connection between the

12  storage device and the management device 70 and that

13  could potentially be a LAN, and the connection 71 from

14  this to the switch card is a LAN connection.

15      Q.  Is it possible to store a boot image in the

16  memory storage device 74 or perhaps a memory storage

17  device 72?

18                 MS. HEYMAN:  Objection, form.

19                 THE WITNESS:  I'm looking for 72 on the

20  figure.  Can you refer me to where that is?

21  BY MR. GANTI:

22      Q.  Sure.  It's supposed to be a memory storage

23  device, but in Figure 1 it looks like it's a building,

24  but I think it's supposed to be a memory structure.

25  It's kind of in the middle of the figure.

1       A.   Okay.  It will take me a moment to find the

2  reference to those.

3       Q.   Sure.  Maybe I could help you out.  Try the top

4  of column 4, I believe that's where those memory storage

5  devices 72 and 74 were first introduced; column 4, lines

6  16 to 25.

7       A.   Uh-huh.  Okay.  Yes.  Device 74 is the storage

8  device, a network attached storage device, and 72 is a

9  non-volatile storage device.  Potentially either of

10 those could store a boot image.

11      Q.   Now, Figure 1 also shows some devices towards

12 the bottom of the system, such as items 54, 56, 58 and

13 60.

14           Working our way backwards, item 60, do you

15 have any understanding of what item 60 is in, according

16 to Hipp?

17      A.   60 is called a transaction.  It is called a

18 legacy system.  So 60 is just saying that this device

19 could connect potentially to an older mainframe system

20 or some other computer system.

21      Q.   Can you provide any more explanation on what a

22 legacy system is?

23           MS. HEYMAN:  Objection, form.

24           THE WITNESS:  Legacy usually refers to an

25 older system that -- it may be older technology, but

1   there may be some applications that are still running

2   and still need to be supported.

3   BY MR. GANTI:

4        Q.  Is it possible to store a boot image in a

5   legacy system?

6        A.  Potentially a boot image could be stored there,

7   yes.

8        Q.  And Figure 1 also depicts item 56 which is an

9   application server.  Would that be a location for

10  storing a boot image?

11       A.  As I said earlier, any kind of server can be

12  used to store a boot image, but it requires particular

13  software to do that.

14       Q.  I'd like to refer you to column 9, line 61 to

15  62 of the Hipp reference and specifically focusing on

16  the phrase "wake on LAN."

17       A.  Yes.

18       Q.  Are you there?  Okay.

19            According to your understanding of Hipp,

20  what does it mean when Hipp refers to this wake from

21  LAN?

22            MS. HEYMAN:  Objection, form.

23            THE WITNESS:  A wake on LAN is a way of

24  having a server or a desktop, or even a portable device,

25  come out of a low power mode when it receives traffic

```
 1  over the network.
 2  BY MR. GANTI:
 3      Q.  Does that have anything to do with booting a
 4  CPU?
 5               MS. HEYMAN:  Objection to form.
 6               THE WITNESS:  The wake on LAN by itself
 7  doesn't directly refer to booting, although in the
 8  references, that phrase is often in the sentence after
 9  the reference to "boot from LAN."
10  BY MR. GANTI:
11      Q.  Let's talk about "boot from LAN."
12               How is "boot from LAN" different from "wake
13  from LAN"?
14               MS. HEYMAN:  Objection, form.
15               THE WITNESS:  "Boot from LAN" means that
16  you are booting the processor based on the boot image
17  that's some place across the network.  "Wake on LAN," as
18  I said before, is only concerned with waking up the
19  processor and bringing it to a full power mode after
20  receiving LAN traffic.
21  BY MR. GANTI:
22      Q.  I would like to refer you to column 18, line 60
23  to 64, and specifically Hipp's disclosure of a parallel
24  command bus, and let me know when you find it, please.
25      A.  Yes, I see that.
```

1      Q.  Okay.  Can you explain what Hipp is trying to

2   say when it discloses a parallel command bus or -- let

3   me rephrase that question.

4            What is a parallel command bus as disclosed

5   by Hipp?

6      A.  A parallel command bus is another collection of

7   signals that are communicated and that includes other

8   signals that are used for debugging in the serial port

9   and there may be other connections as well.

10     Q.  Do you see Hipp's statement on -- starting on

11  line 61 that says, it begins with:  Allows an operator

12  of the network to perform a hardware reset -- open

13  paren -- boot from LAN?

14     A.  Yes.  The rest of that sentence says:  Boot

15  from LAN -- comma -- boot from hard disk.

16     Q.  Can you provide any explanation on how that

17  would work?

18            MS. HEYMAN:  Objection to form.

19            THE WITNESS:  There may just be a reset

20  switch, and when you press the switch, it sends a signal

21  over this bus and it tells the processor to boot.

22  BY MR. GANTI:

23     Q.  Where would that switch be located?

24     A.  It could be a physical hardware switch or it

25  could be a command through the single board computer to

1  tell it to do that.

2      Q.  Could it be an instruction that's sent remotely

3  from another computer?

4              MS. HEYMAN:  Objection, form.

5              THE WITNESS:  At some point that -- if it

6  was sent from another computer, that would have to be

7  translated into a way of driving this parallel command

8  bus and then causing the boot to happen.

9  BY MR. GANTI:

10     Q.  So it is possible to remotely transmit an

11  instruction over the parallel command bus to boot from

12  LAN?

13     A.  I'm not sure I understand the question.

14     Q.  So in one example you stated that the parallel

15  command bus could be coupled to a hardware reset button;

16  is that correct?

17             MS. HEYMAN:  Objection, form.

18             THE WITNESS:  Potentially it could be.

19  BY MR. GANTI:

20     Q.  And are there other implementations that are

21  possible?

22             MS. HEYMAN:  Objection to form.

23             THE WITNESS:  This command bus would be

24  tied to the single board computer which can then cause

25  the processor to boot, and that processor, that single

1  board computer, also can talk to a remote management

2  entity so that the command can originate in some other

3  system and eventually make its way down to this bus

4  which causes the processor to actually do the boot.

5  BY MR. GANTI:

6      Q.  I'd like to refer you to your declaration which

7  was provided to you as Exhibit 2, and if you can turn to

8  page 40, there's a claim chart which identifies the

9  beginning of claim 14, and let me know when you find it.

10     A.  Yes, I'm there.

11     Q.  You found it.  Okay.

12         Do you believe that Hipp discloses a BIOS

13  for configuring the CPU module and instructing a network

14  attached storage to locate an operating system from

15  which to boot?

16     A.  Yes, it does.

17     Q.  Do you believe that disclosure is explicitly

18  stated in Hipp?

19     A.  I give -- in this claim chart, I cite to the

20  places where all the elements of that are disclosed,

21  yes.

22     Q.  Is it your understanding that Hipp discloses

23  storing a boot image in a network attached storage?

24     A.  Yes.

25     Q.  Can you show me where that's disclosed in Hipp?

1      A.  One place that it's cited is in -- at the

2  beginning of the claim chart where it says -- for claim

3  14 where it says storage server 54 provides network

4  attached storage NAS, and that is a place that can store

5  a boot image.

6      Q.  Does Hipp disclose storing the boot image in a

7  network attached storage?

8      A.  It describes boot from LAN in a couple of

9  sentences down in that same claim chart and boot from

10 LAN means it's booting from a network attached storage

11 device.

12     Q.  Correct me if I'm wrong, but earlier you stated

13 that memory storage device 74 in Figure 1 could be a

14 location for storing a boot image; is that correct?

15                MS. HEYMAN:  Objection to form.

16                THE WITNESS:  I said that it could

17 potentially store a boot image.  In this case, the

18 network attached storage device 54 is the one that would

19 store boot images for the cards -- the web server

20 processing cards 32.

21 BY MR. GANTI:

22     Q.  But you said it is possible to store the boot

23 image in memory storage device 74; isn't that correct?

24     A.  You could store a boot image there, yes.

25     Q.  Is memory storage device 74 a network attached

1  drive may have other things on it.

2  BY MR. GANTI:

3      Q.  So just to clarify, is it possible for the

4  network or -- I'm sorry.  Let me start over again.

5              A web server processing card that does not

6  include an associated disk drive may have some other

7  onboard memory; is that correct?

8              MS. HEYMAN:  Objection to form.

9              THE WITNESS:  Are you asking about -- any

10  processing card is going to have memory in order to do

11  processing, so yes, it would have memory.

12  BY MR. GANTI:

13      Q.  Is it possible to store a boot image in that

14  memory?

15      A.  The memory of a processing card is generally

16  volatile memory, so you can't store the boot image there

17  because you lose the boot image when the power fails.

18      Q.  So going back to that embodiment where the web

19  server processing card 32 does not include an associated

20  disk drive, how does Hipp disclose booting that device

21  for the very first time?

22              MS. HEYMAN:  Objection to form.

23              THE WITNESS:  It's disclosing booting from

24  LAN and there are well-known standards of how to boot a

25  processor that doesn't have its own local disk drive.

1  The Pixy specification describes that in great detail.

2       Q.  Is it possible for the web server processing

3  card to boot from another web server processing card

4  included in the same chassis?

5            MS. HEYMAN:  Objection to form.

6            THE WITNESS:  That's, I guess it -- that

7  would be possible if the appropriate software was

8  running to be able to do that.

9  BY MR. CRAIN:

10      Q.  So taking a look at claim 15 of the '021

11 patent, claim 15 states:  Wherein a CPU module is

12 configured to boot remotely from an OS located in a

13 network attached storage and wherein the computer

14 network appliance is free of a local hard disk drive.

15           Based on your understanding in Hipp, is

16 this explicitly closed?

17      A.  Yes.  It discloses connection to a network

18 attached storage and it discloses remote boot.

19      Q.  But isn't it possible for one web server

20 processing card to boot from another web server

21 processing card?

22           MS. HEYMAN:  Objection, form.

23           THE WITNESS:  That may be possible, but

24 that's not what this claim calls for.  To meet the claim

25 elements, you need to be able to boot from a NAS and it

DELL INC. v. ACCELERON, LLC
Robert Horst on 3/19/2014

1                           CHANGES AND SIGNATURE                    Page 223

2       WITNESS NAME: Robert Horst          DATE OF DEPOSITION: 3/19/14

| | PAGE | LINE | CHANGE | REASON |
|---|---|---|---|---|
| 3 | | | | |
| 4 | 6 | 10 | Glen -> Glenn | Clarification of Testimony |
| 5 | 12 | 24 | claim -> claims | Clarification of Testimony |
| 6 | 23 | 11 | lie -> law | Clarification of Testimony |
| 7 | 34 | 3 | there's -> the | Clarification of Testimony |
| 8 | 48 | 5 | network storage unit -> Network Storage Unit | Clarification of Testimony |
| 9 | 58 | 4 | front-on -> fault-tolerant | Clarification of Testimony |
| 10 | 59 | 24 | SM bus -> SMBUS | Clarification of Testimony |
| 11 | 60 | 6,10 | SM bus -> SMBUS | Clarification of Testimony |
| 12 | 71 | 1 | on-ship -> on-chip | Clarification of Testimony |
| 13 | 108 | 19 | micro -- or controller -> microcontroller | Clarification of Testimony |
| 14 | 118 | 15-20 | <add quotes around paragraph> | Clarification of Testimony |
| 15 | 134 | 2 | claim meaning -> plain meaning | Clarification of Testimony |
| 16 | 145 | 2 | it -> its | Clarification of Testimony |
| 17 | 147 | 1-2 | print circuit poured -> printed circuit board | Clarification of Testimony |
| 18 | 148 | 6 | It's -> it | Clarification of Testimony |
| 19 | 148 | 6-7 | articulating which -> articulating door which | Clarification of Testimony |
| 20 | 148 | 7 | assist meaning-> as meeting | Clarification of Testimony |
| 21 | 155 | 7 | carriers nothing -> carriers. Nothing | Clarification of Testimony |
| 22 | 159 | 22 | volume metric -> volumetric | Clarification of Testimony |
| 23 | 165 | 4 | currents -> cards | Clarification of Testimony |
| 24 | 167 | 16 | CP -> CPU | Clarification of Testimony |
| 25 | 169 | 11 | process -> processors | Clarification of Testimony |
| 26 | 184 | 8 | NA2 -> any two | Clarification of Testimony |
| 27 | 203 | 17 | transaction. It -> transaction it | Clarification of Testimony |
| 28 | 218 | 2 | i-scuzzy -> iSCSI | Clarification of Testimony |
| 29 | 221 | 1 | Pixy -> PXE | Clarification of Testimony |

Page 224

1      I, ROBERT HORST, have read the foregoing deposition

2  and hereby affix my signature that same is true and

3  correct, except as noted above.

4

5  See Attached California All-Purpose                    _____ 4/22/14
   Acknowledgement for the Notarization

6                                                         ROBERT HORST

7                                            BHAVANA R. PATEL

8  THE STATE OF TEXAS       )                Notary Public
                                             Date  APRIL-22-2014
9  COUNTY OF TRAVIS         )

10          Before me, _____, on this day

11  personally appeared ROBERT HORST) known to me (or proved

12  to me under oath of through _____)

13  (description of identity card or other document) to be

14  the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed the

16  same for the purposes and consideration therein

17  expressed.

18          Given under my hand and seal of office this

19  _____ day of _____, _____.

20

21

22

23                           _____

24                           NOTARY PUBLIC IN AND FOR
                             THE STATE OF _____
25

# DECLARATION OF WILLIAM O. PUTNAM
## Regarding Certain Claims of
## U.S. Patent 6,948,021

## I.    Introduction

1.      My name is William O. Putnam. I am an independent consultant in the field of computer systems and networking, including local area network (LAN), wide area network (WAN), Internet, and World Wide Web-based technologies. A copy of my Curriculum Vitae, including my educational background and professional experience is attached to this declaration as Exhibit A. A copy of my publications is attached as Exhibit B. A list of matters in which I have provided testimony as an expert during the past four years is attached to this declaration as Exhibit C.

2.      I have been retained as a technical expert by counsel for Acceleron, LLC, to review and analyze the patent and related materials involved in the action titled *Dell, Inc., v. Acceleron, LLC,* an *inter partes* review before the Patent Trial and Appeal Board of the United States Patent Office, and to provide assistance to the Board, if needed, in its consideration and understanding of

ACCL. 2001

16.      Based on my review of the '021 patent, it is my opinion that the relevant field of art of the patent is the field of digital computer systems and networking. I have studied and worked in that field since 1980, and am a person of skill in the art.

17.      Based on my review of the materials provided to me, as well my own knowledge and experience from 30 years of work and study in the field of digital computer systems and networking, I believe that a person of ordinary skill in the field of art of the '021 patent as of November 16, 2000, would likely have possessed at least an undergraduate degree in electrical engineering, computer engineering, or computer science, or the equivalent thereof, along with several years of work experience in the field. That experience would include working with digital computer systems including microprocessors and their associated components and peripherals, as well as computer networking technologies including Ethernet networks and associated network hardware such as hubs, switches, and routers. I am a person of at least ordinary skill in the art, and have been since before the date of filing of the '021 patent.

## C. Claim Construction

18.      In order to conduct an analysis of the subject claims and the cited references, it is necessary to construe the claims at issue. It is my

understanding that, in an *inter partes* review, the claims of an unexpired

patent are to be given the broadest reasonable construction in light of the

specification of the patent. Further, I understand that claim language should

be read in light of the specification as it would be interpreted by one of

ordinary skill in the art at the time of invention.

19.    For purposes of my review and this declaration, I have developed and

used the following claim constructions for certain terms used in the claims of

the '021 patent:

   a) *caddy*: "a carrier for a module"

   b) *bay*: "a structure defining a space that receives a module"

20.    In developing these constructions, I have relied primarily upon the

language of the claims themselves and the specification and file history of the

'021 patent. I note that that support for these constructions can be found in

the specification of the '021 patent at the following locations:

   *caddy:* '021 patent at 2:5-10; 3:32-34, Figure 1, and claim 3.

   *bay:* '021 patent at 2:6-10; 3:28-32; 3:51-54; 5:21-23; Figures 1-3,

   and claims 4 and 32.

21.     Additional support for these constructions may be found in the following references:[12]

    a) *caddy*

        1.  Microsoft Computer Dictionary, 4th Edition, Microsoft Press, 1999, page 70 *(caddy)*: "A plastic carrier that holds a CD-ROM and is inserted into a CD-ROM drive."

        2.  Caddy products listing from Amazon.com – included with this Declaration as Exhibit 2004.

    b) *bay*

        1.  Microsoft Computer Dictionary, 4th Edition, Microsoft Press, 1999, page 45 *(bay)*: "A shelf or opening used for the installation of electronic equipment—for example, the space reserved for additional disk drives, CD-ROM drives, or other equipment in the cabinets of microcomputers. *See also* drive bay."

        2.  Microsoft Computer Dictionary, 4th Edition, Microsoft Press, 1999, page 84 *(chassis)*: "A metal frame on which

---

[12] Copies of these references are attached to this declaration.

electronic components, such as printed circuit boards, fans, and power supplies are mounted. See the illustration."

3. Microsoft Computer Dictionary, 4th Edition, Microsoft Press, 1999, page 411 (*slot*): "1. *See* expansion slot. 2. An integrated circuit mounting connector designed to connect a microprocessor with the PCs data bus."

4. Microsoft Computer Dictionary, 4th Edition, Microsoft Press, 1999, page 174 (*expansion slot*): "A socket in a computer, designed to hold expansion boards and connect them to the system bus (data pathway)."

22.     Computer systems are often mounted in a case or frame referred to as a *chassis*.[13] A typical computer system chassis may contain a number of distinct, identified spaces in the chassis designed to hold components such as expansion boards, hard drives, optical drives, or memory card readers. These spaces are typically defined by surrounding structure and identifying labels or markings, and are known as *bays*.[14] Different types of components may have

---

[13] See page 84 (*chassis*), Microsoft Computer Dictionary, 4th Edition, Microsoft Press, 1999.

[14] See page 45 (*bay*), Microsoft Computer Dictionary, 4th Edition, Microsoft Press, 1999.

bays of different sizes and shapes. Some devices, such as hard disk drives, conform to an industry standard so that they are more easily installed in standard sized bays. The Microsoft Computer Dictionary entry for *chassis* includes an illustration of a computer chassis containing several bays in the front for mounting hard drives and other peripheral devices. The meaning and usage of the terms *bay* and *chassis* to a person of skill in the art have not changed substantially since the date of filing of the '021 patent.

23.    Often, a removable component of a system is placed in a *caddy*, [15] and then installed into a designated bay in the computer system chassis. As noted in the Microsoft Computer Dictionary, a *caddy* is a type of carrier. The example given is a CD-ROM disc that may be inserted into and removed from a CD-ROM drive, but caddies are also used to hold other removable elements of a computer system, such as hard drives, tape drives, card readers, and CPU modules. Different types of components may have different sizes and types of caddies.

24.    Typically, a caddy is used to facilitate installation and removal of a component in a computer system chassis. As such, a caddy is not just a

---

[15] Microsoft Press Computer Dictionary, 4th Edition, Microsoft Press, 1999, page 70.

structure that attaches or mounts a component to a chassis, such as a mounting bracket, guide, or rail. Rather, a caddy is typically a structure separate from a component that holds and supports the component, fits the component to a designated location, orientation, or position in a system chassis, and is designed to be inserted into and removed from the chassis. Put another way, a caddy is a carrier for a removable component of a computer system. A caddy may be used to hold a component in a particular location and orientation in order to ensure proper connectivity to other components as well as to provide for adequate air flow around the component and through the chassis.

25.    Caddies as described in the references and exhibits listed above (Exhibits 2003 and 2004) are consistent with the meaning of the term caddy as known and used by persons of skill in the art during the period of my work in the field. The meaning and usage of the term *caddy* to a person of skill in the art have not changed substantially since the date of filing of the '021 patent.

26.    It is my opinion that the constructions provided above are supported by the intrinsic and extrinsic evidence presented, and are consistent with the "broadest reasonable construction supported by the specification" standard for claim construction in a *inter partes* review proceeding. They are also consistent with the ordinary meanings of these terms as they are and have

been known and used in the field of digital computer and network systems throughout my years of experience in that field. Further, it is my opinion that these constructions are consistent with the understanding of a person of ordinary skill in the art as of the date of filing of the '021 patent.

## V.    Overview of the '021 Patent

27.    The '021 patent describes a computer network appliance including CPU modules, a power module, and an Ethernet switch module having hot-swappable connectors that mate to corresponding hot swap connectors on a backplane.[16] The patent describes the CPU modules as each functioning as a stand-alone computer,[17] including a CPU, memory I/O circuitry, and BIOS.[18]

28.    The hardware BIOS on each CPU module provides remote boot capability enabling the CPU modules to boot from boot files stored in a predetermined location on a network attached storage (NAS) system and run different types of operating systems.[19] This enables a CPU module to run

---

[16] '021 patent at 3:18-23.

[17] '021 patent at 4:34-35.

[18] '021 patent at 4:28-35.

[19] '021 patent at 4:36-44.

modules, and to report problems or remotely reset a CPU module if needed.[31] The microcontroller module is also hot-swappable.[32]

32.　　Another feature of the '021 patent is the use of structures within the system chassis to contain and support various system components, while facilitating removal and installation during hot-swapping operations.[33] The chassis compartment is divided into a number of bays – five in the front for CPU modules and three in the rear for the power module, Ethernet switch module, and microcontroller module.[34] A CPU module can be inserted into any of the bays located in the front of the chassis.[35] Up to five CPU modules may be mounted horizontally in the designated bays.[36]

33.　　Further, the modules are supported by caddies – removable structures to which the component modules are attached for ease of insertion and removal.[37] The use of caddies also facilitates proper alignment and mating of

––––––––––––––––––––––

[31] '021 patent at 7:61 to 8:14.

[32] '021 patent at 7:51-61.

[33] '021 patent at 2:5-10 and 3:58-63.

[34] '021 patent at 3:28-31.

[35] '021 patent at 5:21-23.

[36] '021 patent at 3:28-34, 5:21-23, and Figure 1.

[37] '021 patent at 3:32-37.

the module and backplane connectors, as well as enhancing air flow within

the chassis, which helps to keep the CPU modules and other components

from overheating.[38]

## VI.    Overview of the Cited Prior Art

34.        The primary reference relied upon in the petition for *inter partes* review

is U.S. Patent 6,757,748 (the Hipp patent), which was granted to Christopher

Hipp on June 29, 2004, resulting from an application filed on July 20, 2000.

In addition, some arguments presented in the petition combine the Hipp

patent with U.S. Patent 6,157,974 (the Gasparik patent) which was granted to

Frank Gasparik on December 5, 2000, resulting from an application filed on

December 23, 1997. I have been asked to review and consider these two

references for purposes of this analysis.

### A. U.S. Patent 6,757,748, Filed July 20, 2000. (Hipp)

35.        The Hipp patent describes a digital computer system that acts as a

network server connected to a private network, a management network, and a

public network such as the Internet.[39] The server is comprised of a case

_____

[38] '021 patent at 2:5-6.

[39] Hipp patent at 3:40 to 4:25, and Figure 1.

housing up to 24 web server cards[40], each of which provides the functionality of a single-board computer.[41] The web server cards are configured and function similarly.[42] The three networks are configured, maintained, and operated independently of one another.[43]

36.     Each web server card is coupled with a passive midplane mounted on a server chassis.[44] Network interface cards are provided to connect the web server cards, via the midplane, to the public, private, and management networks.[45] The public network provides access to the Internet.[46] The private network provides access to "back-office" network applications including a storage server, an applications server, a database server, and legacy systems.[47] The management network provides access to additional storage systems and to a management system that may be used to monitor, manage,

---

[40] Hipp Patent at 15:34-37, 15:58-60, and Figure 1.

[41] Hipp patent at 3:54-56.

[42] Hipp patent at 3:47-48.

[43] Hipp patent, at 3:42-59.

[44] Hipp patent at 3:60-63.

[45] Hipp patent at 3:64 to 4:25.

[46] Hipp patent at 4:4-5.

[47] Hipp patent at 5:22-40.

back-up, and control the web server cards and other components of the system.[48]

37.    The connections to the public and private networks are made through network interface cards connected to the midplane. Each public or private network interface card provides only 12 Ethernet connections for communication with up to 12 web server cards.[49] Two network interface cards are required for the public network, and two for the private network, in order to support up to 24 web server cards connected to both networks.[50] Each network interface card uses a single connector to attach to the midplane.[51] The public and private network interface cards can be configured for straight pass-through, as a hub, or as a switch.[52]

38.    The connection from the web server cards to the management network is made through a network interface card that provides 24 Ethernet connections,

---

[48] Hipp patent at 5:65 to 6:3.

[49] Hipp patent at 12:8-13, 13:5-9, and Figures 4-6

[50] Hipp patent at 15:40-44 and Figures 9 and 12.

[51] Hipp patent at Figures 4-6, 9, and 12.

[52] Hipp patent at 12:65 to 13:

as well as an I2C bus connection.[53] The management network interface card has two connectors, each supporting 12 web server cards and the I2C bus, for attachment to the midplane.[54] The management network interface card can be configured for straight pass-through, as a hub, or as a switch.[55]

39.     The Hipp patent appears to be directed more toward providing increased capacity in web server applications, rather than fault tolerance. For example, there is no redundancy in the connectivity of the web server cards to the public, private, and management networks – each card is connected to only one network interface for each network, and two separate network interface cards are required for each network in order to support the maximum of 24 web server cards.[56] Redundant communications links may be provided between a network interface card and an external network, but each web server card is only connected internally to a single network interface card.[57] This is further evidenced by the use of the 80-pin SCA connector for the

---

[53] Hipp patent at 14:5-12.

[54] Hipp patent at Figure 7.

[55] Hipp patent at 14:18-24.

[56] Hipp patent at 9:41-49; 12:9-13, 21-25, and 32-36; 14:5-5-11

[57] Hipp patent at 12:56-61 and 4:49-53.

network interface cards.[58] An 80-pin SCA connector does not have enough data lines to support all 24 web server cards.[59]

40.　　The components of the Hipp server system are enclosed in a chassis that provides support for the midplane board, web server cards, power supplies, and network interface cards.[60] The chassis includes card guides and midplane connectors to support up to 24 web server cards.[61] The web server cards are mounted vertically, in a densely-packed configuration.[62] Additional connectors are provided on the back of the midplane board for up to four network interface cards for the public and private networks and one dual-connector network interface card for the management network.[63] In addition, two connectors on the back of the midplane board are provided for the power supplies, which are mounted in the rear of the chassis.[64]

---

[58] Hipp patent at 10:1-4, 12:40-45, 13:7-9, and Figures 5 and 6.

[59] A total of 48 data lines are required for 12 connections supporting 12 web server cards. A total of 96 data lines would be required for 24 server cards. Hipp patent at 12:32-36 and

[60] Hipp patent at 16:6 to 17:3, and Figures 8-12.

[61] Hipp patent at 15:58-60.

[62] Hipp patent at Figures 10-12.

[63] Hipp patent at Figure 9.

[64] Hipp patent at 16:62 to 17:3.

the public and private networks, include only 12 Ethernet connections, so that each network interface card can support a maximum of 12 web server cards.[68] Two network interface cards are therefore required in Hipp's system in order to connect all 24 web server cards to each network.

47.     Each web server card is connected to only one of the two available network interface cards for each network. No web server card is connected to all of the network interface cards, and no individual network interface card for the public and private networks is connected to every web server card. On both the public and private networks, only one of the two network interface cards is connected to any particular web server card. If one network interface card fails, as many as half of the web server cards will be cut off from one of the networks. Thus, Hipp's switched network interface cards 40 and 48 do not teach or disclose a single "Ethernet switch module [that] can be used as a shared resource by the plurality of CPU modules," as required by claim 30 of the '021 patent. Rather, Hipp discloses multiple Ethernet switch modules on separate network interface cards, each supporting a different group of web server cards.

---

[68] Hipp patent at 12:7-9; 12:37-47.

48.    Hipp does describe an embodiment in which 12 web server cards, each having a 3.5-inch disk drive, are installed using every other slot.[69] There is no disclosure, however, regarding the wiring of the Ethernet connections on the midplane board to indicate or suggest that the public and private network interface cards are or should be routed to alternating slots. The specification is silent in that regard, but it would seem simpler and less expensive to wire the first interface card to the first 12 slots and the second interface card to the next 12 for connection with the public and private networks. A number of other configurations are also possible.

49.    For these reasons, it is my opinion that the person of ordinary skill in the art would not read the Hipp patent as teaching or disclosing every element of claim 1 of the '021 patent.

## B. Claim 3

50.    Claim 3 of the '021 patent reads:

> *3. The computer network appliance of claim 2, wherein the chassis comprises caddies providing air flow from the front to the rear of the chassis.*

51.    According to the claim construction provided above, a caddy is "a carrier for a module." As discussed above, caddy is a carrier, typically made of

---

[69] Hipp patent at 16:57-61 and 18:51-54.

metal or plastic, used to hold a modular system component such as a disk drive and fit the component into a designated location in a system chassis. A caddy is used to mount and support such a component in the chassis, typically in a way that provides for adequate air flow and cooling, and to make it easier to install and remove the device as needed.

52.     Hipp does not teach the use of a chassis including caddies. Rather, Hipp seems to be directed toward fitting as many web server cards into the chassis as possible in a minimum amount of space.[70] Viewing Figures 1-12 of the patent, it is apparent that no carriers or other structures are provided to support the web server cards or other components of Hipp's system. The only structures other than the chassis itself appear to be the midplane board with its connectors and the card guides provided to align each web server card with the corresponding midplane connector. In my opinion, the card guides would not be considered to be caddies by a person of shill in the art. Further, no caddies are visible carrying or supporting the network interface cards or the power supplies. The Hipp specification does not describe the use of caddies or similar structures with any of the components installed in the

_____

[70] Hipp patent at 19:42-44; 19:59-67.

chassis. For this reason, it is my opinion that the Hipp patent does not disclose every element of claim 3 of the '021 patent.

53.    I understand that it has been suggested that the built-in box fans mounted on the articulating door of the chassis might be construed as caddies. I would not agree with such a construction. The fans are described in the specification as standard three-inch box fans of the type commonly used in microcomputer systems.[71] These fans are comprised of a motor and blade assembly permanently mounted in a plastic housing. Screw holes in the corners of the housing are provided so that the fan may be attached to the chassis.[72] The housing an integral part of this type of fan, and is not designed to be easily removable from the chassis. Indeed, the Hipp patent specification describes the fans as "built in" to the chassis.[73] A construction that included the box fan housing as a caddy would, in my opinion, be overly broad and unreasonable.

## C. Claim 4

54.    Claim 4 of the '021 patent reads:

> *4. The computer network appliance of claim 2, wherein the chassis comprises bays and*

---

[71] Hipp patent at 16:18-23.

[72] Hipp patent at Figures 10-12

[73] Hipp patent at 16:2-3.

## D. Claim 7

57.     Claim 7 of the '021 patent reads:

> *7. The computer network appliance of claim 6, wherein the data input/output connector is a standard ethernet connector allowing heterogeneous CPU modules of differing CPU architectures mounted on a same chassis to communicate with each other.*

58.     Hipp does not teach the CPU modules of differing CPU architectures mounted on the same chassis to communicate with each other. Hipp states that many CPUs with comparable processing power to a 500MHz Pentium II may be used[82] but notes that "Each web server processing card 32 and 132-135 are configured and function similarly."[83] There is no teaching that web server cards using different CPU types or architectures can be used within the same chassis. In fact. The only architecture proposed in the Hipp patent is the standard Inter X86 CPU architecture.[84]

## E. Claim 14

59.     Claim 14 of the '021 patent reads:

> *14. The computer network appliance of claim 1, wherein a CPU module comprises hardware BIOS for configuring the CPU module and instructing a network attached storage (NAS) to locate an operating system (OS) from which to boot.*

---

[82] Hipp patent at 8:15-22.

[83] Hipp patent at 3:47-48.

[84] Hipp patent at 8:15-22 and 45-47.

60.    Hipp does not teach a hardware BIOS "instructing a network attached storage (NAS) to locate an operating systems from which to boot." Hipp does mention "boot from LAN" capability[85] as a feature of the network interface chips on the web server cards, as well as a BIOS on the web server card "which contains instructions for sending information from a program to the appropriate hardware device within network 30".[86] Hipp also mentions that "storage server 54 provides network attached storage (NAS)" on the private network.[87] However, there is no specific teaching or suggestion to boot the web server cards from the NAS or to instruct the NAS to locate an operating system from which to boot.

61.    In addition to the local disk drive typically included with each web server card, the Hipp specification discloses several sources from which a web server card could potentially boot over a local area network (LAN). The management network includes non-volatile storage devices 72 and 74, as well as remote management system 70. The private network includes application server 56, database server 58, and legacy systems 60. These devices would

---

[85] Hipp patent at 9:61-62 and 18:60-64.

[86] Hipp patent at 10:47-54.

[87] Hipp patent at 5:35-36.

not be considered NAS (network attached storage) devices by a person of skill in the art, but any of these devices or systems could serve as a location storing an operating system from which to boot. All that is required is a device or system with non-volatile storage to hold a boot file and operating system. Remote boot capability is not unique to network attached storage (NAS) systems.

62.    For these reasons, it is my opinion that the Hipp patent does not disclose every element of claim 14 of the '021 patent.

**F. Claim 15**

63.    Claim 15 of the '021 patent reads:

> *15. The computer network appliance of claim 1, wherein a CPU module is configured to boot remotely from an OS located in an NAS, and wherein the computer network appliance is free of a local hard disk drive (HDD).*

64.    While Hipp does disclose a diskless configuration for the web server cards,[88] as discussed above, Hipp does not teach booting the web server cards from an operating system (OS) located on a network attached storage (NAS) system. Hipp does not disclose a CPU module "configured to boot remotely from an OS located in an NAS." For this reason, it is my opinion that the Hipp patent does not disclose every element of claim 15 of the '021 patent.

65.    In addition, since Hipp does not disclose all of the elements of claim 1, it also does not disclose every element of claim 15.

**G. Claim 16**

66.    Claim 16 of the '021 patent reads:

> *16. The computer network appliance of claim 15, wherein remote booting of a CPU module allows the CPU module to run different types of operating systems.*

67.    As discussed above, Hipp does not teach the remote booting of a CPU module from a network attached storage system (NAS). Further, Hipp does not teach remote booting of a CPU module for the purpose of allowing the CPU module to run different types of operating systems. The Hipp specification mentions the potential negative performance effects of using the Windows operating system rather than the preferred Linux operating system for the web server cards,[89] but does not suggest that web server cards in the same chassis can run different operating systems at the same time, or that a web server card can be booted alternately with either operating system. Rather, Hipp teaches that "Each web server processing card 32 and 132-135

---

[88] Hipp patent at 18:54-56.

[89] Hipp patent at 8:37-30.

are configured and function similarly,"[90] indicating that all of the cards boot

and run the same operating system, preferably Linux.[91]

68.    In fact, in my experience, the most common scenario involving remote

booting of computer systems from a server is one in which all of the client

computer system boot the same operating system from a common boot file

and OS on a central boot server. Storing the boot information and operating

system on a central server makes it much simpler to maintain a distributed

network of computers, since you need only maintain a single copy of the boot

file and operating system in a single central location. Networks using

Microsoft servers and client workstations typically use this method. For these

reasons, it is my opinion that the Hipp patent does not disclose every element

of claim 16 of the '021 patent.

69.    Finally, because Hipp does not teach all of the elements of claim 15 or

claim 1, it also does not teach all of the elements of claim 16.

## H. Claim 19

70.    Claim 19 of the '021 patent reads:

*19. The computer network appliance of claim 18, wherein an ethernet connection is a*

_____

[90] Hipp patent at 3:47-48.

[91] Hipp patent at 25-27.

*switched fast ethernet connection.*

71. Because Hipp does not teach all of the elements of Claim 18, it also does not

teach all of the elements of claim 19 of the '021 patent.

## I. Claim 20

72.     Claim 20 of the '021 patent reads:

*20. A computer network appliance comprising:*

*a hot-swappable CPU module;*

*a hot-swappable power module;*

*a hot-swappable ethernet switch module; and*

*a backplane board having a plurality of hot swap mating connectors; and*

*a microcontroller module and a dedicated ethernet path, wherein the dedicated
ethernet path is separate from a switched fast ethernet connection and provides the
microcontroller module with a connection to remotely poll the CPU module, the power
module and the ethernet switch module;*

*wherein each of the CPU module, the power module and the ethernet switch module
includes a hot swap connector for connecting with a specific hot swap mating
connector of the backplane board.*

73.     Hipp does not teach a dedicated Ethernet path separate from a switched

fast Ethernet connection that provides a microcontroller with a connection to

remotely poll the CPU module, the power module and the Ethernet switch

module. The only connections available from the management network

interface card 68 containing the single board computer 160, other than the 24

switched Ethernet connections for the web server cards, are the serial I2C bus

communications links 188 that may be used to couple the single board

computer to connectors 164 and 162, and then to the midplane board[92] The

I2C bus is described by Hipp as a serial port connection[93]. This serial

connection may be used to communicate with the web server cards, public

and private network interface cards, and power supplies, for control and

monitoring purposes, but is not an Ethernet connection.[94]

74.    Further, single board computer 160 may collect, receive, store, and

transfer information from the web server cards and other system components,

such as the network interface cards and power supplies, but it is not described

in the specification as "polling" those components.[95] For example, the Hipp

specification notes that "web server processing card 32 may transfer this

information to single board computer 160 and/or remote systems 70" for

various uses.[96] Rather, any communication that might be construed as

"polling" appears to be one of the functions of the remote management

_____

[92] Hipp patent at 15:7-19.

[93] Hipp patent at 13:61-65; 10:7-12; 15:7-14; and 15:58-62.

[94] Hipp patent at 10:7-12; 13:61-65; 15:7-30; 15:59-62; 18:60-64.

[95] Hipp patent at 14:44-49; 15:24-30; 20:29-36; 21:6-8; 21:21-23; 21:28-54.

[96] Hipp patent at 20:30-36; 21:21-23; 21:28-30; 21:34-38

system 70[97]. Management system 70 is described as downloading the collected information (via communications link 71) from single board computer 160 for processing.[98] In the absence of single board computer 160, management system 70 is described as "sampling" or collecting measurements and information regarding network components at less frequent intervals than when the single board computer is provided.[99] In that configuration, however, there would be no element corresponding to the recited microcontroller module. For these reasons, it is my opinion that the Hipp patent does not disclose every element of claim 20 of the '021 patent.

75.    I understand that it has been suggested that communication link 71 could be construed as a dedicated Ethernet path separate from a switched fast Ethernet connection as recited in the claim. I do not agree. Communications link 71 connects management network interface 49 or management network interface card 68 to remote management system 70.[100] The claim requires that the recited "dedicated ethernet path [is] separate from a switched fast ethernet

---

[97] Hipp patent at 20:64 to 21:1; 22:14-24.

[98] Hipp patent at 20:64 to 21:1.

[99] Hipp patent at 22:18-23.

[100] Hipp patent at 4:16-19; 13:14-17; Figure 1.

connection" provide "the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module." Communications link 71 does not perform the recited function. Rather, Hipp's single board computer 160 is described as receiving, collecting, and storing information about system components and transmitting that information over communications link 71 to remote management system 70.[101] No communication between the web server cards, network interface cards, or power supplies and the single board computer 160 takes place over communications link 71. When single board computer 160 is not present, remote management system 70 may communicate with the web server cards via communications link 71,[102] but since single board computer 160 is not present, there is no element corresponding to the recited microcontroller module.

## J.  Claim 30

76.      Claim 30 of the '021 patent reads:

> *30. A method of mounting a plurality of hot-swappable CPU modules in a computer network appliance, wherein each CPU module is an independently-functioning stand-alone computer, each CPU module comprising a hot swap connector including ground*

---

[101] Hipp patent at 15:24-30 and 20:64 to 21:1.

[102] Hipp patent at 22:14-23.

80.     For these reasons, it is my opinion that the combination of Hipp and Gasparik does not teach or suggest all of the elements of claim 30 of the '021 patent.

## VIII.   Conclusion

81.     Having carefully reviewed the materials provided to me, it is my opinion that a person of ordinary skill in the art at the time of invention of the '021 patent would not read the Hipp patent, or the combination of the Hipp and Gasparik patents, as teaching or disclosing the claim elements discussed above.

Digitally signed by William Putnam
DN: cn=William Putnam, o=Southeastern Roep
Access LLC, ou=SRA Atlanta,
email=putnam@southeasternropeaccess.com,
c=US
Date: 2014.04.09 14:43:50 -04'00'

William O. Putnam, 8 April 2014

Case: 15-1513    Document: 42    Page: 294    Filed: 09/30/2015

Amazon.com : New 2.5" G176J Y961D G281D WX387 SAS Hard Drive Tray..., R420, R510 : Computer Drive Enclosures : Computers & Accessories    3/17/14, 2:14 PM



' G176J Y961D G281D
SAS Hard Drive Tray/Caddy
oweredge R415, T410,
20, R510

1 customer review

5

hipping when purchased from SCSI4ME. Not
azon Prime.

d sold by SCSI4ME.

and high quality
the following Dell server: T310 R410 T410
) T610 R710 T710 R815 M605 M610 M710
5 M1000E MD1120 MD1220
with Dell Part #: G176J / 0G176J / G281D /
0G281D / WX387
- package included 4 x Drive Mounting Screw
- 1 x2.5"G176J SAS/SATA Hard Drive Tray for Dell

Click to open expanded view

2 new from $10.25

**Qty:** [1]

$10.25 + $2.49 shipping
In Stock. Sold by SCSI4ME

☐ Include 2-Year Warranty for
$4.63

**Add to Cart**

or

Sign in to turn on 1-Click ordering.

**Add to Wish List**

**More buying choices**

USA Okeba Industries    Add to Cart
Inc.
$10.80 + $1.99 shipping

2 new from $10.25

Have one to sell?    Sell on Amazon

Share

## What Other Items Do Customers Buy After Viewing This Item?

VicTsing 2.5" SFF Hot-Swap SCSI SAS SATA Tray Caddy for Dell G176J Dell PowerEdge T310
T320 T410 ...
(8)
$10.99

OKEBA 2.5" SAS Hard Drive HDD Tray/Caddy for Dell Poweredge R620, R710, T710, R720, R820
(6)
$13.99

Patuoxun 2.5" SAS/SATA Hard Drive Tray Caddy for Dell G176J PowerEdge T410 PowerEdge R610 PowerEdge ...
(13)
$10.09

› **Explore similar items**

## Product Details

**Shipping Information:** View shipping rates and policies

**ASIN:** B009L0NCLY

**Item model number:** FD004

**Average Customer Review:** ★☆☆☆☆ ⊟ (1 customer review)

Would you like to **update product info**, **give feedback on images**, or **tell us about a lower price**?



EXHIBIT KG
10 3-19-14
Horst

Case: 15-1513    Document: 42    Page: 295    Filed: 09/30/2015

Amazon.com : New 2.5" G176J Y961D G281D WX387 SAS Hard Drive Tray..., R420, R510 : Computer Drive Enclosures : Computers & Accessories    3/17/14, 2:14 PM

## Product Description

Works with the following for Dell Poweredge T310, R310, T320, R320, R415, T410, T420, R420, R510, R515, R520, T620, R610, T610, R620, R710, T710, R720, R820, M520, M600, M605, M610, M610x, M620, M710, M710HD, R715, R810, R815, M805, M820, M905, M910, R910, M915, M1000e

Dell Powervault: MD1120, MD1220, MD3220i, MD3620i, MD3620f package included :

4 x Drive Mounting Screw
1 x2.5"G176J SAS/SATA Hard Drive Tray for Dell

## Customers Who Viewed This Item Also Viewed



VicTsing 2.5" SFF Hot-Swap SCSI SAS SATA Tray Caddy for Dell G176J Dell ...

(8)

$10.99

OKEBA 2.5" SAS Hard Drive HDD Tray / Caddy for Dell Poweredge R620, R710, T710, ...

(6)

$13.99

Patuoxun 2.5" SAS / SATA Hard Drive Tray Caddy for Dell G176J PowerEdge T410 ...

(13)

$10.09

VicTsing 2.5" SAS / SATA Hard Drive Tray Caddy for Dell G176J Dell PowerEdge R310 ...

(4)

$10.99

## Product Ads from External Websites (What's this?)

Sponsored Content    Page 1 of 5











Dell G9146 SAS SATA 3.5" Hot-Swap Tray
$20.50
No Shipping Info
Yobitech LLC

Dell KG7NR SAS SATA 2.5" Hot-Swap Tray
$18.50
No Shipping Info
Yobitech LLC

Dell KG7NR SAS SATA 2.5" Hot-Swap Tray
$18.50
No Shipping Info
Yobitech LLC

Dell 0G281D SAS SATA 2.5" Hot-Swap Tray
$18.50
No Shipping Info
Yobitech LLC

Dell G281D SAS SATA 2.5" Hot-Swap Tray
$18.50
No Shipping Info
Yobitech LLC

See a problem with these advertisements? Let us know

Advertise here

## Customer Questions & Answers

See questions and answers

## Customer Reviews

(1)

1.0 out of 5 stars

5 star          0        Share your thoughts with other customers

A2095

Case: 15-1513    Document: 42    Page: 296    Filed: 09/30/2015

Amazon.com : New 2.5" G176J Y961D C281D WX387 SAS Hard Drive Tray ... R420, R510 : Computer Drive Enclosures : Computers & Accessories    3/17/14, 2:14 PM

| | | |
|---|---|---|
| 4 star | 0 | Write a customer review |
| 3 star | 0 | |
| 2 star | 0 | |
| 1 star | 1 | |

See the customer review

## Most Helpful Customer Reviews

**Very cheaply made**
By cedub on September 20, 2013

Amazon Verified Purchase

These caddies are made very cheaply. I ordered 6 caddies. So far, 4 of them have been defective. Two of the caddies were broken upon receipt (which OKEBA promptly sent out replacements, so kudos to them for good support). Two more of the caddies spontaneously broke while sitting inside of the server. OKEBA has provided great support on the products. I would recommend purchasing from them as they stand behind their products. But I would definitely not suggest purchasing this Drive Caddy.

Comment    Was this review helpful to you?    Yes    No

**See the customer review**

Write a customer review

Advertisement

**Product Images from Customers**



Add a product image

**Search Customer Reviews**

| | Search |
|---|---|

✔ Only search this product's reviews

## Feedback

▸ If you have a question or problem, visit our **Help pages**.

▸ Would you like to **update product info**, **give feedback on images**, or **tell us about a lower price**?

▸ If you are a seller for this product and want to change product data, click **here** (you may have to sign in with your seller id).

## Your Recently Viewed Items and Featured Recommendations

Loading...

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon.com Rewards Visa Card | Your Account |
| Investor Relations | Become an Affiliate | Amazon.com Store Card | Shipping Rates & Policies |

Amazon.com : New 2.5" G176J Y961D G281D WX387 SAS Hard Drive Tray..., R420; R510 : Computer Drive Enclosures : Computers & Accessories      3/17/14, 2:14 PM

| | | | |
|---|---|---|---|
| Press Releases | Advertise Your Products | Shop with Points | Amazon Prime |
| Amazon and Our Planet | Independently Publish with Us | Credit Card Marketplace | Returns & Replacements |
| Amazon in the Community | › See all | Amazon Currency Converter | Manage Your Kindle |
| | | | Help |

## amazon.com

Australia  Brazil  Canada  China  France  Germany  India  Italy  Japan  Mexico  Spain  United Kingdom

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **6pm**<br>Score deals<br>on fashion brands | **AbeBooks**<br>Rare Books<br>& Textbooks | **AfterSchool.com**<br>Kids' Sports, Outdoor<br>& Dance Gear | **Alexa**<br>Actionable Analytics<br>for the Web | **AmazonFresh**<br>Groceries & More<br>Right To Your Door | **Amazon Local**<br>Great Local Deals<br>in Your City | **AmazonSupply**<br>Business, Industrial<br>& Scientific Supplies | **Amazon Web Services**<br>Scalable Cloud<br>Computing Services |
| **Audible**<br>Download<br>Audio Books | **BeautyBar.com**<br>Prestige Beauty<br>Delivered | **Book Depository**<br>Books With Free<br>Delivery Worldwide | **Bookworm.com**<br>Books For Children<br>Of All Ages | **Casa.com**<br>Kitchen, Storage<br>& Everything Home | **CreateSpace**<br>Indie Print Publishing<br>Made Easy | **Diapers.com**<br>Everything<br>But The Baby | **DPReview**<br>Digital<br>Photography |
| **East Dane**<br>Designer Men's<br>Fashion | **Fabric**<br>Sewing, Quilting<br>& Knitting | **IMDb**<br>Movies, TV<br>& Celebrities | **Junglee.com**<br>Shop Online<br>in India | **Kindle Direct Publishing**<br>Indie Digital Publishing<br>Made Easy | **Look.com**<br>Kids' Clothing<br>& Shoes | **MYHABIT**<br>Private Fashion<br>Designer Sales | **Shopbop**<br>Designer<br>Fashion Brands |
| **Soap.com**<br>Health, Beauty &<br>Home Essentials | **TenMarks.com**<br>Math Activities<br>for Kids & Schools | **Vine.com**<br>Everything<br>to Live Life Green | **Wag.com**<br>Everything<br>For Your Pet | **Warehouse Deals**<br>Open-Box<br>Discounts | **Woot!**<br>Discounts and<br>Shenanigans | **Yoyo.com**<br>A Happy Place<br>To Shop For Toys | **Zappos**<br>Shoes &<br>Clothing |

Conditions of Use   Privacy Notice   Interest-Based Ads © 1996-2014, Amazon.com, Inc. or its affiliates

**A2097**



SCSI4ME
MEETING YOUR DATA STORAGE NEEDS!

Email: sales@scsi4me.com
Phone: 703-372-1195
M-F 9:30-5PM EST

Cart Contents | Checkout | My Account

Browse All | Shop Brand

Search All Categories Search

Home » Hard Drive Caddy Tray » Dell Caddies » F463R

Hard Drive Caddy Tray
- Dell Caddies
- HP Caddies
- IBM Caddies

SAS Products
SCSI Products
SATA Products
SSD / Solid State Drive
IDE Products
Fibre Channel
Direct Attached Storage / DAS
External Drive Enclosures
NAS / SAN Storage
CPU Processors
Servers / Workstations
Tape Drives
Power Supply
Others
Cables & Accessories

Manufacturers
Please Select

What's New?

LSI00410/CBL-SFF8643-SATASB-06M
$24.00

# Dell F463R 3.5" SAS / SATA 3.5" Hard Drive Tray Caddy for PowerEdge C2100, C1100 Rack Server

~~$20.00~~ $12.00

[F463R]

Available Options:

Condition:
Used. Working System Pull.

Screws:
Yes

Reviews

Enter Quantity: 1

Add to Cart

## Product Description

**Compatible Part Numbers:**

- 0F463R, F463R

**Works with the following PowerEdge server**

- PowerEdge C2100, C1100

*List is by no means complete. Please check picture of tray to see if it is what you have. Please let us know if you have successfully use it in a server not listed. Thanks.

PayPal
Get 6 Months to pay on $99 or more
Check out with PayPal and choose Bill Me Later*
Subject to credit approval. See terms. US customers only.

Shopping Cart
0 items

Manufacturer Info
- Dell Homepage
- Other products

Notifications
Notify me of updates to Dell F463R 3.5" SAS / SATA 3.5" Hard Drive Tray Caddy for PowerEdge C2100, C1100 Rack Server

Share Product

Reviews
Write a review on this product!

GODADDY VERIFIED & SECURED VERIFY SECURITY

Reviews | Add to Cart

Customers who bought this product also purchased

Seagate Cheetah 15K.7 ST3600057SS 600GB 15,000RPM 3.5-inch 6Gb/s SAS-2 Hard Drive.

Dell G176J 2.5" SAS SATAu Hard Drive Caddy Tray for PowerEdge R620 R720 R820 T710 ...G281D KG7NR WX387 Y961D 18KYH XN391

Genuine Dell 9W8C4 3.5" to 2.5" Adapter for F238F and F9541 3.5" Trays

Dell F238F 3.5" SAS SATAu Hard Drive Caddy Tray for PowerEdge R320 R420 R520 R720 T320 T420 T620 T710

Dell 9D988 3.5-inch Hot-Swap SCSI Hard Drive Caddy Tray Carrier for PowerEdge 2850 2800 1850 2600 6600 PowerVault 220S

Dell 3.5-inch Hot-Swap SAS SATA Hard Drive Caddy Tray for Dell PowerEdge Server 1950 2900 2950 6900. F9541 compatible

Contact Us / Help | My Account | FAQs /Resources | Payment Accepted

- Contact Us
- Technical Questions
- General FAQs
- Terms & Conditions

- Login/Register
- My Account
- Order History/Status
- RMA Request

- Learning Center
- SCSI FAQs, SAS FAQs
- Driver Downloads
- Rebate Center



© 2001-2013 SCSI4ME Corporation.

**A2100**

3/17/14, 1:07 PM

**Quick Links**

Drive Caddies/Trays
Solid State Drives
SATA Hard Drives
SATA Hard Drives 3.5"
SATA Hard Drives 2.5"
SAS Hard Drives
SAS 3.5" Hard Drives
SAS 2.5" Hard Drives
SCSI Hard Drives
IDE Hard Drives
SCSI RAID Controllers
Storage Components

# Dell F238F / X968D SAS / SATA Hard Drive Tray/Caddy



**Item Number: DEL-F238F-BN-OE**
**Manufacturer's Part Number: F238F**

Dell F238F / X968D / G302D / 0G302D SAS / SATA 3.5" Hard Drive Tray/Caddy - Brand New for SAS / Serial SCSI and SATA Hard Drives for Dell Poweredge R310, T310, R320, R410, R415, T420, T410, R510, R515, R520, T610, T620, R710, T710, R720, NX3000 and PowerVault MD1200, MD3200 with new style angular facia - Brand New Dell Original with screws.

Get this item <u>as soon as **Tuesday**</u>, if you order within the next: **00 Days 03:52:11**.

**View Cart**

Your Cart is Empty
View Cart

Search
Search for ..   Go
Advanced Search

Storage
  SCSI
  SAS
  SATA Hard Drives
  Internal & External
  & Accessories
  SSD - Solid State
  Drives
  DAS - Direct
  Attached Storage
  NAS - Network
  Attached Storage
  Fibre /Fiber Channel
  IDE / ATA / PATA
  Laptop Drives
  Hard Disk Drive
  Trays / Caddies -
  SCSI, SAS, SATA /
  PATA / IDE




More Photos Coming Soon

**Price:** **$49.00**

**Condition:** Brand New - <u>What does this mean?</u>

**Warranty:** 1 Year - Reseller - <u>What does this mean?</u>

**In Stock: 102** <u>Need more?</u>

[ 🛒 Add to Cart ] 1

**Also Available in:**

| Condition | Quantity | Price | Warranty |
|---|---|---|---|
| **Brand New** | 102 | 49.00 | 1 Year - Reseller |
| **New Pull** | 50 | 39.00 | 1 Year - Reseller |
| **Used Pull** | 29 | 29.00 | 1 Year - Reseller |

    

## Detailed Description

Dell F238F / X968D / G302D / 0G302D SAS / SATA 3.5" Hard Drive Tray/Caddy - Brand New for SAS / Serial SCSI and SATA Hard Drives for Dell Poweredge R310, T310, R320, R410, R415, T420, T410, R510, R515, R520, T610, T620, R710, T710, R720, NX3000 and PowerVault MD1200, MD3200 with new style angular facia - Brand New Dell Original with screws.



**A2102**

**Dell Trays – Hotswap Hard Disk Trays**

HP / Compaq Trays - Hotswap Hard Disk Trays

IBM Trays - Hotswap Hard Disk Trays

Tray / Caddy / Sled Screws & Bolts

Sun Trays - Hotswap Hard Disk Trays

Xyratex Trays - Hotswap Hard Disk Trays

Cases & Enclosures & Storage Arrays

Laptop Caddies / Trays

Laptop / Notebook Caddies / Trays & Interposers

Screws & Bolts for Hard Disk Drive Trays / Caddies / Sleds / Brackets

DVR Upgrades

Drive Wizard

Cables & Adapters

Networking

Computers

Audio & Video

Monitors

Gadgets & Executive Toys



656 Ratings ★★★★★

DPNs: F238F 0F238F X968D 0X968D
CN-0F238F-42940-95P-06XJ-A00
CN-0X968D-42940-968-0406-A00

## Compatibility

This tray/caddy is fully compatible with Dell PowerEdge Servers and Storage arrays that support SATA or SAS 3.5" hard drives including:

PowerEdge R210
PowerEdge R310
PowerEdge R320
PowerEdge R410
PowerEdge R420
PowerEdge R510
PowerEdge R515
Poweredge R520
PowerEdge R710
PowerEdge R720
PowerEdge T100
PowerEdge T105
PowerEdge T110
PowerEdge T300
PowerEdge T310
PowerEdge T320
PowerEdge T410
PowerEdge T420
PowerEdge T610
PowerEdge T620
PowerEdge T710
PowerEdge T720
PowerVault MD1200
PowerVault MD3200
PowerVault MD3200i
PowerVault NX3000
PowerVault NX3100
PowerEdge R720XD

## Specifications

Brand New Dell Original tray / bracket / sled / carrier / assembly / caddy with four screws.

This tray will accept any 3.5" x 1.0" SAS / SATA hard drive. Not for usage with SATA interposer.

**Click here to view the manufacturers item description/brochure**

## Condition
**Brand New - What does this mean?**

## Warranty
**1 Year - Reseller - What does this mean?**




**A2104**

## Related Items  

We also have hot-swap SAS and SATA hard drives to fit in this tray:



Dell F238F / X968D SATA / SAS Hard
Drive Tray

New Pull - **$39.00**
**In Stock: 50** Need more?

 1



Seagate Cheetah 15K.7 ST3450857SS
SAS Hard Disk

Brand New - **$239.00**
**Low Stock** - (Call for ETA)
**See Similar Stock**

 1



Dell F238F / X968D SAS / SATA Hard
Drive Tray/Caddys

Used Pull - **$29.00**
**In Stock: 29** Need more?

 1



Seagate 15K.7 ST3450857SS SAS
Hard Disks Drive

New Pull - **$199.00**
**In Stock: 5** Need more?

 1



Hitachi 0B23662 HUS156045VLS600
SAS Hard Disk Drive

New Pull - **$179.00**
**In Stock: 9** Need more?

 1



Seagate ST3450802SS 450GB 3.5"
10K SAS Hard Drive

Refurbished - **$150.00**
**In Stock: 4** Need more?

 1



**SCSI4ME**
*MEETING YOUR DATA STORAGE NEEDS!*

Email: sales@scsi4me.com
Phone: 703-372-1195
M-F 9:30-5PM EST

Cart Contents | Checkout | My Account

Browse All | Shop Brand

Search | All Categories ⬦ | | Search

Home » Hard Drive Caddy Tray » F238F Dell Original

| | | |
|---|---|---|
| **Hard Drive Caddy Tray** | **Genuine Dell F238F 3.5" SAS SATAu Hard Drive Caddy Tray for PowerEdge R & T Series Servers** | |
| Dell Caddies | [F238F Dell Original] | |
| HP Caddies | | |
| IBM Caddies | **Available Options:** | |
| SAS Products | **Condition:** | |
| SCSI Products | Brand New ⬦ | |
| SATA Products | **Screws:** | |
| SSD / Solid State Drive | Yes ⬦ | |
| IDE Products | 😊 **Reviews**   Enter Quantity: 1 | |
| Fibre Channel | 🛒 **Add to Cart** | |

$49.00 **$20.00**



**Shopping Cart**
0 items

**Manufacturer Info**
- Dell Homepage
- Other products

**Notifications**
Notify me of updates to **Genuine Dell F238F 3.5" SAS SATAu Hard Drive Caddy Tray for PowerEdge R & T Series Servers**

**Share Product**

**Reviews**
Write a review on this product!

VERIFIED & SECURED

**Product Description**

Dell 3.5" SAS SATA Hard Drive Tray for PowerEdge R & T Series Servers and PowerVault Enclosures

**PayPal**
Get 6 Months to pay on $99 or more
Check out with PayPal and choose Bill Me Later®

Note: This tray is for 3.5" drives. To install a 2.5" drive in this 3.5" tray, you can use the Dell 9W8C4 3.5" to 2.5" Adapter.

Note: This tray is genuine Dell

Original OEM. We also have aftermarket trays available for a cheaper price.

**Compatible Part Numbers:**

- 0F238F, F238F, X968D, 0X968D, C302D, 0C302D

Works with the following PowerEdge servers and PowerVault enclosures that use 3.5-inch SAS or SATA drives.

- PowerEdge R310, R320, R410, R415, R510, R515, R710
- PowerEdge R320, R420, R520, R720, R720xd
- PowerEdge T310, T410, T610, T710

Left sidebar:
External Drive Enclosures
NAS / SAN Storage
CPU Processors
Servers / Workstations
Tape Drives
Power Supply
Others
Cables & Accessories

Manufacturers
Please Select ⬦

What's New?

LSI00412/CBL-SFF8643-SAS8482SB-06M
$29.00

- PowerEdge T320, T420, T620
- PowerVault MD1200, MD3200, MD3200i, MD3600i, 3600f
- PowerVault NX200, NX300, NX3000, NX3100, NX3200

*List is by no means complete. Please check picture of tray to see if it is what you have. It should work with most R and T series servers that are configured to use 3.5" hotswap SAS/SATA drives.

Reviews                                          Add to Cart

Customers who bought this product also purchased



Fujitsu MBC2073RC 73GB 15K RPM 2.5-inch SFF SAS Hard Drive

WD Red WD20EFRX 2TB 7200RPM 3.5" SATA 6Gb/s Hard Drive for NAS w/64MB Cache

Molex 74547-0201 SFF-8088 to SFF-8088 Mini SAS 26-Mini SAS 26 External MiniSAS Cable. 1-Meter.

Dell PERC H810 PowerEdge RAID Controller PCI-Express Gen2.0 6Gb/s SAS SATA RAID Controller. BBU included.

Genuine HP 651687-001 651699-001 Proliant Gen8 G8 2.5-inch SFF SAS SATA HDD SSD Drive Carrier Tray

Seagate Cheetah 15K.7 ST3600057SS 600GB 15,000RPM 3.5-inch 6Gb/s SAS-2 Hard Drive.

| Contact Us / Help | My Account | FAQs /Resources | Payment Accepted |
|---|---|---|---|
| • Contact Us<br>• Technical Questions<br>• General FAQs<br>• Terms & Conditions | • Login/Register<br>• My Account<br>• Order History/Status<br>• RMA Request | • Learning Center<br>• SCSI FAQs, SAS FAQs<br>• Driver Downloads<br>• Rebate Center | Google Checkout<br>VISA  MasterCard  AMEX  DISCOVER<br>PayPal<br>VISA  AMEX  BANK |

© 2001-2013 SCSI4ME Corporation.

# Dell PowerEdge M620 Systems Owner's Manual

Regulatory Model: HHB
Regulatory Type: HHB003





EXHIBIT KG
3 -19-14
11
Horst

ACCL. 2005

A2112

⚠ CAUTION: If you need to power off the blade to service a hard drive/SSD, wait 30 seconds after the blade's power indicator turns off before removing the hard drive/SSD. Otherwise, the hard drive/SSD may not be recognized after it is reinstalled and the blade is powered on again.

## Configuring The Boot Drive

The drive or device from which the system boots is determined by the boot order specified in the System Setup.

## Removing A Hard Drive/SSD From A Hard-Drive/SSD Carrier

1. Remove the four screws from the slide rails on the hard-drive/SSD carrier.
2. Lift the hard drive/SSD out of the hard-drive/SSD carrier.



Figure 16. Removing and Installing a Hard Drive/SSD in a Hard-Drive/SSD Carrier

1. hard drive/SSD
2. screw holes (4)
3. hard-drive/SSD carrier
4. screws (4)

## Installing A Hard Drive/SSD In A Hard-Drive/SSD Carrier

1. Insert the hard drive/SSD into the hard-drive/SSD carrier with the drive's controller board's connector end of the drive at the back of the carrier.
2. From the back of the carrier, slide the drive into the carrier.
3. Align the screw holes on the hard drive/SSD with the holes on the hard-drive/SSD carrier.

    ⚠ CAUTION: To avoid damaging the drive or the carrier, do not overtighten the screws.

4. Attach the four screws to secure the hard drive/SSD to the hard-drive/SSD carrier.

51

**From:** Despertt, Sonja [mailto:Sonja.Despertt@USPTO.GOV] **On Behalf Of** Trials
**Sent:** Monday, July 07, 2014 3:21 PM
**To:** Ganti, Vivek; Trials
**Cc:** Crain, Andrew; Gravois, Robert; 'kevin.meek@bakerbotts.com'; 'paula.heyman@bakerbotts.com'; 'nick.schuneman@bakerbotts.com'; 'cat.garza@bakerbotts.com'
**Subject:** RE: conference call request RE: IPR2013-00440

Counsel:

The panel has considered the matter and does not see the need for a conference.  The Patent Owner's request for authorization is denied.  Whether a reply contains arguments or evidence that  is outside the scope of a proper reply under 37 C.F.R. 42.23(b) is left to the discretion of the Board.  Specifically, the panel will determine whether a reply and accompanying evidence are outside the scope of a proper reply and evidence when the parties' briefs are reviewed and the final decision is prepared.   See case IPR2013-00276 Paper 28.

Regards,
Sonja Despertt


**From:** Ganti, Vivek [mailto:Vivek.Ganti@thomashorstemeyer.com]
**Sent:** Monday, July 07, 2014 8:49 AM
**To:** Trials
**Cc:** Crain, Andrew; Gravois, Robert; 'kevin.meek@bakerbotts.com'; 'paula.heyman@bakerbotts.com'; 'nick.schuneman@bakerbotts.com'; 'cat.garza@bakerbotts.com'
**Subject:** conference call request RE: IPR2013-00400

Dear PTAB Staff,

I serve as counsel for Patent Owner Acceleron in IPR2013-00440.  This IPR is assigned to ALJ Thomas L. Giannetti, ALJ Trenton A. Ward, and ALJ Jeremy M. Plenzler.  Petitioner's counsel is copied on this email.

Patent Owner requests a conference call with the board to address the following issue.  On June 17, Petitioner filed a Reply to Patent Owner's Opposition.  Patent Owner believes this Reply improperly alleges new invalidity arguments that Patent Owner had no opportunity to address in its Opposition brief.  In addition the Reply introduces new grounds for invalidity (e.g., IPR was instituted on grounds of anticipation for some claims and Petitioner's Reply alleges new obviousness grounds for these claims through its Reply).

Patent Owner requests a conference call to seek authorization to move to strike those arguments/grounds raised in Petitioner's Reply that are outside the scope of this proceeding.  As an alternative, Patent Owner seeks any other remedy the board deems just, including, for example, the filing of a sur-reply by Patent Owner.

The parties have conferred and are available on Thursday, July 10th.

Regards,

Vivek Ganti



400 Interstate North Parkway SE
Suite 1500
Atlanta, Georgia  30339-5029
Phone:  (770) 933-9500
Fax:  (770) 951-0933
thomashorstemeyer.com

Confidentiality Notice: This e-mail message and any attachments are intended only for the use of those to whom it is addressed and may contain information that is confidential and prohibited from further disclosure under law. If you have received this e-mail message in error, its review, use, retention, and/or distribution is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail message and destroy all copies of the original message and any attachments.



**SRI INTERNATIONAL, INC., Plaintiff, v. DELL INC. and SECUREWORKS, INC., Defendants. SRI INTERNATIONAL, INC., Plaintiff, v. CISCO SYSTEMS, INC., Defendant.**

**Civ. No. 13-737-SLR,Civ. No. 13-1534-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2015 U.S. Dist. LEXIS 63022*

**May 14, 2015, Decided**
**May 14, 2015, Filed**

**COUNSEL:** [*1] For SRI International Inc., a California Corporation, Plaintiff (1:13-cv-00737): Thomas Lee Halkowski, LEAD ATTORNEY, Fish & Richardson, P.C., Wilmington, DE; Howard G. Pollack, Joanna M. Fuller, PRO HAC VICE; Warren K. Mabey , Jr., Fish & Richardson, P.C., Wilmington, DE.

For Dell Inc., a Delaware Corporation, Defendant (1:13-cv-00737): Francis DiGiovanni, LEAD ATTORNEY, Drinker Biddle & Reath LLP, Wilmington, DE; Masood Anjom, Paula Heyman, Roger J. Fulghum, Tammy P. Rhodes, PRO HAC VICE; Thatcher A. Rahmeier, Drinker Biddle & Reath LLP, Wilmington, DE.

For SecureWorks Inc., a Georgia Corporation, Defendant (1:13-cv-00737): Francis DiGiovanni, LEAD ATTORNEY, Drinker Biddle & Reath LLP, Wilmington, DE; Paula Heyman, Roger J. Fulghum, Roger J. Fulghum, Tammy P. Rhodes, PRO HAC VICE.

For SecureWorks Inc., a Georgia Corporation, Counter Claimant (1:13-cv-00737): Francis DiGiovanni, LEAD ATTORNEY, Drinker Biddle & Reath LLP, Wilmington, DE.

For SRI International Inc., a California Corporation, Counter Defendant (1:13-cv-00737): Thomas Lee Halkowski, LEAD ATTORNEY, Fish & Richardson,

P.C., Wilmington, DE; Howard G. Pollack, PRO HAC VICE.

For Dell Inc., a Delaware Corporation, Counter Claimant [*2] (1:13-cv-00737): Francis DiGiovanni, LEAD ATTORNEY, Drinker Biddle & Reath LLP, Wilmington, DE; Masood Anjom, Paula Heyman, Roger J. Fulghum, Tammy P. Rhodes, PRO HAC VICE.

For SecureWorks Inc., a Georgia Corporation, Counter Claimant (1:13-cv-00737): Francis DiGiovanni, LEAD ATTORNEY, Drinker Biddle & Reath LLP, Wilmington, DE.

For SRI International Inc., a California Corporation, Counter Defendant (1:13-cv-00737): Thomas Lee Halkowski, LEAD ATTORNEY, Fish & Richardson, P.C., Wilmington, DE; Howard G. Pollack, Joanna M. Fuller, PRO HAC VICE; Warren K. Mabey , Jr., Fish & Richardson, P.C., Wilmington, DE.

For SRI International Inc., a California Corporation, Plaintiff (1:13-cv-01534): Thomas Lee Halkowski, LEAD ATTORNEY, Fish & Richardson, P.C., Wilmington, DE; David M. Hoffman, David S Morris, Howard G. Pollack, Phillip W. Goter, PRO HAC VICE; Warren K. Mabey , Jr., Fish & Richardson, P.C., Wilmington, DE.

For Cisco Systems Inc., a California Corporation, Defendant (1:13-cv-01534): Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Michael J. Flynn, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For Cisco Systems Inc., a California Corporation, [*3] Counter Claimant (1:13-cv-01534): Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For SRI International Inc., a California Corporation, Counter Defendant (1:13-cv-01534): Thomas Lee Halkowski, LEAD ATTORNEY, Fish & Richardson, P.C., Wilmington, DE; David M. Hoffman, Howard G. Pollack, Phillip W. Goter, PRO HAC VICE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM ORDER**

At Wilmington this 14th day of May, 2015, having heard argument on, and having reviewed the papers submitted in connection with, the parties' proposed claim construction;

IT IS ORDERED that the disputed claim language of *U.S. Patent Nos. 6,711,615 ("the '615 patent")* and *6,484,203 ("the '203 patent")* shall be construed consistent with the tenets of claim construction set forth by the United States Court of Appeals for the Federal Circuit in *Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)*, as follows:

1.  **"[I]nvoking countermeasures:"[1] [2]** "Taking an action in response including both passive and active responses." In the absence of arguments supporting an alternative construction, the court adopts its previous construction of this term. (*See* Civ. No. 04-1199; D.l. 468 at 5)

----

1  Claims 3 and 15 of the *'615 patent* and claims 3 and 14 of the *'203 patent.*
2  Unless otherwise specified, the court relies solely on intrinsic evidence [*4] in reaching its claim construction. *See generally Teva Pharm.*

*USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 834 (2015).*

2.  **"[N]etwork traffic data:"[3] [4]** "Data obtained from direct examination of network packets." This construction is informed by the specification and the patentee's statements during reexamination, wherein the patentee argued: "According to its plain meaning, the phrase 'network traffic data' refers to data obtained from network traffic, i.e., network packets. Thus, the method of claim 1 reciting 'detecting, by the network monitors, suspicious network activity based on analysis of network traffic data' requires direct examination of network packets." (D.l. 111 at JA2835, JA3226) The patentee noted that "each enumerated category [recited in claim 1] specifically requires that the associated data be obtained by direct examination of network packets." (*Id.*) The patentee identified instances where the specification equates "traffic" and "packets," citing column 5:14-15 of the *'615 patent*, which recites "discarded traffic (i.e., packets)." (*Id.*) The patentee also distinguished "network traffic data" from the terms "network traffic measures" and "network traffic statistics," which the specification uses "when discussing information **derived** from network traffic observation, [*5] as compared to the data from which the measures and statistics are derived." (*Id.*) (emphasis in original) The patentee's careful distinction between "network traffic data" and information derived from network traffic observation (such as statistical measures) is contrary to plaintiff's proposed construction of "data derived from or describing network packets." However, defendants' proposed construction of "network packets" is lacking precision where the patentee states that network traffic data refers to data **obtained from** network traffic and then equates "traffic" with "packets." (*Id.*)

----

3  Claims 1 and 13 of the *'615 patent* and claims 1 and 12 of the *'203 patent*
4  The court declines to separately construe the partially overlapping terms "based on analysis of network traffic data" and "detecting, by the network monitors, suspicious network activity based on analysis of network traffic data / detecting suspicious network activity based on analysis of network traffic data" to avoid redundancy in the court's analysis.

3.  Regarding "direction examination," plaintiff argues that during reexamination, the patentee merely

disclaimed host-based monitoring, not all methods of indirect examination of network packets. Specifically, [*6] the patentee overcame prior art disclosing a host-based audit log by arguing that the prior art method "do[es] not monitor network packets, as required by the claims." (D.l. 111 at JA1934) The patentee later clarified that "the claim language requires the suspicious network activity to follow from analysis of the network packets, not logs or other information generated therefrom or otherwise gleaned." (*Id.* at JA3489) The patentee reiterated that "the claim term 'analysis of network traffic data' refers to analysis of network packets, not some proxy thereof." (*Id.* at JA3490) The disclaimer of claim scope, therefore, is broader than excluding host-based monitoring of audit logs, and explicitly extends to proxy information or "other information generated therefrom or otherwise gleaned." The court agrees with the patentee's own statement that "by reciting 'based on analysis of network [packets],' the claim requires direct examination of those network packets to detect suspicious network activity." (*Id.* at JA3489) (modification in original)

4. "[A]dapted to:"[5] "Configured to." The Federal Circuit has held that "the phrase 'adapted to' is frequently used to mean 'made to,' 'designed to,' or 'configured to,' [*7] but it can also be used in a broader sense to mean 'capable of or 'suitable for.'" *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc., 672 F.3d 1335, 1348-49 (Fed. Cir. 2012).* As in *Aspex*, the intrinsic evidence at bar supports a narrower interpretation of "adapted to" by describing how the hierarchical monitors "are designed or configured to accomplish the specified objective, not simply that they can be made to serve that purpose." *Id. at 1349.* For example, the specification states that the monitors 16d-f "correlate intrusion reports" ('*615 patent*, col. 4:8-11)[6] and a single monitor "subscribes to the analysis results produced by service monitors 16a-c, and then propagates its own analytical reports to its parent enterprise monitor 16f." (*Id.* at col. 10:8-11) Additionally, the claims recite "one or more hierarchical monitors in the enterprise network, the hierarchical monitors adapted to automatically receive and integrate the reports of suspicious activity." (*Id.* at col. 16:3-6)

5    Claim 13 of the '*615 patent* and claim 12 of the '*203 patent*

6    The '*615 patent* and the '*203 patents* share a specification, and all citations are to the '*615 patent* unless otherwise noted.

5. The description of the hierarchical monitors in the intrinsic evidence suggests that monitors 16d-f are intended to actively propagate and correlate reports, not that they are merely capable [*8] of doing so. Indeed, the purpose of the invention -- to "provide[] a framework for the recognition of more global threats" through an "analysis hierarchy" including various monitors — would be ill-served if the hierarchical monitors were not configured to perform their stated task. (*Id.* at col. 3:43-45) Moreover, the claims at issue do not use the word "for" followed by the future tense of a verb, a form of claiming that the Federal Circuit has found particularly suggestive of recitations of "capability, as opposed to actual operation." *Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1204-05 (Fed. Cir. 2011)* (claims reciting "a logical engine for preventing execution" and "a communications engine for obtaining a Downloadable"; see also *Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217 (Fed. Cir. 2014)* (claim reciting "a processor for arranging information for transmission").

6. "[W]ithin an enterprise network / in the enterprise network:"[7] "Part of an enterprise network." The preamble is limiting. The Federal Circuit has held that if "limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Proveris Scientific Corp. v. Innovasystems, Inc., 739 F.3d 1367, 1372 (Fed. Cir. 2014).* Here, the term "enterprise network" derives antecedent basis from the preamble in that "an enterprise network" appears in the [*9] preamble and is followed by a recitation of "deploying a plurality of network monitors in the enterprise network" in the body of the claim. ('*615 patent*, col. 15:5-6) (emphasis added) Plaintiff argues that by indicating that the network monitors are in the enterprise network yet failing to indicate the location of hierarchical monitors, the drafter intentionally untethered the hierarchical monitors from the enterprise network. (*See id.* at claim 1) However, the court discerns no such intention as hierarchical monitors are a type of network monitor (D.l. 71 at 2), and it would be unnecessary for the drafter to additionally specify the location of the hierarchical monitors after stating that the network monitors are within the enterprise network.

7    Claims 1 and 13 of the '*615 patent* and claims 1 and 12 of the '*203 patent*

7. "[S]uspicious network activity:"[8] "Activity that indicates an unknown, but suspected, intrusion." Plaintiff proposes that suspicious activity is an umbrella term that encompasses malicious activity, while defendants argue that suspicious and malicious activity are distinct categories. The specification describes how the signature engine 24 "maps an event stream against abstract representation of event sequences that [*10] are known to indicate undesirable activity." ('615 patent, col. 7:33-35) Next, "[t]he signature engine scans the event stream for events that represent attempted exploitations of **known attacks** against the service, or other activity that stands alone as warranting a response from the monitor." (Id. at col. 7:40-43) (emphasis added) Examples of known attacks include "address spoofing, tunneling, source routing, SATAN attacks, and abuse of ICMP messages ('Redirect' and 'Destination Unreachable' messages in particular)." (Id. at col. 7:51-55) In addition to detecting known attacks, the "signature engine 24 can also examine the data portion of packets in search of a variety of transactions that indicate **suspicious, if not malicious**, intentions by an external client." (Id. at col. 7:6466) (emphasis added) The specification describes how "analysis engines 22, 24 receive large volumes of events and produce smaller volumes of intrusion or suspicion reports." (Id. at col. 8:23-25) The court agrees with defendants that the specification draws a distinction between suspicious and malicious activity, a distinction that is consistent with the specification and the plain and ordinary meaning of the words. However, [*11] defendants' proposed addition of "unconfirmed" is likely to introduce unnecessary ambiguity in that the patent uses the word "known" rather than "confirmed" to characterize malicious attacks. (See id. at col. 7:34-36; 7:40-43)

8 Claims 1 and 13 of the '615 patent and claims 1 and 12 of the '203 patent

8. "[S]elected from the following categories: {.. .}:"[9] "Chosen from at least one of the specified categories: {.. .}." The parties dispute whether the term should be characterized as a Markush group. The Federal Circuit has held that "[a] Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B and C." Abbott Labs. V. Baxter Pharm. Prods., Inc., 334 F.3d 1274, 1280 (Fed. Cir. 2003); see also Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1372 (Fed. Cir. 2005) ("If an applicant tries to claim a Markush group without the

word 'consisting,' the PTO will insist upon the addition of this word to ensure a closed meaning."). The MPEP defines a Markush group as "any claim that recites a list of alternatively useable species regardless of format." MPEP § 2173.05(h). For example, the MPEP states that "[a]lternative expressions using 'or' are acceptable, such as 'wherein R is A, B, C, or D.'" Id.

9 Claims 1 and 12 of the '203 patent

9. Claims 1 and 12 of the '203 patent do not use the language "consisting of and do not recite [*12] the enumerated categories in the alternative, thereby failing to satisfy either of the most fundamental hallmarks of Markush claiming. Defendants argue that plaintiff should be held to its repeated representation in previous litigation (D.l. 127, ex. 4 at 5, ex. 5 at 3-4, ex. 6 at ¶ 26, ex. 7 at 90:10-23; D.l. 143 ex. 17 at 1, ex. 18 at 3, ex. 19 at 7, ex. 23 at ¶ 33) and reexamination (D.l. 111 at JA2614) that the claims involve a Markush group. However, it is the court's opinion that these representations were ill-founded, and that merely stating (albeit repeatedly) that a phrase is a Markush group does not make it so.

10. "[E]nterprise network:"[10] "A network having a plurality of network monitors used in connection with a project or undertaking, for example, a large, privately owned wide area network." The specification states that "enterprise 10 surveillance **may be used** where domains 12a-12c are interconnected under the control of a single organization, such as a large privately owned WAN (Wide Area Network)." ('615 patent, col. 4:27-31) (emphasis added) The specification also states that "enterprise 10, however, need not be ...centrally administered." (Id. at col. 4:33-34) Under the most straightforward [*13] reading of this disclosure, the conditional language "may be used" demonstrates the patentee's unwillingness to make control by a single organization a necessary feature of the invention. The additional disclosure that an enterprise need not be centrally administered does not add clarity, as the parties' experts' dispute whether a person of ordinary skill in the art would expect an enterprise lacking central administration to be under the control of a single organization. (D.l. 110, ex. 3 at ¶¶ 611; D.l. 128 at ¶ 19) The court discerns no other disclosure in the specification or claims that compels a different conclusion.

10 Claims 1, 6, 13 and 18 of the '615 patent and claims 1, 6, 12 and 17 of the '203 patent

2015 U.S. Dist. LEXIS 63022, *13

/s/ Sue L. Robinson                                    United States District Judge

Trials@uspto.gov                                              Paper 94
Tel: 571-272-7822                                  Entered:  May 9, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

CORNING INCORPORATED
Petitioner

v.

DSM IP ASSETS B.V.
Patent Owner

————————————

Case IPR2013-00048
Patent 6,298,189 B1

————————————

Before FRED E. McKELVEY, GRACE KARAFFA OBERMANN,
JENNIFER S. BISK, SCOTT E. KAMHOLZ, and ZHENYU YANG,
*Administrative Patent Judges.*

KAMHOLZ, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Case IPR2013-00048
Patent 6,298,189 B1

# I. INTRODUCTION

## A. Background

Petitioner Corning Incorporated ("Corning") filed a petition (Paper 6, "Pet.") to institute an *inter partes* review of claims 1-52 (the "challenged claims") of U.S. Patent No. 6,298,189 B1 (Ex. 1001 (the "'189 patent")).[1] The Board instituted trial for the challenged claims on the following grounds of unpatentability asserted by Corning:

| Reference(s) [2] | Basis | Claims challenged |
|---|---|---|
| A. Shustack | § 102 | 1-3, 5-7, 9-11, 13-15, 37-39, 45-47, and 49-51 |
| B. Shustack | § 103 | 1-3, 5-7, 9-11, 13-15, 37-39, 45-47, and 49-51 |
| C. Szum '928 | § 102 | 1, 5, 9, 13, 37, 45, and 49 |
| D. Shustack and Jackson | § 103 | 4, 8, 12, 16, 40, 48, and 52 |
| Combination A, B, C, or D; and Chawla | § 103 | 17-20 |
| Combination A, B, C, or D; and Hager | § 103 | 21-24 |
| Combination A, B, C, or D; and Tortorello | § 103 | 25-28 |

---

[1] Case IPR2013-00049 concerns claims 53-66 of the '189 patent.

[2] The petition relies on the following references:  U.S. Patent No. 5,352,712 (Ex. 1003 ("Shustack")); WO 95/15928 (Ex. 1005 ("Szum '928")); U.S. Patent No. 4,900,126 (Ex. 1007 ("Jackson")); U.S. Patent No. 5,696,179 (Ex. 1008 ("Chawla")); U.S. Patent No. 5,182,784 (Ex. 1009 ("Hager")); U.S. Patent No. 5,847,021 (Ex. 1010 ("Tortorello")); WO 97/46380 (Ex. 1011 ("Botelho")); U.S. Patent No. 4,707,076 (Ex. 1012 ("Skutnik")); and U.S. Patent No. 5,408,564 (Ex. 1013 ("Mills")).

2

Case IPR2013-00048
Patent 6,298,189 B1

| Combination A, B, C, or D; and Botelho | § 103 | 29-32 |
|---|---|---|
| Combination A, B, C, or D; and Skutnik | § 103 | 33-36 |
| Combination A, B, C, or D; and Mills | § 103 | 41-44 |

Decision to Institute 3-4 (Paper 15, "Dec.").

After institution of trial, Patent Owner DSM IP Assets B.V. ("DSM") filed a Patent Owner Response (Paper 46, "Resp."), and Corning filed a Reply to the Patent Owner Response (Paper 65, "Reply"). DSM filed a Supplemental Response (Paper 74, "Supp. Resp.") with leave of the Board, and Corning filed a Supplemental Reply (Paper 75, "Supp. Reply"). DSM filed a Motion for Observations on Cross-Examination of Corning Reply Declarants (Paper 78, "Obs."), and Corning filed a Response to the Observations (Paper 86, "Obs. Resp.").

DSM also filed a Motion to Amend Claims (Paper 47, "Motion to Amend"). In it, DSM proposed claims 67, 68, 69, and 70 to substitute for patented claims 6, 7, 14, and 15, respectively. Motion to Amend 1-6. Corning filed an Opposition to the Motion to Amend Claims (Paper 64, "Opp."). DSM filed a Reply to the Opposition (Paper 76, "Motion Reply").

DSM also filed a Motion to Exclude certain of Corning's evidence (Paper 79, "PO Motion to Exclude"). Corning filed an Opposition (Paper 85, "PO Excl. Opp."), and DSM filed a Reply (Paper 89, "PO Excl. Reply"). Corning filed a Motion to Exclude certain of DSM's evidence (Paper 82, "Pet. Motion to Exclude"). DSM filed an Opposition (Paper 84), and Corning filed a Reply (Paper 90).

Case IPR2013-00048
Patent 6,298,189 B1

Corning relies upon declarations of Dr. Michael Winningham
(Ex. 1014) and Ms. Inna Kouzmina (Ex. 1015) in support of its Petition.
DSM relies upon declarations of Dr. Christopher Bowman (Ex. 2034) and
Dr. Carl Taylor (Ex. 2032) in its Response, along with a deposition of
Dr. Winningham (Exs. 2027-2031) and portions of Ms. Kouzmina's
deposition (Exs. 2024-26). Corning relies upon declarations of
Dr. Jiann-Wen Woody Ju (Ex. 1035) and Dr. Dotsevi Sogah (Ex. 1068), a
responsive declaration of Dr. Winningham (Ex. 1078), along with
depositions of Dr. Bowman (Exs. 1070-72, 1075-77) and Dr. Taylor
(Exs. 1045-47) and a portion of Ms. Kouzmina's deposition (Ex. 1044) in its
Reply. DSM relies upon a supplemental declaration of Dr. Bowman in its
Supplemental Response (Ex. 2055). Corning relies upon depositions of
Dr. Winningham (Ex. 1080)[3] and Dr. Dotsevi Sogah (Ex. 1079) in its
Supplemental Reply. DSM relies upon depositions of Dr. Winningham (Ex.
2085), Dr. Sogah (Exs. 2073-74), and Dr. Ju (Exs. 2087-88) in its Motion
for Observations on Cross-Examination of Corning Reply Declarants.

Oral argument was conducted on February 11, 2014. A transcript is
entered as Paper 93 ("Tr."). Both parties indicated during oral argument that
the oral argument in case IPR2013-00045 relates to this proceeding as well.
Tr. 3:12-14; 24:19-21. The transcript for case IPR2013-00044 is entered as
Paper 89 in that proceeding.

The Board has jurisdiction under 35 U.S.C. § 6(c). This final written
decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

---

[3] Ex. 1080 is a rough transcript. DSM submitted an official transcript as
Ex. 2088.

Case IPR2013-00048
Patent 6,298,189 B1

Corning has proved that claims 5, 13, 17, 29, 33, 37, 45, and 49 are unpatentable. Corning has not proved that claims 1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52 are unpatentable.

DSM's Motion to Amend Claims is denied without prejudice.

Corning's Motion to Exclude Evidence is dismissed.

DSM's Motion to Exclude Evidence is dismissed-in-part and denied-in-part.

### B. *The Invention*

The '189 patent generally relates to radiation-curable coating compositions for optical glass fibers commonly used in data transmission. Ex. 1001, 1:18-19. In particular, the patent describes optical glass fibers coated with two radiation-cured coatings. *Id.* at 1:26-27. An inner primary coating contacts the glass surface of the fiber. *Id.* at 1:28-30. An outer primary coating overlays the inner coating. *Id.* For identification purposes, the outer primary coating may include colorant or, alternatively, a third colored layer, called an ink coating, which is applied to the outer primary coating. *Id.* at 1:53-58. Figure 1, depicting such an optical glass fiber, is reproduced below.

5

Case IPR2013-00048
Patent 6,298,189 B1



FIG. 1

Figure 1, above, illustrates a longitudinal cross-sectional view of a coated optical glass fiber 7 coated with an inner primary coating 8 and a commercially available outer primary coating 9. *Id.* at 8:8-9, 10:7-9.

To create a cable or ribbon assembly, used in the construction of multi-channel transmission cables, a plurality of coated optical fibers are bonded together in a matrix material. *Id.* at 1:39-47. In order to connect the fibers of multiple ribbons, the surface of a glass fiber must be accessible. *Id.* at 1:53-2:6. This is often accomplished by a process known as "ribbon stripping"—removing the coatings and the matrix material, preferably as a cohesive unit. *Id.* The '189 patent is directed to a ribbon assembly having improved ribbon stripping capabilities. *Id.* at 1:21-23.

As described in the Background of the Invention, the prior art discloses ribbon assemblies composed of multiple optical glass fibers with both an inner and outer coating and an optional outer ink layer. *Id.* at 4:64-

6

5:4. The two compositions used as the inner and outer coatings are often modified to provide desired properties—providing bare optical glass fibers, which, when stripped, are substantially free of residue. *Id.*

Claims 2 and 5, reproduced below, are illustrative of the claimed subject matter:

> 2. A system for coating an optical glass fiber comprising a radiation-curable inner primary coating composition and a radiation-curable outer primary coating composition wherein:
>
> said inner primary coating composition comprises propoxylated nonyl phenol acrylate and an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said inner primary coating composition after radiation cure having the combination of properties of:
>
> (a) a fiber pull-out friction of less than 40 g/mm at stripping temperature;
>
> (b) a crack propagation of greater than 1.0 mm at stripping temperature;
>
> (c) a glass transition temperature of below 10° C.; and
>
> (d) sufficient adhesion to said glass fiber to prevent delamination in the presence of moisture and during handling; and
>
> said outer primary coating composition comprises an oligomer having at least one functional group capable of polymerizing under the influence of radiation, said outer primary coating composition after radiation cure having the combination of properties of:
>
> (e) a glass transition temperature of above 40° C.; and

(f) a modulus of elasticity of between about 10 MPa to about 40 MPa at stripping temperature;

and wherein the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature.

5. A radiation-curable inner primary coating composition for an optical glass fiber comprising at least one oligomer having at least one functional group capable of polymerizing under the influence of radiation, said composition, after radiation cure, having the combination of properties of:

(a) a fiber pull-out friction of less than 20 g/mm at 90° C;

(b) a crack propagation of greater than 1.0 mm at 90° C;

(c) a glass transition temperature of below 10° C; and

(d) adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity.

## II. DISCUSSION

### A. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). Claim terms are also given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the

entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

### *1. "In the presence of moisture" (claims 1-4 and 9-12)*

Claims 1-4 and 9-12 require an inner primary coating, or a composition after cure, that exhibits "sufficient adhesion to [a] glass fiber to prevent delamination in the presence of moisture and during handling." We refer to that property in our analysis as "the claimed adhesion property."

The parties disagree about the meaning of the term "in the presence of moisture," which appears in the limitation relating to the claimed adhesion property. Corning argues that the term is broad enough to embrace exposure to 95% relative humidity as disclosed in the '189 patent for a wet adhesion test. Pet. 17; *see* Ex. 1001, 28:50-29:5 (disclosing conditions of wet adhesion test). DSM counters that "in the presence of moisture" means exposure to liquid water—that is, 100% relative humidity—as would be present, for example, in the water soak delamination test described in the '189 patent. Resp. 15-18 (citing Ex. 2032 ¶¶ 59-66). That delamination test involves soaking a cured coating sample in a hot water bath for up to 24 hours. Ex. 1001, 27:21-37 (describing conditions of the water soak delamination test); 29:20-58 (Table 3). DSM produces evidence that under conditions of 95% relative humidity, "by definition, there will be no

Case IPR2013-00048
Patent 6,298,189 B1

moisture condensation on the surface of the coating because moisture condenses at 100% relative humidity." Ex. 2032 ¶ 61; *See* Resp. 17.

The evidence supports a conclusion that the broadest reasonable interpretation of the term "moisture" is liquid water—that is, a condition of 100% relative humidity. The written description uses the term "moisture" in a context that suggests liquid water. *See, e.g.*, Ex. 1001, 28:65-67 (applying a "wax/water slurry" to surface of sample film in order "to retain moisture"); 35:17-18 (applying heat to remove "moisture" from samples, suggesting removal of liquid water). Moreover, where the written description discusses water in vapor form, the inventors use the word "humidity" or "atmospheric moisture," but not "moisture" alone. *See, e.g., id.* at 21:47 (referring to "atmospheric moisture"); 28:48, 60, 65 (referring to "humidity"). The '189 patent further discloses that a "ribbon assembly can be buried under ground or water for long distance connections, such as between cities," which is consistent with the proposition that an optical fiber coating must endure long periods of immersion in liquid water without delaminating. Ex. 1001, 67:43-45. In light of the context in which the term "moisture" appears in the specification, we conclude that the inventors used that term in its ordinary sense to refer to liquid water.

The '189 patent, thus, is directed to a coating composition that, after radiation cure, has sufficient adhesion to glass to prevent delamination in the presence of liquid water. We decline to resolve what temperature, or length of time of exposure to liquid water the coating must endure, without delaminating, in order to satisfy the claimed adhesion property. Resolving those conditions is not necessary to our analysis, which focuses on whether Corning's wet adhesion test, conducted under conditions of 95% relative

10

Case IPR2013-00048
Patent 6,298,189 B1

humidity, is probative of the extent to which a cured coating delaminates from glass when exposed to liquid water.

### 2. *"Stripping temperature"*

Corning argues that the '189 patent describes stripping temperature as being from about 90°C to about 120°C. Pet. 16 (citing Ex. 1001, 13:32-34). DSM does not contest this construction.

We do not agree with Corning that the '189 patent defines the term "stripping temperature" as "about 90°C to about 120°C." Rather, the patent indicates that stripping temperature is "typically" within this range. Ex. 1001, 13:32-34; *accord id.* at 14:21-25 ("[F]or most coating compositions the design ribbon stripping temperatures are usually about 90° C. to about 120° C., but may be different depending on the specific design parameters for the particular coating composition."). This disclosure is too imprecise to serve as a definition. *See Paulsen*, 30 F.3d at 1480.

The '189 patent does refer repeatedly, however, to 90°C as an exemplary stripping temperature. *E.g.*, Ex. 1001, 31:14-15, 31:41-42, 50:55. The '189 patent also identifies 100°C as an exemplary stripping temperature, particularly in the context of measuring change in length. *Id.* at 14:46-47, 18:44-45. Whatever other temperatures this term encompasses, it certainly encompasses at least the ones specifically identified. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification."). The limitation requires no further construction.

11

A2273

### 3. "Fiber pull-out friction"

Every challenged claim requires that the inner primary coating, or the inner primary coating composition after cure, have a fiber pull-out friction of less than a specified amount at a specified temperature. *See, e.g.*, claims 2 and 5, sec. I.B, *supra*. The parties do not propose express construction of this term, but they do disagree as to certain details of the procedure for testing fiber pull-out friction. *E.g.*, Resp. 31; Reply 3.

The '189 patent describes a procedure that may be used for testing fiber pull-out friction:

> The fiber pull-out friction test can be performed as follows. The sample consists of a bare, clean optical fiber, one end of which has been embedded in a 250 micron thick sheet of cured inner primary coating to be tested. This assembly is mounted in a suitable instrument such as a Rheometrics RSA-II rheometer, and the temperature raised to a representative ribbon stripping temperature (such as 90° C.), and the fiber pulled slowly out of the sheet at a rate of 0.1 mm/sec. The instrument records and plots force vs distance. The plots typically show a linear region of negative slope, which is the result of a decreasing area of contact between fiber and coating, as the fiber is being withdrawn. The slope is measured, and is the output of the test. Low slope values correspond to a low fiber pull-out friction, and vice versa. Three test samples should be performed and their average used as the final output of the test.

Ex. 1001, 31:35-50. Although this test is not described as being the only one that can be used to determine fiber pull-out friction, it is specifically identified in the '189 patent. Consequently, we construe "fiber pull-out

Case IPR2013-00048
Patent 6,298,189 B1

friction" as encompassing at least a fiber pull-out friction measurement
obtained using the procedure disclosed in the above-quoted passage. *See*
*Oatey*, 514 F.3d at 1276.

### 4. Other terms

Corning proposes constructions for several other terms, Pet. 16-18,
none of which DSM contests. We have considered Corning's arguments but
determine that the limitations discussed need not be construed in a manner
that departs from their ordinary and customary meanings for purposes of this
decision, and do not need to be construed expressly.

### B. Reliability of Dr. Winningham's Testimony

DSM argues that Dr. Winningham's opinions are unreliable because
he "fails to understand" the legal standards for obviousness. Resp. 55-57.
In particular, DSM argues that Dr. Winningham gave no consideration to the
relevant time period when addressing who is one of skill in the art for
obviousness purposes. *Id.* DSM quotes the following portion of
Dr. Winningham's deposition in support of this argument:

> Q. Does the time, does the year make any
> difference in terms of who that skilled scientist
> would be in that relevant art?
> A. I'm not making that distinction.
> Q. So at any time?
> A. Yes.

*Id.* at 56-57 (quoting Ex. 2029, 424:18-23).

DSM argues both that Dr. Winningham's testimony should be
excluded and given little or no weight. Resp. 45-47; PO Mot. To Exclude 1-
7. We address the admissibility of Dr. Winningham's testimony below in
our decision on DSM's motion to exclude evidence. To the extent that

A2275

Case IPR2013-00048
Patent 6,298,189 B1

DSM's argument goes to the weight to be accorded Dr. Winningham's testimony, it is not persuasive. DSM identifies no particular instances in which Dr. Winningham's silence as to the relevant time period for determining who is one of skill in the art weakens his testimony. We agree with Corning that the thoroughness of Dr. Winningham's testimony outweighs the concern DSM expresses.

We also are not persuaded that Dr. Winningham made the admission that DSM argues. DSM's question appears to address whether Dr. Winningham made any distinctions about the qualifications and experience of a skilled scientist over time, not whether Dr. Winningham based his obviousness opinions on the knowledge of that skilled scientist at the time the invention was made. We do not find Dr. Winningham's supposed admission determinative on the issue of whether he failed to consider the relevant time period in his obviousness opinions.

DSM also argues that Dr. Winningham failed to analyze the underlying test data as rigorously as an independent expert and instead trusted Ms. Kouzmina's statements based on his experience working with her and confidence in her skills. Resp. 57-59. Corning argues that it was appropriate for Dr. Winningham to rely on Ms. Kouzmina based on their long working relationship, that Dr. Winningham had sufficient information on which to base his opinions, and that Drs. Bowman and Taylor did no better in reviewing DSM data. Reply 14-15.

DSM's assertion does not persuade us that all of Dr. Winningham's opinions should be accorded no weight for lacking a basis in underlying data. DSM identifies no evidence that refutes Dr. Winningham's statement that his confidence in Ms. Kouzmina's work is based on their long working

14

**A2276**

Case IPR2013-00048
Patent 6,298,189 B1

relationship. We credit this statement and accord Dr. Winningham's opinions the weight to which they are entitled.

### C. Material Property Limitations

The crux of Corning's case-in-chief is that the prior art compositions are made of the same chemical substances as are presently claimed, and that Corning's testing of those prior art compositions reveals them to possess inherently the claimed material property limitations. *See* Pet. 4-5. DSM argues, among other things, that Corning improperly tested some of the material property limitations. Resp. 26-35. DSM's arguments in this regard cut across Corning's various unpatentability challenges, so we address DSM's material property limitation arguments first.

The Board gives consideration to the arguments, and the evidence cited in support of those arguments, that the parties make. The Board will not scour the record in search of evidence relevant to a particular issue, nor will it attempt to fit evidence together into a coherent explanation that supports an argument. Such activities are the province of advocacy. *See Stampa v. Jackson*, 78 USPQ2d 1567, 1571 (BPAI 2005) (quoting *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 111-12 (2d Cir. 1999) ("Appellant's Brief is at best an invitation to the court to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant. We decline the invitation.")).

### 1. "Fiber pull-out friction"

As discussed above in section II.A.3, every challenged claim requires that the inner primary coating, or the inner primary coating composition after cure, have a fiber pull-out friction of less than a specified amount at a

15

**A2277**

Case IPR2013-00048
Patent 6,298,189 B1

specified temperature.  Claims 1, 5, 9, and 13 (and claims 17, 21, 25, 29, 33, 37, 41, 45, and 49 as they depend from claim 5 or claim 13) require a fiber pull-out friction of less than 20 g/mm, whereas all other challenged claims require a fiber pull-out friction of less than 40 g/mm.  Claims 5-8 and 13-16 (and the claims dependent from claims 5 and 13) specify a temperature of 90°C,[4] whereas all other claims specify "stripping temperature."  As discussed above in section II.A.2, we construe "stripping temperature" as encompassing 90°C, because the '189 patent gives this temperature as an example of a stripping temperature.

### a. Summary of Parties' Arguments and Evidence

We summarize here the arguments that the parties present on the issue of the fiber pull-out friction testing, along with the supporting evidence the parties cite.

In its Petition, Corning's principal evidence concerning fiber pull-out friction is provided in Ms. Kouzmina's declaration.  Ex. 1015 ¶¶ 33-37. Ms. Kouzmina states that fiber pull-out friction was measured for Shustack Example I and Szum '928 Example 5B, following the procedure described in the '189 patent at column 31, lines 35-50.  *Id.* ¶ 33; Pet. 24, 36 (both citing Ex. 1015 ¶ 37).  Ms. Kouzmina states that a section of bare, clean optical fiber was embedded in a film of inner primary coating, the film being about 250 microns thick.  Ex. 1015 ¶ 34.  The film was then cured with ultraviolet light.  *Id.*  The cured samples were mounted on a compumotor slide and enclosed in a heating chamber.  *Id.* ¶ 35.  The slide was set to a

---

[4] Claim 13 specifies the temperature as "at least at 90°C."

Case IPR2013-00048
Patent 6,298,189 B1

speed of 0.1 mm/s, and the instrument recorded and plotted force versus

speed.  *Id.* ¶ 36.  Ms. Kouzmina then states:

> The plots typically showed a negative slope as a
> result of the decreasing area of contact between
> fiber and coating, as the coating was withdrawn.
> The slope was measured and was the output of the
> test. The value reported was an average of three
> measurements.

*Id.*  The results indicate that Shustack Example I and Szum '928 Example

5B had fiber pull-out friction measurements of 5.6 g/mm, and 6.6 g/mm,

respectively.  *Id.* ¶ 37.  Corning argues that these results demonstrate that

both Shustack Example I and Szum Example 5B meet every version of the

"fiber pull-out friction" limitation.  Pet. 24-26; 36-37.

DSM filed additional evidence describing Corning's testing procedure

and the data underlying Corning's friction measurements, as part of its

Response.  In particular, DSM filed the procedure, plots, and results of the

testing of Shustack Example I, and the plots for Szum '928 Example 5B.

Exs. 2015, 2042.

The plots from Corning's fiber pull-out friction tests of Shustack

Example I and Szum '928 Example 5B are reproduced below:

17

Case IPR2013-00048
Patent 6,298,189 B1



Ex. 2015, 2.



Ex. 2042, 1.

Case IPR2013-00048
Patent 6,298,189 B1

The graphs plot force along the $y$ axis and distance along the $x$ axis, and each shows results for three samples. Corning's test procedure is as follows:

> Samples were prepared based on conditions stated in the patent. 15mil wet films were casted with a draw down box to cure approximately 250[μ]m film. The actual[] film thickness was approximately 260[μ]m. An arm length of fiber was cut from a reel. Approximately 3 inches in from one end a 1 inch window strip was made. The fiber was taped to a glass microscope slide, so that the window strip was approximately one quarter inch from end of slide. Another slide was positioned opposite of this slide with a one half inch gap, allowing the majority of striped fiber to rest on this slide. The fiber was lifted up and a drop of coating was placed on the slide. The window striped fiber was then placed back down on the drop of coating and taped to the glass slide. The film was cast over the striped fiber to encase the bare glass fiber. This film was then cured at 1 J/cm$^2$ UV dose. The striped glass fiber encased in film was cut to a 1 cm gauge length. Samples were mounted on the motorized slide for strip force test, with the 'wet pull out' sample holder. A heating chamber was mounted on the motorized slide to enclose the test sample. The temperature was controlled at 90°C by a temperature controller with a thermal couple. The slide was manually controlled by the indexer to maintain a speed of 0.1 mm/sec. Data was collected using LabNotebook software.

Ex. 2015, 1. For Shustack Example I, the slope was "measured from the region of the graph in which the force appears to be in a linear relationship with the displacement." *Id.* That region is reported as extending from

Case IPR2013-00048
Patent 6,298,189 B1

2.76 mm to 7 mm. *Id.* The slope in that region is given as -5.625 (average of three samples), which Ms. Kouzmina reported in her declaration as 5.6 g/mm. *Id.*; Ex. 1015 ¶ 37.

DSM argues that the plot data underlying the reported friction values indicates that a "cohesive failure" occurred during testing, thereby rendering Corning's testing unreliable. Resp. 26-31. DSM explains that a cohesive failure is the separation of one portion of a coating from another, so that the pull-out friction test measures the friction between the torn surfaces of the separated coating portions, rather than the friction between the inner primary coating and the optical fiber. *Id.* at 27-28 (citing Ex. 2032 ¶¶ 77-85). Dr. Taylor states that a properly run fiber pull-out friction test should result in a plot with a "substantial linear region of negative slope." Ex. 2032 ¶ 80. DSM argues, citing Dr. Taylor, that the plots do not include any "substantially smooth linear region." Resp. 31 (citing Ex. 2032 ¶¶ 86-90; Exs. 2036-37).[5] DSM reasons that because a cohesive failure during pull-out testing would result in a plot lacking a linear region of negative slope, the absence of a linear region from Corning's data indicates that there was a cohesive failure. *Id.*

Dr. Taylor identifies several factors in Corning's test procedure that may explain what he perceives as an absence of a substantial linear region in these plots. Resp. 31 (citing Ex. 2032 ¶¶ 86-90). First, Dr. Taylor states that

---

[5] Dr. Taylor does not describe Corning's plots as lacking any "substantially smooth linear region." Instead, he states that they "have no linear region from which to measure a slope" and that they lack any "substantial linear region." Ex. 2032 ¶ 86.

A2282

Case IPR2013-00048
Patent 6,298,189 B1

the Corning employee who performed the tests, Mr. Aaron Gleason, does not mention cleaning the bare optical fiber with a "solvent wipe." Ex. 2032 ¶¶ 87, 90 (citing Ex. 2015, 1). According to Dr. Taylor, a bare optical fiber must be cleaned by wiping it with a solvent capable of extracting residue left behind when the original coating on the fiber is stripped off. Ex. 2032 ¶¶ 78, 79. Dr. Taylor states that the cleaning step is necessary before the bare fiber is embedded in a test coating, because the residue could interfere with adhesion between the bare fiber and the test coating, thereby lowering the friction measurement. *Id.* ¶ 79.

Second, Dr. Taylor states that Mr. Gleason made no effort to position the bare fiber in the drop of test coating or to define the shape of the coating. *Id.* ¶¶ 88, 90 (citing Ex. 2015, 1). According to Dr. Taylor, positioning the bare fiber too close to the edge of the test coating could cause tearing during the fiber pull-out friction test. Ex. 2032 ¶ 82. Dr. Taylor states that if the fiber is positioned closer to one edge of the coating than another, the thinner side of the coating will be able to absorb less energy than the thicker side and will be more likely to tear during the test. *Id.*

Third, Dr. Taylor states that a sudden drop in force after an initial maximum indicates that the pulling force caused a tear or cohesive failure in the coating, such that the subsequent friction measurements are artificially low. *Id.* ¶ 83.

Fourth, Dr. Taylor states that Corning used an instrument that was designed for a "pull-out" test, rather than one designed for a fiber pull-out friction test. *Id.* ¶¶ 89, 90 & n.3. According to Dr. Taylor, Corning's experimental setup prevented the application of any "normal force" (i.e., clamping or squeezing) on the test sample. *Id.* ¶ 90 n.3. Dr. Taylor states

21

**A2283**

Case IPR2013-00048
Patent 6,298,189 B1

that the coating must be squeezed against the fiber to an extent sufficient to ensure that the full surfaces of the coating and the fiber are in contact and therefore contribute to the friction generated during the pull-out; otherwise, the friction measured will be artificially low. *Id.* ¶¶ 85, 90 n.3. Dr. Taylor also states that an inadequate normal force may manifest itself as considerable noise in the signal, due to "slip-stick" behavior induced by inadequate clamping. *Id.* ¶ 84.

DSM also argues that it made its own preparations of Shustack Example I and Szum '928 Example 5B, tested them for fiber pull-out friction, and measured average friction values of 26 g/mm and 23 g/mm, respectively. Resp. 41-43 (citing Ex. 2032 ¶¶ 77-85, 91-98, 130-149). DSM argues that because Corning's fiber pull-out friction testing was flawed, the only reliable evidence of record concerning fiber pull-out friction is DSM's, and this data demonstrates that neither Shustack Example I nor Szum '928 Example 5B exhibits a fiber pull-out friction within the scope of claims 1, 5, 9, 13, and various claims dependent from claims 5 and 13. Resp. 44-45.

In reply, Corning argues that its test procedure followed the procedure described in the '189 patent. Reply 2-3. Corning also argues that an independent review by Dr. Ju, a new reply witness for Corning, confirms that Corning's fiber pull-out friction plots exhibit a linear region of negative slope indicating a friction of less than 20 g/mm, and that there is no evidence of cohesive failure during the tests. *Id.* at 3 (citing Ex. 1035 ¶¶ 16, 32-39). In response to DSM's own testing of Shustack Example I and Szum '928 Example 5B, Corning argues that DSM's measurements are artificially high, because DSM's testing employee clamped the samples with an unspecified and unmeasured force, thereby imposing an external normal force that

22

exaggerated the friction measurement. *Id.* at 4-5 (citing Ex. 1035 ¶¶ 40, 50, 52, 53, 57-77; Ex. 1045, 160:8-17, 163:20–164:7, 170:16–171:10, 212:25–213:21, 250:15–253:10, 258:8–259:3; Ex. 1046, 365:17-23).

In its Motion for Observations on cross-examination of Corning reply declarants, DSM cites numerous passages from its deposition of Dr. Ju to attack Dr. Ju's declaration testimony concerning fiber pull-out friction testing in general, and Corning's and DSM's testing in particular. Obs. 1-8.

### b. Analysis

The issue between the parties as to Corning's fiber pull-out friction plots is whether they exhibit a linear region of negative slope. Corning argues that they do, and the description in Exhibit 2015 that a region of the Shustack Example I plot showing a "linear relationship" was used to calculate slope bears out this argument. *See* Ex. 2015, 1. DSM, in contrast, argues that Corning's plots lack "a substantially smooth linear region" but offers little evidence to support this assertion beyond Dr. Taylor's statements that the plots "have no linear region from which to measure a slope" and that they lack any "substantial linear region." *See* Resp. 31; Ex. 2032 ¶ 86. Dr. Taylor gives no credible explanation for the basis on which he reaches these conclusions. Even if Dr. Taylor provided some underlying facts or data for this conclusion, Dr. Taylor's statements do not support DSM's argument that there is no substantially *smooth* linear region.

As between the conflicting evidence on this point, we credit Corning's evidence, particularly from Exhibit 2015, in which Corning's Mr. Gleason identifies the region of linear relationship as extending between displacements of 2.76 mm and 7 mm. DSM does not explain why this determination is invalid. We agree with Corning that the plots for Shustack

Case IPR2013-00048
Patent 6,298,189 B1

Example I show a linear region of negative slope from 2.76 mm to 7 mm. To be sure, the signal is noisy, and the plots are jagged, but that does not mean that a linear relationship is not discernible in that region.

All of DSM's critiques of the Corning test procedure hinge on its assertion that Corning's plots lack a linear region. *See* Resp. 31. Because we determine that DSM has not provided credible evidence showing that Corning's plots lack a linear region, we determine that DSM has not shown that its critiques of Corning's procedure are relevant.

Moreover, even when we consider the merits of DSM's critiques, we do not find them persuasive. DSM's argument that the bare fiber must be wiped with a solvent to remove residue is unsupported. Dr. Taylor simply asserts this to be the case, without providing credible support. *See* Ex. 2032 ¶ 78. The '189 patent says simply that the fiber must be clean. Ex. 1001, 31:36. Ms. Kouzmina says that the fiber was clean. Ex. 1015 ¶ 34. DSM has not explained how Ms. Kouzmina's evidence fails to show that Corning followed the '189 patent's instructions.

DSM's critique of Corning's positioning of the fiber in the test coating similarly is based on silence in Corning's evidence, rather than evidence that Corning did not comply with the test procedure described in the '189 patent. Corning's technician "encased" a section of bare fiber in the test coating. Ex. 2015, 1. DSM does not explain credibly how "encasing" the fiber in the coating is inferior to, or even materially different from, "embedding" the fiber, as indicated in the '189 patent.

DSM's argument that a "sudden drop" in measured force after the initial maximum indicates a torn coating or cohesive failure is not persuasive because it is not directed to Corning's test data. *See* Ex. 2032 ¶ 83. It is

24

**A2286**

Case IPR2013-00048
Patent 6,298,189 B1

instead a theoretical statement by Dr. Taylor. Dr. Taylor does not state that he observes a sudden drop in Corning's plots. *See id.* Even if we were to infer that Dr. Taylor considers the Corning plots to exhibit sudden drops, DSM's argument is not persuasive, because Dr. Taylor does not explain what he means by a "sudden drop," in terms of either timing or magnitude (i.e., how sudden is "sudden," and how far is a "drop"). Dr. Taylor also does not identify underlying facts or data to support his assertion that a sudden drop is indicative of a torn coating or cohesive failure. Although we have no reason to doubt that Dr. Taylor's knowledge and experience in the relevant art qualify him as a credible expert witness, we assign little or no weight to assertions of his that are not substantiated by some evidence—such as citation to a scholarly work or to his own experience—concerning how he knows or believes the assertions to be true.

DSM's argument that insufficient normal force results in artificially low friction measurements similarly is not persuasive because it is supported by no more than Dr. Taylor's assertions to that effect. *See* Ex. 2032 ¶¶ 84-85, 90 & n.3. Dr. Taylor does not provide any credible basis for his conclusion that some degree of clamping is necessary to ensure complete engagement of the friction-bearing surfaces and to avoid slip-stick behavior. Although Dr. Taylor points out that Corning used a sample holder for a pull-out test (as opposed to a fiber pull-out friction test), and that no normal force is applied during a pull-out test (*id.* at 90 & n.3), it does not follow from this that some normal force is required to be applied during a fiber pull-out friction test. Again, we assign little or no weight to Dr. Taylor's assertions in this regard because they are unsupported by some evidence of how he knows or believes them to be true.

25

Case IPR2013-00048
Patent 6,298,189 B1

Regarding DSM's own fiber pull-out friction testing, we agree with
Corning that DSM's use of an unquantified clamping force brings the
reliability of DSM's results into doubt. Dr. Taylor describes the clamping
process as follows:

> The sample was placed into a DMA instrument
> with the embedded fiber end in the lower clamp,
> which was tightened to firmly hold the coating
> film in the clamp during the test and apply an
> adequate level of normal force to the coating film.

Ex. 2032 ¶ 95. Dr. Taylor does not explain how firmly the clamp was
tightened or how much normal force would be considered "adequate." DSM
argues that the amount of normal force has no effect on the measurement of
fiber pull-out friction and that Dr. Ju admitted as much in deposition. Tr.
43:22-44:9; Obs. ¶ 6 (citing Ex. 2090, 164:23–168:2). We do not agree that
Dr. Ju admits that normal force has no effect on friction under the conditions
of the fiber pull-out friction test. The cited passage of Dr. Ju's deposition
largely involves DSM's counsel reading passages from various scientific
papers to Dr. Ju and eliciting agreements from Dr. Ju that the papers'
statements are correct. Dr. Ju qualifies each of his agreements by saying
"[w]ithin the scope of that paper" or something similar. *E.g.*, Ex. 2090,
166:3. The last of these exchanges concerns the following statement from
page 19 of Exhibit 2095, following an equation giving a relation between
contact area and load: "This explains that for soft rubber sliding on a smooth
surface, perfect contact, the frictional force is more or less constant,
independent of the load, W." Ex. 2090, 167:10-13. Dr. Ju states: "Within
this specific condition as stated in that statement after equation 3.5, within
the context of the consideration in this report, I think I would agree. But you

26

**A2288**

must satisfy those conditions that [are] described following this -- the sentence after equation 3.5." *Id.* at 167:17-22. We read Dr. Ju's answer as an agreement to the findings in Exhibit 2095, but as not an admission that the conclusion given applies to the conditions of Corning's testing. DSM does not identify other, credible, evidence to show that frictional force is independent of load under the conditions of Corning's fiber pull-out friction test.

For these reasons, we credit Corning's testing evidence over DSM's. We are persuaded that Corning has shown that Shustack Example I and Szum '928 Example 5B each inherently possess a fiber pull-out friction within the scope of every challenged claim.

### 2. "Sufficient Adhesion"

As discussed above in section II.A.1, each of claims 1-4 and 9-12 requires an inner primary coating, or a composition after cure, that exhibits "sufficient adhesion to [a] glass fiber to prevent delamination in the presence of moisture and during handling." Corning argues that the prior art compositions disclosed in Shustack (Example I) and Szum '928 (Example 5B) meet this limitation. Corning bases this argument on the results of wet adhesion tests carried out under conditions of 95% relative humidity on coatings prepared according to Shustack Example I and Szum '928 Example 5B. Pet. 24-26 (citing Ex. 1014 ¶¶ 119, 121; Ex. 1015 ¶ 51), 36-37 (citing Ex. 1014 ¶¶ 141, 144; Ex. 1015 ¶ 51).

DSM responds that the wet adhesion test does not evaluate for delamination, which is caused by exposure to liquid water, and that a different test—the water soak delamination test—is the only method

Case IPR2013-00048
Patent 6,298,189 B1

disclosed in the '189 patent for assessing delamination. Resp. 15-16 (citing Ex. 2032 ¶¶ 59-66). DSM also comes forward with its own test results, which allegedly show that the Szum coating, in fact, delaminates when subjected to the conditions of the water soak delamination test disclosed in the '189 patent. Resp. 43-44.

A dispositive question thus arises: Does Corning show by a preponderance of evidence that the Shustack and Szum coatings exhibit sufficient adhesion to prevent delamination from glass in the presence of liquid water? For the reasons set forth below, we answer that question in the negative. We first address the conditions set forth in the '189 patent for the wet adhesion test and the water soak delamination test. We then consider whether the wet adhesion test, which Corning performed on the Shustack Example I and Szum '928 Example 5B coatings, is probative of the claimed adhesion property. Finally, we explain why an evaluation of DSM's water soak delamination test data is not necessary to our analysis.

*a. The Wet Adhesion Test*

The '189 patent describes a wet adhesion test for evaluating a cured coating sample on a glass substrate. Ex. 1001, 28:50-58. The wet adhesion test is conducted "at a temperature of 23±2° C. and a relative humidity of 50±5% for a time period of 7 days." *Id.* at 28:59-61. A portion of the sample film is then "further conditioned at a temperature of 23±2° C. and a relative humidity of 95% for a time period of 24 hours." *Id.* at 28:62-65. During that step, "[a] layer of polyethylene wax/water slurry [is] applied to the surface of the further conditioned film to retain moisture." *Id.* at 28:65-77.

28

Case IPR2013-00048
Patent 6,298,189 B1

The written description makes plain that the wet adhesion test assesses a cured coating that is conditioned at 95% relative humidity. *Id.* at 28:62-65. Corning acknowledges that fact. *See, e.g.*, Pet. 17 (citing Ex. 1015 ¶ 107) ("The term 'wet adhesion' is described in the '189 patent at col. 28, lines 46-51 as adhesion at 95% relative humidity."). Corning raises no argument that application of a layer of "wax/water slurry" to the surface of the coating represents an exposure to 100% relative humidity. Ex. 1001, 28:65-67; *see* Reply 6 (stating that the wet adhesion test described in the '189 patent relates to conditioning "at 95% relative humidity—not liquid water immersion." (citing Ex. 1001, 28:65-67)).

After conditioning the sample at 95% relative humidity, the sample that appears "uniform and free of defects" is "peeled back from the glass." Ex. 1001, 29:6-10. The wet adhesion test is performed on the peeled-back sample using a device that includes "a horizontal support and a pulley." *Id.* at 29:1-5. With the glass secured to the horizontal support, a wire is "attached to the peeled-back end of the sample, run along the specimen and then run through the pulley in a direction perpendicular to the specimen." *Id.* at 29:9-14. A wet adhesion value is determined by clamping the free end of the wire "in the upper jaw of the testing instrument," which is activated "until the average force value, in grams force/inch," becomes "relatively constant." *Id.* at 29:14-17. The '189 patent discloses that "[t]he preferred value for wet adhesion is at least about 5 g/in." *Id.* at 29:17-18.

On this record, we find that the wet adhesion test assesses the mechanical force required to peel a cured coating away from a glass substrate, after conditioning the coating at 95% relative humidity.

29

**A2291**

Case IPR2013-00048
Patent 6,298,189 B1

### b. *The Water Soak Delamination Test*

The '189 patent also discloses a water soak delamination test in which "coated microscope slides [are] soaked in [] water." *Id.* at 27:32, 43. The samples are soaked in a beaker of deionized water that is placed in a 60° C. hot water bath. *Id.* at 27:43-45. The samples are "observed for delamination periodically. The time when the first signs of delamination" appear is recorded. *Id.* at 27:45-47.

Table 2 in the '189 patent specification describes a "hot water soak" in which samples are "aged for 4 hours at 60° C.," the water bath is "shut-off for about 70 hours," and then the temperature is "brought back to 60° C. for an additional 48 hours." *Id.* at 28:8-10, 14-16. The degree of delamination observed after the hot water soak is reported in Table 2 as "none" or "delam. [a]fter 1 hour at 60° C." *Id.* at 27:66; 28:8-10. Table 3 similarly reports results for a delamination test that is described as a "60[°] C Water Soak." *Id.* at 29:45. Delamination results are reported in terms such as "No Delamination After 24 Hours," "Slight Delamination After 15 Minutes," and "No Delamination After 8 Hours; Slight Delamination After 24 Hours." *Id.* at 29:45-52.

On this record, we find that the water soak delamination test assesses the ability of a cured coating to withstand the hydrodynamic forces that cause delamination of a cured coating from a glass substrate in the presence of liquid water.

### c. *Corning Fails to Establish that the Szum Coating Inherently Exhibits the Claimed Adhesion Property*

The '189 patent discloses that the wet adhesion test evaluates the force required to peel a coating away from a glass substrate, after the coating

30

Case IPR2013-00048
Patent 6,298,189 B1

has been conditioned at 95% relative humidity. Ex. 1001, 29:1-18.

The '189 patent identifies a different test—a water soak delamination test—
for evaluating the extent of delamination that occurs when a cured coating is
exposed to liquid water. *Id.* at 27:21-37. In DSM's view, Corning fails to
establish sufficiently that the wet adhesion test, or "[p]eel test," can "be used
to reliably determine what the results of a delamination test would be."
Resp. 32. We agree.

Corning prepared the Szum coating and subjected it to substantially
the same wet adhesion test that is described in the written description of
the '189 patent. *Compare* Ex. 1015 ¶¶ 48-51 (describing the wet adhesion
test procedure performed on the Shustack Example I and Szum '928
Example 5B coatings) *with* Ex. 1001, 28:50–29:18 (describing a wet
adhesion test procedure performed on an inventive example). The '189
patent instructs, however, that coating samples are subjected to a water soak
test and "examined for delamination" prior to conducting the wet adhesion
test. Ex. 1001, 28:45-46. Specifically, the wet adhesion test is performed
"[i]n addition" to the water soak delamination test." *Id.* at 28:44-48. It is
the delamination test that ascertains "[t]he time when the first signs of
delamination" appear in a coating sample that is immersed in water. *Id.*
at 27:22-37.

Although the '189 patent describes a sequence of testing that includes
both a delamination test and a wet adhesion test, Corning comes forward
with no evidence that the Szum coating was subjected to a delamination test.
*Id.*; *see* Ex. 1015 ¶¶ 48-50 (Corning's test procedures). Dr. Winningham
was unaware of any delamination test performed by Corning on the Szum
coating. Resp. 33 (citing Ex. 2029, 469:17–471:17). Corning relies on wet

31

**A2293**

Case IPR2013-00048
Patent 6,298,189 B1

adhesion values for the Shustack Example I and Szum '928 Example 5B coatings that are expressed as a grams-per-inch mechanical force required to peel each coating away from a glass substrate after conditioning at 95% relative humidity. Ex. 1015 ¶¶ 51.

On this record, we find that Corning relies on test results obtained for the Szum coating after exposure to conditions of 95% relative humidity, but not to liquid water. As explained in our claim construction analysis, exposure to 95% relative humidity is not "in the presence of moisture" (i.e., liquid water) as specified in the challenged claims. Corning argues that the Shustack Example I and Szum '928 Example 5B coatings exhibit wet adhesion values of 77 g/in and 44 g/in, respectively, "when conditioned at 95% relative humidity," but does not explain how those results are probative of adhesion in the presence of liquid water—that is, 100% relative humidity. *See*, *e.g.*, Pet. 26 (citing Ex. 1014 ¶ 121); *see* Ex. 2032 ¶ 48 (moisture condenses at 100% relative humidity). On that basis, we determine that Corning fails to show by a preponderance of evidence that the Szum and Shustack coatings meet the claimed adhesion property.

A second independent basis supports our determination. Corning comes forward with evidence insufficient to support an inference that the results of a 95% relative humidity wet adhesion test correspond to an ability to withstand the hydrodynamic forces that effect delamination. Corning argues that Dr. Winningham "has confirmed that a coating composition with an adhesion to glass of either 23 g/in or 44 g/in, as in Szum, would have sufficient adhesion to the glass fiber to prevent delamination in the presence

of moisture and during handling." Pet. 26 (citing Ex. 1014 ¶ 121), 37 (citing Ex. 1014 ¶ 144).[6] Dr. Winningham's opinion on that point is unsupported and, therefore, unpersuasive. *See* Ex. 1014 ¶¶ 121, 144 (reciting opinion without objective proof).

In that regard, Dr. Winningham repeats, verbatim, attorney argument set forth in the petition, but identifies no objective evidence explaining how a wet adhesion value, which indicates a mechanical force required to peel a coating away from a glass substrate, correlates to an ability to withstand the hydrodynamic forces that effect delamination. *Id.* Dr. Winningham's bare opinion is entitled to little weight in the absence of objective, evidentiary support. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) (finding lack of factual support for expert opinion "may render the testimony of little probative value in a validity determination").

During cross-examination, Dr. Winningham testified about the differences between a water soak delamination test and a wet adhesion test, which he refers to in his testimony as "a peel test":

> Q. If one was concerned about the ability of a coating to delaminate from a substrate when exposed to water, would performing a peel test not give sufficient information to satisfy the interested person?

---

[6] In addition to the experimental test results tending to establish a wet adhesion value of 44 g/in for the Szum coating, Corning points to the reference itself for a teaching that the Szum coating exhibits "an adhesion to glass at 95% relative humidity of 23 g/in." Pet. 37 (citing Ex. 1005, 25:12).

Case IPR2013-00048
Patent 6,298,189 B1

> A. I think those tests measure — are looking at
> different things or measuring different things,
> so I'm not sure if — I can't say categorically
> that a peel test is going to tell you what's going
> to happen in a water delamination test.
> Different tests.

Ex. 2029, 460:12-21; *see* Resp. 32 (citing this testimony).

Dr. Winningham also testified that the water soak delamination test evaluates the "hydrodynamic forces" that work to delaminate a coating from a glass substrate, whereas "a peel test" evaluates the "mechanical forces" exerted, where "one is applying a — mechanical force to a film and pulling the film off a substrate." Ex. 2029, 459:3-18. That testimony of Corning's witness is consistent with the explanation of the relevant hydrodynamic forces that is provided by DSM's witness, Dr. Taylor. *See* Ex. 2032 ¶¶ 65-66.

At the oral hearing, Corning's counsel directed our attention to test results reported in Table 3 of the '189 patent and, for the first time, argued that those results establish "a clear correlation between the films that passed the hot water soak test . . . and films that have a certain wet adhesion." IPR2013-00045, Paper 89, 10:15-17 (Transcript). That argument, and Corning's reliance on Table 3, is not set forth in the petition or the reply. *See* Pet. 26, 37; Reply 5-7. We deem Corning to have waived that argument raised by counsel for the first time at the oral hearing. *Cf. Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1320-21 n.3 (Fed. Cir. 2005) (arguments not raised in an opening brief are deemed waived).

Case IPR2013-00048
Patent 6,298,189 B1

That argument also is unpersuasive because it is unsupported by convincing, objective evidence that explains a relationship between the wet adhesion values and the water soak delamination results reported in Table 3. In that regard, Corning asks us to infer a relationship between wet adhesion values (reported as a grams-per-inch mechanical force) and water soak delamination results (reported as an observation, for example, of slight delamination after 15 minutes) from Table 3. *See* IPR2013-00045, Paper 89 10:15-17; Ex. 1001, 29:43-52 (Table 3). That is a leap we will not undertake in the absence of persuasive evidence, such as a technical article or expert testimony, explaining some relationship between those disparate tests. Pet. 26, 37; Reply 5-7 (identifying no such evidence).

Because the issue is not discussed in the briefs, moreover, we have no evidence as to how the wet adhesion value obtained for the Szum coating, which never endured a hot water soak, is comparable to the wet adhesion values reported in Table 3, which appear to relate to coating samples that endured both a hot water soak and the wet adhesion test. *See* Ex. 1001, 28:45-59 (wet adhesion test is performed "[i]n addition" to water soak delamination test); *see also id.* at 29:6-8 (after conditioning, "samples that appeared to be uniform and free of defects" were selected for the wet adhesion test, implying that samples that delaminated were excluded from such testing).

In sum, two independent reasons support our determination that the wet adhesion test results advanced by Corning fail to show adequately that the Szum coating has "sufficient adhesion . . . to prevent delamination in the presence of moisture" within the meaning of the challenged claims. First, the wet adhesion test assesses a property of the coating after conditioning

Case IPR2013-00048
Patent 6,298,189 B1

at 95% relative humidity, which is not "in the presence of moisture." Second, Corning identifies no persuasive evidence from which we reasonably can discern that the wet adhesion test evaluates for "delamination."

### d. DSM's Delamination Test Results are Not Necessary to our Analysis

DSM presents evidence that the Szum '928 Example 5B coating exhibits insufficient adhesion to prevent delamination in the presence of liquid water. Specifically, DSM contends that it formulated a coating according to Szum '928 Example 5B and subjected it to the water soak delamination test described in the '189 patent. Resp. 43-44 (citing Ex. 2032 ¶¶ 104-07). DSM reports that the Szum coating "experienced delaminations, visible to the unaided eye," and that those "delaminations appeared as water-filled voids or 'blisters' between the inner primary coating and the glass." Id.[7]

Corning bears the burden of showing by a preponderance of evidence that the Shustack Example I and Szum '928 Example 5B coatings inherently disclose the claimed adhesion property. We need not resolve whether DSM properly formulated the Szum '928 Example 5B coating or whether DSM's test results accurately reflect the ability of that coating to withstand

---

[7] Corning does not discuss DSM's adhesion testing of Szum '928 Example 5B in its Reply. Corning argues, in case IPR2013-00049, that DSM's results are unreliable because DSM failed to follow the correct procedure for preparing the Szum coating. IPR2013-00049, Paper 68 (Reply) 7-8. In particular, Corning argues that DSM used the wrong photoinitiator in its formulation, which negatively affected the ability of the Szum coating to withstand delamination. Id. (citing Ex. 1068 ¶¶ 95-105).

Case IPR2013-00048
Patent 6,298,189 B1

delamination in the presence of moisture. Our decision rests on Corning's failure to show sufficiently that its wet adhesion test results, which relate to the mechanical force sufficient to peel a coating away from a glass substrate after conditioning at 95% relative humidity, are probative of whether either of the Shustack or Szum coatings has "sufficient adhesion . . . to prevent delamination in the presence of moisture" (i.e., liquid water).

Based on the record developed at trial, Corning fails to show by a preponderance of evidence that either Shustack Example I or Szum '928 Example 5B inherently discloses the claimed adhesion property. Because each of claims 1-4 and 9-12 includes a limitation directed to that property, each claim survives Corning's challenge based on anticipation by, or obviousness over, Shustack, obviousness over Shustack and Jackson, and anticipation by, or obviousness over, Szum '928.

### 3. *"Adhesion to glass of at least 12 [or 5] g/in when conditioned at 95% relative humidity"*

Claims 5-8 each require that the inner primary coating, or the inner primary coating composition after cure, have an "adhesion to glass of at least 12 g/in when conditioned at 95% relative humidity." Claims 13-16 have the same limitation, except the numerical value is 5 g/in instead on 12 g/in.[8]

Unlike the "sufficient adhesion" limitation discussed above, this limitation is directed unambiguously to the wet adhesion test described in the '189 patent at column 28, line 50, to column 29, line 18. Corning argues that Shustack Example I and Szum '928 Example 5B exhibit wet adhesion

---

[8] Claim 13 has an apparent typographical error of "which conditioned" instead of --when conditioned--.

Case IPR2013-00048
Patent 6,298,189 B1

values, when tested in accordance with the procedure described in the '189 patent, of 77 g/in and 44 g/in, respectively. Pet. 24, 26, 36-37; Ex. 1015 ¶¶ 48-51. DSM does not challenge Corning's evidence as to the wet adhesion levels of Shustack Example I and Szum '928 Example 5B.

Upon consideration of Corning's evidence, we are persuaded that Shustack Example I and Szum '928 Examples 5B inherently possess the adhesion to glass property recited in claims 5-8 and 13-16.

### 4. "Crack propagation"

Every challenged claim requires that the inner primary coating, or the inner primary coating composition after cure, have a crack propagation of greater than 1.0 mm (claims 1-8) or 0.7 mm (claims 9-16) at stripping temperature (claims 1-4, 9-12) or 90°C (claims 5-8, 13-16). As discussed above in section II.A.2, we construe "stripping temperature" as encompassing 90°C, because the '189 patent gives this temperature as an example of a stripping temperature.

Corning argues that Shustack Example I and Szum '928 Example 5B exhibit crack propagation values, when tested in accordance with the procedure described in the '189 patent at column 31, lines 7-20, of 1.5 mm and 1.3 mm, respectively. Pet. 24, 36; Ex. 1015 ¶¶ 38-42. DSM does not challenge Corning's evidence as to the crack propagation property of Shustack Example I and Szum '928 Example 5B.

Upon consideration of Corning's evidence, we are persuaded that Shustack Example I and Szum '928 Examples 5B each inherently possesses a crack propagation within the scope of every challenged claim.

Case IPR2013-00048
Patent 6,298,189 B1

### 5. *"Glass transition temperature" of inner primary coating*

Every challenged claim requires that the inner primary coating, or the inner primary coating composition after cure, have a glass transition temperature of below 10°C (claims 1-8) or 0°C (claims 9-16). Corning argues that Shustack Example I and Szum '928 Example 5B exhibit glass transition temperatures, when tested in accordance with the procedure described in the '189 patent at column 34, line 57 to column 35, line 24, of -38.9°C and -34.9°C, respectively. Pet. 24, 36; Ex. 1015 ¶¶ 43-47. DSM does not challenge Corning's evidence as to the glass transition temperature of the inner primary coating for Shustack Example I or Szum '928 Example 5B.

Upon consideration of Corning's evidence, we are persuaded that Shustack Example I and Szum '928 Examples 5B each inherently possesses a glass transition temperature for the inner primary coating within the scope of every challenged claim.

### 6. *"Glass transition temperature" of outer primary coating*

Each of claims 2-4, 6-8, 10-12, and 14-16 requires that the outer primary coating, or the outer primary coating composition after cure, have a glass transition temperature of above 40°C. Corning argues that Shustack Examples X and XI have glass transition temperatures of 48.5°C and 46.8°C, respectively, when measured according to the procedure described in the '189 patent at column 34, line 57 to column 35, line 24. Pet. 28;

Case IPR2013-00048
Patent 6,298,189 B1

Ex. 1015 ¶¶ 43-47.[9],[10]  DSM does not challenge Corning's evidence as to the glass transition temperature of the outer primary coating for Shustack Examples X or XI.[11]

Upon consideration of Corning's evidence, we are persuaded that Shustack Examples X and XI each inherently possesses a glass transition temperature for the outer primary coating within the scope of claims 2-4, 6-8, 10-12, and 14-16.

### 7. "Modulus of elasticity" of outer primary coating

Each of claims 2-4, 6-8, 10-12, and 14-16 requires that the outer primary coating, or the outer primary coating composition after cure, have a modulus of elasticity of either (a) between about 10 MPa to about 40 MPa (claims 2-4 and 6-8) or (b) greater than 25 MPa (claims 10-12 and 14-16), at either (1) stripping temperature (claims 2-4 and 10-12) or (b) 100°C (claims 6-8 and 14-16).  As discussed above in section II.A.2, we construe "stripping

_____

[9] Corning conceded at oral argument that it no longer bases any challenges on Shustack Example IX.  IPR2013-00048, Paper 93, 3:3-10.  We give that example no further consideration.

[10] Corning also argues that Szum '928 Example 2 meets the recited glass transition temperature of the outer primary coating (Ex. 1015 ¶ 47), but Corning does not challenge any of claims 2-4, 6-8, 10-12, or 14-16 for anticipation by Szum '928.

[11] DSM's experts argue that the glass transition temperatures of Corning's reproductions of Shustack Examples X and XI may have been affected by Corning's choice of oligomer.  _E.g._, Ex. 2034 ¶¶ 65-76; Ex. 2032 ¶¶ 131-132.  We address that argument in the context of the "modulus of elasticity" limitation discussion in section II.C.7.

A2302

Case IPR2013-00048
Patent 6,298,189 B1

temperature" as encompassing 100°C, because the '189 patent gives this temperature as an example of a stripping temperature.

Corning argues that Shustack Examples X and XI meet this limitation. Pet. 28; Ex. 1015 ¶ 52-55. Corning's expert, Dr. Winningham, acknowledges, however, that the express disclosure in Shustack does not identify what oligomer is used to make those examples. Ex. 1014 ¶ 74 n.5. Shustack describes the oligomer used in Example X as "aliphatic urethane acrylate oligomer with polyester backbone (I) (used as a mixture containing 12% hexanediol acrylate)." Ex. 1003, 30:32-36. Dr. Winningham states that EBECRYL® 284 aliphatic urethane acrylate oligomer was disclosed in EP 0 407 004, prior to publication of Shustack, as having all the properties specified by Shustack, including preparation in 12% hexanediol acrylate. Ex. 1014 ¶ 74 n.5.[12] Dr. Winningham states that EBECRYL® 284 oligomer would have been "suitable" for use in Shustack Example X. *Id.*

Corning argues that Shustack Examples X and XI, as synthesized using the EBECRYL® 284 oligomer, have moduli of elasticity of 30 MPa and 18 MPa at about 100°C, respectively, when measured according to the procedure described in the '189 patent at column 34, line 57 to column 35, line 24. Pet. 28; Ex. 1015 ¶¶ 52-55.

DSM argues that Corning's reproductions of Shustack Examples X and XI are not reliable indicators of the inherent modulus of elasticity in the prior art compositions, because Corning arbitrarily selected EBECRYL® 284 urethane acrylate as the oligomer it used to synthesize them.

---

[12] EP 0 407 004 is of record as Exhibit 1018. EBECRYL® 284 oligomer is disclosed at, e.g., page 12, lines 34-35.

Case IPR2013-00048
Patent 6,298,189 B1

Resp. 37-40, 47-49. In particular, DSM argues that Shustack does not specify which oligomer was used to make Examples X and XI and that Corning's selection of EBECRYL® 284 aliphatic urethane oligomer was arbitrary. *Id.* According to DSM, "many possible oligomers . . . fall within the broad category" that could be used in Shustack Examples X and XI. *Id.* at 40. DSM argues that Shustack's disclosure of a genus does not amount to disclosure of the species within that genus. *Id.* at 39-40 (citing *Metabolite Labs., Inc. v. LabCorp*, 370 F.3d 1354, 1367 (Fed. Cir. 2004)). Dr. Bowman opines:

> Within these large classes of oligomers, there are almost infinite possible combinations of structures. For example, there is no disclosed range of molecular weight for the oligomer. (*See* [Ex. 1003] at 18:35–19:41, 29:30–31:30). There is no disclosure regarding the number of acrylate functionalities. (*See id.*) There is also no discussion of the kind of polyester or polyether repeat units that should be used or whether the oligomers should be branched or not. (*See id.*) These variables have significant effects on the glass transition temperature and the modulus, and would, in many cases, affect the thermal expansion characteristics of these coatings. Molecular weight and functionality, in particular, would have a significant effect on glass transition temperature and modulus.

Ex. 2034 ¶ 65. Dr. Bowman also argues that were "many aliphatic urethane oligomers with polyester backbones known to a person of ordinary skill in the art at the time that would have resulted in a coating with a modulus of greater than 40 MPa at 100°C." Ex. 2034 ¶ 74. DSM concludes that following Shustack's express disclosure for Examples X and XI does not

lead unavoidably to a coating composition having the recited modulus of elasticity upon cure. Resp. 40. For these reasons, argues DSM, Shustack Examples X and XI do not inherently disclose this property. *Id.*

Corning argues, in reply, that Dr. Bowman concedes that EBECRYL® 284 oligomer is an acceptable choice for synthesizing Shustack Examples X and XI, and that Corning's reply expert, Dr. Sogah, can identify no other commercially-available oligomer that meets the criteria specified in Shustack. Reply 10 (citing Ex. 1068 ¶¶ 86-88; Ex. 1070, 433:13-24).

Upon consideration of the parties' arguments and evidence, we agree with DSM that Corning has not shown that Shustack Examples X and XI inherently possess the claimed modulus of elasticity. Shustack does not identify EBECRYL® 284 aliphatic urethane acrylate as the oligomer to be used, and we agree with DSM that Corning has not shown that one of ordinary skill in the art would have interpreted Shustack's description of the oligomer as unambiguously identifying the EBECRYL® 284 oligomer.

Corning's argument that Shustack inherently discloses the modulus of elasticity limitations is predicated on the assertion that Shustack Examples X and XI necessarily possess moduli of elasticity within the scopes of claims 2-4, 6-8, 10-12, and 14-16. *See* Pet. 28. But the only evidence Corning offers in support of this argument is modulus testing upon versions of Shustack Examples X and XI made with the EBECRYL® 284 oligomer. Corning's evidence is persuasive to show that Examples X and XI formulated with the EBECRYL® 284 oligomer possess the required modulus. It is not persuasive, however, to show that Examples X and XI, *as disclosed in Shustack*, inherently disclose this property. We reach this

conclusion because Corning has not shown that either (a) one of ordinary skill in the art would have, at once, envisaged EBECRYL® 284 oligomer from the disclosure in Shustack, or (b) every oligomer that meets the requirements specified in Shustack Example X would, if used to make that example, result in a coating with the required modulus of elasticity.

As to issue (a), Corning does not address expressly in its Petition the issue of what oligomer Shustack discloses for Examples X and XI. Instead, Corning argues (through Dr. Winningham and Dr. Bowman) that EBECRYL® 284 oligomer is a suitable choice because it meets Shustack's requirements. *See* Ex. 1014 ¶ 74 n.5; Ex. 1070, 433:13-24. But suitability, without more, does not establish that EBECRYL 284 oligomer is the oligomer Shustack discloses for Examples X and XI. Dr. Sogah's evidence that he is unaware of any other suitable oligomers that are commercially available (Ex. 1068 ¶¶ 86-88) does not address the question of whether any other suitable oligomers exist or have been disclosed by Shustack.

The disclosure of a genus may be read as a disclosure of the constituent species if one of ordinary skill in the art could "at once envisage" them from the generic disclosure. *In re Petering,* 301 F.2d 676, 681 (CCPA 1962). We credit Dr. Bowman's testimony that the class of oligomers that would meet Shustack's criteria is "almost infinite," because Shustack does not specify details such as molecular weight for the oligomer, the number of acrylate functionalities, the kind of polyester repeat units, and whether the oligomers should be branched. *See* Ex. 2034 ¶ 65. Corning has not come forward with sufficient evidence to show that one of ordinary skill in the art would have interpreted Shustack's disclosure as identifying the EBECRYL® 284 oligomer uniquely or as one of a sufficiently small and

Case IPR2013-00048
Patent 6,298,189 B1

closely related set of oligomers as to be, at once, envisaged from the generic disclosure.

As to issue (b), we further credit Dr. Bowman's testimony that the unspecified details in Shustack's oligomer description may have substantial effects on the material properties that a resulting coating would possess, including glass transition temperature and modulus of elasticity. *See* Ex. 2034 ¶¶ 65-76. Put another way, Corning has not shown that the properties of a coating made with the EBECRYL® 284 oligomer is indicative of the properties that would result from making Shustack Example X or XI with another oligomer. Without such a showing, Corning has not established that the properties it relies upon from Shustack are inherent in Shustack.

For these reasons, we determine that Corning has not shown that Shustack discloses the modulus of elasticity limitations of claims 2-4, 6-8, 10-12, and 14-16.

### 8. *"Ratio of the Change in Length"*

Each of claims 2, 6, 10, and 14 requires that "the ratio of the change in length of said inner primary coating composition, after radiation cure, to the change in length of said outer primary coating composition, after radiation cure, is less than 2 when said cured compositions are heated from 25° C. to stripping temperature." Claims 3, 4, 7, 8, 11, 12, 15, and 16 require the same ratio but refer to the inner primary coating and outer primary coating directly, rather than to the coating compositions after cure. Every challenged claim requires, therefore, a ratio of the changes in length of less than 2 between 25°C and stripping temperature. As discussed above in

45

section II.A.2, we construe "stripping temperature" as encompassing 100°C, because this temperature is given as an example of a stripping temperature.

### a. Summary of Parties' Arguments and Evidence

In its Petition, Corning's principal evidence concerning the change-in-length ratio is provided in Ms. Kouzmina's declaration. Ex. 1015 ¶¶ 56-61. Ms. Kouzmina states that change in length was measured for each of Shustack Examples I, X, and XI, and Szum '928 Examples 2 and 5B, following the procedures described in the '189 patent at column 14, lines 42-57. *Id.* ¶¶ 56-59; Pet. 29 (citing Ex. 1015 ¶ 60). Ms. Kouzmina states that the testing was carried out using an optical microscope with a heated stage. Ex. 1015 ¶ 57. Ms. Kouzmina then explains the process used to test the samples and to obtain images of the samples at 25°C and 100°C. *Id.* ¶ 58. In particular, Ms. Kouzmina explains that each test sample film was lightly coated with talc particles to prevent sticking, placed on a microscope slide, and then on the heated microscope stage. *Id.* The sample was held at 25°C for ten minutes, and then an image of the sample was captured through the microscope's objective lens. *Id.* The image had a resolution of 2080×1536. *Id.* The sample was then heated to 100°C and imaged again. *Id.*

Ms. Kouzmina then addresses how change in length of each sample was calculated. *Id.* ¶ 59. The entirety of Ms. Kouzmina's evidence as to how the change in length was calculated is contained in paragraph 59 of her declaration:

> 59. Change in length of the sample was calculated by comparing the length between two points on the sample when the sample was at two different temperatures.

Case IPR2013-00048
Patent 6,298,189 B1

*Id.* The changes of length thus calculated for each sample are reported in paragraph 60, and the ratios between the changes of length of various samples are reported in paragraph 61.  Ms. Kouzmina reports that the ratio of changes in length is less than 2 for all combinations in which Shustack Example I or Szum '928 Example 5B provides the inner primary coating, and Shustack Example X or XI, or Szum '928 Example 2, provides the outer primary coating.  *Id.* ¶ 61; Pet. 22, 30, 40 (citing Ex. 1015 ¶ 61).

DSM argues the procedure Corning followed for determining the change in length was unreliable and scientifically unsound, because it relied on "subjective 'eyeballing'" by Earl Sanford, the Corning microscopist who performed the work.[13]  Resp. 34.  DSM cites the following deposition testimony of Ms. Kouzmina:

> Q. Do you know how [Mr. Sanford] chose the two points on the film?
> **A. I do not know which specifically points were used for each photograph.  But I have a general idea.**
> Q. What's your general idea?
> **A. A general idea is that you would choose a point that is easy to track and that is represented by a marked, you know, particle or a part of the top particle that you would record the coordinates off, and then you would follow that spot as a sample is being heated.**
> Q. So do you know how the precise spots were chosen and how they were tracked?
> MR. McGUIRK:· Objection to form.

---

[13] Mr. Sanford's first name is indicated at Ex. 1035 ¶ 80.

Case IPR2013-00048
Patent 6,298,189 B1

> **A. I don't know exactly how the precise paths were chosen. It was Mr. Sanford's discretion, and tracked just visually following the selected spot in the microscope and then recording its position.**

Ex. 1044, 123:18–124:12.[14]

DSM also relies on declaration testimony from Dr. Taylor, who dismisses the measurement procedure as "an unmitigated exercise of human discretion (*e.g.*, eye-balling specific pixels . . . )." Ex. 2032 ¶ 111. Dr. Taylor states further that the quality of the measurement is "entirely dependent on the test operator's precision (or lack thereof) in identifying the same two points in two different images in which all the points have moved. In my opinion, such a test is unreliable at best and unacceptable as a[n] art-recognized methodology." *Id.*

Dr. Taylor also argues that Corning's data is unreliable because the samples were not completely free to expand. *Id.* ¶ 115. Dr. Taylor reasons that the samples would have adhered to the microscope slides on which they were placed during testing, because the samples become tacky when heated. *Id.*

Finally, Dr. Taylor argues that Corning's measurements suffer from a relative error of at least 75%. *Id.* ¶ 122. Dr. Taylor reaches this conclusion based on the following facts:

---

[14] Corning does not seek to exclude testimony elicited from the objected-to question. The objection is dismissed as moot.

1. The change in length observed in each test was on the order of 20 pixels. *Id.* ¶ 117 (citing Ex. 2050).
2. In the PDF file format images provided by Corning, features that might be used as landmarks for measuring length are about 8×8 pixels. *Id.* ¶¶ 119-121.
3. The microscopist's measurement is subject, therefore, to an uncertainty of ±4 pixels on each end, for a total of ±8 pixels per measurement. *Id.* ¶ 122.
4. Because two measurements are compared to determine the change of length, the uncertainty is doubled to ±16 pixels. *Id.*
5. 16 pixels is 75% of the 20-pixel change noted in most experiments. *Id.*

Corning argues, in reply, that neither the challenged claims, nor any other part of the '189 patent, specifies the proper way in which to conduct a change-in-length test. Reply 7-8 (citing Ex. 1046, 563:13–564:17; Ex. 1035 ¶¶ 78-90). Corning also argues that its measurement procedure was sound. *Id.* at 8 (citing Ex. 1035 ¶ 82). In particular, Corning argues that (a) the samples were not constrained from free expansion, because the talc dusting prevented sticking (*id.* (citing Ex. 1035 ¶ 82)); and (b) Dr. Taylor's error estimation of 75% is grossly exaggerated, because the PDF file format images he used had far lower resolution than the original TIF file format images (*id.* at 8-9 (citing Ex. 1035 ¶¶ 84, 85, 88)). Corning's reply expert, Dr. Ju, estimates the error rate for an experienced microscopist, such as Mr. Sanford, to be on the order of 2-5%. Ex. 1035 ¶ 89.

Corning also argues that Dr. Taylor failed to consider that specific talc particles, which are distinguishable on the high-resolution TIF file format

Case IPR2013-00048
Patent 6,298,189 B1

images, were used as reference points for determining change in length.
Reply 4 (citing Ex. 1035 ¶¶ 84-88).[15]

Dr. Ju states as follows in paragraphs 86 and 87 of his declaration:

> 86. Further, Dr. Taylor fails to recognize that Corning utilized distinct talc particles as the reference points for determining the change in length value, as explained by Ms. Kouzmina in her deposition:
>
> > Q. What was done to ensure that the same spots were being measured at the different temperatures?
> >
> > A. (Kouzmina). Precision of picking the spot and the talc particles or ink were assisting in that task.
> >
> > Q. So the talc and the ink were used to help pinpoint the spots?
> >
> > A. (Kouzmina). Correct.
>
> [Ex. 1044] at 126:24–127:7.
>
> 87. As noted in Dr. Taylor's own testimony, talc particles vary in size and shape ("some pictures I've seen of individual talc particles appear that they're not necessarily just round, you know, they can be elongated structures and so forth," [Ex. 1046] at 548:5–8). Corning was able to use these distinct particles or specific features in these particles in the high-resolution .tif images as reference points for determining change in length when heated.

Ex. 1035 ¶¶ 86, 87.

---

[15] Corning does not cite paragraph 87, but the context makes clear that paragraph 87 is also relied upon.

Case IPR2013-00048
Patent 6,298,189 B1

In its Motion for Observations on Cross-Examination, DSM cites Exhibit 2090 (deposition of Dr. Ju) as relevant to Dr. Ju's declaration testimony. Obs. ¶ 15 (citing Ex. 2087, 17:12–19:1). In particular, DSM points out that Dr. Ju's understanding of Corning's measurement procedure was based on his observation by videoconference of a demonstration of the procedure that Mr. Sanford performed. Ex. 2090, 17:12–19:1. DSM suggests that Dr. Ju would have been able to judge neither the precision of Mr. Sanford's measurements nor his ability to distinguish talc particles over a videoconference connection. Obs. ¶ 15. Corning responds with other citations to Dr. Ju's deposition, in which Dr. Ju states that he could see the image pixels and talc particles and that he asked Mr. Sanford, Ms. Kouzmina, and others questions about the testing procedure, including "how they were sure that the pixel that they were identifying could be found with the assistance of [a] talc particle." Obs. Resp. ¶ 11 (quoting Ex. 2090, 17:23-24; 19:13-19).

### b. Analysis

Upon consideration of the evidence summarized above in section II.C.8.a, we determine that Corning has not shown that the various asserted prior art coating compositions, when cured, necessarily would have possessed the recited ratio of changes of length. Corning has not cited sufficient evidence demonstrating that its change-in-length measurements were performed in a manner sufficiently rigorous and reliable to prove unpatentability of the challenged claims by a preponderance of the evidence.

As noted above, the only evidence in the Petition concerning how changes in length were calculated is provided in paragraph 59 of Ms. Kouzmina's declaration. Ms. Kouzmina does not explain what points

51

were selected on each sample for each length measurement, how those points were selected, or how the points were tracked between images at different temperatures, in order to be certain that the same points on the sample were measured.

An explanation of the experimental methods used to generate results is an essential part of experiment-based expert testimony. It forms part of the "underlying facts or data" on which the expert testimony should be based. *See* 37 C.F.R. § 42.65(a). Those underlying facts or data were not supplied in the relevant portion of Ms. Kouzmina's declaration—paragraph 59—and Ms. Kouzmina's testimony on that issue is, therefore, entitled to little or no weight. No Petition evidence other than paragraph 59 of Ms. Kouzmina's declaration addresses the change-of-length calculation. Consequently, we determine that the Petition evidence is insufficient to show that the prior art composition inherently exhibit the claimed change-in-length property.[16]

Consideration of further evidence developed and cited during the trial underscores the gaps in Corning's proofs. First, none of Corning's witnesses actually performed the change-in-length experiments or saw them performed first-hand. *See* Ex. 2022, 124:9-12; Ex. 1035 ¶¶ 80-82. At best, Ms. Kouzmina's knowledge of how the experiments were conducted was

---

[16] Dr. Winningham addresses the change-in-length determination in his declaration. Ex. 1014 ¶¶ 100-04. Corning does not cite to this evidence in its Petition or other briefing, therefore, we do not give it further consideration. Even if considered, it would not be persuasive, because Dr. Winningham provides no more detailed explanation of the measurement and calculation procedures than does Ms. Kouzmina.

based on her incomplete understanding of Mr. Sanford's work.  *See* Ex. 2022, 124:9-10.

Dr. Ju observed a demonstration by Mr. Sanford, but the evidence Corning cites does not indicate that the procedure Dr. Ju observed during the demonstration was the same procedure that Mr. Stanford used when making the measurements Corning relies upon in the Petition.  Corning thus cites no credible evidence to show that Ms. Kouzmina's and Dr. Ju's testimony accurately portray the procedure actually used by Mr. Sanford.

But even if we were to accept that the testimony evidence of Ms. Kouzmina and Dr. Ju in fact describes the process that Mr. Sanford actually used to calculate change in length, we are not provided enough information to permit us to assess the reliability of the measurements produced by Mr. Sanford.  In particular, the cited evidence does not make clear how points on each sample were selected or how they were tracked. Although both Ms. Kouzmina and Dr. Ju refer to the use of talc particles or ink as reference points, they do not explain with any precision how the talc or ink is used for this purpose.  *See* Ex. 1035 ¶ 86 (quoting Ex. 1044, 126:24-127:7).[17]  Dr. Ju testified that he asked Mr. Sanford and Ms. Kouzmina how they could be sure that a pixel being identified could be found with the assistance of a talc particle (*see* Ex. 2090, 19:13-19), but Corning cites no credible evidence as to whether Dr. Ju received an answer to that question, what the answer was, or whether Dr. Ju considered the answer reasonable.  Questions remain, consequently, about precisely what

---

[17] Exhibit 1044 is identical to Exhibit 2022.

Case IPR2013-00048
Patent 6,298,189 B1

Mr. Sanford did.  Conspicuously absent is any evidence from Mr. Sanford himself on these crucial points of fact.

For example, even if we were to accept that talc particles were used for identification and tracking, it is still not clear from the cited evidence how reliable that method would be.  According to Corning, the talc was applied to prevent the sample from sticking to the microscope slide.  Reply 3 (citing Ex. 1035 ¶ 82).  It is not clear from this evidence whether the talc particles would have served as faithful position markers, by adhering to the sample, or would have skidded about as the sample expanded against the microscope slide.  Corning has not pointed us to credible evidence from which we can understand how the talc particles in fact behaved during this testing or how Mr. Sanford perceived them to behave.

Because the cited evidence does not provide a clear explanation of how the change-in-length measurements were made, we cannot assess its reliability.  We find Corning's evidence concerning the change-in-length measurement to be not credible.  For these reasons, Corning fails to show by a preponderance of evidence that any combination of coatings, in which Shustack Example I or Szum '928 Example 5B provides the inner primary coating, and Shustack Example X or XI, or Szum '928 Example 2, provides the outer primary coating, meets the "ratio of the change in length" limitation.  Because each of claims 2-4, 6-8, 10-12, and 14-16 recites this limitation, each of these claims survives Corning's challenges.

  *D. Supplemental Response and Reply*

In its Supplemental Response, DSM asserts that "Corning's GPC [gel permeation chromatography] data does not prove that Corning properly synthesized the prior art oligomers."  Supp. Resp. at 5.  DSM argues that the

**A2316**

Case IPR2013-00048
Patent 6,298,189 B1

GPC data is relevant to this challenge, because Corning used oligomer
RT-38 to replicate Szum '928 Example 5B. *Id.* at 6 (citing Ex. 2075).

   According to Dr. Bowman, when synthesizing an oligomer, the
presence of a significant amount of low molecular weight starting materials
would indicate an incomplete synthesis. Ex. 2052 ¶ 7. Dr. Bowman also
states that unreacted starting materials can detrimentally impact the
functional properties of the resulting coating composition. *Id.* In
Dr. Bowman's view, the starting materials of Corning's sample co-eluted
with the tracer, which made it "difficult, if not impossible, to determine from
these [GPC] spectra whether the oligomer functionalization reaction is
complete in Corning's oligomer compositions." *Id.* ¶ 12. Dr. Bowman
estimates "there might be 30 or 40 percent of small molecular weight
compounds that are present in those [Corning oligomers]." Ex. 1071
171:16-19.

   Corning disagrees. Supp. Reply 3. Dr. Sogah, an expert for Corning,
explains: "The main purpose of analyzing a GPC chromatogram that is run
on a GPC designed to assess oligomer formation is to see if oligomer peaks
appear in the high molecular-weight region of the chromatogram." Ex. 1068
¶ 56. Dr. Sogah states that a skilled polymer chemist would not analyze the
low molecular-weight region to confirm oligomer formation. *Id.* ¶ 57.
"Even if a skilled scientist were to focus on the low molecular-weight region
of the GPC chromatogram[,] . . . there is no information available in the
Corning GPC chromatograms in this region to indicate that the oligomer has
not been properly formed." *Id.* ¶ 58; *see id.* ¶¶ 59-60. In Dr. Sogah's
opinion, given the highly reactive nature of the reagents used in the oligomer
formation, together with the long reaction time Corning used to prepare the

Case IPR2013-00048
Patent 6,298,189 B1

oligomers, it would be "highly unlikely" that the unreacted starting materials

would be present in amounts of 30-40%, as Dr. Bowman alleges. *Id.* ¶¶ 64-

66. Dr. Sogah further points out:

> Additionally, oligomers in general are fairly viscous, to the point that this viscosity is observable to the naked eye. Having 30-40% unreacted HEA [the starting material], or any other liquid, in the final product of an oligomer synthesis would certainly affect the viscosity of the resulting product. A skilled chemist with experience synthesizing oligomers would immediately recognize that such a resulting product does not have the viscosity and other physical attributes associated with a typical oligomer. For example, HEA is volatile and has a very strong, pungent odor which a skilled chemist would almost certainly notice when handling this material. For all the reasons stated above, I think it would be highly unlikely that a skilled chemist with experience in synthesizing oligomers would be confused into thinking that the final "oligomer" product being synthesized actually contained 30-40% small molecular weight compounds, such as unreacted HEA.

*Id.* ¶ 68.

We find Dr. Sogah's explanation more persuasive. First, after

Corning submitted Dr. Sogah's declaration rebutting Dr. Bowman's opinion,

DSM cross-examined Dr. Sogah extensively, *see* Exs. 2076-77, but did not

call our attention to any of his deposition testimony in its Motion for

Observations on Cross-examination of Corning Reply Declarants. *See* Paper

63.

More importantly, DSM's scientists do not appear to have given

consideration to the low-molecular-weight region of the GPC spectrum. *See*

56

Case IPR2013-00048
Patent 6,298,189 B1

Ex. 1075, 144:6-147:22.  Indeed, when DSM's scientist presented the oligomer test data to Dr. Bowman, she did not include data of the low-molecular-weight region.  *See id.* at 146:12-15 ("So the one that I'm sure had been done before it was the di -- the diisocyanate diacrylate.  They had run that before.  She thought she knew where it should show up, but couldn't pull out that data."); *id.* at 146:20-25 ("And I think the same thing was true of the lauryl acrylate as was true of the diisocyanate diacrylate.  She knew from her experience where it would show up, but I again indicated I needed more than her experience, that I wanted see that run as a sample itself . . . .").  Dr. Bowman's account confirms Dr. Sogah's position, i.e., when analyzing a GPC chromatogram to assess oligomer formation, a skilled polymer chemist would focus on the oligomer peaks in the high-molecular-weight region, and not the peaks of the starting materials or tracer in the low-molecular-weight region.  Ex. 1068.

We find that Corning has established that it prepared the oligomer it used for testing properly.  DSM has not presented enough evidence to lead us to doubt the quality of Corning's oligomer preparation.

### E. Unpatentability Challenges

#### 1. Anticipation of claims 1-3, 5-7, 9-11, 13-15, 37-39, 45-47, and 49-51 by Shustack

##### a. Claims 1-3, 6-7, 9-11, and 14-15

Shustack does not anticipate claims 1-3 and 9-11, because Corning has not shown that Shustack Example I possesses the "sufficient adhesion" limitation, as discussed above in section II.C.2.

Shustack does not anticipate claims 2, 3, 6, 7, 10, 11, 14, and 15, because Corning has not shown that Shustack's inner and out coatings

57

**A2319**

Case IPR2013-00048
Patent 6,298,189 B1

possess the "change in length" limitation, as discussed above in section II.C.8.

Shustack also does not anticipate claims 2, 3, 6, 7, 10, 11, 14, and 15, because Corning has not shown that Shustack Examples X and XI possess the modulus of elasticity limitations recited in these claims, as discussed above in section II.C.7.

### b. Claims 38, 39, 46, 47, 50, and 51

Shustack does not anticipate claims 38, 39, 46, 47, 50, and 51, because these claims depend from claims that Shustack does not anticipate.

### c. Claims 5 and 13

Shustack anticipates claims 5 and 13. Corning has shown that Shustack Example I possesses all the structural limitations and material property limitations of these claims, as discussed above in sections II.C.1, II.C.3, II.C.4, and II.C.5.

### d. Claims 37, 45, and 49

Each of these multiple dependent claims depends from claim 5 or claim 13.

#### (1) Claim 37

Claim 37 requires that at least one oligomer be a radiation curable oligomer comprising at least one terminal linear moiety. Corning argues that the hydroxyethyl acrylate (HEA) end groups, which Shustack discloses may be used as end groups in Example I (Ex. 1003, 10:42), are terminal linear moieties, because they do not contain cyclic or branched units. Pet. 29 (citing Ex. 1014 ¶ 129). The '189 patent identifies HEA as a radiation-curable oligomer. Ex. 1001, 53:40-42. DSM does not challenge Corning's evidence as to this claim.

58

Case IPR2013-00048
Patent 6,298,189 B1

Upon consideration of Corning's argument and evidence, we are persuaded that Shustack Example I anticipates claim 37, because the oligomer used in Example I may be terminated with HEA end groups, which are terminal linear moieties.

### (2) Claim 45

Claim 45 requires that "at least one oligomer is a urethane oligomer having at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a urethane group, wherein the concentration of said urethane groups is about 4% by weight or less, based on the total weight of said inner primary coating composition." Corning argues that the HEA end groups are radiation-curable (i.e., polymerizable) and are linked to the polybutadiene polymeric block of the urethane acrylate oligomer. Pet. 29-30 (citing Ex. 1014 ¶ 130). Ms. Kouzmina reports that the concentration of urethane groups of the Shustack Example I coating composition is 2.6% by weight. *Id.* at 30 (citing Ex. 1015 ¶ 66). DSM does not challenge Corning's evidence as to this claim.

Upon consideration of Corning's argument and evidence, we are persuaded that Shustack Example I anticipates claim 45, because the chemical structure of the Shustack Example I oligomer, and the composition's urethane concentration, are within the scope of the claim.

### (3) Claim 49

Claim 49 requires that "at least one oligomer is comprised of at least one polymeric block linked to at least one functional group capable of polymerizing under the influence of radiation via a linking group, and

Case IPR2013-00048
Patent 6,298,189 B1

wherein said at least one polymeric block has a calculated molecular weight of at least about 2000."

Corning's argument for this claim is similar to that for claim 45. Pet. 30. Corning argues further that Shustack discloses a hydrocarbon polyol molecular weight range of 500 to 4000. *Id.* (citing Ex. 1003, 9:29-34). Corning argues that one of ordinary skill in the art would have selected a polyol with a molecular weight of about 3000 in order to achieve a soft inner primary coating. *Id.* (citing Ex. 1014 ¶ 130). DSM does not challenge Corning's evidence as to this claim.

We are not persuaded by Corning's argument that the claim is anticipated because one of ordinary skill would have selected a molecular weight of 3000. Corning offers no credible evidence to support this argument beyond an unsupported assertion of its truth by Dr. Winningham. *See* Ex. 1014 ¶ 130. We conclude, therefore, that Corning has not demonstrated that Shustack anticipates claim 49.

In summary, we conclude that Shustack anticipates claims 5, 13, 37, and 45, but not claims 1-3, 6, 7, 9-11, 14, 15, 38, 39, 46, 47, and 49-51.

> 2. *Obviousness of claims 1-3, 5-7, 9-11, 13-15, 37-39, 45-47, and 49-51 over Shustack*

Corning argues that, to the extent different coatings disclosed in Shustack are not expressly disclosed as combinable as inner and outer primary coating compositions, it would have been obvious to combine them. Pet. 31.

As discussed above in section II.E.1.a, we have determined that claims 1-3, 6, 7, 9-11, 14, 15, 38, 39, 46, 47, and 49-51 are not anticipated by Shustack because of deficiencies in Corning's evidence supporting that

challenge. Those deficiencies taint Corning's obviousness challenge and are not remedied by the combinations of different coatings in Shustack. We determine that Corning has not demonstrated that claims 1-3, 6, 7, 9-11, 14, 15, 38, 39, 46, 47, and 49-51 would have been obvious over Shustack.

Claims 5, 13, 37, and 45 relate only to an inner primary coating composition and, as such, do not rely on combination with an outer primary coating composition. Corning's challenge in this regard appears to be misplaced. Nevertheless, as anticipation is the "epitome" of obviousness, *In re McDaniel*, 293 F.3d 1379, 1385 (Fed. Cir. 2002), and we have determined that Corning has proved the anticipation of these claims by Shustack, we also determine that claims 5, 13, 37, and 45 would have been obvious over Shustack, for the reasons given above with regard to anticipation.

### 3. *Anticipation of claims 1, 5, 9, 13, 37, 45, and 49 by Szum '928*

Szum '928 does not anticipate claims 1 and 9, because Corning has not shown that Szum '928 Example 5B possesses the "sufficient adhesion" limitation, as discussed above in section II.C.2.

Szum '928 anticipates claims 5 and 13. Corning has shown that Szum '928 Example 5B possesses all the structural limitations and material property limitations of these claims, as discussed above in sections II.C.1, II.C.3, II.C.4, and II.C.5.

Szum '928 anticipates claim 37, because the oligomer of Example 5B includes HEA end groups, which, as discussed above, are terminal linear moieties within the scope of claim 37.

Szum '928 anticipates claim 45. Corning argues that the radiation-curable HEA groups are linked to a polypropylene polymer block of the

Case IPR2013-00048
Patent 6,298,189 B1

oligomer, and that the coating is calculated to have a urethane concentration of 3.2% by weight. Pet. 38 (citing Ex. 1014 ¶ 153; Ex. 1015 ¶ 68). DSM does not challenge Corning's argument or evidence.

Szum '928 anticipates claim 49. Corning argues that Szum '928 discloses that the molecular weight of the polypropylene glycol polymeric block in the urethane oligomer is "about 2000." *Id.* (citing Ex. 1005, 23:16-17). DSM does not challenge Corning's argument or evidence. The claim requires a molecular weight of "at least about 2000." We determine, under the facts of this case, that the disclosure of "about 2000" meets the limitation of "at least about 2000."

In summary, we conclude that Szum '928 anticipates claims 5, 13, 37, 45, and 49, but not claims 1 and 9.

### 4. *Obviousness of claims 4, 8, 12, 16, 40, 48, and 52 over Shustack and Jackson*

Claims 4, 8, 12, 16, 40, 48, and 52 relate to ribbon assemblies. Corning relies on Shustack for disclosure of all limitations except those relating to the ribbon assembly structure and argues that it would have been obvious to form a ribbon assembly as taught by Jackson using individual fibers configured as taught by Shustack. Pet. 39-41.

Corning has not shown that Shustack Example I possesses the "sufficient adhesion" limitation of claims 4 and 12, as discussed above in section II.C.2.

Corning has not shown that Shustack's inner and out coatings possess the "change in length" limitation of claims 4, 8, 12, and 16, as discussed above in section II.C.8.

Case IPR2013-00048
Patent 6,298,189 B1

Corning has not shown that Shustack Examples X and XI possess the modulus of elasticity limitations recited in claims 4, 8, 12, and 16, as discussed above in section II.C.7.

Because Corning relies on Shustack to teach these limitations, the deficiencies noted above undermine Corning's obviousness challenge and are not remedied by the combination with Jackson. We determine that Corning has not demonstrated that claims 4, 8, 12, and 16 would have been obvious over Shustack and Jackson. Claims 40, 48, and 52 each depend from claim 8 or claim 16 and are not unpatentable over Shustack and Jackson, as well.

5. *Obviousness of claims 17-20 over Chawla in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 17-20 each require that at least one inner primary coating composition oligomer is radiation-curable and comprises at least one glass coupling moiety, at least one slip agent moiety, and at least one radiation-curable moiety. The claims are each multiple dependent claims and differ in their dependencies. Claim 17 depends from claim 5 or claim 13, claim 18 depends from claim 6 or claim 14, claim 19 depends from claim 7 or claim 15, and claim 20 depends from claim 8 or claim 16.

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose an oligomer with the features of claims 17-20. Pet. 42. Corning argues that Chawla discloses silane-oligomers that meet the limitations of claims 17-20, and also that the silane-oligomers are useful on optical fibers and have good strength and water-resistance characteristics. *Id.* at 42-45 (citing Ex. 1008, 2:1-12; 2:67–3:17; 3:34-40; 7:42-47; 8:59-67; 9:10-13; 12

63

Case IPR2013-00048
Patent 6,298,189 B1

tbl.4; 9:57-65; 10:12-19; Ex. 1014 ¶¶ 182, 183, 187). Corning also argues

that Chawla discloses inclusion of as little silane-oligomer as about 5% by

weight. *Id.* at 44 (citing Ex. 1008 7:42-44). Corning argues that it would

have been obvious to include Chawla's silane-oligomers in a small amount

(about 5% by weight) in Shustack's or Szum '928's coating compositions to

obtain these benefits, and that inclusion of a small amount of them would

not be expected to change the resulting material properties. *Id.* at 43-44

(citing Ex. 1014 ¶¶ 183-186).

DSM argues, in response, that Chawla discloses including silane-

oligomers in coating compositions at preferably above 15% by weight, and

up to 95% by weight, and that none of Chawla's examples includes silane-

oligomers at less than 10% by weight. Resp. 51.

Upon consideration of the parties' argument and evidence, we agree

with Corning that it would have been obvious to include a small amount of

Chawla's silane-oligomer in the coating composition of Shustack Example I

or Szum '928 Example 5B in order to improve strength and water resistance,

without otherwise significantly affecting the compositions' other material

properties. DSM's argument does not address Chawla's disclosure that as

little as 5% silane-oligomer may be added. Even if inclusion of larger

amounts of silane-oligomer might not have been obvious, due to effects on

the claimed material properties, the claims encompass small additions that

would have been obvious. *See In re Lintner*, 458 F.2d 1013, 1015 (CCPA

1972) ("Claims which are broad enough to read on obvious subject matter

are unpatentable even though they also read on nonobvious subject

matter."); *In re Muchmore*, 433 F.2d 824, 826 (CCPA 1970) (affirming

64

**A2326**

Case IPR2013-00048
Patent 6,298,189 B1

obviousness rejection where claim "reads on both obvious and unobvious subject matter.").

We determine that Corning has demonstrated the unpatentability of claim 17, as dependent from claim 5 and from claim 13, for obviousness over Shustack and Chawla and over Szum '928 and Chawla. Claims 18-20 depend from claims that Corning has not shown to be unpatentable over Shustack, over Shustack and Jackson, or over Szum '928. We determine that Corning has not shown that claims 18-20 are unpatentable.

### 6. *Obviousness of claims 21-24 over Hager in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 21-24 each require that the inner primary coating composition further include a soluble wax that is soluble in the inner primary coating composition. The claims are each multiple dependent claims and differ in their dependencies. Claim 21 depends from claim 5 or claim 13, claim 22 depends from claim 6 or claim 14, claim 23 depends from claim 7 or claim 15, and claim 24 depends from claim 8 or claim 16.

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose a soluble wax as recited in claims 21-24. Pet. 45. Corning argues that Hager discloses a soluble wax that one of ordinary skill in the art would expect to be soluble in the claimed inner primary coating compositions. Pet. 45-46 (citing Ex. 1014 ¶¶ 190-194). Corning further argues that one of ordinary skill in the art would have included Hager's soluble wax in an in inner primary coating composition of Shustack or Szum '928 because Hager teaches that such waxes are "useful on optical fibers and improve the water

65

Case IPR2013-00048
Patent 6,298,189 B1

resistance of the coating against wicking to the coated fiber strand."
Pet. 45-46 (citing Ex. 1009, 1:19-21, 4:18-19; Ex. 1014 ¶ 191).

DSM argues that Hager's coatings are directed to use on fibers that
are used as overwraps for optical fiber cables, not to the optical fibers
themselves. Resp. 51-52 (citing Ex. 1009, 1:5-10).

We agree with DSM that Hager is directed to coatings for overwrap
fibers, not optical fibers. The portions of Hager that Corning cites do not
indicate that Hager's waxes are useful when coated directly onto optical
fibers. Hager consistently distinguishes fibers used as protective overwraps
from optical fibers. *See* Ex. 1009, 1:5-10, 4:63-68. Corning has not
explained why it would have been obvious to incorporate Hager's waxes
into inner primary coating compositions for optical fibers.

For these reasons, we determine that Corning has not shown that
claims 21-24 are unpatentable for obviousness over Shustack and Hager,
Szum '928 and Hager, or Shustack, Jackson, and Hager.

> 7. *Obviousness of claims 25-28 over Tortorello in combination*
> *with Shustack, or with Szum '928, or with Shustack and*
> *Jackson*

Claims 25-28 each require that at least one inner primary coating
composition oligomer is a radiation-curable silicone oligomer and comprises
a silicone compound and at least one radiation-curable moiety. The claims
are each multiple dependent claims and differ in their dependencies. Claim
25 depends from claim 5 or claim 13, claim 26 depends from claim 6 or
claim 14, claim 27 depends from claim 7 or claim 15, and claim 28 depends
from claim 8 or claim 16.

Case IPR2013-00048
Patent 6,298,189 B1

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose an oligomer with the features of claims 25-28. Pet. 48. Corning argues that Tortorello discloses the claimed silicone oligomers, and that one of ordinary skill in the art would have incorporated Tortorello's oligomers in the inner primary coating compositions of Shustack or Szum '928 in order to be able to adjust various properties, including the glass transition temperature. Pet. 48-49 (citing Ex. 1010, 2:24-38, 5:9-16; Ex. 1014 ¶¶ 197-199, 202). Corning argues that one skilled in the art would not have expected inclusion of Tortorello's oligomer to affect the claimed properties of the inner primary coating compositions, because Tortorello indicates that even small amounts (as little as 5%) can be introduced. *Id.* at 50 (citing Ex. 1010, 7:30-31; Ex. 1014 ¶ 201).

Corning's argument does not persuade us that the claims are unpatentable. Corning argues that it would have been obvious to add Tortorello's silicone to be able to adjust glass transition temperature, yet Corning also argues that adding Tortorello's oligomer would *not* change the glass transition temperature so as to move it outside the claimed range. Corning has not explained why it would have been obvious to add an ingredient to a coating composition in so a small quantity as to have little or no effect on precisely the property that the ingredient is intended to change.

For these reasons, we determine that Corning has not shown that claims 25-28 are unpatentable for obviousness over Shustack and Tortorello, Szum '928 and Tortorello, or Shustack, Jackson, and Tortorello.

Case IPR2013-00048
Patent 6,298,189 B1

> 8. *Obviousness of claim 29-32 over Botelho in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 29-32 each require that the inner primary coating composition include a non-radiation-curable, silicone compound. The claims are each multiple dependent claims and differ in their dependencies. Claim 29 depends from claim 5 or claim 13, claim 30 depends from claim 6 or claim 14, claim 31 depends from claim 7 or claim 15, and claim 32 depends from claim 8 or claim 16.

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose a non-radiation-curable, silicone compound. Pet. 51. Corning argues that Botelho discloses inclusion of silicone in an inner primary coating composition. Pet. 52 (citing Ex. 1011, 5:18-21, 10:15-21, 11:24-28; Ex. 1014 ¶¶ 205-07, 209). Corning argues that it would have been obvious to include silicone in an inner primary coating composition because Botelho suggests this and "attributes several benefits of the disclosed primary coatings." *Id.* (citing Ex. 1011, 5:22-35; Ex. 1014 ¶¶ 206-07). Corning does not identify in its petition what benefits Botelho attributes to the inclusion of silicone in an inner primary coating composition. Corning argues that Botelho discloses adding silicone in an amount as little as 2% by weight, an amount that would not be expected to alter the claimed material properties so that they were outside the claimed ranges. *Id.* at 51-52 (citing Ex. 1011, 11:3-13; Ex. 1014 ¶ 208).

DSM argues that Botelho does not disclose "any metrics for evaluating stripping performance." Resp. 53 (citing Ex. 1011 in its entirety).

Case IPR2013-00048
Patent 6,298,189 B1

Upon consideration of the parties' arguments and evidence, we agree with Corning that it would have been obvious to include a small amount of silicone compound in Shustack's or Szum '928's inner primary coating composition to improve, e.g., strippability. We agree with Corning that Botelho discloses inclusion of silicone compound for this purpose. *See* Ex. 1011, 5:22-35, 24:2-3. Whether Botelho discloses metrics for evaluating stripping performance is of little moment to the obviousness determination.

We determine that Corning has demonstrated the unpatentability of claim 29, as dependent from claim 5 and from claim 13, for obviousness over Shustack and Botelho and over Szum '928 and Botelho. Claims 30-32 depend from claims that Corning has not shown to be unpatentable over Shustack, over Shustack and Jackson, or over Szum '928. We determine that Corning has not shown that claims 30-32 are unpatentable.

    9.   *Obviousness of claims 33-36 over Skutnik in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 33-36 each require that the inner primary coating composition include a radiation-curable fluorinated oligomer, a radiation-curable fluorinated monomer, or a non-radiation-curable fluorinated compound. The claims are each multiple dependent claims and differ in their dependencies. Claim 33 depends from claim 5 or claim 13, claim 34 depends from claim 6 or claim 14, claim 35 depends from claim 7 or claim 15, and claim 36 depends from claim 8 or claim 16.

A2331

Case IPR2013-00048
Patent 6,298,189 B1

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose the fluorinated materials recited in claims 33-36.  Pet. 54.[18] Corning argues that Skutnik discloses use of radiation-curable fluorinated monomers, specifically, a fluorinated monoene.  *Id.* (citing Ex. 1012, 1:67– 2:19, 2:29-34; Ex. 1014 ¶¶ 213, 217).  Corning argues that Skutnik discloses several benefits of including a fluorinated monoene in an inner primary coating composition, such as improved thermal stability, electrical resistivity, mechanical and moisture protection, and refractive index control. *Id.* at 55 (citing Ex. 1012, 2:34-41, 11:59-63; Ex. 1014 ¶ 214).  Corning argues that Skutnik discloses inclusion of fluorinated monoenes at a level of as little as 10%, a level at which one of ordinary skill would not expect the claimed material properties to exceed the claimed ranges.  *Id.* at 55-56 (citing Ex. 1012, 2:19-22; Ex. 1014 ¶ 216).

DSM argues that Corning bases its assertions on the extreme low end of fluorinated monoene concentration disclosed in Skutnik, and that the claimed material properties would be altered significantly at the higher concentrations Skutnik discloses.  Resp. 54 (citing Ex. 2032 ¶¶ 234-236). Dr. Taylor states that "if the [weight percent] of the fluorinated monomer were increased above the extreme low end of the disclosed range, a person of ordinary skill in the art would expect the properties of the coating to change in unpredictable ways."  Ex. 2032 ¶ 236.

---

[18] Corning states only that Shustack, Szum '928, and Jackson fail to disclose the radiation-curable, fluorinated monomer.  For purposes of this decision, we interpret Corning's argument as acknowledging that Shustack, Szum '928, and Jackson do not disclose any of the materials listed in claims 33-36.

A2332

Case IPR2013-00048
Patent 6,298,189 B1

Upon consideration of the parties' arguments and evidence, we agree with Corning that it would have been obvious to include a small amount of fluorinated monoene in Shustack's or Szum '928's inner primary coating composition to improve various properties. DSM asserts that inclusion of fluorinated monoene above 10% by weight would have undesirable effects. Even if it were the case that inclusion of larger amounts of fluorinated monoene would not have been obvious, due to effects on the claimed material properties, the claims encompass small additions that would have been obvious. *See In re Lintner*, 458 F.2d at 1015.

We determine that Corning has demonstrated the unpatentability of claim 33, as dependent from claim 5 and from claim 13, for obviousness over Shustack and Skutnik and over Szum '928 and Skutnik. Claims 34-36 depend from claims that Corning has not shown to be unpatentable over Shustack, over Shustack and Jackson, or over Szum '928. We determine that Corning has not shown that claims 33-36 are unpatentable.

> 10. *Obviousness of claims 41-44 over Mills in combination with Shustack, or with Szum '928, or with Shustack and Jackson*

Claims 41-44 each require that the inner primary coating composition include a solid lubricant. The claims are each multiple dependent claims and differ in their dependencies. Claim 41 depends from claim 5 or claim 13, claim 42 depends from claim 6 or claim 14, claim 43 depends from claim 7 or claim 15, and claim 44 depends from claim 8 or claim 16.

Corning acknowledges that Shustack, Szum '928, and Jackson do not disclose a solid lubricant. Pet. 57. Corning argues that Mills discloses the use of a solid lubricant in an interfacial layer outside the inner and outer primary coatings, though not within the inner primary coating. *Id.* at 57-58.

Case IPR2013-00048
Patent 6,298,189 B1

Corning argues that it would have been obvious to include a small amount of solid lubricant in an inner primary coating composition of Shustack or Szum '928 in view of Mills's disclosure that lubricant improves strippability of coatings on optical fibers. *Id.* at 58 (citing Ex. 1013, 3:10-28; Ex. 1014 ¶¶ 222, 223). Corning argues that other references disclose the desirability of including lubricants in coatings. *Id.* (citing, e.g., Ex. 1008, 7:37-41; Ex. 1010, 14:66–15:12; Ex. 1014 ¶ 222).

DSM argues that Mills addresses use of solid lubricant only in an interfacial layer, not in the glass-contacting inner primary coating. Resp. 55 (citing Ex. 2032 ¶¶ 237-239). According to Dr. Taylor, Mills's focus is on strippability of outer coatings from a fiber, not the glass-contacting inner primary coating. Ex. 2032 ¶ 239. DSM also argues, through Dr. Taylor, that introducing solid lubricant into the inner primary layer would not have been obvious because the particles of solid lubricant may harm the glass fiber. *Id.*

Corning's argument and evidence do not persuade us that the claims are unpatentable. We agree with DSM that Mills's solid lubricants are intended specifically for use in an interfacial layer that overlies the inner primary and outer primary coatings. *See* Ex. 1013, 2:65-3:3 (first protective layer is made of low-modulus inner coating and higher-modulus outer coating). Corning identifies no disclosure in Mills to indicate that solid lubricants are suitable additives to the first protective layer. Corning relies instead on generic disclosure in other references that the primary layer may include lubricants. But these other references do not address solid lubricants in particular. Corning's argument is not directed, therefore, to the particular feature claimed. We credit Dr. Taylor's testimony that solid lubricant may

72

**A2334**

Case IPR2013-00048
Patent 6,298,189 B1

not be a suitable additive in an inner primary coating because of damage it may cause to the glass fiber. *See* Ex. 2032 ¶ 239.

For these reasons, we determine that Corning has not shown that claims 41-44 are unpatentable for obviousness over Shustack and Mills, Szum '928 and Mills, or Shustack, Jackson, and Mills.

## III.    MOTION TO AMEND

"A motion to amend may cancel a challenged claim or propose a reasonable number of substitute claims." 37 C.F.R. § 42.121(a)(3). DSM moves to substitute claims 67, 68, 69, and 70 for original claims 6, 7, 14, and 15, respectively. Mot. to Amend 1-6. The overall framework of our amendment process is geared towards deciding motions to amend where the claims sought to be replaced are under a continuing threat of cancellation by virtue of the patentability challenge upon which trial is instituted. *See* 35 U.S.C. § 316(d) (tethering amendments to "challenged" patent claims and contemplating amendments that "materially advance" settlement of an ongoing dispute); *see also* 37 C.F.R. § 42.121(a)(2)(i) (an amendment may be denied where it "does not respond to a ground of unpatentability involved in the trial"). Absent some showing of special circumstances, we are not convinced that our charter of deciding cases quickly and efficiently favors dedicating our limited resources to evaluating the patentability of DSM's proposed substitute claims, after we have resolved the main controversy in DSM's favor.

Having determined that none of DSM's claims 6, 7, 14, and 15 is proved unpatentable, we deny without prejudice the motion to amend. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,767 (indicating that a

Case IPR2013-00048
Patent 6,298,189 B1

motion to amend may be denied, without prejudice, if it is determined that patent owner's original claims are not unpatentable).

## IV.  MOTIONS TO EXCLUDE EVIDENCE

### A. DSM's Motion

DSM moves to exclude Dr. Winningham's testimony as unreliable, based on an argument that he failed to review data underlying his opinions and, further, failed to apply the correct legal standard for obviousness.  PO Mot. to Exclude 1-6.  Whether a witness's testimony fails to include underlying facts or data on which an opinion is based goes to the weight that should be accorded the testimony, and not its admissibility.  *See* 37 C.F.R. § 42.65(a).  DSM's arguments concerning the legal standard for obviousness that Dr. Winningham applied is not persuasive, for reasons discussed above in section II.B.  We deny the motion to exclude as to Dr. Winningham's evidence.

DSM also moves to exclude certain test results and testimony relating to fiber pull-out and change-in-length testing.  *Id.* at 7-12.  As to the fiber pull-out friction testing, DSM argues that Corning failed to explain how the test was performed.  *Id.* at 7-9.  We disagree with DSM.  Again, whether a witness's testimony fails to include underlying facts or data on which an opinion is based goes to weight, not admissibility.  DSM's motion to exclude is denied as to this evidence.  As to the change-in-length measurements and calculations, *id.* at 9-11, we explain above in section II.C.8.b that Corning's evidence is not persuasive.  Because we consider that evidence on its merits and decide the issue in DSM's favor, we need not

74

reach the question of admissibility.  The motion is dismissed as to the change-in-length evidence.

DSM also moves to exclude paragraphs 10-39 and 60-91 of the declaration of Dr. Ju (Ex. 1035), and paragraphs 16-30, 86-89, and 95 of the declaration of Dr. Sogah (Ex. 1068) that Corning submitted with its Reply, along with the Reply itself for its reliance on that evidence.  PO Mot. to Exclude 12-15.  We do not rely on the challenged reply evidence to reach our final decision.  Therefore, we dismiss as moot the motion to exclude as to the Reply and the challenged reply evidence.

On this record, DSM's motion to exclude evidence is dismissed-in-part and denied-in-part.

### B. Corning's Motion

Corning also moves to exclude evidence.  Pet. Mot. to Exclude 1-14.  Specifically, Corning seeks to exclude testimony relating to the water soak delamination tests that DSM performed on prior art coatings, as well as opinions relating to DSM's fiber pull-out friction tests.  *Id.*  We rely on none of that evidence to reach our final decision.  Here again, we decline to exclude evidence that does not underlie our decision.

On this record, Corning's motion to exclude evidence is dismissed as moot.

## V. CONCLUSION

Corning has proved, by a preponderance of the evidence, that claims 5, 13, 17, 29, 33, 37, 45, and 49 of the '189 patent are unpatentable.  Corning has failed to prove, by a preponderance of the evidence, that claims

Case IPR2013-00048
Patent 6,298,189 B1

1-4, 6-12, 14-16, 18-28, 30-32, 34-36, 38-44, 46-48, and 50-52 are
unpatentable.

In particular, we determine that:

1. Shustack anticipates and renders obvious claims 5, 13, 37, and
   45, but not claims 1-3, 6, 7, 9-11, 14, 15, 38, 39, 46, 47, and 49-
   51;

2. Szum '928 anticipates claims 5, 13, 37, 45, and 49, but not
   claims 1 and 9;

3. Claims 4, 8, 12, 16, 40, 48, and 52 are not unpatentable for
   obviousness over Shustack and Jackson;

4. Claim 17, but not claims 18-20, is unpatentable for obviousness
   over Shustack and Chawla and over Szum '928 and Chawla;

5. Claims 21-24 are not unpatentable for obviousness over
   Shustack and Hager, Szum '928 and Hager, or Shustack,
   Jackson, and Hager;

6. Claims 25-28 are not unpatentable for obviousness over
   Shustack and Tortorello, Szum '928 and Tortorello, or
   Shustack, Jackson, and Tortorello;

7. Claim 29, but not claims 30-32, is unpatentable for obviousness
   over Shustack and Botelho and over Szum '928 and Botelho;

8. Claim 33, but not claims 34-36, is unpatentable for obviousness
   over Shustack and Skutnik and over Szum '928 and Skutnik;
   and

9. Claims 41-44 are not unpatentable for obviousness over
   Shustack and Mills, Szum '928 and Mills, or Shustack, Jackson,
   and Mills.

Case IPR2013-00048
Patent 6,298,189 B1

VI.    ORDER

For the reasons given, it is

ORDERED that claims 5, 13, 17, 29, 33, 37, 45, and 49 of U.S. Patent
No. 6,298,189 B1 are determined to be UNPATENTABLE;

FURTHER ORDERED claims 1-4, 6-12, 14-16, 18-28, 30-32, 34-36,
38-44, 46-48, and 50-52 of U.S. Patent No. 6,298,189 B1 are not determined
to be unpatentable;

FURTHER ORDERED that DSM's motion to amend claims is
*denied*, without prejudice;

FURTHER ORDERED that DSM's motion to exclude evidence is
*dismissed-in-part* and *denied-in-part*;

FURTHER ORDERED that Corning's motion to exclude evidence is
*dismissed*; and

FURTHER ORDERED that because this is a final decision, parties to
the proceeding seeking judicial review of the decision must comply with the
notice and service requirements of 37 C.F.R. § 90.2.

Case IPR2013-00048
Patent 6,298,189 B1

For PETITIONER:
Michael L. Goldman
Jeffrey Townes
LeClairRyan, A Professional Corporation
Michael.Goldman@leclairryan.com
Jeffrey.Townes@leclairryan.com


For PATENT OWNER:
Sharon A. Israel
Joseph Mahoney
Mayer Brown, LLP
SIsrael@mayerbrown.com
JMahoney@mayerbrown.com

A2340

Trials@uspto.gov                                                              Paper 58
352.272.7822                                                    Entered: February 2, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

FACEBOOK, INC., LINKEDIN CORP., and TWITTER, INC.,
Petitioner,

v.

SOFTWARE RIGHTS ARCHIVE, LLC,
Patent Owner.

———————

Case IPR2013-00478
Patent 5,544,352

———————

Before SALLY C. MEDLEY, CHRISTOPHER L. CRUMBLEY, and
BARBARA A. PARVIS, *Administrative Patent Judges.*

CRUMBLEY, *Administrative Patent Judge.*


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*


I.      BACKGROUND

*A. Introduction*

On July 30, 2013, Facebook, Inc., LinkedIn Corp., and Twitter, Inc.
(collectively "Petitioner") filed a Petition requesting an *inter partes* review
of claims 26, 28–30, 32, 34, and 39 of U.S. Patent No. 5,544,352 (Ex. 1001,
"the '352 patent"). Paper 1 ("Pet."). On February 3, 2014, we instituted

IPR2013-00478
Patent 5,544,352

trial on all challenged claims, on certain of the grounds of unpatentability alleged in the Petition. Paper 17 ("Decision to Institute" or "Inst. Dec.").

After institution of trial, Software Rights Archive, LLC ("Patent Owner"), filed a Patent Owner Response ("PO Resp."). Paper 34. Petitioner also filed a Reply. Paper 43 ("Reply").

A consolidated oral hearing for IPR2013-00478, IPR2013-00479, IPR2013-00480, and IPR2013-00481, each involving the same Petitioner and the same Patent Owner, was held on October 30, 2014. The transcript of the consolidated hearing has been entered into the record. Paper 57, "Tr."

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown by a preponderance of the evidence that claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable.

B. *Related Proceedings*

Petitioner and Patent Owner both indicate that the '352 patent is involved in the following co-pending district court proceedings: *Software Rights Archive, LLC v. Facebook, Inc.,* Case No. 12-cv-3970; *Software Rights Archive, LLC v. LinkedIn Corp.,* Case No. 12-cv-3971; and *Software Rights Archive, LLC v. Twitter, Inc.,* Case No. 12-cv-3972, each pending in the United States District Court for the Northern District of California. Pet. 1; Paper 8, Patent Owner's Mandatory Notice, 2.

In addition, we instituted trial on Petitioner's petitions on related patents including: (1) IPR2013-00479 and IPR2013-00480, *inter partes* reviews of U.S. Patent No. 5,832,494 (the "'494 patent"); and (2) IPR2013-00481, an *inter partes* review of U.S. Patent No. 6,233,571 (the "'571 patent"). The '352 patent issued from the parent of the application that

IPR2013-00478
Patent 5,544,352

issued as the '494 patent. The '571 patent issued from an application that was a divisional of the application that issued as the '494 patent. The '352 patent was the subject of Reexamination No. 90/011,010.

### C. The '352 patent

The '352 patent relates to computerized research on databases. Ex. 1001, 1:7–11. The '352 patent discloses that it improves search methods by indexing data using proximity indexing techniques. *Id.* at 3:42–55. According to the '352 patent, proximity indexing techniques generate a quick-reference of the relations, patterns, and similarity found among the data in the database. *Id.* at 3:53–55.

Figure 2 of the '352 patent illustrates the high-level processing of software for computerized searching (*Id.* at 8:7–8) and is reproduced below:



*Fig. 2*

Figure 2 depicts software system 60 comprising Proximity Indexing Application Program 62, Computer Search Program for Data Represented by Matrices ("CSPDM") 66, and Graphical User Interface ("GUI") program 70.

3

*Id.* at 10:53–60.

Processing of software system 60 begins with Proximity Indexing Application Program 62 indexing a database. *Id.* at 11:4–5. Then, CSPDM 66 searches the indexed database and retrieves requested objects. *Id.* at 11:6–10. CSPDM 66 relays the retrieved objects to GUI program 70 to display on a display. *Id.* at 11:10–13.

Software system 60 runs on a computer system comprising, for example, a processor of a personal computer. *Id.* at 9:39–44. The system comprises a display, which displays information to the user. *Id.* at 10:4–7. Exemplary displays include computer monitors, televisions, LCDs, or LEDs. *Id.*

The processor is connected to a database to be searched. *Id.* at 9:46–47. The database contains cases—also called full textual objects—that contain citations to other objects within the database. *Id.* at 12:1–10. Each full textual object is assigned a number corresponding to its chronological order in the database. *Id.*

The '352 patent discloses that any two textual objects in the database may be related through a number of "patterns." *Id.* at 12:31–32. For example, object A may cite B, or the two objects may cite the same object C. *Id.* at 12:46–61. The Proximity Indexing Application (discussed above) applies algorithms to these relationships to create a matrix of pattern vectors that represent the relationships between the various objects in the database. *Id.* at 12:62–13:3, 14:18–20. The CSPDM is used to search the indexed database. *Id.* at 14:20–21.

4

IPR2013-00478
Patent 5,544,352

*D. Illustrative Claim*

Of the challenged claims, only claim 26 is independent, whereas claims 28–30, 32, 34, and 39 depend, directly or indirectly, from claim 26. Claim 26 is illustrative of the claimed subject matter and is reproduced below:

> 26. A non-semantical method for numerically representing objects in a computer database and for computerized searching of the numerically represented objects in the database, wherein direct and indirect relationships exist between objects in the database, comprising:
>
> marking objects in the database so that each marked object may be individually identified by a computerized search;
>
> creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database;
>
> storing the first numerical representations for use in computerized searching;
>
> analyzing the first numerical representations for indirect relationships existing between or among objects in the database;
>
> generating a second numerical representation of each object based on the analysis of the first numerical representation;
>
> storing the second numerical representation for use in computerized searching; and
>
> searching the objects in the database using a computer and the stored second numerical representations, wherein the search identifies one or more of the objects in the database.

Ex. 1001, 35:28–54.

**A2345**

IPR2013-00478
Patent 5,544,352

### E. The Prior Art References Upon Which Trial Was Instituted

Yahiko Kambayashi et al., *Dynamic Clustering Procedures for Bibliographic Data*, Kyoto Univ., Dep't of Inf. Sci., 90–99 (1981) ("Kambayashi") (Ex. 1004).

Colin F.H. Tapper, *Citation Patterns in Legal Information Retrieval*, 3 Datenverarbeitung im Recht 249–75 (1976) ("Tapper 1976") (Ex. 1005).

Colin Tapper, *The Use of Citation Vectors for Legal Information Retrieval*, 1 J. of Law and Info. Sci. 131–61 (1982) ("Tapper 1982") (Ex. 1006).

Edward A. Fox, *Characterization of Two New Experimental Collections in Computer and Information Science Containing Textual and Bibliographic Concepts* (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dep't of Comp. Sci.) ("Fox Collection") (Ex. 1007).

Edward A. Fox, *Some Considerations for Implementing the SMART Information Retrieval System under UNIX* (Sept. 1983) (Ph.D. dissertation, Cornell Univ. Dep't of Comp. Sci.) ("Fox SMART") (Ex. 1008).

Edward A. Fox, *Extending the Boolean and Vector Space Models of Information Retrieval with P-Norm Queries and Multiple Concept Types* (Aug. 1983) (Ph.D. dissertation, Cornell Univ. Dept. of Comp. Sci.) ("Fox Thesis") (Ex. 1009).

The parties do not dispute the prior art status of the references.

6

IPR2013-00478
Patent 5,544,352

### F. The Pending Grounds of Unpatentability

| Reference(s) | Basis | Claims instituted |
|---|---|---|
| Kambayashi | § 102 | 26, 28–30, 32, 39 |
| Fox Thesis, Fox SMART, and Fox Collection | § 103 | 26, 28–30, 32, 34, 39 |
| Tapper 1976 and Tapper 1982 | § 103 | 26, 28–30, 32, 34, 39 |

## II.    ANALYSIS

### A. Claim Construction

#### 1.    Principles of Law

Petitioner asserts, and Patent Owner does not dispute, that the '352 patent expired on August 6, 2013. Pet. 6. The Board's interpretation of the claims of an expired patent is similar to that of a district court's review. *See In re Rambus, Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012). We, therefore, are guided by the principle that the words of a claim "are generally given their ordinary and customary meaning," as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citation omitted). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). There is a "heavy presumption," however, that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted).

7

**A2347**

IPR2013-00478
Patent 5,544,352

### 2. Overview of the Parties' Positions

In the Decision to Institute, we found it instructive to construe the claim terms *direct relationships*, *indirect relationships*, *pool-similarity searching*, and *pool-importance searching*.  Inst. Dec. 10–14.  Our constructions are set forth in the table below.

| Claim Term or Phrase | Construction |
|---|---|
| *direct relationships* | "relationships where one object cites to another object"  Inst. Dec. 13. |
| *indirect relationships* | "relationships where at least one intermediate object exists between two objects and where the intermediate object(s) connect the two objects through a chain of citations"  Inst. Dec. 13. |
| *pool-similarity searching* | "identifying at least one object based on degree of similarity to a selected pool of objects"  Inst. Dec. 14. |
| *pool-importance searching* | "identifying at least one object based on the importance of the object to a selected pool of objects"  Inst. Dec. 14. |

Petitioner does not challenge any of our constructions.  Reply 1–2. Patent Owner appears to agree with many of our constructions, and states that it uses our constructions for the purpose of evaluating patentability of the challenged claims of the '352 patent.  PO Resp. 12–14.  Based on the complete record now before us, we discern no reason to change our prior constructions.

Additionally, Patent Owner addresses the following phrases or terms: 1) *objects in a computer database*; 2) *computerized searching*; 3) *non-semantical method*; 4) *some indirect relationships are weighed more heavily than other indirect relationships*; and 5) *relationships exist between or among subsets of objects*, which are discussed below.  *Id.* at 9–14.

8

Petitioner's Reply further addresses *database* and *numerical representation*, but otherwise does not contest Patent Owner's proposed constructions of these terms.  Reply 2.

### 3.    *numerical representation*

Patent Owner's Response does not proffer an explicit construction of *numerical representation*, but appears to interpret the term to exclude strings that may include letters.  PO Resp. 21 (distinguishing prior art as having "non-numerical character strings).  At oral argument, Patent Owner confirmed that its construction of *numerical representation* is something "represented only by digits," or in other words "expressed by numbers, not by letters."  Tr. 85.

Petitioner responds that *numerical* includes "any representation of binary or digital data that can be processed and analyzed by a computer," and means simply "of or relating to numbers."  Reply 1; Tr. 13.  Petitioner's construction is, therefore, not limited to representations consisting only of numbers.  At oral argument, Petitioner argued that the inclusion of a single number into a string is sufficient to make that string a *numerical representation*.  Tr. 25.

Petitioner's proffered construction is overly broad and unsupported by the specification.  While one dictionary definition of *numerical* is "of or relating to a number or series of numbers," it may also refer to "expressed in or counted by numbers."  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (2000) (Ex. 3001); *see also* COLLINS ENGLISH DICTIONARY (2000) (Ex. 3002) ("measured or expressed in numbers").

The specification of the '352 patent uses *numerical* consistent with this latter interpretation.  In the Initial Extractor Subroutine, the "full textual

9

IPR2013-00478
Patent 5,544,352

objects" of the database are numbered "with Arabic numbers from 1 through n." Ex. 1001, 14:49–50. These numbers are used to create vectors and matrices, which are then run through various algorithms such as the Opinion Patterner Subroutine. *Id.* at 14:55–15:22. "Numerical factors" are then "calculated" to determine "values." *Id.* at 15:19–22; 18:63–67. This emphasis on calculation, values, and on processing by computer algorithms, leads us to conclude that *numerical representation*, as used in the '352 specification, must refer to solely numbers, so that a computer can process the representations using mathematical algorithms.

Petitioner's attempt to link the *numerical representation* of the specification to the West "key number" system is unpersuasive. Reply 2. While the specification of the '352 patent does discuss the key number system, and such "key numbers" include letters, there is no indication that the patentee intended to link the *numerical representation* of the claims to the West key number system discussed—and distinguished—in the background portion of the specification. Ex. 1001, 2:38–43 ("such a numbering process is subjective and is prone to error").

Nor do we find persuasive Petitioner's argument that *numerical* is somehow distinct from "numeric," in that the latter term means only numbers but the former may encompass letters. Tr. 13. Not only was this argument advanced for the first time at oral hearing,[1] but it is unsupported by any evidence of record. Indeed, the two terms are used interchangeably in dictionary definitions. *See* Ex. 3001 (entry for "numerical also numeric"); Ex. 3002 (entry for "numerical or numeric").

---

[1] Our Rules do not permit arguments to be raised for the first time at oral hearing. 37 C.F.R. § 42.70(a) (permitting oral argument only on "an issue raised in a paper.").

10

For these reasons, we construe *numerical representation* as "representation consisting exclusively of numbers or a set of numbers."

### 4.    *objects in a computer database and computerized searching*

Patent Owner addresses the terms *objects in a computer database* and *computerized searching*, both of which appear in claim 26. PO Resp. 9–11. Rather than proffer a construction for either term, however, Patent Owner discusses the general concept of computerized searching in the '352 patent. *Id.* It is not clear what construction Patent Owner wishes us to adopt, and we are not persuaded that either term requires an explicit construction.

### 5.    *non-semantical method*

Patent Owner asks that we interpret *non-semantical method* to mean "a method that uses the direct relationships between one database object and another and does not otherwise account for words and phrases in a textual object." PO Resp. 11. We note that Petitioner raised a similar construction in the Petition, but the Board declined to construe the term expressly in the Decision to Institute. Pet. 6–7; Inst. Dec. 11. We also note that we adopted a similar construction for "non-semantically" in the related case IPR2013-00481. We consider the proffered construction to be reasonable and consistent with the specification of the '352 patent, and adopt it herein.

### 6.    *some indirect relationships are weighed more heavily than other indirect relationships*

Patent Owner asks that we construe this phrase as "some *types* of indirect relationships are weighed more heavily than others." PO Resp. 13 (emphasis in original). To support this interpretation, Patent Owner cites the specification of the '352 patent, which discloses that the different "patterns," which include direct and indirect relationships, are assigned various weights.

11

Ex. 1001, 13:34–38. Petitioner does not dispute this construction. We consider the proffered construction to be reasonable and consistent with the specification of the '352 patent, and adopt it herein.

### 7. *relationships exist between or among subsets*

Patent Owner does not set forth an express construction for this phrase which appears in claim 34, but instead states that the "relationships" are the direct and indirect relationships of claim 26, and that subsets are a portion of a textual object. PO Resp. 13–14. Patent Owner has not persuaded us that an express construction of this phrase is necessary.

### B. *Anticipation of Claims 26, 28–30, 32, and 39 by Kambayashi*

We instituted trial to determine whether claims 26, 28–30, 32, and 39 are unpatentable under 35 U.S.C. § 102 as anticipated by Kambayashi. Dec. Inst. 19–20. To establish anticipation, Petitioner must prove that each and every element in a claim, arranged as is recited in the claim, may be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). We determine that Petitioner has not shown by a preponderance of the evidence that claims 26, 28–30, 32, and 39 are unpatentable as anticipated by Kambayashi.

### 1. *Kambayashi*

Kambayashi describes a method for clustering, which is said to be "an important tool for efficient retrieval of documents in bibliographic database systems." Ex. 1004, Abstract. The reference discloses the creation of "Direct Reference Matrix R," defining direct reference as "when a paper A refers to a paper B." *Id.* at 91–92. Kambayashi also discloses a set of pairs

IPR2013-00478
Patent 5,544,352

(ID, IDF) where ID and IDF are the identification codes of the papers and (ID, IDF) means that paper ID cites paper IDF. *Id.* at 93.

Kambayashi also discloses the creation of two secondary matrices, "Bibliographic Coupling Matrix B" (papers with one or more citation in common) and "Co-citation Matrix C" (citations frequently cited together). *Id.* at 92. These secondary matrices consist of vectors derived from the (ID, IDF) pairs noted above. *Id.* at 93–34. A "Similarity Matrix S" may then be created via weighted summation of matrices R, B, and C. *Id.* at 92.

### 2.    Claim 26

We focus our analysis herein on two steps required by the method of claim 26: "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database," and "analyzing the first numerical representations for indirect relationships existing between or among objects in the database." Petitioner contends that Kambayashi discloses both of these steps in two alternative embodiments.

First, Petitioner directs us to Kambayashi's disclosure of (ID, IDF) pairs, and their use in creating the B and C matrices. Petitioner asserts that deriving the (ID, IDF) pairs may be considered to be creating a first numerical representation, and that they represent direct relationships between documents ID and IDF. Pet. 24–25; Tr. 22. The (ID, IDF) pairs are then analyzed for indirect relationships, leading to B and C matrices which Petitioner contends are second numerical representations. Pet. 25–26.

Second, Petitioner identifies Kambayashi's Direct Reference Matrix R as a first numerical representation that represents direct relationships. Pet. 24–25; Tr. 22. As noted above, Matrix R is used—along with matrices B

13

and C—to generate a Similarity Matrix S. Petitioner contends that if Matrix R is considered to be the first numerical representation, then Matrix S would be a second numerical representation within the scope of claim 26. Tr. 22.

Upon review of the disclosure of Kambayashi, we find neither of these arguments persuasive. First, in the case of the (ID, IDF) pairs that are used to derive the B and C matrices, Patent Owner argues that ID and IDF are *strings* that contain letters. PO Resp. 21. This is supported by the disclosure of Kambayashi, which discloses identification codes such as EVER7404 and GARDL7710. Ex. 1004, 96. The testimony of Dr. Jacobs, Patent Owner's declarant, explains how Kambayashi's source database shows that identification codes begin with the first four letters of the first author's name. Ex. 2113 ¶¶ 100–103 (citing Ex. 2023). Because, as discussed above, the proper construction of *numerical representation* is a representation that contains only numbers, Kambayashi's (ID, IDF) pairs cannot be the first numerical representation of claim 26.

Nor do we find that the Direct Reference Matrix R / Similarity Matrix S system of Kambayashi meets the limitations of claim 26. Petitioners assert, and we agree, that Matrix R is an array of numbers that represents direct relationships between the objects in the Kambayashi database. Pet. 24–25; Ex. 1004, 92 (values $r_{ij}$ of matrix R are either 0 or 1). This conclusion is supported by the fact that, in order to derive Matrix S, Matrix R is multiplied by a constant $w_R$. Ex. 1004, 92. It would not make sense to multiply a matrix containing strings of letters by a constant.

Matrix S, however, cannot be the second numerical representation of claim 26. The claim requires that the representation be created by "analyzing the first numerical representations for indirect relationships

14

**A2354**

IPR2013-00478
Patent 5,544,352

existing between or among objects in the database." Matrix S, however, is generated according to the following formula:

$$S = w_R * R + w_B * B' + w_C * C' \quad (Id.)$$

Patent Owner argues that multiplying matrix R by a constant is not *analyzing*, as that term is used in claim 26. PO Resp. 21. We agree. While Matrix S does take into account indirect relationships between objects, those relationships are not derived from an analysis of Matrix R (the first numerical relationship). Rather, the indirect relationships are accounted for in Matrix S by the inclusion of Matrices B (which tracks bibliographic coupling) and C (which tracks co-citation). *Id.* The indirect relationships reflected in the B and C matrices, in turn, are not derived from Matrix R, but rather from the (ID, IDF) pairs, which we have determined above cannot be the first numerical relationship. For these reasons, Matrix S of Kambayashi does not meet the second numerical representation limitation of claim 26, because it is not generated by analyzing the first numerical representation.

We, therefore, conclude that Kambayashi fails to disclose an embodiment having all elements of claim 26, as arranged in the claim. Kambayashi does not anticipate claim 26.

### 3.    *Dependent Claims*

The remaining instituted claims all depend, directly or indirectly, from claim 26, and incorporate claim 26's requirements of a first numerical representation, and second numerical representation. We, therefore, find that Kambayashi does not anticipate the dependent claims, for the same reasons discussed above with respect to claim 26.

15

**A2355**

IPR2013-00478
Patent 5,544,352

*C. Obviousness of Claims 26, 28–30, 32, 34, and 39 Over Fox Papers*

We instituted trial to determine whether claims 26, 28–30, 32, 34, and 39 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined disclosures of Fox Thesis, Fox SMART, and Fox Collection (collectively, "the Fox Papers"). Inst. Dec. 14–19. In support of the asserted ground of unpatentability, Petitioner sets forth the teachings of the cited prior art, provides detailed claim charts, and cites to the declaration of Dr. Fox (Ex. 1016 ¶¶ 68–145), explaining how each limitation is taught in the cited prior art combination. Pet. 9–23.

The claim chart persuasively reads all elements of each of claims 26, 28–30, 32, 34, and 39 onto the teachings of the Fox Papers, taken together. Despite the counter-arguments in Patent Owner's Response, and the evidence cited therein, which we have also considered, Petitioner has shown by a preponderance of the evidence that each of claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable, under 35 U.S.C. § 103, as they would have been obvious over the combination of Fox Thesis, Fox Collection, and Fox SMART.

*1. Fox Thesis*

Fox Thesis describes improving query and document representation schemes for information retrieval. Ex. 1009, 261. In particular, useful types of bibliographic data are incorporated into a model to test clustering and retrieval functions. *Id.* at 164. Bibliographic connections between articles are illustrated for an exemplary set "O" of documents, which are represented by letters A through G. *Id.* at 165–66, Fig. 6.2. This exemplary set "O" includes direct and indirect citation references. *Id.* at 166–67, Table 6.2.

16

**A2356**

Based on the reference pattern for a set of documents, Fox Thesis describes deriving various measures of the interconnection between the documents. *Id.* at 166. For example, weights are assigned "based upon integer counts" for bibliographically coupled documents. *Id.* at 167. Citation submatrices represent reference or citation information. *Id.* at 169. For example, submatrix *bc* represents bibliographically coupled reference information and submatrix *cc* represents co-citation reference information. *Id.* at 169–72, Figs. 6.3–6.5.

2.    *Fox SMART*

Fox SMART describes the System for Mechanical Analysis and Retrieval of Text ("SMART") as a project for designing a fully automatic document retrieval system and for testing new ideas in information science. Ex. 1008, 3. Fox SMART describes the computer system used to implement the experiments described in the Fox Thesis. Ex. 1016, ¶ 27. The software components of SMART are implemented in the C Programming Language and run under the UNIX™ operating system on a VAX™ 11/780 computer. Ex. 1008, 1, 4.

In SMART, an automatic indexing component constructs stored representations of documents. *Id.* at 3. Bibliographic information is used to enhance document representations. *Id.* at 29. The SMART system may process basic raw data, such as an exemplary N collection of articles and citation data describing which articles are cited by others. *Id.* at 29–30. Data is entered into the SMART system as a set of tuples $\{(d_i, d_j)|d_i \rightarrow d_j\}$ which describe the cited and citing documents, as well as the direction of citation. *Id.* at 29. The exemplary input data also includes indirect citation relationships, such as bibliographic coupled and co-citation relationships.

17

IPR2013-00478
Patent 5,544,352

*Id.* at 30–32. These relationships are used to create extended vectors which can then be clustered and searched to aid document retrieval. *Id.* at 29.

### 3. Fox Collection

Fox Collection describes collections of data which are said to be useful for investigating the interaction of textual and bibliographic data in retrieval of documents. Ex. 1007, 1. According to the testimony of Dr. Edward Fox, Fox Collection was originally part of the same work as Fox Thesis and Fox SMART, and describes the manner in which the data sets were obtained and processed prior to their use in the Fox SMART experiments. Ex. 1016 ¶ 27.

According to Fox Collection, the experiments were performed on a collection of bibliographic records (title, abstract, author, keywords, etc.) from the *Communications of the ACM*, termed the "CACM collection." Ex. 1007, 14.[2] Two individuals then examined printed copies of the articles referenced by the CACM bibliographic records, and citation data was obtained from the articles and entered into a set Raw_data. *Id.* The citation data contained pairs of identifiers (citing, cited) which were the document id numbers ("dids") of the citing record and record it cites. *Id.* From this Raw_data matrix, secondary matrices such as bc (bibliographic coupling) and cc (co-citation) were derived computationally. *Id.* at 14–16.

---

[2] Fox Collection also discusses an ISI Collection, but in his Reply Declaration Dr. Fox explains that he cites the ISI collection to "emphasize findings in the prior art about the value of using co-citation data (a non-semantic indirect relationship) in information retrieval, not to fully address all the elements of claims. . . . For the sake of simplicity, the Board should focus on the methodology given in Fox Papers, and the examples of their use with the CACM Collection." Ex. 1030, ¶ 6.

18

IPR2013-00478
Patent 5,544,352

#### 4. *Claim 26*

Petitioner's claim chart persuasively reads all elements of claim 26 onto the combined teachings of Fox Thesis, Fox SMART, and Fox Collection. Pet. 9–23 (citing Ex. 1007, 14–15, 43, 48; Ex. 1008, 3, 12–13, 16, 18, 25–27, 29–33, 36, 38–39, 41–43, 53; Ex. 1009, 17, 19, 179, 181–82, 195, 199, 203, 211; 1016 ¶¶ 71–108, 122–131). For instance, the combination of Fox Thesis, Fox SMART, and Fox Collection teaches "marking objects in the database" and "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database," as recited in claim 26. In particular, Fox Collection teaches assigning document identification numbers ("dids") to the articles in the CACM collection, which is "marking objects in the database." Ex. 1007, 14. Printed copies of each article with a bibliographic entry in the CACM collection then are reviewed manually, to obtain bibliographic subvectors in the form "Raw_data (cited, citing)." *Id.* This is a first numerical representation created based on the direct relationship between the "cited, citing" pair of bibliographic records.

The combination of Fox Thesis, Fox SMART, and Fox Collection also teaches "analyzing the first numerical representations for indirect relationships existing between or among objects in the database" and "generating a second numerical representation of each object based on the analysis of the first numerical representation," as recited in claim 26. Fox SMART teaches that direct relationships may be represented by tuples called "CITED," which contain a citing document, a cited document, and the direction of the citation. Ex. 1008, 29. These tuples are then processed to

19

construct submatrices such as *bc* and *cc*, which contain numbers representing indirect relationships. *Id.* at 30–32 ("construct BC by counting the number of identical tuples of C"). Dr. Fox testifies that the CITED tuples of Fox SMART refer to the Raw_data derived from the CACM collection. Ex. 1016 ¶ 124. Because these *bc* and *cc* submatrices are numerical representations, and are generated from the first numerical representations CITED which are based on direct relationships, we find that the Fox Papers together teach "generating a second numerical representation of each object based on the analysis of the first numerical representation."

### a. *Combination of References*

As to whether Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection, we determine that Petitioner has articulated sufficient reasoning with a rational underpinning as to why one of ordinary skill in the art would have combined the retrieval systems taught in Fox Thesis, Fox SMART, and Fox Collection. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Dr. Fox states that the three publications arose from the same thesis project, and were originally one document. Ex. 1016 ¶ 70. Furthermore, Dr. Fox notes that Fox Thesis "explain[s] the method and experimental results of [his] information retrieval work," Fox SMART "detail[s] the updated SMART computer system used to execute the experiments," and Fox Collection "describes how the data sets were obtained and processed prior to being used in the experiments." *Id.* We give Dr. Fox's statement that one of skill in the art would have been motivated to combine the references because they "describe a complete project with its underlying system and data" (*id.*)

20

IPR2013-00478
Patent 5,544,352

substantial weight, because it is consistent with the considerable overlap in the disclosures of the Fox Papers and their internal references to one another. *See, e.g.,* Ex. 1009, 343 (Fox Thesis cites to Fox SMART); Ex. 1008, 84 (Fox SMART cites to Fox Thesis).

### b. *Patent Owner's Counterarguments*

We have considered Patent Owner's counterarguments but do not find them persuasive. Patent Owner contends that various elements of claim 26 are not taught or suggested by the Fox Papers in combination. First, Patent Owner argues that the Fox Papers do not teach a computer database in which direct and indirect relationships exist between objects in the database. PO Resp. 17. Because the databases of the Fox Papers are bibliographic databases, they contain certain information about documents such as title, abstract, author, and publication date. *See, e.g.,* Ex. 1007, 14 (describing CACM database). The Fox databases do not contain the full documents, meaning that the databases do not contain the portions of the documents that cite to other documents. As such, Patent Owner argues, the databases cannot have objects having direct and indirect relationships, as required by claim 26. PO Resp. 17–18.

We have construed *direct relationships* to mean "relationships where one object cites to another object." Based on this construction, the bibliographic records of Fox Collection's CACM database do not have direct relationships, because they do not contain cites to one another. It is only after the full documents—which are not in the database—are manually reviewed, and the first numerical representation (Raw_data) is entered, that the database contains objects that have direct relationships. Claim 26, however, requires that direct and indirect relationships exist between objects

21

in the database first, prior to creating a first numerical representation.  In other words, the Raw_data of the Fox Collection CACM database cannot be both the objects that have relationships, as well as the first numerical representation of those relationships.

Petitioner contends, however, that it would have been "trivial and obvious" to modify the databases of the Fox Papers to contain full text documents.  Reply 10.  Dr. Fox's testimony supports this argument, noting that if storage resources allowed storage of the full text of documents, this would have been understood as preferable.  Ex. 1016 ¶¶ 76, 89.  We credit Dr. Fox's testimony on this point, as it is consistent with the disclosure of Fox Thesis that "some [information retrieval] systems store the full text of the various documents."  Ex. 1009, 6.  Fox Thesis adds that full text permits users to "locate documents of interest," as well as "retrieve and/or examine paragraphs, passages, sentences, or single word occurrences (in context)." *Id.*  These extra capabilities are described as "straightforward generalizations of document retrieval methods." *Id.*

We, therefore, conclude that the Fox Papers suggested to one of ordinary skill in the art at the time of the invention the modification of the Fox databases to include full text documents.  With such a modification, the databases would contain, as objects, the full text documents.  Therefore, even prior to generation of the Raw_data, the database would contain objects that have direct and indirect relationships due to their citation of one another.  Patent Owner's argument to the contrary is unpersuasive.

In the same vein, Patent Owner argues that the Fox Papers do not teach "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in

IPR2013-00478
Patent 5,544,352

the database." PO Resp. 31.  Because, for example, the Raw_data disclosed
in the Fox Collection is derived from documents that are not in the CACM
database, but rather compiled from full text printed versions of the
documents, Patent Owner argues that Raw_data is not *based on* the object's
direct relationship with other objects.  *Id.* at 32.

We find this argument unpersuasive for the same reasons outlined
above for the objects limitation.  The Fox Papers suggest inclusion of full
text documents in the databases.  With such a modification, the databases
would have—even prior to creation of Raw_data—objects with direct
relationships.  The subsequently-created Raw_data relation would be based
on those objects, thus satisfying the first numerical representation element of
claim 26.

Patent Owner's remaining contentions relate to whether the Petitioner
has satisfied the requirements for combining the teachings of Fox Thesis,
Fox SMART, and Fox Collection.  For example, Patent Owner contends that
the systems disclosed in the individual Fox Papers are "narrowly tailored"
and would not have been combined merely because of their common
authorship.  PO Resp. 26.

As indicated above, we determine that Petitioner has articulated
sufficient reasoning with a rational underpinning as to why one of ordinary
skill in the art would have combined the retrieval systems taught in Fox
Thesis, Fox SMART, and Fox Collection.  *See KSR*, 550 U.S. at 398.  For
instance, Dr. Fox wrote each of Fox Thesis, Fox SMART, and Fox
Collection.  See Ex. 1009, i; Ex. 1008, 1; Ex. 1007, 1.

Patent Owner also contends that the Raw_data relation of Fox
Collection could not be combined with the CITED tuples of Fox SMART,

**A2363**

because they are "fundamentally incompatible." PO Resp. 27. In support of this argument, Dr. Jacobs testifies, for example, that CITED does not describe using document ids ("dids") while Raw_data does. Ex. 2113 ¶¶ 170–171. Dr. Fox testifies to the contrary, stating that the CITED tuples of Fox SMART specifically refer to the Raw_data derived from the CACM collection. Ex. 1016 ¶ 124. We give Dr. Fox's testimony on this point substantial weight. Our determination is not only due to Dr. Fox's personal knowledge of the Fox Papers, but also supported by the descriptions of Raw_data and CITED in the references. The references indicate that both Raw_data and CITED contain pairs of document identifiers, with the sole difference being that CITED also contains a third data element that signifies the direction of the citation. Furthermore, while the description of CITED in Fox SMART is silent as to document ids, other portions of the document discuss dids which are an "index in range 1 . . . N." Ex. 1008, 36. We do not consider the combination of Raw_data with CITED, or the combination of the systems of Fox Collection, Fox SMART, and Fox Thesis, to be beyond the level of ordinary skill in the art.

Patent Owner further contends that using indirect relationships in a computerized search system would not have been predictable at the time of the invention of the '352 patent. PO Resp. 50. Patent Owner's contention is based on its view that the combined teachings of Fox Thesis, Fox SMART, and Fox Collection are not sufficient because they do not teach computerized searching of an electronic database. PO Resp. 54; *see also* Tr. 49 ("[T]he Fox papers by themselves don't get you there . . . every one . . . is directed to printed articles, not an electronic database."). According to Patent Owner, the prior art cited by Petitioner teaches experiments that are

not directed to a computer database, "but rather are directed toward limited experimentation with bibliographic relationships existing among paper documents." PO Resp. 1.

We disagree with Patent Owner. For example, Fox SMART teaches an implementation in which software components of SMART are implemented in the C Programming Language and run under the UNIX™ operating system on a VAX™ 11/780 computer. Ex. 1008, 1, 4. In SMART, an automatic indexing component constructs stored representations of documents. *Id.* at 3. In light of the various teachings of Fox Thesis, Fox SMART, and Fox Collection discussed herein, we determine that Fox Thesis, Fox SMART, and Fox Collection, taken together, teach or suggest computerized searching of an electronic database.

Patent Owner also contends that the inclusion of indirect relationships into search "degrades results," and therefore provides a teaching away from the invention. PO Resp. 50. As Patent Owner acknowledges, its evidence of degraded results does not teach away from the *combination* of the Fox Papers, but rather from the *modification* of the teachings of the Fox Papers to incorporate "an electronic database that has references to the objects in the database." Tr. 49–50. We found above, however, that the Fox Papers teach this feature. In addition, to the extent modification of the Fox Papers is necessary to meet claim 26, we have found that modification is expressly suggested by the Fox Papers themselves. The record is insufficient to establish a teaching away.

Patent Owner also asserts objective indicia of non-obviousness, focusing on Google's search engine using its PageRank algorithm. PO Resp. 56–60. As an initial matter, Patent Owner's contentions again appear

25

IPR2013-00478
Patent 5,544,352

to be based on its view that the combined teachings of Fox Thesis, Fox SMART, and Fox Collection are not sufficient because they do not teach computerized searching of an electronic database. *Id.* at 58 ("Link analysis technology applied to the Web, as claimed in the '352 patent and embodied in PageRank, satisfied a long felt need for improved computerized search." (citation omitted)); Tr. 60–61 ("[I]t certainly wouldn't have been obvious to one of ordinary skill based on Fox's work to extend these ideas from this paper collection to electronic databases."). For the reasons discussed above, we disagree with Patent Owner's view and determine that Fox Thesis, Fox SMART, and Fox Collection, taken together, teach or suggest computerized searching of an electronic database.

Furthermore, we note that Patent Owner has not shown that the asserted success of a commercial embodiment of the '352 patent actually resulted from features recited in the claims of the '352 patent. Patent Owner has not provided sufficient evidence to support a nexus between claim 26 and the Google PageRank algorithm. Because Patent Owner has failed to provide the source code of PageRank, or any other detailed information beyond publicly-available, generalized hearsay statements about Google's search (Ex. 2050), the record is insufficient to prove that PageRank uses the method of claim 26.

Even if PageRank's algorithm incorporates the method of claim 26, we cannot determine that Google's success is due to the method of claim 26, as opposed to other elements of the algorithm. Patent Owner's declarant Dr. Amy N. Langville conceded that the Google search technology involves a combination of link analysis (non-semantic) and semantic searching, whereas claim 26 recites a non-semantical method. Ex. 1034, 76:19–21.

<div align="center">26</div>

Even if we were to conclude that the PageRank algorithm utilized the non-semantical method of claim 26, we could not determine whether the alleged success of PageRank is due to its non-semantical aspects, its semantical aspects, or some combination of both.

Patent Owner also points to Google's license of the '352 patent as evidence of nexus.  PO Resp. 59–60.  Patent Owner, however, admits that this license resulted in the settlement of a lawsuit (*id.*), which without additional contextual evidence, weighs against finding a nexus.

Additionally, we determine that in light of the weak showing of secondary considerations, the evidence of obviousness with respect to Fox Thesis, Fox SMART, and Fox Collection, is sufficient to support the conclusion that claim 26 would have been obvious. *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007). As discussed above, Petitioner has provided a strong case of obviousness.

Accordingly, even after considering the counter-arguments in Patent Owner's Response, and the evidence cited therein, we find that Petitioner has shown by a preponderance of the evidence that claim 26 is unpatentable as it would have been obvious over the combination of Fox Thesis, Fox SMART, and Fox Collection.

### 5. *Dependent Claims*

Petitioner's claim chart persuasively reads all elements of dependent claims 28, 29, 30, 32, 34, and 39 onto the teachings of Fox Thesis, Fox SMART, and Fox Collection, taken together.  Pet. 16–23 (citing Ex. 1007, 12, 14–15, 43, 48–49; Ex. 1008, 14, 16, 24–25, 29, 30–33, 36–38, 41, 43–52; Ex. 1009, 1, 15, 17, 23, 126, 151, 173–74, 177–79, 181–82, 191–92, 194, 202, 213–18, 224, 232, 234, 238–43, 257; Ex. 1016 ¶¶ 71–108, 110–

27

121, 124–125, 127–128, 132–135, 137–145).  For instance, we determine that Petitioner has shown by a preponderance of the evidence that the combination of Fox Thesis, Fox SMART, and Fox Collection teaches that the first and second numerical representations are vectors that are arranged in first and second matrices, as required by claim 28.  Fox SMART teaches CITED, which is a set of tuples indicating a pair of documents linked by a direct relationship, as well as the direction of citation.  Ex. 1008, 29.  These tuples are vectors, as are the components of the *bc* and *cc* submatrices, which represent indirect relationships.  *Id.* at 30–32.  Furthermore, the objects in the CACM database are bibliographic records which include publication date (Ex. 1007, 14), and therefore are assigned chronological data as required by claim 28.

We also determine that Petitioner has shown by a preponderance of the evidence that the combination of Fox Thesis, Fox SMART, and Fox Collection teaches weighing, wherein some indirect relationships are weighed more heavily than other indirect relationships, as recited in claim 32.  Fox Thesis, for example, discloses assigning weights to subvectors such as *bc* and *cc*, which are different types of indirect relationships.  Ex. 1009, 257 (Table 8.13).  In one weighting scheme disclosed in Fox Thesis, bibliographic coupling indirect relationships (*bc*) are weighted at .009, more heavily than co-citation indirect relationships (*cc*), weighted at 0.  *Id.*

Claim 39 requires both pool-similarity searching and pool-importance searching.  As noted above, we construed *pool-similarity searching* as "identifying at least one object based on degree of similarity to a selected pool of objects" and *pool-importance searching* as "identifying at least one object based on the importance of the object to a selected pool of objects."

IPR2013-00478
Patent 5,544,352

We determine that the Fox Papers have been shown by a preponderance of the evidence to teach these elements. Fox Thesis and Fox SMART disclose a feedback search in which results are presented to a user, ranked according to importance, and then used to construct a new search. Ex. 1008, 24, Fig. 6; Ex. 1009, 151, Fig. 5.1. This teaches pool-importance searching as required by claim 39. Similarly, Fox SMART discloses a search that "perform[s] exact matches as well as general similarity computations" (Ex. 1008, 37–38), which meets the pool-similarity searching limitation of claim 39.

Additionally, for the reasons discussed above with respect to claim 26, we determine that Petitioner has satisfied the requirements for combining the teachings of Fox Thesis, Fox SMART, and Fox Collection.

Patent Owner argues that Petitioner has not proven by a preponderance of the evidence that all elements of the dependent claims are taught or suggested by the Fox Papers. PO Resp. 35–39. Some of these arguments, for example those made with respect to claims 28, 29, 30, and 34, are based on the fact that the databases of the Fox Papers do not include objects because the bibliographic records do not cite to one another. *Id.* Just as we found such arguments unpersuasive with respect to claim 26, we are not persuaded by them here. The Fox Papers suggest the inclusion of full text documents into the databases, and that such a modification could be beneficial.

Patent Owner also argues that claim 28's limitation that the step of searching comprises the steps of matrix searching of the second matrices and examining the chronological data is not met by the Fox Papers. *Id.* at 35–36. According to Patent Owner, the Fox Thesis discloses a "preliminary clustering experiment" in which chronological data is "summarily dismissed

29

**A2369**

IPR2013-00478
Patent 5,544,352

because of poor results." *Id.* We do not consider this reading of the Fox Thesis accurate. The quotation from the reference provided by Patent Owner, "the clustering result does not seem as good as that of the other methods" (Ex. 1009, 217), is partial and misleading. The full sentence reads: "*If the* clustering result does not seem as good as that of other methods *then a likely explanation is that improper coefficients were chosen and used in computing the combined similarity value*." *Id.* (omitted portion emphasized). Not only does Patent Owner omit the qualifier "if," but also the explanation that the result likely is due to improper weighting coefficients. This is far from the "summary dismissal" of chronological data asserted by Patent Owner.

Indeed, as Petitioner notes, other portions of the Fox Papers expressly disclose searching using indirect relationship matrices in combination with chronological data. Ex. 1008, 41 (p-norm queries include date, as well as bibliographically coupled or co-cited articles). We are not persuaded by Patent Owner's arguments regarding claim 28.

Patent Owner also contends that the Fox Papers do not teach or suggest marking subsets of objects in the database, as required by claim 34. PO Resp. 38. Fox SMART discloses "separate indexing of paragraphs or even sentences." Ex. 1008, 25; *id.* at 80 ("vectors could be computed for smaller items than just documents"). According to Patent Owner, however, the markings "must be usable by a computerized search to individually identify a specific subset of an object in a computer database as a search result." PO Resp. 38. This alleged requirement is drawn from the *marking* limitation of claim 26. *Id.* Claim 26, however, only requires that the "marked object . . . be individually identified by a computerized search."

30

The subsets of claim 34 are marked, but this marking does not transform the subsets into objects as recited in claim 26. Patent Owner's argument that computerized searching of the marked subsets is required by claim 34 lacks merit.

Finally, Patent Owner argues that the Fox Papers do not teach or suggest pool-importance searching, as required by claim 39. PO Resp. 39. Patent Owner correctly notes that "importance is distinct from similarity," and therefore pool-importance searching is different than pool-similarity searching. *Id.* The Petition, Patent Owner argues, only identifies disclosures of pool-similarity searching in the Fox Papers, and, therefore, fails to establish that all elements are taught or suggested by the prior art. *Id.*

We disagree with Patent Owner's argument. In its claim chart, Petitioner set forth distinct disclosures from the Fox Papers to meet the pool-importance searching and pool-similarity searching elements. Pet. 22–23. For instance, Fox SMART teaches using "general similarity computations," (Ex. 1008, 37–38) which Petitioner contends is pool-similarity searching, as well as a "feedback" search loop in which results are ranked according to importance to a user, and then further results are retrieved (*id.* at 24, Fig. 6), which Petitioner contends is pool-importance searching. As we concluded above, the feedback search function disclosed in the Fox Papers teaches pool-importance searching, as required by claim 39.

For the foregoing reasons, Petitioner has shown by a preponderance of the evidence that claims 28, 29, 30, 32, 34, and 39 of the '352 patent are unpatentable under 35 U.S.C. § 103(a) as they would have been obvious over Fox Thesis, Fox SMART, and Fox Collection.

31

IPR2013-00478
Patent 5,544,352

### D. *Obviousness of Claims 26, 28–30, 32, 34, and 39 Over the Tapper Papers*

We instituted trial to determine whether claims 26, 28–30, 32, 34, and 39 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined disclosures of Tapper 1976 and Tapper 1982 (collectively, "the Tapper Papers"). Inst. Dec. 21–24.

We have considered Petitioner's arguments and evidence, as well as the counter-arguments in Patent Owner's Response, and the evidence cited therein, and conclude that Petitioner has not shown by a preponderance of the evidence that each of claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable, under 35 U.S.C. § 103, as having been obvious over the Tapper Papers.

#### 1. *Tapper 1976*

Tapper 1976 discloses a "citation vector technique" for retrieving legal information that seeks to overcome perceived deficiencies in Boolean search strings. Ex. 1005, 270–71. Rather than characterizing a legal document by the words it contains, vector matching focuses on the citations the document contains. *Id.* at 263. Tapper 1976 also notes that the technique may be used as an adjunct to a full-text retrieval system. *Id.* at 272.

By repeating the vector characterization of the documents, Tapper 1976 discloses that a matrix may be created that shows the similarities between the documents. *Id.* By re-ordering the matrix, the documents may be clustered according to their similarity. *Id.* The reference also discloses that "second generation citations" may be used: "if a case cites cases A', B' and C', and case A' cites a1', a2' and a3', case B' b1', b2' and b3' and case C'

32

c1', c2' and c3' the original case would be represented by a combination of its own vector, and those of cases A', B' and C'." *Id.* at 266.

### 2.    *Tapper 1982*

Tapper 1982 similarly focuses on the drawbacks of full-text searching of legal documents and the alternative use of citation vectors for legal research. Ex. 1006, 135–36. The reference discusses weighting certain citation vectors more heavily than others, for example by the difference in the ages of the citing and cited case. *Id.* at 138.

A pilot project implementing such a citation vector-based system is also described by Tapper 1982. *Id.* at 139. The reference discloses a correlation algorithm used in the pilot project to cluster together vectors with a high degree of association. *Id.* at 143–44. Such clustering is said to permit a document to be retrieved "not only because it is itself closely associated with another target document, but also because both it and the target document are closely associated with a third." *Id.*

### 3.    *Claim 26*

As discussed above, claim 26 requires steps of "creating a first numerical representation for each identified object in the database based upon the object's direct relationship with other objects in the database." We find that this limitation is neither taught nor suggested by the combined Tapper Papers.

Petitioner's claim chart identifies several portions which allegedly teach a first numerical representation. Pet. 47–48. For example, Tapper 1976 is cited as disclosing "quantifiable representation in the form of numerical weighting" *Id.* (citing Ex. 1005, 263). These "quantifiable representations" are of "other characteristics" of the citations, such as age or

33

IPR2013-00478
Patent 5,544,352

the importance of the court or jurisdiction deciding the case, not the citations (relationships) themselves. Ex. 1005, 263.

Similarly, Tapper 1982 is cited as disclosing "[a]scription of numerical values to vector elements." Pet. 48 (citing Ex. 1006, 141). But Tapper 1982 explicitly defines "vectors" as "the strings [a document] contains and the frequency of their occurrence." Ex. 1006, 134. In other words, the "numerical values" of Tapper 1982 are the *frequency* of the appearance of citation *strings*, which as we discussed above, connotes the inclusion of letters. The Petition provides no citation to either Tapper Paper that teaches representing direct relationships with a first numerical representation.

In its Reply Brief, Petitioner identifies two other disclosures by the Tapper Paper it contends satisfy the *first numerical representation* limitation. First, Petitioner argues that "the legal citations in Tapper clearly qualify as numerical representations." Reply 4–5. The legal citations Petitioner identifies, however, are in the exemplary form of "500 F.2d 411," which includes letters. As we have construed the term, this is not a numerical representation, but rather the "strings" of the vectors discussed above.

Second, Petitioner notes that the Tapper Papers describe assigning cases in the database a unique ID number. *Id.* (citing Ex. 1006, 148). At oral argument, Petitioner's counsel directed our attention to Table 2 of Tapper 1982, which includes in the leftmost column pairs of numbers which signify pairs of documents. Tr. 14; Ex. 1006, 147. At most, the assignment of these numbers could satisfy the marking step of claim 26 (Ex. 1006, 148 ("[t]he first column gives the numbers allocated to the cases.")); they are not

34

generating a first numerical representation. The document numbers indicated by Petitioner are numerical representations of *documents*, not of the *relationships* between those documents. Claim 26 requires that the first numerical representations are based on direct relationships in the database. The numbers allocated to the cases of Tapper 1982 cannot satisfy this limitation.

Nor can the document number *pairs* of Table 2 be a first numerical representation, as Tapper 1982 does not disclose that they represent a direct relationship (i.e., one of the documents in the pair citing the second). Rather, the pairs of documents appear to be listed together in the table because of their high "correlation values." Ex. 1006, 148. As Petitioner acknowledges, these correlation values represent indirect relationships between the documents (Reply 6 ("correlation values of cases' indirect relationships")), therefore they cannot be a first numerical representation that represents a direct relationship.

Petitioner argues in the alternative that "there is nothing non-obvious about creating citation vectors consisting solely of numbers." Reply 4–5. At the outset, we note that this argument was presented for the first time in the Reply; the sole modification to the Tapper Papers addressed in the Petition is the combination of the disclosures of the two references. Pet. 45–46. Nor did Petitioner present any testimony with the Petition regarding the Tapper Papers, or how a person of ordinary skill in the art would have modified the references. It would be a proper exercise of our discretion, therefore, to not consider this argument and the Reply Declaration of Dr. Fox (Ex. 1016), which presents testimony on the Tapper Papers for the first

IPR2013-00478
Patent 5,544,352

time.[3] *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) ("a reply that raises a new issue or belatedly presents evidence will not be considered.")

Even if we were to consider Petitioner's Reply and Dr. Fox's Reply Declaration, however, we are not persuaded. Petitioner cites to various portions of the Tapper Papers (Reply 4–5), but none of these citations sufficiently establish a reason to substitute numerical representations for those disclosed in Tapper. For example, Petitioner argues—using pieced-together quotations—that "Tapper [1982] also makes clear that one could 'very easily' use a 'simple conversion table' to map 'extracted' citations to any 'chosen style.'" *Id.* at 5 (citing Ex. 1006, 136). Upon reading the full context from which these quotes are drawn, however, it is clear that Tapper 1982 is discussing "parallel reports of the same decision." Ex. 1006, 136. In other words, Tapper 1982 does not contemplate converting letter-containing case citations into numbers, but rather converting one letter-containing citation into another.

Dr. Fox's Reply Declaration (Ex. 1030 ¶¶ 107–115) relies on the same arguments as Petitioner's Reply, and we find them unpersuasive for the same reasons. Nor are we persuaded by the portions of Dr. Jacobs's cross-examination Petitioner cites (Reply 5 (citing Ex. 1033, 313:7–316:23, 339:3–342:6)), as Dr. Jacobs's testimony was to what a person of ordinary skill would have understood from the '352 patent specification, not the Tapper Papers. *See In re Vaeck*, 947 F.2d 488, 493 (Fed. Cir. 1991) (suggestion to make invention cannot "be founded . . . in the applicant's

---

[3] We address Patent Owner's Motion to Exclude portions of the Reply Declaration below.

IPR2013-00478
Patent 5,544,352

disclosure"). The record before us does not support the conclusion that a person of ordinary skill in the art would have modified the combined disclosures of the Tapper Papers to include a first numerical representation.

### 4. *Dependent Claims*

The remaining instituted claims all depend, directly or indirectly, from claim 26, and thus incorporate claim 26's requirement of a first numerical representation. We, therefore, find that the Tapper Papers do not teach or suggest all elements of these dependent claims.

### E. *Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 47) in which Patent Owner seeks to exclude portions of the Reply Declaration of Dr. Edward A. Fox (Ex. 1030) ("Reply Declaration") submitted with Petitioner's Reply. In particular, Patent Owner identifies three issues with the Declaration, each of which is based on the argument that portions of the Declaration are improper reply evidence.

In its Reply, a Petitioner may only respond to arguments raised in the Patent Owner's Response. 37 C.F.R. § 42.23(a). "A reply that raises a new issue or belatedly presents evidence will not be considered." Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,767 (Aug. 14, 2012). The Practice Guide provides, as indications of improper reply evidence, "new evidence necessary to make out a *prima facie* case for . . . patentability or unpatentability . . ., and new evidence that could have been presented in a prior filing." *Id.*

A motion to exclude evidence under 37 C.F.R. § 42.64(c), however, "normally is not the proper vehicle for resolution of a dispute regarding reply arguments and evidence exceeding the proper scope of a reply." *ABB,*

IPR2013-00478
Patent 5,544,352

*Inc. v. Roy-G-Biv Corp.*, Case IPR2013-00063, slip op. 13–14 (PTAB May 16, 2014) (Paper 71); *Corning Inc. v. DSM IP Assets B.V.*, Case IPR2013-00047, slip op 7 n.3 (PTAB May 1, 2014) (Paper 84) (characterizing such motions as "now disfavored"). Rather, when evaluating the record after oral argument, the Board is capable of determining what, if any, evidence exceeds the proper scope of rely, and accordingly disregarding that evidence.

While we, therefore, *deny* Patent Owner's Motion, we also note that even if it were proper, we would dismiss it as moot. With respect to the objected-to portions of the Reply Declaration which discuss the Tapper Papers, we have considered them above, found Dr. Fox's testimony unpersuasive, and found in favor of Patent Owner on the Tapper Papers ground. With respect to the Fox Papers ground, we have found in favor of Petitioner, but did not rely on any of the objected-to portions of the Reply Declaration in so doing. A decision to exclude the Reply Declaration would, therefore, not affect our determinations in this case.

### F. Motions to Seal

Patent Owner filed a Motion to Seal (Paper 35) the Declaration of Dr. Amy N. Langville ("Langville Declaration") filed as Exhibit 2114. Petitioner filed a Motion to Seal (Paper 42) the Transcript of the Deposition of Amy N. Langville, Ph.D. ("Langville Transcript") filed as Exhibit 1034. Both of these motions are unopposed.

Regarding Patent Owner's Motion to Seal, according to Patent Owner paragraphs 25, 112, and 113 of the Langville Declaration makes reference to certain facts about confidential licenses to the patents under review. Paper

IPR2013-00478
Patent 5,544,352

35, 3. Additionally, Patent Owner contends that this information has not been made, and will not be made, public. *Id.*

Regarding Petitioner's Motion to Seal, according to Petitioner, Patent Owner has designated the transcript as confidential. Paper 42, 3. To avoid public disclosure, therefore, Petitioner submits sealing the Langville Transcript is appropriate. *Id.*

There is a strong public policy in favor of making information filed in *inter partes* review proceedings open to the public. *See Garmin Int'l v. Cuozzo Speed Techs., LLC*, Case IPR2012-00001 (PTAB Mar. 14, 2013) (Paper 34). Under 35 U.S.C. § 316(a)(1), the default rule is that all papers filed in an *inter partes* review are open and available for access by the public.[4] The standard for granting a motion to seal is "good cause." 37 C.F.R. § 42.54. A moving party bears the burden of showing that the relief requested should be granted. 37 C.F.R. § 42.20(c).

Regarding Patent Owner's Motion to Seal, Patent Owner, as the moving party, has failed to carry its burden. Patent Owner identifies only three paragraphs in the Langville Declaration that purportedly contain confidential information. However, Patent Owner has not pointed to proof in the record that any information contained in these paragraphs is confidential. Additionally, although Patent Owner contends that this information has not been made, and will not be made, public, Patent Owner presented this information during the hearing on October 30, 2014, which

---

[4] Additionally, we note that confidential information subject to a protective order ordinarily would become public 45 days after final judgment in a trial. Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,761. However, after denial of a petition to institute a trial or after final judgment in a trial, a party may file a motion to expunge confidential information from the record. 37 C.F.R. § 42.56.

IPR2013-00478
Patent 5,544,352

was open to the public. *See* Tr. 54:12–25. We, therefore, determine that Patent Owner has not met its burden of proof.

Regarding Petitioner's Motion to Seal, Patent Owner's designation of the transcript as confidential is not sufficient to show that the transcript contains confidential information. We, therefore, determine that Petitioner has not met its burden of proof.

We recognize a denial of the motions to seal would unseal immediately the material that Patent Owner desires to remain confidential and the effect would be irreversible. Therefore, rather than denying the motions at this time, we will provide Patent Owner and Petitioner one week to (1) withdraw the motions to seal and request that we expunge Exhibits 2114 and 1034, or (2) withdraw the motions to seal, request that we expunge Exhibits 2114 and 1034, and replace them with redacted versions that leave out the confidential information. We note that we have not relied on the three paragraphs of the Langville Declaration that Patent Owner identifies as containing allegedly confidential information.

## III.    CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that claims 26, 28–30, 32, 34, and 39 of the '352 patent are unpatentable under 35 U.S.C. § 103, as they would have been obvious over Fox Thesis, Fox SMART, and Fox Collection, taken together.

40

IPR2013-00478
Patent 5,544,352

## IV. ORDER

For the reasons given, it is

ORDERED that claims 26, 28–30, 32, 34, and 39 of U.S. Patent No. 5,544,352 are determined by a preponderance of the evidence to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude the Reply Declaration of Dr. Edward A. Fox (Exhibit 1030) is denied;

FURTHER ORDERED that Exhibit 2114 and Exhibit 1034 will be made available to the public after 5 PM Eastern five business days after the entry date of this decision, unless prior to that time, each of Patent Owner and Petitioner (1) withdraws the motions to seal and requests that we expunge Exhibits 2114 and 1034, or (2) withdraws the motions to seal, requests that we expunge Exhibits 2114 and 1034, and replaces them with redacted versions that leave out the confidential information; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

41

IPR2013-00478
Patent 5,544,352

FOR PETITIONER:

Heidi L. Keefe
COOLEY, LLP
hkeefe@cooley.com
dcpatentdocketing@cooley.com.

David Silbert
KEKER & VAN NEST, LLP
djs@kvn.com
efiling@kvn.com


FOR PATENT OWNER:

Martin M. Zoltick
Nancy J. Linck
Soumya P. Panda
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
mzoltick@rfem.com
nlinck@rfem.com
SRA-IPR@rfem.com

42

**A2382**

Trials@uspto.gov
571-272-7822

Paper 42
Date: October 8, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

LEVEL 3 COMMUNICATIONS, LLC,
Petitioner,

v.

AIP ACQUISITION LLC,
Patent Owner.

————————

Case IPR2013-00296
Patent 7,724,879 B2

————————

Before JAMESON LEE, HOWARD B. BLANKENSHIP, and
JUSTIN BUSCH, *Administrative Patent Judges.*

BUSCH, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00296
Patent 7,724,879 B2

# I. BACKGROUND

Level 3 Communications, LLC ("Petitioner") filed a Petition[1] (Paper 6, "Pet.") requesting *inter partes* review of claims 1–15 (all the claims) of U.S. Patent No. 7,724,879 B2 ("the '879 patent") under 35 U.S.C. §§ 311–319. On October 31, 2013, the Board instituted an *inter partes* review of claims 1–15 ("the challenged claims") on four asserted grounds of unpatentability ("Dec. on Inst."). Paper 14. Subsequent to institution, AIP Acquisition LLC ("Patent Owner") filed a Patent Owner Response ("PO Resp."). Paper 20. Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response. Paper 30. Oral hearing was held on July 15, 2014.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable.

## A. The '879 Patent (Ex. 1001)

The '879 patent relates to methods for allowing "communication between otherwise incompatible communication networks in a manner that is transparent to the calling party." Ex. 1001, 1:61–63. For example, claimed methods allow the Internet, or another data network, to function like a telecommunications network. *Id.* at 6:36–38. Calling parties may dial remote locations for the price of a local access and service fee to have voice conversations with called parties in those locations and to avoid using long distance carriers. *Id.* at 6:38–42. In order to make such calls, a local system

---

[1] We refer to the corrected Petition filed May 29, 2013.
[2] The record includes a transcript of the oral hearing ("Hr'g Tr."). Paper 41.

2

may be dialed via computer access or a regular telephone, which prompts the calling party for the called party's telephone number or other identification. *Id.* t 6:42–44. The calling party then is connected to t e called party over the nternet or another data network, such as by connecting the parties via a nod through local call or through other networks. *I* . at 6:44–47. For example, a calling party may access a node t at convers the telephone transmission (.g., the voice transmission) into data su ported by the net ork chosen by the node. *Id.* at 6:47–49. In this example, a network may connect t another node proximate to th called p rty that then converts the ata trans ission back into a voice communication and converts the voice commu ication into a local call to the alled part with the called part node op rated by an independent servi e provide located elsewhere, suc as in ano her country. *Id.* at 6:49–54.

A method, as recited in the challenged claims, is illustrated by the con eptual block diagram in Figure 9, repro uced belo :



Fig re 9 provides an overview of the transmission flow between a calling part and a called party. *See id.* at 6:36–56. In Figure 9 of the '879 patent, a

A2385

IPR2013-00296
Patent 7,724,879 B2

conceptual block diagram depicts the principles of operation of the method, as recited in independent claim 1, for transmitting voice communications between a calling party and a called party over a data network or another network. *Id.* at 4:3–4, 14:27–45. The calling party at calling location 48 transmits a call to calling party access device 12 via intercept 16 over link 50A. *Id.* at 14:62–15:3. Intercept 16 may be part of central local node 18. *Id.* at 15:11–12. Local node 18 receives transmissions from access device 12, converts those transmissions from a first format (e.g., a telecommunication protocol) to "an internet protocol" for transmission over data network 20, and sends the converted transmissions over data network 20 in order to establish and transmit voice communication for a phone call with called party access device 14. *Id.* at Fig. 9.

As an alternative to communicating through data network 20, additional two-way direct link connections 46A–E are depicted. *Id.* at 14:29–36. Through these connections, calling party access device 12 may route communications to called party access device 14 via either communications network 10[3] or another network 200, such as a cellular, Asynchronous Transfer Mode (ATM), or frame relay network. *Id.*; *see also id.* at 7:34–39. Access device 14 may receive the voice communication via a central local node 24 and/or a central office 22. *Id.* at 15:4–8. Central local node 24 and central office 22 may be separate components. *Id.* at 15:12–14. The transmissions are converted from the internet protocol to another format suitable for reception by access device 14, such as the telecommunications

---

[3] In Figure 9 of Ex. 1001, communications network 10 is identified as "voice network 10."

4

IPR2013-00296
Patent 7,724,879 B2

protocol from which the transmissions were originally converted. *See id.* at
4:34–42.


### B. Illustrative Claim

Independent claim 1, which is the only independent claim and is
illustrative of the subject matter, is reproduced below:

> 1.  A method for communication between two access
> devices via one or more networks, comprising the steps:
>       receiving a transmission in a first format through a first
> communication network from a first access device, the first
> format comprising a telecommunication protocol for
> establishing and transmitting voice communication for a phone
> call in one of a digital telephone network, an analog telephone
> network, and a cellular network;
>       performing a first conversion converting the transmission
> from the first format to a second format, the second format
> being an internet protocol;
>       sending the converted transmission through a second
> communication network, the second communication network
> being a data network, for reception by a second access device;
> and
>       performing a second conversion further converting the
> converted transmission from the second format to a further
> format suitable for the second access device, wherein the first
> access device and the second access device comprise
> telecommunication nodes, and said further format comprises
> said first format or another telecommunication protocol.


### C. Related Proceedings

On May 17, 2012, Patent Owner filed an action against Petitioner
alleging infringement of the '879 patent, *AIP Acquisition LLC v. Level 3
Communications, LLC*, Civ. Action No. 12-617 (D. Del.). Pet. 1. The '879
patent is also involved in the following district court actions: *AIP*

A2387

IPR2013-00296
Patent 7,724,879 B2

*Acquisition LLC v. iBasis, Inc.*, Civ. Action No. 12-616 (D. Del.); *AIP Acquisition LLC v. Time Warner Cable Inc.*, Civ. Action No. 12-01692 (D. Del.); *AIP Acquisition LLC v. Cox Communications Inc.*, Civ. Action No. 12-01691 (D. Del.); *AIP Acquisition LLC v. Comcast Corp.*, Civ. Action No. 12-01690 (D. Del.); *AIP Acquisition LLC v. Cablevision Systems Corp.*, Civ. Action No. 12-01688 (D. Del.); and *AIP Acquisition LLC v. Charter Communications Inc.*, Civ. Action No. 12-01689 (D. Del.). *See* Pet. 1–2. The '879 patent is also involved in *Cisco Sys., Inc. v. AIP Acquisition LLC*, IPR2014-00247 (PTAB), a currently-pending *inter partes* review.

### D. Asserted Grounds of Unpatentability

The Board instituted *inter partes* review on the following asserted grounds of unpatentability under 35 U.S.C. § 103(a) (Dec. on Inst. 33):

| References | Basis | Challenged Claim(s) |
|---|---|---|
| Kammerl[4] and Iwami[5] | § 103(a) | 1–7 and 15 |
| Kammerl, Iwami, and Kobayashi[6] | § 103(a) | 8, 9, and 11–13 |
| Kammerl, Iwami, Kobayashi, and Chau[7] | § 103(a) | 10 |
| Kammerl, Iwami, and Gordon[8] | § 103(a) | 14 |

---

[4] US 5,051,983, Sept. 24, 1991 (Ex. 1013) ("Kammerl").

[5] US 5,604,737, Feb. 18, 1997 (filed Dec. 13, 1994) (Ex. 1006) ("Iwami").

[6] US 5,337,352, Aug. 9, 1994 (Ex. 1007) ("Kobayashi").

[7] US 5,187,710, Feb. 16, 1993 (Ex. 1008) ("Chau").

[8] US 5,608,786, Mar. 4, 1997 (filed Feb. 13, 1995) (Ex. 1005) ("Gordon").

A2388

IPR2013-00296
Patent 7,724,879 B2

## II. ANALYSIS

### A. Claim Construction

No terms need to be construed for purposes of this decision and both parties state that claim construction does not affect the issues in this case. Hr'g Tr. 5:6, 28:10–11, 28:19–29:13. Therefore, we do not explicitly construe any term.

### B. Submitted Evidence

#### 1. Kammerl (Ex. 1013)

Kammerl is directed to "a method and a circuit for speech transmission in a broad-band communications network." Ex. 1013, 1:14–16. Kammerl discusses the fact that a broad-band communications network that transmits signals in packets was known and "[t]ransmission of speech signals following dial connections between subscriber's sets is provided in this known system." *Id.* at 1:18–26. Kammerl further discloses that the packet switching network may serve as a transit network when connected between two public switched telephone networks (PSTNs) via interworking units. *Id.* at 5:57–61.

Kammerl explains that lag times occurring in speech transmission (due to packing and depacking times, processing times, and waiting times) over fixed length packet networks were known to negatively affect the quality of speech signal transmissions. *Id.* at 1:29–37. Kammerl further identifies a problem in hybrid networks (those networks that "include analog/digital telephone switching network[s] in addition to broad-band packet switching networks") occurring in a transfer between the networks. *Id.* at 1:37–43. In particular, Kammerl explains that "the transit time of echo signals caused by the hybrid sets can assume a size such that the echo

7

signals are perceived as interference" due to the "lag times in packet switching networks." *Id.* at 1:43–48.

Kammerl acknowledges that one prior art solution to suppressing the echo signals was to include echo suppressors or echo compensators on the transmission lines, but that such circuitry was expensive and, therefore, undesirable in some instances. *Id.* at 1:49–52. Kammerl also recognizes that "there have already been proposals for reducing the lag times in broadband packet switching networks by filling packets of a fixed length only partially with speech signals in speech signal transmission." *Id.* at 1:53–56.

Kammerl attempts to overcome the identified problems by reducing lag times. *Id.* at 1:57–60. Kammerl's specific invention is directed to a method for reducing the degree of packet filling in order to reduce lag times for telephone connections over the packet exchange network, "whereas the full packet capacity can be utilized for communication signals to be transmitted following connections of other services," reducing or eliminating the need for the echo suppression systems. *Id.* at 1:64–2:10. Kammerl accomplishes this alteration by configuring the network transfer units to insert control signals into signaling packets when establishing a connection between a PSTN and a packet network to indicate that packet filling should be reduced for transmission of speech signal packets in the hybrid connection. *Id.* at 2:11–3:5. Kammerl purports to provide a solution that adds "[o]nly a slight additional control expense" and that requires minimal transmissions of a control signal to adjust packet filling because "only one network transfer unit is included in the control of the transmission of speech signal packets even" in communications networks "in which a packet switching system is inserted as a transit switching system over network

8

IPR2013-00296
Patent 7,724,879 B2

transfer units between two telephone exchanges." *Id.* at 2:11, 2:51–65; *see also id.* at 5:57–6:3 (explaining that only the interworking units that receive packets from the packet switching network deliver control signals that may adjust packet filling).

### 2. *Iwami (Ex. 1006)*

Iwami is directed to a method and system for establishing a connection for voice communication between a terminal connected to a data network and a terminal connected to a PSTN and allowing various communication functions between the two terminals. Ex. 1006, Abstract, 1:55–2:17. Iwami discloses that the data network may support various protocols, including Internet Protocol (IP), such that Iwami may send packets over its network using UDP/IP and TCP/IP. *Id.* at 17:44–58.

### C. *Petitioner's Objections to Alleged New Patent Owner Arguments at Oral Hearing*

Petitioner objects to various arguments made by Patent Owner at the oral hearing. Specifically, Petitioner's objections are: (1) *Crocs v. International Trade Commission*, 598 F.3d 1294 (Fed. Cir. 2010) was not of record; (2) Patent Owner's arguments regarding unpredictable results constitutes new argument; (3) Patent Owner's description of Mashinsky having invented the use of IP for a low cost, low quality network constitutes new argument; and (4) reference to page 276 of the Peterson reference constitutes new argument. Hr'g Tr. 40–41, 47, 60–61, 64, 71–72, 74.

Patent Owner relies on *Crocs*, for the first time at oral hearing, for having facts similar to the present case. *Id.* at 60–61. Petitioner has had no prior opportunity to review and address the facts and, therefore, we sustain Petitioner's objection.

9

**A2391**

IPR2013-00296
Patent 7,724,879 B2

For the first time at oral hearing, Patent Owner argues that the '879 patent discloses unpredictable results and the '879 patent was the first to use IP as a low cost, low quality bridging network between two PSTNs. Parties are not permitted to raise new arguments or evidence at oral hearing. *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012). Patent Owner asserts that the arguments in contention were presented in response to Petitioner's new argument in Petitioner's Reply. Hr'g Tr. 47–48. According to Patent Owner, Petitioner in its Reply argued that "the '879 patent, itself, was evidence that somehow the IP quality problems were a non-issue." *Id.* at 47. There is, however, no such exception to the rule against asserting new argument during oral argument. Petitioner's objection to Patent Owner's arguments relating to unpredictable results and Mashinsky's invention of the use of IP as a low cost, low quality bridging network between two PSTNs is sustained.

Finally, we overrule Petitioner's objection to Patent Owner's reference to page 276 of the Peterson reference (Ex. 2015). Exhibit 2015 was submitted as evidence with the Patent Owner Response. Page 276 of Exhibit 2015 states that "one of the biggest challenges [for IP] will be to provide quality or service guarantees that are suitable for high-quality voice and video, [which] is likely to be available in ATM networks from the outset" and that "IP, at present, . . . is best suited to those [applications] without real-time constraints." Patent Owner merely refers to a plain statement on a page of Peterson that was previously provided to Petitioner, in support of Patent Owner's pre-existing argument that Kammerl was concerned with providing high quality voice service, beyond the capability of IP. *See, e.g.*, PO Resp. 5, 15–19, 29–30, 41–43.

10

IPR2013-00296
Patent 7,724,879 B2

### D. Alleged New Arguments in Petitioner's Reply

As discussed above, Patent Owner asserts Petitioner presented a new argument in its Reply regarding whether the '879 patent's failure to address the issues of sending voice data over IP provides support for Petitioner's position that IP quality problems were not an issue at the time of invention of the '879 patent. Hr'g Tr. 47–48. However, Petitioner's argument was raised in response to Patent Owner's allegations of a teaching away and, thus, was properly responsive to argument raised in the Patent Owner Response.

### E. Section 103(a) Patentability

First, we address the limitations of each of the claims as set forth in Petitioner's challenge in sections 1–4 below. In section 5, we address Petitioner's rationale for combining the references and Patent Owner's argument that Kammerl cannot be combined with Iwami.

#### 1. Subject Matter of Claims 1–7 and 15

The Board instituted trial on Petitioner's challenge of obviousness of claims 1–7 and 15 over Kammerl and Iwami. Dec. on Inst. 21–28. Petitioner relies on Kammerl as teaching each limitation of independent claim 1 except for the limitation reciting "the second format being an internet protocol." Pet. 47–52. As discussed above, Kammerl discloses a method and system for transmitting voice signals, including using a packet network as a transit network between two PSTNs. Ex. 1013, 5:57–61. Petitioner argues that Kammerl teaches each of the limitations of independent claim 1 except for using an internet protocol because Kammerl discloses receiving a transmission from a first device connected to a PSTN in a format used by an analog or digital phone network, converting the

11

transmission to a second format used by Kammerl's ATM network, sending the converted transmission across the ATM network, and, in the case where the packet network serves as a transit network, converting the transmission back to a format used by an analog or digital phone network. Pet. 47–52.

Petitioner argues Iwami teaches a second format that is an internet protocol because Iwami discloses, as discussed above, a system that sends voice transmissions between a network using IP and a phone network. *Id.* at 49–50. Petitioner provides claim charts and explanations demonstrating where each of the limitations of claims 1–7 and 15, other than "the second format being an internet protocol," is taught by Kammerl. *Id.* at 47–55. Petitioner asserts Iwami teaches "the second format being an internet protocol" and, in addition to Kammerl, teaches "the second conversion is performed at the second access device," as recited in claim 6. *Id.* at 23–24, 41–42, 49, 54.

Patent Owner does not dispute that Kammerl and Iwami teach the limitations for which Petitioner cites each reference. Having reviewed the evidence of record, we are persuaded Petitioner has demonstrated that Kammerl and Iwami teach the limitations recited in claims 1–7 and 15.

## 2. *Subject Matter of Claims 8, 9, and 11–13*

The Board instituted trial on Petitioner's challenge of obviousness of claims 8, 9, and 11–13 over Kammerl, Iwami, and Kobayashi. Dec. on Inst. 28–30. Petitioner asserts Kobayashi teaches the additional limitations recited in dependent claims 8, 9, 11, and 13 related to routing based on user preferences because "Kobayashi teaches a method of improving transmission quality by routing on the basis of the recorded preferences of users of the network." Pet. 56 (citing Ex. 1007, 3:20–25); *id.* at 25–27, 28–

12

IPR2013-00296
Patent 7,724,879 B2

29, 56–58.  Petitioner further contends Kammerl teaches "the transmission comprises execution of a call setup procedure," as recited in dependent claim 12 because Kammerl discloses "call setup procedures that involve inserting signaling procedure signals from subscriber[s'] sets into packets and relaying them between the subscriber[s'] sets."  Pet. 57.  Petitioner provides claim charts demonstrating where each of the additional limitations of claims 8, 9, and 11–13 is taught by the references.  *Id.* at 25–29, 56–58.

Patent Owner does not dispute that Kammerl, Iwami, and Kobayashi teach the limitations for which Petitioner cites each reference.  Having reviewed the evidence of record, we are persuaded Petitioner has demonstrated that Kammerl, Iwami, and Kobayashi teach the limitations recited in claims 8, 9, and 11–13.

### 3.  Subject Matter of Claim 10

The Board instituted trial on Petitioner's challenge of obviousness of claim 10 over Kammerl, Iwami, Kobayashi, and Chau.  Dec. on Inst. 30–31. Petitioner argues Chau teaches "wherein the at least one criteria comprises credit availability of a calling party," as recited in dependent claim 10 because Chau discloses performing a credit check on callers.  Pet. 29, 58. Petitioner provides a claim chart demonstrating where the additional limitation of claim 10 is found in Chau.  *Id.* at 29.

Patent Owner does not dispute that Kammerl, Iwami, Kobayashi, and Chau teach the limitations for which Petitioner cites each reference.  Having reviewed the evidence of record, we are persuaded Petitioner has demonstrated that Kammerl, Iwami, Kobayashi, and Chau teach the limitations recited in claim 10.

IPR2013-00296
Patent 7,724,879 B2

### 4. Subject Matter of Claim 14

The Board instituted trial on Petitioner's challenge of obviousness of claim 14 over Kammerl, Iwami, and Gordon. Dec. on Inst. 31–32. Petitioner argues Gordon teaches a transmission "related to a fax transmission," as recited in dependent claim 14 because Gordon discloses sending a fax transmission over a data network. Pet. 20–21, 58–59. Petitioner provides a claim chart demonstrating where the additional limitation of claim 14 is found in Gordon. *Id.* at 20–21.

Patent Owner does not dispute that Kammerl, Iwami, and Gordon teach the limitations for which Petitioner cites each reference. Having reviewed the evidence of record, we are persuaded Petitioner has demonstrated that Kammerl, Iwami, and Gordon teach the limitations recited in claim 14.

### 5. Combinability of Cited Art

Petitioner argues Kammerl teaches the general concept of using a data network as a transit network between two PSTNs (Pet. Reply 3–6), including sending, receiving, and converting transmissions in such a hybrid network. Pet. 47–59. Thus, as discussed above, Petitioner asserts Kammerl teaches each limitation of independent claim 1 except for the limitation of "the second format being an internet protocol," Iwami teaches a second format that is an internet protocol, and it would have been obvious to a person of ordinary skill in the art to use the Internet Protocol taught by Iwami in the network topology taught by Kammerl. *Id.* at 47–52. Petitioner argues a person having ordinary skill in the art ("PHOSITA"), at the time of invention of the '879 patent, would have combined Kammerl and Iwami to allow "voice communications to be transmitted on networks other than ATM

14

IPR2013-00296
Patent 7,724,879 B2

networks[, which] is the reason that internetworking or internet protocols such as the Internet Protocol were developed—to allow internetworking of diverse networks." *Id.* at 49.

Patent Owner acknowledges that one teaching of Kammerl is a "generic network topo[logy] that shows a packet switch[ed] network . . . serving as a bridging network between PSTN to PSTN." Hr'g Tr. 31:18–21. However, Patent Owner argues that Kammerl's purpose is to reduce lag times when transmitting voice packets over a data network in order to improve the transmission quality and reduce the need for expensive echo-cancellation equipment. PO Resp. 30. Patent Owner further argues Kammerl was designed to meet the high quality of service levels required by traditional PSTN customers (*see, e.g.*, Hr'g Tr. 32, 35, 37–39) and that IP "was not capable of providing high quality voice services" in 1996. *Id.* at 40 (quoting Ex. 2015, 276 ("For IP, one of the biggest challenges will be to provide quality of service guarantees that are suitable for high quality voice and video, something that is likely to be available in ATM networks from the outset")). Thus, Patent Owner contends that a PHOSITA would not have used Iwami's IP over Kammerl's ATM network, or substituted Iwami's packet network using IP for Kammerl's ATM network, because the teachings of Kammerl outweigh the asserted benefit of internetworking provided by Iwami. PO Resp. 28–53. Specifically, Patent Owner argues that Kammerl teaches away "from implementations that would introduce lag" and that using IP over an ATM network (or substituting Iwami's IP network for Kammerl's ATM network) necessarily introduces delays associated with processing (i.e., reassembly and segmentation) the data

IPR2013-00296
Patent 7,724,879 B2

packets at each router the packets encounter, rendering Kammerl inoperable. *Id.* at 32–41, 52–53.

Petitioner responds that Patent Owner focuses on one particular teaching of Kammerl and ignores Kammerl's broader teaching that a data network can be used as a transit network between two PSTNs. Pet. Reply 5–6. Petitioner asserts that, even assuming using IP for voice transmission with reduced packet filling according to Kammerl's specific invention would increase delay, Kammerl's teachings as a whole must be considered rather than focusing on one particular teaching. *Id.* at 12–13 (citing *In re Heck*, 699 F.2d 1331, 1333 (Fed. Cir. 1983); *see also EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) ("A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect."). Petitioner also argues that Patent Owner's examples of how the combination of Iwami and Kammerl would introduce delay actually demonstrates that the combination does work, refuting Patent Owner's argument that the combination would be inoperable or nonfunctional. Pet. Reply 13–14.

As an initial matter, we note that the challenged claims have a broad scope. For example, independent claim 1 is directed to a method comprising receiving a transmission in a telecommunication protocol format, converting the transmission into an internet protocol format, sending the transmission through a data network, and converting the transmission into a telecommunication protocol format.

Claims 2–7, 12, 14, and 15 further define details relating to where certain method steps occur and the types of communications, parties, networks, and devices involved in a transmission. Claim 8 recites an

16

IPR2013-00296
Patent 7,724,879 B2

additional step of routing based on criteria defined by user preferences and claims 9–11 further define the criteria used in routing decisions. Claim 13 recites an additional step of storing information related to the transmission.

As discussed above, independent claim 1 of the '879 patent differs from Kammerl only in that the data network disclosed by Kammerl does not use an internet protocol and, thus, Kammerl does not disclose that the recited second format is an internet protocol. With respect to Iwami, independent claim 1 of the '879 patent differs from Iwami in that Iwami only discloses a single conversion from a telecommunication protocol to an internet protocol. Iwami does not disclose performing the recited second conversion.

We are not persuaded by Patent Owner's argument that Kammerl's focus on reducing lag results in a teaching away from any combination that would increase lag times. *See* PO Resp. 41–43. Patent Owner does not point to, nor do we see, anything in Kammerl that "criticize[s], discredit[s], or otherwise discourage[s] the solution claimed in the" '879 patent or otherwise rises to the level of a teaching away. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Moreover, while Kammerl's purpose was to speed up transmission of voice data over an ATM network and may have provided a high quality of service intended to meet standards demanded by traditional PSTN customers, nothing recited in the broad claims of the '879 patent requires a system meeting such quality standards.[9]

Furthermore, there is nothing in Kammerl stating that a network using an internet protocol would not function as a transit network between two

---

[9] Claim 9 broadly recites that a route for transmission is selected based on a user-specified level of transmission quality, but does not recite any limitation that would preclude a PHOSITA from considering the use of IP.

17

IPR2013-00296
Patent 7,724,879 B2

PSTNs. In fact, Kammerl's invention is directed specifically to an improvement on ATM or fixed-length packet networks. Kammerl never mentions, and thus, never criticizes, discredits, or otherwise discourages, using a network with messages formatted in an internet protocol as a transit network between two PSTNs.

Patent Owner focuses on what Kammerl's goals and considerations were at the time of Kammerl's invention. However, for purposes of an obviousness analysis, we look to what a PHOSITA would have considered obvious when looking to the relevant art, including Kammerl and Iwami, and whether that PHOSITA would have found it obvious to combine the teachings found in the art to result in the claimed invention at the time of invention of the '879 patent.

Regarding Patent Owner's teaching away argument, we look to whether the references teach away from the broad challenged claims. *See In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be *productive of the result sought by the applicant*") (emphasis added). Patent Owner admits that the '879 patent uses IP for applications where it is acceptable to have low quality. Hr'g Tr. 45:17–46:3, 46:20–47:16.

Regardless of whether a transit network using IP would have met the high quality of service expected by PSTN to PSTN customers, a PHOSITA would have at least considered an internet protocol, such as the IP network disclosed in Iwami, as an obvious choice for a protocol to transmit voice data between two PSTNs. The PHOSITA would have considered it obvious to use such a design for applications where a lower quality of service was

18

IPR2013-00296
Patent 7,724,879 B2

acceptable. Even if the PHOSITA would have concluded that such a design would not suffice for certain applications[10] or would not have been commercially successful, it would have been an obvious to that PHOSITA that combining Kammerl and Iwami would result in an operable system.

Patent Owner points to evidence indicating that "one of the biggest challenges" for IP around the time of the invention would be "to provide quality of service guarantees that are suitable for high-quality voice and video." *Id.* at 40 (quoting Ex. 2015, 276). Although Patent Owner's evidence indicates that the IP community faced challenges to provide Quality of Service *guarantees* for high-quality voice and video, that evidence indicates those skilled in the art were considering using IP for *high-quality* voice applications. Moreover, that evidence provides little insight as to whether a PHOSITA would have considered it obvious to use IP in a bridging network between two PSTNs in applications where Quality of Service guarantees were not important.

Furthermore, we do not find Patent Owner's argument that Petitioner was unable to identify a single "patent or reference that disclosed . . . IP as a bridging network between PSTN-to-PSTN calls" persuasive. Hr'g Tr. 39. Petitioner's challenges to the claims of the '879 patent are not based on anticipation under 35 U.S.C. § 102, but obviousness under 35 U.S.C. § 103(a).

In light of the scope of the claims, the differences between the recited claims and the cited references, and the state of the art at the time of

---

[10] We find Patent Owner's argument that, in 1996, it was known that IP "was ill-suited for real[-]time applications like voice" supports a finding that using IP as a transit network, even if less than ideal, would have been obvious.

IPR2013-00296
Patent 7,724,879 B2

invention of the '879 patent[11], we find the rationale provided by Petitioner for combining Kammerl and Iwami to be persuasive. The Petitioner has established that a PHOSITA, at the time of invention of the '879 patent, would have been aware of both Kammerl's disclosure of transmitting voice between two PSTNs using an ATM network as a transit network and Iwami's disclosure of transmitting voice between an IP network and a phone network.

We find a PHOSITA would have considered using an IP network as a transit network between two PSTNs in order to provide the benefits of simpler internetworking of diverse networks, even at the expense of potentially slower transit speeds. Ex. 1002 ¶ 227. Additionally, we also find persuasive Petitioner's contention that "an internet protocol network [was] one of a finite number of identified communications mechanisms that were well-known at the time." *Id.* ¶ 229. Thus, even if a PHOSITA would have considered the benefits of using IP as a protocol for a transit network between two PSTNs to not be worth the tradeoff in transit time, the Petition establishes that modifying Kammerl to use an internet protocol as taught by Iwami would have been obvious to that PHOSITA. Therefore, we find Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have combined Kammerl and Iwami and that the combination of Kammerl and Iwami teaches the subject matter recited in claims 1–7 and 15.

---

[11] Mr. Stephen B. Weinstein (declarant for Patent Owner) and Dr. Vincent C. Jones (declarant for Petitioner) both indicated that the Internet and IP were "coming to prominence from 1994 through 2001." Ex. 1022. 18:15–21; *see also* Ex. 1002 ¶¶ 30–32.

A2402

IPR2013-00296
Patent 7,724,879 B2

Petitioner argues that incorporating each of Kobayashi, Chau, or Gordon with Kammerl's teachings is merely applying well-known techniques to Kammerl in a known way to achieve predictable results. Pet. 56, 58, 59. We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have combined Kobayashi with Kammerl and Iwami and that such a combination teaches the subject matter recited in claims 8, 9, and 11–13. We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have combined Chau with Kammerl, Iwami, and Kobayashi and that such a combination teaches the subject matter recited in claim 10. We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have combined Gordon with Kammerl and Iwami and that such a combination teaches the subject matter recited in claim 14.

## III. CONCLUSION

Petitioner has demonstrated by a preponderance of the evidence that: claims 1–7 and 15 are unpatentable over Kammerl and Iwami; claims 8, 9, and 11–13 are unpatentable over Kammerl, Iwami, and Kobayashi; claim 10 is unpatentable over Kammerl, Iwami, Kobayashi, and Chau; and claim 14 is unpatentable over Kammerl, Iwami, and Gordon.

IPR2013-00296
Patent 7,724,879 B2

## IV. ORDER

In consideration of the foregoing, it is:

ORDERED that claims 1–15 of the '067 patent are held *unpatentable*; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the  notice and service requirements of 37 C.F.R. § 90.2.

22

**A2404**

IPR2013-00296
Patent 7,724,879 B2

For Patent Owner:

Michael Ray
Jon Wright
David Clonts
mray-ptab@skgf.com
jwright-ptab@skgf.com
dclonts@akingump.com

For Petitioner:

Robert Devoto
John Phillips
Karl Renner
Jason Wolffe
Dan Smith
devote@fr.com
phillips@fr.com
axf@fr.com
wolff@fr.com
dcs@fr.com

# CERTIFICATE OF FILING AND SERVICE

I certify that today, September 30, 2015, the foregoing **CORRECTED JOINT APPENDIX** was filed with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on Cross-Appellant's counsel by means of email as well as by the Court's CM/ECF system, which should have sent a Notice of Docket Activity to:

Norman Andrew Crain (andrew.crain@thomashorstemeyer.com)
Kenneth Anthony Knox (kenny.knox@thomashorstemeyer.com)
Robert Duncan Gravois (robert.gravois@thomashorstemeyer.com)

THOMAS HORSTEMEYER, LLP
400 Interstate North Parkway SE
Suite 1500
Atlanta, GA 30339
(770) 933-9500

Upon acceptance by the Court of the e-filed document, six (6) paper copies will be filed with the Court within the time provided in the Court's rules.

Dated: September 30, 2015

_____
/s/ Kevin Meek
Kevin Meek

BAKER BOTTS L.L.P.
98 San Jacinto Blvd.
Suite 1500
Austin, TX 78701
(512) 322-2500

*Attorney for Appellant*